**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **D&D LANDHOLDINGS,** | ) | |
| | ) | **No. 06-877 L** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Hon. Margaret M. Sweeney** |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S MOTION TO TRANSFER AND SUGGESTION OF CONSOLIDATION</u>**

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

SUSAN V. COOK, Senior Attorney
E. KENNETH STEGEBY, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorneys for Defendant

<u>OF COUNSEL</u>:

A. Ted Kundrat
Melissa Erny
U.S. Customs and Border Protection
Department of Homeland Security
Indianapolis, Indiana 46278
Tel: (317) 614-4413
Fax: (317) 298-1498

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . iii

INDEX OF EXHIBITS . . . . . . . . . . iv

BACKGROUND . . . . . . . . . . 3

I. BORDER PATROL OPERATIONS . . . . . . . . . . 4

II. CONSTRUCTION OF THE BORDER PATROL FENCE . . . . . . . . . . 7

III. PLAINTIFFS' CLAIMS RAISE LARGELY IDENTICAL LEGAL ISSUES AND ARE BASED ON SUBSTANTIALLY SIMILAR FACTUAL ALLEGATIONS . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . 12

I. TRANSFER WILL SIGNIFICANTLY PROMOTE THE EFFICIENT ADMINISTRATION OF JUSTICE . . . . . . . . . . 13

A. A Transfer Will Keep the Remaining Discovery Process, as Well as the Remainder of the Litigation Process, Streamlined . . . . . . . . . . 13

B. The Legal and Factual Differences in the Complaints, if any, are Largely Irrelevant and do Not Weigh Against Transfer . . . . . . . . . . 14

C. Transfer and Consolidation is Not Premature and Would Significantly Promote the Efficient Administration of Justice . . . . . . . . . . 15

1. The Otay Mesa Court has Not Rejected Consolidation of D&D Landholdings and International Industrial Park with Otay Mesa . . . . . . . . . . 16

2. The Present Case, International Industrial Park and Otay Mesa are Not at Different Discovery Phases, and No Relevant Factual or Legal Arguments Militate Against Transfer or Consolidation . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

Cienega Gardens v. United States, 62 Fed. Cl. 28, 33 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Karuk Tribe of California v. United States, 27 Fed. Cl. 429, 433 (1993) . . . . . . . . . . . . . . . . 14-15

## FEDERAL STATUTES

8 U.S.C. § 1357(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 10

Public Law No. 104-208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

## FEDERAL RULES

RCFC 40.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 12

RCFC 40.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

RCFC 42(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

RCFC 42.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

# INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| A | Order issued by Judge Baskir on Nov. 1, 2006. (Otay Mesa v. United States) |
| B | Preliminary Status Conference Transcript, from hearing held Oct. 31, 2006. (Otay Mesa v. United States) |
| C | Map of Parcels 1-12 |
| D | Defendant's Notice of Indirectly Related Cases, filed Jan. 18, 2007. (Otay Mesa v. United States) |
| E | Map Showing Distances of Fences Relative to Plaintiffs' Parcels 1 and 3 |
| F | Joint Status Report, filed April 6, 2007. (Otay Mesa v. United States) |
| G | Plaintiffs' Response to Defendant's Notice of Indirectly Related Cases, filed Jan. 25, 2007. (Otay Mesa v. United States) |
| H | Order issued by Judge Baskir on Dec. 14, 2006. (Otay Mesa v. United States) |
| I | Plaintiffs' Unopposed Motion to Amend Complaint, filed Dec. 4, 2006. (Otay Mesa v. United States) |

**DEFENDANT'S MOTION TO TRANSFER AND SUGGESTION OF CONSOLIDATION AND MEMORANDUM IN SUPPORT THEREOF**

Defendant, the United States, hereby respectfully moves the Court to transfer the present case to Judge Lawrence M. Baskir pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims ("RCFC" or "Rules") to promote the efficient administration of justice. Defendant also respectfully suggests, pursuant to Rule 42.1, that a consolidation of this case with Otay Mesa Property, L.P. v. United States, No. 06-167 (Fed. Cl.) L (Baskir, J.) and International Industrial Park v. United States, No. 06-877 L (Fed. Cl.) (Wheeler, J.),[1/] would be appropriate for the same reason. A memorandum in support of this motion follows.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION**

On March 3, 2006, three plaintiff landowners, Otay Mesa Property L.P., Rancho Vista Del Mar and Otay International LLC, filed a complaint in Otay Mesa Property, L.P. v. United States, No. 06-167 L (Fed. Cl.) (Baskir, J.). After a Preliminary Status Conference, held on October 31, 2006, Judge Baskir ordered that the claims of the Otay Mesa plaintiffs be severed and that a separate case be created for each of the three plaintiffs. See Order, Otay Mesa, No. 06-167 L, §§ 1-2 (Fed. Cl. filed Nov. 1, 2006) (attached hereto as Exhibit A). The court did so on the grounds that it believed the claims of the three plaintiffs were indirectly, rather than directly, related. See Transcript of PSC held on October 31, 2006 ("PSC Transcript"), Otay Mesa, No. 06-167 L, p. 14-15 (Fed. Cl. filed Dec. 1, 2006) (attached hereto as Exhibit B) ("I'm now uncertain as to whether or not they are directly related under our rules. I suspect they are indirectly related . . . ."). Nevertheless, the court ordered that the three newly created cases be

[1/] Defendant has filed a largely identical Motion to Transfer in International Industrial Park.

consolidated pursuant to Rule 42(a) under the lead case Otay Mesa. See Exhibit A, § 3. On December 21, 2006, the Otay Mesa plaintiffs filed an amended complaint.

On December 22, 2006, Plaintiff here and plaintiff in International Industrial Park, who are both represented by the same counsel as the Otay Mesa plaintiffs, filed almost identical complaints that substantially mirror the amended complaint in Otay Mesa. As in the present case, plaintiffs' main arguments in Otay Mesa and International Industrial Park are that: (1) Defendant has affected a physical taking of their properties in violation of the Fifth Amendment by allowing agents of the United States Border Patrol, which is part of the Bureau of Customs and Border Protection, Department of Homeland Security, to enter onto their properties for many years; and (2) the Border Patrol has constructed a border fence that channels illegal immigrants onto their properties for roundup and arrest.

Collectively, the present case, Otay Mesa and International Industrial Park involve twelve parcels of land that are either contiguous or within a short distance of each other, and all of the parcels are located in San Diego County, California, on or near the United States' border with Mexico. See Exhibit C.[2/] All of the complaints cover the same time period, and there are significant connections between all plaintiffs in terms of ownership and control. See Exhibit B, p. 13. Moreover, all of the lawsuits involve the same witnesses and substantially the same documents, and all of the plaintiffs are seeking the same remedy: just compensation under the Fifth Amendment. Accordingly, Defendant filed on January 18, 2007 a Notice of Indirectly Related Cases in Otay Mesa (attached hereto as Exhibit D) pursuant to Rule 40.2(b), listing this

---

[2/] The Otay Mesa plaintiffs own Parcels 1-9, Plaintiff here owns Parcels 10 and 12, and plaintiff in International Industrial Park owns Parcel 11.

case and International Industrial Park as indirectly related to the Otay Mesa case.

Because the present case, Otay Mesa and International Industrial Park are based on the same operative facts and raise the same legal issues, a transfer of this case to Judge Baskir pursuant to Rule 40.1(b) would significantly promote the efficient administration of justice, thereby preserving the resources of the Court and the parties involved in these cases. For the same reasons, Defendant suggests, pursuant to Rule 42.1, that consolidation of this case, Otay Mesa and International Industrial Park would be appropriate.

**BACKGROUND**

The property at issue here, as well as in Otay Mesa and International Industrial Park, are all located within the Border Patrol's San Diego Sector, which is one of 20 Border Patrol Sectors tasked with patrolling the borders of the United States. The area of patrol responsibility for the San Diego Sector is bounded on the west by the Pacific Ocean and extends east, along the international border between the United States and Mexico, to the San Diego/Imperial County line, a distance of approximately 60 miles. The Sector's area of responsibility consists of a mixture of highly urbanized and densely populated cities and rural areas that are minimally populated, and also includes designated wilderness areas. The terrain varies from beach and mesas to low rolling hills, high desert, steep mountains and deep canyons (also known as "draws.").

Along the Southwest United States border, the San Diego Sector has the largest population of any border area. It is estimated that the population in the area, when counting people residing on both sides of the border, is in excess of six million people. The greater San Diego area has a population of about three and one half million, and the Tijuana region has been

estimated at over two and one half million people. The greatest number of these people live in a corridor bounded on the west by the Pacific Ocean and on the east by the San Ysidro Mountains, extending from south of Tijuana, Mexico, to the northern parts of San Diego County. The large population, well-developed road system, buildings, and mass transit (buses, taxies, a trolley line and an airport), have all contributed to making the San Diego border area one of the most favored and desirable places for aliens to make illegal entry into the United States. During the early to mid-1990's, over half of all illegal entries into the United States were made in the San Diego Sector. At that time, the number of apprehensions exceeded 500,000 per year, and it has been estimated that agents were arresting only about 25 percent of all illegal entrants.

**I. BORDER PATROL OPERATIONS**

The Border Patrol's primary mission is to detect and prevent the entry of terrorists, weapons of mass destruction, and unauthorized aliens into the United States, and to interdict drug smugglers and other criminals, between the country's official Ports of Entry. However, up until 1990, the only type of preventive measures taken to deter illegal border crossings was in many places the installation of a steel cable, stretched from poles no higher than 30 inches and spaced a hundred feet apart. Moreover, in some places there was nothing more than a border marker every several hundred feet. Accordingly, to cross the border into the United States, and mix in with the legal population, or enter businesses or homes, often took less than a minute. A massive number of people entered the United States illegally by foot. In addition, illegal entries were made by so-called "drive-throughs," which were accomplished by simply driving vehicles, usually containing illegal aliens and/or contraband (usually narcotics), frequently at high speeds, anywhere a vehicle could gain access across the border and into the United States – including

over open fields, on agricultural roads near the border, or across open lots.

In 1990, the Border Patrol began building a border fence, known as the "Primary Fence," with the main purpose of stopping the drive-throughs. This project was also followed by an increase in agent manpower at the border. In 1996, to further reduce illegal border crossings, the United States Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law No. 104-208, in which it mandated that the Border Patrol build a system of fences to supplement the Primary Fence, install any necessary lights and construct roads along the border, beginning at the Pacific Ocean and extending approximately 14 miles eastward, terminating at the foothills of the San Ysidro Mountain Range. This border protection system, also known as the "Border Infrastructure System," or "BIS," was designed to reduce illegal entry in the most developed part of the border in the San Diego Sector. According to Congress, the BIS, which is further described below, was meant to deny easy entry to illegal crossers, whether on foot or in vehicles, in a location where population density, highway access, and building developments otherwise reduce the abilities of the Border Patrol agents to detect, prevent or apprehend people making an illegal entry. See IIRIRA, Pub. L. No. 104-208, § 102(b)(1).

In addition to providing a greater deterrent, the BIS was designed and intended to slow down those who attempt to cross the border illegally, providing the Border Patrol agents with precious additional time to respond to illegal entries and increase the opportunities for the agents to effectuate arrests. To that end, the agents patrol the areas between the fences and other federal property. In addition, Border Patrol agents are statutorily authorized to, and routinely do, enter upon private property located within 25 miles of the national border. See, e.g., 8 U.S.C. §

1357(a)(3) ("Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant . . . within a distance of twenty-five miles from any . . . boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border . . . .").

Border Patrol agents also respond to illegal entries using various advanced technology such as cameras and different types of thermal imaging instruments. Moreover, as part of its law enforcement duties, the Border Patrol has installed seismic sensors in the ground on properties in the vicinity of the border since at least 1980. Although sensors are not installed on every parcel at issue in these cases, sensors are presently located on parcels 1, 3-5 and 10.[3] These sensors are triggered by vibrations in the ground caused by illegal entrants walking nearby, and a dispatch office then directs the Border Patrol agents to the areas where the sensors have been triggered. The sensors are installed near known entry points and, while some sensors have remained in the same spot for many years, even decades, others are moved to meet the challenges of constantly shifting patterns of the illegal entries. The agents have also been utilizing portable floodlights to illuminate known crossing points on properties near the border since at least 1994. As with the sensors, the portable floodlights are placed at ever-changing temporary locations for the purpose of deterrence and to increase visibility so that Border Patrol agents are able to conduct Border Patrol law enforcement operations even where the terrain makes it difficult to detect illegal entrants in the dark (near parcels 1 and 3, for example). Also, a single, temporary shelter was constructed on parcel 3 at issue in Otay Mesa in the mid-late 1990's, although that shelter was

[3] Sensors are generally installed on undeveloped properties and, if those properties are developed, the sensors are moved to other undeveloped areas.

completely removed – in a few hours – in April 2004.

The Border Patrol utilizes all of these law enforcement methods and technology along the national border and tailors them to adapt to the changing patterns of unlawful alien border crossings. Accordingly, in their law enforcement capacity, the Border Patrol have over the years had occasion for a variety of reasons to enter onto the properties at issue in this litigation, as well as the properties at issue in Otay Mesa and International Industrial Park.

## II. CONSTRUCTION OF THE BORDER PATROL FENCE

As noted above, in addition to patrolling the border and conducting other traditional law enforcement operations, the Border Patrol has constructed and installed a set of fences and roads to deter and reduce illegal border crossings. As part of what was called "Operation Gatekeeper," the portions of the Primary Fence nearest the subject property were completed in March, 1993. As part of that same Operation, the number of Border Patrol agents was dramatically increased. This led to an increase, and then eventually a decrease, in the apprehension of illegal aliens. The number of illegal aliens apprehended in San Diego County decreased from over 500,000 in Fiscal Year 1993, to a little over 140,000 in Fiscal Year 2006.

Construction of the Secondary Fence, as part of the BIS, began in the mid-1990's. The BIS was mandated by Section 102(b) of the IIRIRA (Pub. Law No. 104-208), which mandated "the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence [Primary Fence], and for roads between the fences." Id. When completed, the BIS will be approximately 14 miles long with minimal, if any, gaps and will consist of three fences and three roads, including an all-weather patrol road between the Primary

and Secondary Fences and service roads just to the north of these fences.

The 14-mile Primary Fence was completed in 1993, and Defendant has also constructed approximately 9 of the 14 miles of the BIS. The portion of the BIS that is located 1.5 miles east of the Otay Port of Entry was constructed by the end of 2001. However, that 1.5 miles of fence was not continuous as it contained gaps where gates and other design features would be later installed. An additional 1/4 mile of fence was constructed in an easterly direction in late 2005 and early 2006. Currently, the fence ends approximately 300 feet to the east of the western-most property line of Parcel 1, owned by plaintiff Otay Mesa Property, LLP, or approximately 2,714 feet to the west of the western-most property line of Parcel 3, owned by plaintiff Rancho Vista parcel. See Exhibit E. On the eastward end of the Secondary Fence, plans for the remaining approximately one mile section to be constructed are currently being developed.

One goal of the BIS is to deny the opportunity for drive-throughs in areas where a vehicle can make entry, and also to make it more difficult for illegal foot crossers to take advantage of developed areas. Rather than having 1 or 2 minutes to detect and apprehend illegal entrants, the fences, lights and access roads have ensured that it takes much longer for illegal entrants to reach developed areas where they can further their illegal entry. In fact, the BIS has not just added minutes, but have in many cases added hours to the travel time it takes to make an illegal entry. This affords agents further opportunities to detect and apprehend illegal crossers, and creates a larger deterrent because the entry is more difficult, and the likelihood of apprehension is greater. The BIS has thereby had the anticipated result of causing illegal entrants, including alien and drug smuggling organizations, to change their methods and places of operation. These illegal entrants have been forced to shift away from developed into undeveloped areas either east or

west of the completed sections of the BIS where detection and arrest is more likely. Moreover, some illegal crossers have simply moved away entirely from the San Diego area. As the Border Patrol continues to build the BIS to completion, the shift away from this area is expected to continue.

Chula Vista Station is one of eight Border Patrol Stations in San Diego Sector and has patrol and enforcement responsibility for the area known as Otay Mesa, which is an area that lays mostly within the city limits of San Diego. Of the 60 miles of linear border patrolled by San Diego Sector, Otay Mesa has a border distance of about 7 miles. Agents from the Chula Vista Station have as their area of responsibility about 4 miles of the eastern portion of Otay Mesa. This area is a mix of industrial warehouses, businesses, light manufacturing, and rural area that has been used for agriculture and graze land. The eastern-most 3 miles of border within Chula Vista Station's patrol responsibility has yet to be developed. The properties at issue here and in Otay Mesa and International Industrial Park are located in these rural and undeveloped areas.

The land on which the Secondary Fence has been constructed was first acquired by the United States through a series of direct condemnations. The United States intends to complete the BIS by 2011, subject to the availability of appropriated funds. The current schedule of the United States Army Corps of Engineers, the agency in charge of handling the necessary land acquisitions, calls for the acquisition of lands necessary to complete the final portions of the BIS eastward in Fiscal Year 2008. Even though the BIS is not yet completed, however, apprehension statistics show a shifting of illegal entries away from the BIS and current Border Patrol operations to areas further east. Based on the statistics, it is reasonable to conclude that once the BIS is completed, most illegal entry attempts will be made on or around federal property to the

east of the properties at issue here and in Otay Mesa and International Industrial Park.

### III. PLAINTIFFS' CLAIMS RAISE LARGELY IDENTICAL LEGAL ISSUES AND ARE BASED ON SUBSTANTIALLY SIMILAR FACTUAL ALLEGATIONS

Plaintiff's core argument here is that Defendant has physically entered onto Plaintiff's property continuously for many years and has intentionally channeled illegal immigrants onto the property for roundup and arrest. See D&D Landholdings Complaint ("D&D Comp."), p. 1. According to Plaintiff, Defendant has thereby committed a physical taking without just compensation in violation of the Fifth Amendment. See id. Plaintiffs in Otay Mesa and International Industrial Park raise largely identical arguments in their complaints. See Otay Mesa Amended Complaint ("OM Am. Comp."), p. 1; International Industry Park Complaint ("IIP Comp."), p. 1.[4] Moreover, all of the plaintiffs claim that the Primary Fence is 11 feet high; is made of steel matting; and is outfitted with infrared surveillance cameras and stadium lighting, and that the United States began channeling illegal aliens onto their properties by constructing the Primary Fence eastward. See D&D Comp., ¶ 5; IIP Comp., ¶ 5; OM Am. Comp.,¶ 7.

In addition, all of the plaintiffs complain that the United States has completed construction of nine miles of the Secondary Fence; that the Secondary Fence runs parallel to the Primary Fence and is made of steel mesh; that this fence begins three miles from the Pacific Ocean; and that it travels east-ward, parallel to and 130-150 feet north of the Primary Fence. See D&D Comp., ¶ 6; IIP Comp., ¶ 6; OM Am. Comp.,¶ 8. Furthermore, while all of the plaintiffs admit that the BIS has cut the number of apprehensions of illegal entrants from about 530,000 in 1993 to 127,000 in 2004, see D&D Comp., ¶ 5; IIP Comp., ¶ 5; OM Am. Comp.,¶ 7, they

---

[4] For purposes of this Motion, the allegations of all three complaints are accepted as true.

nevertheless also contend that:

> The direct, foreseeable, and intended effect of Defendant's border control fencing system and the completion of the Secondary Fence, was to channel illegal immigrants crossing the border from Mexico, eastward away from the city of San Diego, and onto Plaintiff's property, where United States Border Patrol agents can detain, arrest, and deport these individuals.

D&D Comp., ¶ 7; IIP Comp., ¶ 7; OM Am. Comp.,¶ 9. Along the same line, plaintiffs further allege that:

> The Border Fence has operated as it was designed, channeling illegal immigrants eastward away from the city onto Plaintiff's property, where they can be rounded up, arrested, and deported. Since the Fence has not yet been completed, however, it now terminates near Plaintiff's property and, consequently, the roundup and arrest of illegal aliens takes place on Plaintiff's property almost daily.

D&D Comp., ¶ 8; IIP Comp., ¶ 8; OM Am. Comp.,¶ 10. As here, the other plaintiffs also complain that "Border Patrol activity on the property escalated to such a degree that Plaintiff was no longer welcome on its own land. Border Patrol agents routinely chase Plaintiff off its own property, and . . . tenants are even afraid to lease Plaintiff's land." D&D Comp., ¶ 9; IIP Comp., ¶ 9; OM Am. Comp.,¶ 11.

Although there are some slight variations in the factual allegations in the various complaints, those differences are largely irrelevant when viewed in light of plaintiffs' two core arguments. For example, in Otay Mesa, plaintiffs allege that Defendant "erected various structures used in connection with its activities on Plaintiffs' property . . . ." OM Am. Comp.,¶ 10. As noted above, this allegation pertains to a single temporary shelter that was erected in the north-western corner of parcel 3 in the mid-late 1990's and was dismantled in a few hours and removed in April 2004. The Otay Mesa plaintiffs also allege that the Border Patrol pitched tents

on their properties and used the properties as a training facility. See OM Am. Comp., ¶ 11. Likewise, plaintiff in International Industrial Park claims that Defendant demanded access to a fenced-off portion of Plaintiff's property. See IIP Comp., ¶ 9. Also, as noted above, the Border Patrol began installing and using seismic sensors in the early 1980's and portable floodlights in the early 1990's on some of the parcels at issue. While these factual claims are not common to all complaints, and they only affect a few of the parcels at issue in these cases, they are closely related to the activities of the Border Patrol and raise the same core legal issues as plaintiffs' two principal arguments: (1) that the United States has channeled, and therefore should be responsible for, aliens who attempt to enter the United States illegally via plaintiffs' properties; and (2) that the entry of Border Patrol agents, even if they are statutorily authorized to enter private property in the process of legitimate law enforcement operations, is a physical taking that is compensable under the Fifth Amendment. Due to the common legal and factual questions, transferring and consolidating these cases is appropriate because it would significantly promote the efficient administration of justice.

## ARGUMENT

Rule 40.1(b) provides that, "[t]o promote . . . the efficient administration of justice, a case may be transferred by order of the assigned judge to another judge upon the agreement of both judges." RCFC 40.1(b). Because this case presents the same factual allegations and legal issues as Otay Mesa and International Industrial Park, a transfer of this case to Judge Baskir with a suggestion of consolidation would allow this Court and the parties to avoid unnecessary costs and duplication of efforts. In addition, a transfer would ensure consistent rulings with respect to the factual and legal issues as to all the parties in all the cases.

# I. TRANSFER WILL SIGNIFICANTLY PROMOTE THE EFFICIENT ADMINISTRATION OF JUSTICE

## A. A Transfer Will Keep the Remaining Discovery Process, as Well as the Remainder of the Litigation Process, Streamlined

The parties have largely completed their exchanges of discovery responses and responsive documents for all cases, and those exchanges are being supplemented as appropriate. See Joint Status Report, Otay Mesa ("OM JSR"), p. 1 (Fed. Cl. filed on April 6, 2007) (attached hereto as Exhibit F). In addition, the parties completed depositions of fact witnesses as to liability issues on February 20-22 and March 26-29, 2007. Plaintiffs conducted 18 depositions of Border Patrol employees, and Defendant deposed two representatives of the plaintiff landowner entities. See id. These representatives own and/or control of the all plaintiff entities.

As the parties worked to complete the discovery, it became apparent that further work to clarify the ownership of the titles to certain of plaintiffs' properties, and to clarify the legal descriptions of those properties, was required. See id. at 2. Plaintiffs have already started that process and will obtain the necessary Preliminary Title Reports from an outside title company. Once the title reports are completed, plaintiffs will provide them to Defendant for review and comment. Plaintiffs and Defendant will then confer to resolve any remaining questions or concerns, with the goal being that at the end of the process no disputed issues remain with respect to any of plaintiffs' titled ownership as to any of the parcels involved in all of these cases. A map will then be constructed that depicts the various properties, and the parties anticipate that they will complete this work by June 29, 2007. See id.

Once the title work and map have been completed, Defendant intends to file a motion for summary judgment on liability. In Otay Mesa, the parties have proposed that Defendant file

such a motion no later than August 1, 2007, and that plaintiffs' oppositions would be due no later than September 14, 2007. Defendant's reply brief, if any, would be due no later than October 31, 2007. See id. Because the same witnesses and documents will be used here as in Otay Mesa and in International Industrial Park, neither the discovery process nor the remaining litigation process will be delayed or impeded in any way if this Court should decide to transfer this case to Judge Baskir. To the contrary, the discovery and briefing schedule would accommodate any modifications deemed necessary if this case is transferred.

**B. The Legal and Factual Differences in the Complaints, if any, are Largely Irrelevant and do Not Weigh Against Transfer**

As noted above, Plaintiffs here and in Otay Mesa raise a few factual allegations that are not raised by the other plaintiffs. For example, in Otay Mesa, plaintiffs complaint that Defendant erected a shelter on its properties. Similarly, those plaintiffs also allege that the Border Patrol pitched tents on their property and used the property as a training facility. See OM Am. Comp.,¶ 11. Finally, Plaintiff in International Industrial Park contends that Defendant demanded access to a fenced-off portion of Plaintiff's property. See IIP Comp., ¶ 9.

That these claims are not raised by each plaintiff is largely irrelevant with respect to this Motion to Transfer, especially when reviewed in light of the two core issues that exist in all of the plaintiffs' complaints. Indeed, these claims are intrinsically related with those issues. To decide these claims would require that the Court also determine the two core issues – whether Border Patrol agents may construct a border fence and may enter private property to fulfill their federally mandated law enforcement duties. Thus, these factual claims do not prevent either a transfer or consolidation. See, e.g., Karuk Tribe of California v. United States, 27 Fed. Cl. 429, 433 (1993) ("The appropriateness of consolidating claims depends on whether the interest of

judicial economy outweighs the potential for delay, confusion, and prejudice that may result from consolidation."); Cienega Gardens v. United States, 62 Fed. Cl. 28, 33 (2004) ("[I]n light of the common legal issues and the strong factual similarities, the common governmental expert witness, and the minimal delay, confusion, and prejudice that would arise from consolidation, the court has opted to consolidate the cases for trial.").

### C. Transfer and Consolidation is Not Premature and Would Significantly Promote the Efficient Administration of Justice

On January 25, 2007, plaintiffs in Otay Mesa filed a response to Defendant's Notice of Indirectly Related Cases. See Plaintiffs' Response to Defendant's Notice of Indirectly Related Cases, Otay Mesa ("Plts. Resp.") (Fed. Cl. filed on Jan. 25, 2007) (attached hereto as Exhibit G). In that response, plaintiffs set forth three arguments as to why consolidation would be premature at this point:

- the cases are at materially different stages of discovery, having been filed nine months apart;
- the Otay Mesa Court ruled, on December 14, 2006, that factual differences among the cases preclude joining these claims in the same Complaint; and
- as discovery and trial preparation proceed, further factual differences among the cases may develop which would preclude the efficient joint trial of all five claims.

See Plts. Resp., p. 2. As already noted above, a transfer and consolidation of the cases would not delay or impede either discovery or the remaining litigation process in any of the cases. To the contrary, the cases would proceed in an orderly fashion and would not be at risk of inconsistent rulings with respect to largely identical legal issues and substantially similar operative facts. To the contrary, a transfer and consolidation would significantly promote the efficient administration of justice by not unnecessarily diverting any resources and efforts of the Court

and the parties.

**1. The Otay Mesa Court has Not Rejected Consolidation of D&D Landholdings and International Industrial Park with Otay Mesa**

The Otay Mesa plaintiffs argue in their response to Defendant's pending Notice of Indirectly Cases that, "as Plaintiffs read the December 14, 2006 Order, [the Otay Mesa court] has already declined to consolidate the claims of D&D Landholdings and International Industrial Park with the earlier-filed three consolidated claims [of Otay Mesa]." Plts. Resp., p.10. This reading of the December 14, 2006 Order is in error.

Plaintiffs filed an unopposed motion to amend their complaint on December 4, 2006, seeking to: (1) add additional parcels of land to the claims of two of the existing Otay Mesa plaintiffs; and (2) add D&D Landholdings and International Industrial Park as additional plaintiffs to that action. See Order, Otay Mesa, p. 1 (Fed. Cl. filed on December 14, 2006) (attached hereto as Exhibit H). In the December 14, 2006 Order, Judge Baskir permitted plaintiffs to add additional parcels of land to the existing plaintiffs, but denied the request to add two additional plaintiffs. See id., p. 1-2. Instead, Judge Baskir stated that "[i]f they so choose, D&D Landholdings and International Industrial Park, Inc. may file separate, individual complaints with the Court of Federal Claims." Id., p. 2.

Although the Court did not expressly state in its December 14, 2006 order the reason for not allowing the addition of D&D Landholdings or International Industrial Park as plaintiffs, Judge Baskir's order did not reject a transfer or subsequent consolidation of this case or International Industrial Park with Otay Mesa. Instead, such transfer and consolidation is fully consistent with that order, as well as his November 1, 2006 Order, in which he: (1) severed the claims of the initial three Otay Mesa plaintiffs; (2) created three separate lawsuits for each of

those plaintiffs on the grounds that the court believed that they were indirectly, rather than directly, related; and (3) ordered the three new cases consolidated under the lead case of Otay Mesa pursuant to Rule 42.1. See Exhibit A. In short, Judge Baskir did not hold in his December 14, 2006 Order that the present case and International Industrial Park are not to be consolidated with Otay Mesa. That court merely stated that D&D Landholdings and International Industrial Park would first have to file separate cases, after which Judge Baskir would consider consolidating the two later-filed cases, as indirectly related, with Otay Mesa.

**2. The Present Case, International Industrial Park and Otay Mesa are Not at Different Discovery Phases, and No Relevant Factual or Legal Arguments Militate Against Transfer or Consolidation**

Plaintiffs in Otay Mesa claim in their response to Defendant's Notice of Indirectly Related Cases that the present case, International Industrial Park and Otay Mesa are at different stages of the discovery process and that consolidation would therefore be improper because it would delay and impede their trial preparations. However, this is inconsistent with their unopposed motion to amend their complaint, which plaintiffs filed just over a month before they responded to Defendant's Notice of Indirectly Related Cases. In their unopposed motion, the Otay Mesa plaintiffs expressly stated that adding D&D Landholdings and International Industrial Park would "not in any way slow down the progress the parties have been making in preparing [Otay Mesa] for resolution by this Court." Unopposed Motion to Amend Complaint, Otay Mesa ("Plts. Unopposed Motion"), 06-167, pp. 2, 10-12 (Fed. Cl. filed on Dec. 4, 2006) (attached hereto as Exhibit I). Moreover, plaintiffs said in that motion that the claims by D&D Landholdings and International Industrial Park does not "change the factual basis of the complaint; the same operative facts support the original and amended complaint." Id. at 12.

Thus, it would be disingenuous for any of the plaintiffs, including D&D Landholdings and International Industrial Park, to argue that transfer and consolidation of these cases is not proper because there are factual differences between the cases that dictate a case-by-case approach.

As plaintiffs have admitted, "[t]he parties themselves have already agreed that depositions and written discovery produced in one of these cases may be used in all [cases] . . . ." Exhibit G, p. 8. To date, Defendant has produced to plaintiffs over 23,000 pages of written discovery; plaintiffs have deposed 18 Border Patrol employees; and Defendant has deposed the two main representatives of plaintiffs' landowner entities. All of this discovery relate to all twelve parcels at issue here and in Otay Mesa and in International Industrial Park. Accordingly, Defendant anticipates that the written discovery provided and depositions taken in Otay Mesa will satisfy any discovery requests in relation to the present case and International Industrial Park.

///

///

## CONCLUSION

For the foregoing reasons, Defendant respectfully asks the Court to grant the Motion to Transfer. Defendant also respectfully suggests that consolidation of the present case with International Industrial Park and Otay Mesa is appropriate.

Dated: April 25, 2007.

Respectfully submitted,

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment & Natural Resources Division

/s/ Susan V. Cook
SUSAN V. COOK, Senior Attorney
E. KENNETH STEGEBY, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorney for Defendant

391837.2