# EXHIBIT A

# In the United States Court of Federal Claims

Case No. 06-167L
(Filed: November 1, 2006)

***************************************************
OTAY MESA PROPERTY L.P., et al., *
*Plaintiffs,* *
*
v. *
*
THE UNITED STATES OF AMERICA, *
*Defendant.* *
*
***************************************************

**ORDER**

The Court held a telephonic preliminary status conference in the above-captioned case on October 31, 2006. This Order confirms the matters decided at that conference.

The Complaint in this Action lists three separate Plaintiffs, all of which are landowners of property located in eastern San Diego, CA, near the border of Mexico. They file suit under the Fifth Amendment to recover just compensation for the physical taking of their land. The Court and the parties discussed the necessity of giving each Plaintiff a separate case number.

The Court hereby orders the following:

1. The Clerk is ordered to sever the claims of the following plaintiffs from that of Otay Mesa Property, L.P.: Rancho Vista Del Mar and Otay International, Inc.

2. The Clerk shall treat the claims of each of these plaintiffs as separate actions and shall assign separate docket numbers to each of those cases.



PENGAD-Bayonne, N.J.
EXHIBIT
A

3. Pursuant to RCFC 42(a), these newly created cases shall be consolidated for all purposes under the lead case, *Otay Mesa Property, L.P., et al. v. United States*, 06-167L, unless otherwise ordered by the Court, and all future filings in this matter shall be filed under the consolidated caption, *Otay Mesa Property, L.P., et al. v. United States*, unless otherwise ordered by this Court. Documents shall be filed using only the first case number 06-167L (Consolidated).

   Note that, "consolidation under Rule 42(a) is simply a procedural device" and "does not merge [multiple] cases into a single claim, nor does it change or expand the parties' rights." *S. Cal. Fed. Sav. and Loan Assoc. v. United States*, 51 Fed. Cl. 676, 678 (2002).

4. This order does not require the parties to file or refile any additional documents in the newly created cases, the dockets and records of which shall be deemed to include any prior filings in this action. **The filing of a separate Complaint for each of the individual plaintiffs is not required.**

5. The court hereby waives any additional filing fees that would otherwise be due pursuant to RCFC 77.1(c).

The parties are currently scheduled to engage in discovery until February 9, 2007, and do not anticipate the severing and consolidation of these cases to affect their discovery schedule. As such, **the parties are hereby ordered to file a Joint Status Report updating the Court on the status of discovery and proposing further proceedings no later than February 19, 2007.** This Joint Status Report should inform the Court what dispositive motions the parties intend to file and propose a briefing schedule for such motions.

IT IS SO ORDERED.

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OTAY MESA PROPERTIES, LLP )
Plaintiff, )
v. ) Docket No. 06-167L
THE UNITED STATES, )
Defendant. )

Tuesday,
October 31, 2006

The parties met, pursuant to notice of the Court, at 1:35 p.m.

BEFORE: HONORABLE LAWRENCE M. BASKIR
Judge

APPEARANCES:

For the Plaintiff:

NANCIE MARZULLA, Esquire
BARBARA WALSEY, Esquire
SASHA NELL, Esquire
Marzulla & Marzulla
1350 Connecticut Avenue, N.W., #410
Washington, D.C. 20036

For the Defendant:

SUSAN V. COOK, Esquire
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W., 312
Washington, D.C. 20004





P R O C E E D I N G S

(1:35 p.m.)

THE CLERK: All rise. The Court of Federal Claims is now in session, the Honorable Lawrence M. Baskir presiding. Otay Mesa Properties v. United States, Case No. 06-167L, comes before the Court today, October 31, 2006, for a status conference.

THE COURT: Good afternoon, everybody. Let's start by having you all identify yourselves, please.

MS. MARZULLA: This is Nancie Marzulla on behalf of the Plaintiff, and with me, Your Honor, is Barbara Walsey and Sasha Nell. These are both attorneys in our law firm.

THE COURT: Very well.

MS. COOK: And this is Susan Cook from the Department of Justice on behalf of Defendant United States, Your Honor.

THE COURT: Now, Ms. Cook, I have a Sue Ellen Wildridge listed. Is that you?

MS. COOK: No, no, Your Honor. That is the assistant attorney general who is the head of the Environment & Natural Resources Division.

THE COURT: Oh, I thought I recognized the name. I guess we just did a mistyping. Okay, sorry





for that.

MS. COOK: Unless I've been promoted and don't know it.

THE COURT: Not at all. Ms. Marzulla.

MS. MARZULLA: Yes.

THE COURT: This is your case. Can you tell us in a few words what this case is about?

MS. MARZULLA: Yes, Your Honor. Essentially this case is a physical taking case involving approximately 750 acre of property in the Otay Mesa area of San Diego, California. In a nutshell, this case involves the channeling of illegal immigrants onto our property by virtue of a secondary fence that was constructed by the United States or completed construction in 2001.

There is a system of two fences in place. The primary fence was built in the nineties. It's near the Pacific Ocean across the border to Texas. But the fence that really precipitated this lawsuit is the one that was completed in 2001.

THE COURT: All right. Now, you've attached an exhibit with a map of sorts. Do you have that handy?

MS. MARZULLA: I do.

THE COURT: All right. Now this map puts





the secondary border fence, it shows a secondary border fence. It does not show the original one.

MS. MARZULLA: That's correct.

THE COURT: Okay. Where would that be in this?

MS. MARZULLA: In my understanding the primary, what we call the primary fence would be on, I guess I would call it the southern side looking at the document. It would be the southern side and it would run parallel to the secondary fence, but it would just keep going.

THE COURT: So it would pass the parcels?

MS. MARZULLA: It would.

THE COURT: In order to make up the 14 miles.

MS. MARZULLA: That's correct.

THE COURT: And the boundary would be also roughly parallel to those two fences?

MS. MARZULLA: That is my understanding. But just to be clear, it's my understanding, and Ms. Cook can correct me if my understanding is incorrect, but the primary fence extends farther than just our parcel. It's a long fence.

THE COURT: Off the page as it were.

MS. MARZULLA: Off the page.



EXHIBIT B

MS. COOK: Actually -- this is Susan Cook -- the primary fence I believe lines up pretty much with the easternmost border of what is marked as parcel 3 on your map. So it terminates right now only about half or three-fourths of a mile from the secondary fence. It does not extend for miles and miles.

MS. MARZULLA: Okay. Well, that was a factual misimpression that I had, so that is a -- thank you, Ms. Cook. I was slightly confused as to where that primary fence terminated.

THE COURT: So if I understand it then, the primary fence terminates near or about the far end, which I guess would be the eastern end of parcel 3.

MS. COOK: That's correct, Your Honor.

MS. MARZULLA: The orange block.

THE COURT: Right, the orange block. Now, there are some black dots, and the black dots appear to start at a notch, if I can call it that, in parcel 1, crosses parcel 1 and then continues out the northwestern corner of parcel 1, is that correct?

MS. MARZULLA: That is correct.

THE COURT: And what are those, what are those marks?

MS. MARZULLA: That is a good question, Your Honor, for which I do not have an answer. That is of





all the many things that we've looked at with respect to these maps, that is something that we did not look at, but my guess is is that is a jurisdictional boundary of some local governmental entity, and again, Ms. Cook, perhaps you could speak to that.

MS. COOK: I don't know what that -- oh, I know what it is. That's the power -- I bet that's the powerline.

MS. MARZULLA: It could well be but I can't say that for sure.

MS. COOK: There is a powerline roughly in that location that extends to and across the border into Mexico. That would be basically the alignment that I'm familiar with, so that might be what -- and of course, under that powerline the power company has an easement.

THE COURT: Now, whose map is this? I have to assume, Ms. Marzulla, this was the Plaintiff's map, but now I guess that's not so.

MS. MARZULLA: It is the Plaintiff's map, but in terms of those dots I could not answer.

THE COURT: Okay.

MS. MARZULLA: Definitely. I think Ms. Cook's supposition is probably right, but to commit to that I would not be willing to do so.





MS. COOK: Yes, based on comparison with other maps I have, that would be the location of the powerline.

THE COURT: Okay.

MS. COOK: It's a big, big, big line.

THE COURT: Now, the complaint talks about and the JPSR talks about a hut or a structure which Ms. Cook suggests is temporary and now gone, and the Plaintiff's complaint suggests that it's still there. Leaving aside whether it's here or there, are you talking about the same structure?

MS. MARZULLA: I don't know if we are.

THE COURT: Okay.

MS. MARZULLA: And there are a number of issues that I think the parties probably disagree on, factual issues. Our clients reported, for example, that just this last August there was a physical structure on their property that it looked as if someone had just burned down. And I've discussed this with Ms. Cook and she said that she was unaware of any structure that was existing on the property and certainly none that had burnt down. So I think that there are many factual issues that the parties are in disagreement on.

THE COURT: Well, your complaint isolates





out a structure.

MS. MARZULLA: That's correct.

THE COURT: But at this point we don't know very much about that structure?

MS. MARZULLA: We don't know -- well, there is no structure now. That much is true. But whether the structure that Ms. Cook refers to is the same structure that our clients refer to, we don't even know if that the same structure.

THE COURT: Okay. Ms. Marzulla, can you identify the location in any way of the Plaintiff's structure?

MS. MARZULLA: No, I cannot, not at this time.

THE COURT: So it could be on any one of the four parcels?

MS. MARZULLA: It could be.

THE COURT: Now, do I understand that the main thrust of the complaint is the diversion of the individuals crossing the border onto one or more of the four parcels by the secondary fence?

MS. MARZULLA: Yes. It's really the secondary fence that brings this issue into sharper ways. You have the primary fence which, of course, prevents the immigrants from coming in, but it doesn't

totally prevent their coming in.

What the secondary fence does, and I really think to get a full sense of how this operates a picture is really worth a thousand words. And that's one of the difficulties of looking at this case is trying to put into words how the fencing system operates. And one of the things the Plaintiffs are going to suggest is that the Court actually make a site visit to the property because I think it will really help bring this case in -- the issues and the facts very sharply into focus for the Court.

But at any rate, so the immigrant gets over the primary fence, and the secondary fence really sort of operates then as a physical funnel to where the immigrants wind up directly on our property, and then the agents are able to readily capture and arrest and do whatever they're going to do with the immigrants from that point.

THE COURT: So that the primary fence deters a portion of the border crossers, but there is some leakage, as it were.

MS. MARZULLA: Correct.

THE COURT: And the secondary fence sends those people eastward, is that right?

MS. MARZULLA: Correct.





THE COURT: To outflank the secondary fence.

MS. MARZULLA: Correct.

THE COURT: And that secondary fence and its terminus ended in '01, is that what I recall you just said?

MS. MARZULLA: The construction of it, yes.

THE COURT: Construction. So it began to have this effect around that time or shortly thereafter.

MS. MARZULLA: Correct.

THE COURT: Now, the fence is yet to come further east, do I understand?

MS. MARZULLA: I think there is, and Ms. Cook can speak to this better than I since she knows what the United States' plans are, but it certainly our understanding based on how we read the JPSR and our discussions with Ms. Cook, is that there may be plans to acquire another one mile of land from our Plaintiffs upon which they can build an additional mile of the fence.

I also understand there is a 3.5 mile gap between the western terminus of that secondary fence and the Pacific Ocean, and I have no idea of whether the United States plans to complete that fence or not.

THE COURT: But the western end of the fence





should have no effect upon your client's property?

MS. MARZULLA: None whatsoever.

THE COURT: Now, the complaint talks about the floodlights and sensors and a variety of other things. Is that for versimilitude or is that a moving part of your --

MS. MARZULLA: That's a moving part. That's part of how the agents operate at night.

THE COURT: So it's not only the diversion onto your property, but it's also the response of the border patrol?

MS. MARZULLA: Correct, it's the combination of the diversion of the illegal immigrants, the channeling effect and the United States through the border agents' activities on our property.

THE COURT: Now, you identified the three Plaintiffs, I gather, by the ownership of the parcels?

MS. MARZULLA: That is correct.

THE COURT: Is the impact the same for all three of the Plaintiffs?

MS. MARZULLA: My answer today would be yes. We have not noticed any difference. My Plaintiffs have not told me that there is any difference. They have joined together because as far as we can tell, as far as they can tell there is no discernable





difference. There is no change in operation of the border agents use of their property. It seems pretty indiscriminant (phonetic) and evenly dispersed throughout the parcels.

THE COURT: Well, the hut, wherever that hut is, would have been on one piece as opposed to another piece, right?

MS. MARZULLA: That's correct, but --

THE COURT: So that would be --

MS. MARZULLA: -- there is more than one hut, Your Honor.

THE COURT: The complaint only talks about one hut.

MS. MARZULLA: Yes, but as of last August my client informs me that there was another hut that they discovered had been burned down, so there might have been more than one hut.

THE COURT: Another hut, right.

MS. MARZULLA: Yes.

THE COURT: We think another hut, we don't know, right?

MS. MARZULLA: Yes.

THE COURT: Well, I'm a little concerned, Ms. Marzulla. We have three Plaintiffs who are not related to each other except I guess by being

neighbors, and I don't know under our rules whether they really should be joined as one collection of Plaintiffs as opposed to having separate complaints maybe dealt with together in some consolidated way. Certainly when it might come to damages it would be different.

MS. MARZULLA: Well, that's an interesting question, Your Honor, but it's my understanding that we have ownership overlap of these corporations; that these corporations, the limited partnership in the corporation are not strangers. In fact, that's why you'll see that you have the same -- if you look at the document called the initial, the Rule 26 initial disclosure that the Plaintiffs filed, you will see that the same operational manager and so forth. You have the same employees with all three separate entities.

So it's not as if -- I think the Court's point would really resonate more strongly if we had three different entities that were complete strangers, but in point of fact --

THE COURT: Well, there is cross ownership.

MS. MARZULLA: Exactly.

THE COURT: But they are separate entities just looking at the face of your complaint.





MS. COOK: Your Honor, excuse me. Susan Cook on behalf of Defendant.

THE COURT: Yes, ma'am.

MS. COOK: It would be our contention that these three, or these three companies or entities are in fact related. They are all basically controlled by a single person. We've had litigation with that person in the past concerning the first portion of the fence that runs -- of the new fence that runs along the base of what is on the map as parcel 1.

And in that case we in fact got a determination from the Court that all the different corporate entities weren't, in effect, pierced the corporate entities, and that they were all under the control of this one person who is Rocky Dela Fuente. So that would be our contention in this case as well.

These are not three unrelated companies and counsel correctly mentions that they are related, and we would definitely agree that they are related and it would be our contention they are in fact controlled by one person.

THE COURT: Well, I've been toying with proposing that the cases be separated with individual complaints, and then consolidated before this Court. I'm now uncertain as to whether or not they are





directly related under our rules. I suspect they are indirectly related, but if they are indirectly related cases, they still would command separate complaints even though they might be consolidated for purposes of litigation, and now it's even more complex from what you say, Ms. Cook.

Well, I don't want this case to get on, to evolve too far before making a decision about whether or not they should have separate complaints. I'm inclined in that direction I tell you even though I'm fully prepared to consolidate them, and I don't know, for example, whether the diversion of border crosses would be the same for all the property, each of the three or four pieces of property as the facts might develop. I'm not certain about the location of the hut as it were, or huts.

MS. MARZULLA: Your Honor, I think what you're going to find is that these cases are -- we're going to be dealing essentially with the same operative facts and the same witnesses for all of these parcels of property, for the four parcels of property.

So I think in terms of the most efficient use of the Court's resources, and certainly the parties' resources, I think that the case moving





forward as a single complaint makes the most sense. Obviously if the Court wants us to prepare two more identical complaints and file those, we would be happy to do that, but there is -- you know, there are going to be two additional cookie-cutter cases that we're going to be putting --

THE COURT: Well, I'm prepared in those circumstances to consolidate the three cases, and either to deal with them collectively or to deal with one of them as a lead case.

MS. MARZULLA: Uh-uh.

THE COURT: I'm just concerned that somewhere down the line the facts would diverge for each of the pieces of property.

MS. COOK: Your Honor, this is Susan Cook. I think I share Plaintiff's counsel's belief that the facts are not going to be particular divergent for the three parcels. But if it would be useful for the Court, the parties could certainly file a joint or separate status report in which they lay out the inner relationship among the ownership, so that we give the Court a better picture of the relationship between the properties.

THE COURT: Ms. Marzulla, do you challenge the commonality of ownership?

MS. MARZULLA: No, Your Honor.

THE COURT: That was determined in the previous case. Are you prepared to accept that now for this case?

MS. MARZULLA: Yes, Your Honor.

THE COURT: And Ms. Cook, let me ask you about your motions. I didn't ask you to discuss them but there apparently are two. Are either of them affected by which parcel we're talking about, either of those motions?

MS. COOK: No, Your Honor, and Plaintiff's counsel and I have discussed which parts of the case might be most amenable to some sort of narrowing or focusing motions, and certainly those grounds that would be amenable would apply equally to the three parcels. So what I have in mind for the motions would not depend on one parcel or the other, the grounds would be uniformer (phonetic). I'm not expressing it very well, but no, there would not be a particular distinction between the parcels.

THE COURT: Well, I am inclined to approach this as Ms. Marzulla suggested, by having two other complaints with two other case names, or case numbers, I guess, as well as names, and then consolidating them and then we can use one of them as the lead case, and





I guess the current number would be the lead case. So shall we do that?

MS. MARZULLA: If that's how Your Honor would like to proceed, obviously that's what we'll do. So we'll just file two additional complaints.

THE COURT: One for Plaintiff No. 2 and one for Plaintiff No. 3, and we will have the lead case Plaintiff No. 1 and the existing case number, and we'll make sure that those case numbers, I guess, would be A, B and C, I suppose.

MS. MARZULLA: So we'll note on the cover sheet that these are two additional related cases that we're filing.

THE COURT: Strictly speaking I'm not sure they're related in terms of the Court's rules, but I think for colloquial purposes they are related, yes. Ms. Cook, let me get back. I think we finished, Ms. Marzulla, in discussing the nature of your case unless there is something you wanted to add. I did interrupt you with the map.

MS. MARZULLA: No, Your Honor.

THE COURT: Okay. So you have three elements, perhaps four, that's the diversion of the border crossers, it's the facilities that the border patrol have erected --





MS. COOK: That's correct.

THE COURT: -- on the property, and it's the intrusion of the border patrol to arrest these border crossers, and maybe the hut.

MS. COOK: That's correct.

THE COURT: Okay, as the four operative elements.

MS. MARZULLA: And I would again stress possibly more than one hut.

THE COURT: Right.

MS. MARZULLA: Or structure. Whatever we want to call it.

THE COURT: Whatever you want to call it. We're looking at any rate for one that was on parcel 3 and that's going to be the lead case. In any event, Ms. Cook, you have some motions that you propose. Why don't you tell us what those are.

MS. COOK: Yes, Your Honor. Of course, we believe that this case, you know, we start out by looking at jurisdiction, and looking at this case jurisdictionally we believe there is a significant statute of limitations concern. A lot of the -- for example, we have physical intrusion of sensors on the property, but that's been there since 1980.

Obviously this property has been situated





along the border. It has not moved. It's always been in this location, and so it has been subject to entry by the border patrol since they began patrol activities in this area, patrol activities which have changed over the years depending on the nature of the particular emphasis in border protection at that particular time.

THE COURT: To interrupt you, would you say that the number of border crossers was higher before the first fence and then the second fence?

MS. COOK: It's a bit more complicated, because, but basically the constructions of the fence, the fence is not constructed to -- the fence is constructed not for an absolute bar. The psychology of the fence is that you're directing the border crossing as much as you can, illegal border crossing, to areas away from established towns, because if they cross the border and they're going from one industrial area to another industrial area they can cross very quickly, and then get lost in the houses or lost in the building.

THE COURT: I understand.

MS. COOK: So the strategy has been to try to direct the illegal immigration out into unsettled areas where, first of all, there is less crime created

and less danger to U.S. citizens created, but also where arrest activities and apprehensive activities can be more effective. So that's been the strategy behind the fence.

Actual apprehensions in the San Diego sector as they call this area of the border patrol jurisdiction have gone down, not up, in recent years, and have been going down for a number of years. The fence has been effective in shifting a lot of the immigration push over to the El Centro area, over to, in particular, the Arizona area.

THE COURT: And that's a considerable distance -- I'm sorry to interrupt you -- considerable distance from the area we're talking about.

MS. COOK: Right, but these smugglers are bringing them up from Central Mexico up to areas where they think they can get their people across, and we can document by statistics that when we put up a fence or we put out a whole mess of agents on the border that apprehensions in that location go down, and apprehensions out in the Yuma area or El Centro or Tucson sectors go up.

THE COURT: Not a whole lot different from urban drug interdiction.

MS. COOK: Exactly. I mean, you know, we're





just talking about illegal immigration obviously with the slow of illegal immigration can go any number of other things, including drug activities.

THE COURT: I'm thinking about urban efforts to suppress the drug traffic in the streets.

MS. COOK: Right.

THE COURT: You flood the area with police and it turns out that the traffic moves somewhere else.

MS. COOK: Exactly.

THE COURT: So you have a statute of limitations issue with respect to some or all of the operative elements that Ms. Marzulla mentioned?

MS. COOK: We do, Your Honor, and Ms. Marzulla and I have discussed it. It is very factual-intensive, and I believe there are also other legal grounds dealing with the background principles and what expectations Plaintiffs could fairly have acquired at the time he acquired this property, and being able to exclude law enforcement from his property.

And so that would probably be the subject of our initial motion because even though statute of limitations is jurisdictional, in this case it would be incredibly -- it would be very factually intense





and there would probably have to be at a minimum an evidentiary hearing to resolve it.

It may well be possible to significantly narrow the contentions in the case and perhaps dispose of it all together on a more broader based, what I would call background principles type of motion --

THE COURT: A 12(b)(6) or summary judgment?

MS. COOK: Yes.

THE COURT: Okay. Now, you all had a proposed discovery schedule which at least by your dates is or is not been followed, has or has not been followed?

MS. MARZULLA: Your Honor, this is Ms. Marzulla, and the parties have generally followed but we have deviated to the extent for -- <u>but for</u> the extent for, excuse me, I'm not speaking well either because I'm looking and trying to speak at the same time. I'm flipping through my pleadings folder to the JPSR itself that sets forth the discovery schedule.

But the initial Rule 26 disclosure exchange, which I referenced earlier, the parties had indicated that we would exchange those disclosures on October 5th. In point of fact the parties exchanged those disclosures on October 13th.

THE COURT: Well, I think I'm not too





concerned about the internal schedule --

MS. MARZULLA: Okay.

THE COURT: -- that you've arranged between the two of you.

MS. MARZULLA: All right.

THE COURT: I think that's flexible. I think the only thing that I would like to focus on is the close of all discovery on the 9th of February. Is that still your intention?

MS. MARZULLA: That is, Your Honor.

THE COURT: Okay, that's fine. It's my practice and it's your suggestion that there be a status conference after that to decide where else we're going to go. I would like to ask that you all file a week or 10 days after the 9th a joint status report.

MS. MARZULLA: Okay.

THE COURT: Which will say that discovery is over successfully, or if it's not over, what the problems are, and whether you need to amend the schedule to extend it; what you propose in the way of motions practice; and proposed schedule for filing briefs; and of course anything else you think ought to be in the status report.

MS. MARZULLA: Your Honor, this is Nancie

Marzulla again. I have just a couple of questions if I may.

THE COURT: Yes.

MS. MARZULLA: Given the fact that we're going to be filing two additional complaints, how will that affect the --

THE COURT: Well, I was going to get back to that and ask you how long you thought it would take to file those complaints.

MS. MARZULLA: Well, given the fact that they're going to be identical, once I discuss it with my clients, I'm anticipating that it shouldn't take long at all.

THE COURT: Should it affect the discovery?

MS. MARZULLA: I do not believe so.

THE COURT: Okay.

MS. MARZULLA: Because again it's going to be the identical witnesses.

THE COURT: Exactly. So February 9th still remains good for close of discovery?

MS. MARZULLA: As far as Plaintiffs are concerned.

THE COURT: Ms. Cook?

MS. COOK: That's fine, Your Honor.

THE COURT: Okay. And how about 10 days





later for a joint status report?

MS. MARZULLA: Okay, that should be fine with Plaintiff.

THE COURT: And then once we get that we will take a look at it and we'll have a status conference to decide what we do next.

MS. MARZULLA: All right. May I ask you a question, Your Honor?

THE COURT: Yes, ma'am.

MS. MARZULLA: The fact that we're filing the additional complaints, how will that relate to your special procedures order? I note that you indicate that the parties should not take more than five depositions without leave of the Court.

THE COURT: Yes, we're going to have a lead case and I guess it should be the first case, the original case should be the lead case.

MS. MARZULLA: Okay. So does that mean then we'll get a total of 15 without leave of Court?

THE COURT: Well, I'm not sure we want to litigate all three independently. I thought we would just litigate the first one.

MS. MARZULLA: Well, then I guess what I should advise the Court is that we will be asking for leave of the Court to take more than five depositions





because there are a number of witnesses that the Defendant has identified on their Rule 26 disclosure. I think this case is far more factually complex than one might anticipate for a physical takings case.

(Telephone ring.)

It is not as cut and dried as it might appear on the papers. There is a lot of back and forth out on the ground. There is lots of instances where Plaintiffs have been chased off their own property by border agents, lots of issues to delve into that makes this case a lot more to it than meets the eye.

So we definitely are going to be asking the Court for leave to take more depositions. Again, the Plaintiffs would strongly suggest that the Court schedule a time to come out and take a look at the property. And as Ms. Cook alluded to, while Plaintiffs would welcome her effort to narrow some of the legal issues for summary disposition. In point of fact, I think ultimately what we're going to find with this case is it's going to be one that the only way we're going to be able to resolve it is through trial, at least on the liability issue.

So I think depositions are going to be key. I don't know yet how many we're going to need, but I





just wanted to alert the Court that it will be receiving such a motion.

THE COURT: Just discuss it with Ms. Cook, and if she's agreeable, then you'll have less problem than if she's not agreeable.

MS. MARZULLA: All right.

THE COURT: Okay?

MS. MARZULLA: That sounds good.

THE COURT: I have nothing else on my agenda so let me ask Ms. Marzulla, anything else you want to cover?

MS. MARZULLA: At present I think that just about does it. It's been very helpful.

THE COURT: Ms. Cook?

MS. COOK: No, Your Honor, nothing else. Thank you very much.

THE COURT: Okay, fine. Well, thank you all very, very much for this. I look forward to seeing what you all produce by the 9th of February.

MS. MARZULLA: We look forward to talking to you.

THE COURT: Okay, very good. We're adjourned.

MS. MARZULLA: All right, Bye-bye.

//

(Whereupon, at 2:35 p.m., the hearing in the above-entitled matter was concluded.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

# EXHIBIT C


EXHIBIT
C
PENGAD-Bayonne, N. J.
N
Bureau of Land Management
Otay Truck Trail
Kuebler Ranch
Parcel 1
Parcel 2
Parcel 3
Parcel 4
Parcel 5
Parcel 6
Parcel 7
Parcel 8
Parcel 9
Parcel 10
Parcel 11
Parcel 12
Alta Road
Alta Road Extension
Otay Mesa Road
Otay Mesa Port of Entry
Johnson Canyon
Donovan State Prison
SD County Detention Facility
Reservoir
Frenchman's Canyon
No Name Draw
Windmill Canyon
Goldmind Draw
25 Saddle
Well Draw
Tin Can Hill
644 Trail
Jenny Wolf's Draw
Murpy's Bowl
18 NG Little Murphy's
56 Scope site / 18 NG Scope Site
1425 Scope Site
Alta Grove
Landing Zone
670 Hump
Old and New
CHP

# EXHIBIT D

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **OTAY MESA PROPERTY L.P., et al.,** | ) | |
| **Plaintiffs,** | ) | **No. 06-167 L** |
| **v.** | ) | **Hon. Lawrence M. Baskir** |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**NOTICE OF INDIRECTLY-RELATED CASES**

Defendant, the United States of America, hereby submits this Notice of Indirectly-Related Cases pursuant to RCFC 40.2(b). The above styled action and the cases of International Industrial Park, Inc. v. United States, No. 06-876L, and D & D Landholdings, L.P. v. United States, No. 06-877L, present common issues of fact such that consolidation of the cases and the adoption of a coordinated discovery schedule would significantly promote the efficient administration of justice.

The present case was filed on March 3, 2006. An Amended Complaint, adding four additional parcels of adjacent or nearby property to the instant litigation, was filed December 21, 2006. The indirectly related



PENGAD-Bayonne, N.J.
EXHIBIT
D

cases were both filed December 22, 2006, and involve two additional parcels of land located in the nearby by or adjacent to the real property involved in the instant litigation. Defendant's Answer to the Amended Complaint in the instant litigation was filed January 12, 2007, and the case is in the initial phases of discovery and therefore has not progressed such that it would stand in a significantly different stage of litigation as compared to the newly-filed cases. Moreover, all three cases were filed by the same attorney of record, and each complaint alleges the same operative facts, covers the same time period, and seeks the same relief, just compensation for a physical taking under the Fifth Amendment. The resolution of the allegations raised in all three complaints will involve the same factual and expert witnesses and substantially the same documents.

The three complaints contain virtually identical language and include identical factual allegations and requests for relief. The complaints all contend that the United States, acting through agents for the Customs and Border Protection, has physically entered onto Plaintiffs' land continuously for several years, and that the construction of the border fences has intentionally channeled illegal immigrants onto Plaintiffs' land.

Because the three complaints present common issues of fact and will

involve the same factual and expert witnesses and substantially the same documents, Defendant respectfully submits that the consolidation of the two newly-filed cases with the present case would promote the efficient administration of justice. Consolidation would also enable the Court to adopt a coordinated discovery schedule for the three complaints in a situation where, because the same witnesses and documents are involved, would otherwise present the opportunity for confusion and conflict; such would also promote the efficient administration of justice.

Dated: January 18, 2007.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

/s/ Susan V. Cook
SUSAN V. COOK
Senior Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, DC 20044-0663
(202) 305-0470
(202) 305-0506 (Fax)
Email: susan.cook@usdoj.gov

OF COUNSEL:
Melissa Erny
A. Ted Kundrat
U.S. Customs and Border Protection
Indianapolis, Indiana 46278

370771.1

# EXHIBIT E

EXHIBIT
E
PENGAD-Bayonne, N. J.



# EXHIBIT F

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **OTAY MESA PROPERTY L.P., et al.,** | ) | |
| **Plaintiffs,** | ) | **No. 06-167 L** |
| **v.** | ) | **Hon. Lawrence M. Baskir** |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

## JOINT STATUS REPORT

Plaintiffs and Defendant hereby file this Joint Status Report in response to the Court's Order of February 16, 2007.

The parties have completed their exchange of discovery responses and responsive documents; those exchanges are being supplemented as appropriate.

The parties have also completed the deposition of fact witnesses as to liability issues. Depositions were held in San Diego, CA, on February 20-22 and March 26-29, 2007. Plaintiffs have conducted 18 depositions of Border Patrol employees, and Defendant has deposed two representatives of Plaintiff entities.



PENGAD-Bayonne, N. J. EXHIBIT F

As the parties worked to complete discovery, it became apparent that further work to clarify Plaintiffs' title to the subject properties, and to clarify the legal descriptions of those properties, was necessary. Plaintiffs have already started that process, which involves the preparation of Preliminary Title Reports by an outside title company. Once the title reports are completed, Plaintiffs will be providing them to Defendant for review and comment. Plaintiffs and Defendant will then confer to resolve any questions or concerns, with the goal being that at the end of the process no disputed issues remain with respect to Plaintiffs' titled ownership of the subject properties. A map will then be constructed that depicts the various properties for ease of reference of the Court and the parties. The parties anticipate that they can complete this work by June 29, 2007.

Once the title work and map has been completed, Defendant intends to file a motion for summary judgment on liability. The parties would propose the following briefing schedule:

Defendant's Motion for Summary Judgment:

August 1, 2007

Plaintiffs' Opposition (1 brief, combined with Cross Motion if desired):

September 14, 2007

Defendant's Reply (1 brief combined with Opposition if cross motion was filed):

October 31, 2007

Plaintiffs' Reply (if cross motion was filed):

December 3, 2007

Since all possible contingencies cannot be anticipated at this time, the parties recognize that it may be necessary to adjust the briefing schedule in the midst of briefing as appropriate to permit a party to fully respond to the arguments presented by the opposing party.

Dated: April 6, 2007.

Respectfully submitted,

s/ Roger J. Marzulla

Roger J. Marzulla
Nancie G. Marzulla
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Attorneys for Plaintiffs

MATTHEW J. McKEOWN
Acting Assistant Attorney General
Environment and Natural Resources Division

s/ Susan V. Cook by s/ Roger J. Marzulla
SUSAN V. COOK
Senior Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, DC 20044-0663
(202) 305-0470
(202) 305-0506 (Fax)
Email: susan.cook@usdoj.gov

Attorneys for Defendant