**UNITED STATES COURT OF FEDERAL CLAIMS**

(E-Filed: October 26, 2007)

| | |
|---|---|
| **D & D LANDHOLDINGS, a limited partnership,** | |
| **Plaintiff,** | **No. 06-877 L** |
| **v.** | |
| **UNITED STATES,** | **Hon. Margaret M. Sweeney** |
| **Defendant.** | |

**DEFENDANT'S MOTION TO DISMISS**
**OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT THEREOF**

October 26, 2007

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

SUSAN V. COOK, Senior Attorney
KELLE S. ACOCK, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorneys for Defendant

OF COUNSEL:
Melissa Erny
A. Ted Kundrat
U.S. Customs and Border Protection
Indianapolis, Indiana 46278

## TABLE OF CONTENTS


MOTION . . . . . . . . . . 1

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT . . . . . . . . . . 3

BACKGROUND . . . . . . . . . . 3

I. PLAINTIFF'S COMPLAINT . . . . . . . . . . 3

II. FACTUAL BACKGROUND . . . . . . . . . . 4

The Border Patrol . . . . . . . . . . 4

The Subject Property and Identity of Plaintiff . . . . . . . . . . 4

Early Efforts to Provide Border Security . . . . . . . . . . 6

The Border Patrol's Statutory Authority . . . . . . . . . . 6

Historical Patrol Activities in East Otay Mesa . . . . . . . . . . 8

Construction of the Primary Fence . . . . . . . . . . 8

Operation Gatekeeper . . . . . . . . . . 10

Construction of the Secondary Fence . . . . . . . . . . 10

The Trend in Illegal Entries . . . . . . . . . . 11

STANDARDS OF REVIEW . . . . . . . . . . 13

I. RULE 12(b)(1) . . . . . . . . . . 13

II. RULE 12(b)(6) . . . . . . . . . . 15

III. RULE 56 . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . 17

I. PLAINTIFF'S TAKINGS CLAIM IS BARRED BY 28 U.S.C. § 2501 . . . . . . . . . . 17

II. PLAINTIFF DOES NOT POSSES A COGNIZABLE PROPERTY RIGHT TO EXCLUDE BORDER PATROL AGENTS FROM ITS PROPERTY . . . . . . . . . . 20

A. The Question of Whether a Cognizable Property Right Exists is a Threshold Inquiry On Which Plaintiff Bears the Burden of Proof . . . . . . . . . . 20

B. The Question of Whether the Alleged Property Right is Recognized as Compensable is Determined With Reference to Existing Rules and Understandings . . . . . . . . . . 21

C. Background Principles Establish That the Right to Exclude the Border Patrol From its Property Is Not Part of Plaintiff's Bundle of Sticks . . . . . . . . . . 23

1. The Special Status of Property Located in the Vicinity of the United States' Border with Mexico Has Been Recognized Since 1907 . . . . . . . . . . 23

2. Long-Standing Statutory Authority Establishes The Border Patrol's Right to Enter Onto Property in the Vicinity of the International Border for the Purposes of Enforcement of the Immigration Law . . . . . . . . . . 24

D. Plaintiff's Property Interest Is Limited by, and Subject to, the Power of the Border Patrol to Enter Onto its Property for Law Enforcement Purposes; The Exercise of this "Police Power" Does Not Give Rise to a Right to Compensation Under the Fifth Amendment . . . . . . . . . . 25

III. EVEN IF PLAINTIFF COULD ESTABLISH THAT IT HAD A COMPENSABLE RIGHT TO EXCLUDE THE BORDER PATROL FROM ITS PROPERTY, PLAINTIFF'S FACTUAL ALLEGATIONS ARE EITHER FACTUALLY INCORRECT, FACTUALLY UNSUPPORTED, OR DO NOT STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED . . . . . . . . . . . . . . . . . . . . . . 29

A. The Entry of the Border Patrol Onto Plaintiff's Property For Purposes of Patrol and to Apprehend Illegal Immigrants . . . . . . . . . 29

B. Construction of the Secondary Fence Has Not Channeled Illegal Immigrants Onto Plaintiff's Property . . . . . . . . . . . . . . . . . . . . . . 29

C. Plaintiff's Allegation that It Has Been Chased Off Its Land . . . . . . . . . . 31

D. Plaintiff's Allegation that the Border Patrol Agents Stated the United States Owned Plaintiff's Property are Inaccurate; Moreover, Even If Such Accounts Were True, Such Would Not State a Claim for a Taking . . . . . . . . . . . . . . . . . . . . . 32

IV. EVEN IF PLAINTIFF HAD A COMPENSABLE RIGHT TO EXCLUDE THE BORDER PATROL FROM ITS PROPERTY, THE NATURE OF THE PHYSICAL INTRUSIONS AT ISSUE HERE WEIGH AGAINST A FINDING OF A TAKING . . . . . . . . . . . . . . . . . . 33

A. The Nature of a Physical Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B. The Installation of Two Sensors on Plaintiff's Property Does Not Constitute a Physical Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C. The Entries of Border Patrol Agents onto Plaintiff's Property Does Not Rise to the Level of a Taking . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# TABLE OF AUTHORITIES

## CASES

$7,990 in U.S. Currency
170 F.3d 843 (8th Cir. 1999) . . . . . . . . . . 26

Acadia Technology, Inc. v. United States
458 F.3d 1327 (Fed. Cir. 2006) . . . . . . . . . . 24, 25, 26, 27

Air Pegasus of D.C., Inc. v. United States
424 F.3d 1206 (Fed. Cir. 2005) . . . . . . . . . . 20

Alameda Gateway, Ltd. v. United States
45 Fed. Cl. 757 (1999) . . . . . . . . . . 32

Alanzo v. Chase Manhattan Bank
N.A., 25 F. Supp. 2d 455 (S.D.N.Y. 1998) . . . . . . . . . . 14

Alde v. United States
28 Fed. Cl. 26 (1993) . . . . . . . . . . 26

Alder Terrace, Inc. v. United States
161 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . 13

Allied General Nuclear Services v. United States
839 F.2d 1572 (Fed. Cir.), cert. denied, 488 U.S. 819 (1988) . . . . . . . . . . 16

American Pelagic Fishing Co. v. United States
379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . . . 22

Amerisource Corp. v. United States
75 Fed. Cl. 743 (2007) . . . . . . . . . . 24

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986) . . . . . . . . . . 16

Ariadne Financial Services Pty. Ltd. v. United States
133 F.3d 874 (Fed. Cir. 1998) cert. denied, 525 U.S. 823 (1998) . . . . . . . . . . 17

Atlas Corp. v. United States
895 F.2d 745 (Fed. Cir. 1990) . . . . . . . . . . 27

Bennis v. Michigan
516 U.S. 442 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Board of Regents v. Roth
408 U.S. 564 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Boise Cascade Corp. v. United States
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 35, 36

Borough of Alpine v. United States,
932 F.2d 170 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bowen v. United States
292 F.3d 1383 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

Cedars-Sinai Med. Ctr. v. Watkins
11 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Celotex Corp. v. Catrett
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Chancellor Manor v. United States
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Colvin Cattle Co., Inv. v. United States
468 F.3d 803 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fallini v. United States
56 F.3d 1378 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) . . . . . . . . . . . . . . . . 17

Fanning, Phillips, Molnar v. West
160 F.3d 717 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Ferreiro v. United States
350 F.3d 1318 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Hair v. United States
52 Fed. Cl. 279 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Hendler v. United States,
952 1364 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Hilkovsky v. United States,
504 F.2d 1112 (Ct. Cl. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Holland v. United States

59 Fed. Cl. 735 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Hopland Band of Pomo Indians v. United States
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Huntleigh USA Corp. v. United States
63 Fed. Cl. 440 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

In re Mrs. Perrin's Case
4 Ct. Cl. 543, 1800 WL 685, 4 (Ct. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

John R. Sand & Gravel Co. v. United States,
457 F.3d 1345 (Fed. Cir. 2006), cert. granted in part,
127 S. Ct. 2877 (May 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Kemp v. United States
65 Fed. Cl. 818 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Knieper v. United States
38 Fed. Cl. 128 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Lenox Hill Hospital v. Shalala
131 F. Supp. 2d 136 (D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Lombardo v. State Farm Mut. Auto. Ins. Co.
800 F. Supp. 208 (E.D. Pa. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Loretto v. Teleprompter Manhattan CATV Corp.
458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 35

Lucas v. South Carolina Coastal Council
505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 27

M & J Coal Co. v. United States
47 F.3d 1148 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Miller v. Schoene
276 U.S. 272 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mugler v. Kansas
123 U.S. 623 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

N.Y. Life Ins. Co. v. United States
190 F.3d 1372 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

One (1) 1979 Cadillac Coupe De Ville,

833 F.2d 994 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Owen Equip. & Erection Co. v. Kroger
437 U.S. 365 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Paradissiotis v. United States
304 F.3d 1271 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Penn Central Transportation Co. v. New York City
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Pixton v. B & B Plastics, Inc.,
291 F.3d 1324 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Poorbaugh v. United States,
27 Fed. Cl. 628 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Ridge Line, Inc. v. United States
346 F.3d 1346 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Seay v. United States
61 Fed. Cl. 32 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

Skip Kirchdorfer, Inc. v. United States
6 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sommers Oil Co. v. United States
241 F.3d 1375 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Sweats Fashions, Inc. v. Pannill Knitting Co.
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tabb Lakes, Ltd. v. United States
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Toews v. United States
376 F.3d 1371 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Toxgon Corp., v. BNFL, Inc.
312 F.3d 1379 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Truckee-Carson Irrigation Dist. v. United States
14 Cl. Ct. 361 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Ochoa,
881 F. Supp. 273 (S.D. Tex. 1995), appeal dismissed,

United States v. Chaves-Ochoa, 68 F.3d 468 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 23

United States v. Santa Maria
15 F.3d 879 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Willow River Power Co.
324 U.S. 499 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Vink v. Hendrilus Johannes Schijf, Rolkan N.V.
839 F.2d 676 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Webb's Fabulous Pharmacies, Inc. v. Beckwith
449 U.S. 155 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**STATUTES**

8 U.S.C. § 110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 22
8 U.S.C.A. § 1357(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 25, 28, 29
13 U.S.C.A § 1357(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16

Coastal Zone Management Act (CZMA),
16 U.S.C. §§ 1451-1464 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Endangered Species Act
16 U.S.C. §§ 1531-1544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

National Environmental Policy Act (NEPA)
42 U.S.C. §§ 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**LEGISLATIVE MATERIALS**

1952 U.S.C.C.A.N. 1358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

**RULES**

RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3
RCFC 12(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,16
RCFC 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**REGULATIONS**

8 C.F.R. § 287.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

## LIST OF EXHIBITS


| Exhibit | Description | Page(s) |
|---|---|---|
| D-1 | Map of Parcels 1-11, including zone designations (DOJ417175) | 4, 5, 11, 31, 32 |
| D-2 | Jun 27, 2007, Congressional Research Service, CRS Report for Congress, “Border Security: Barriers Along the U.S. International Border” (RL33659) (DOJ408669) | 9, 10, 11, 12, 13, 19, 35 |
| D-3 | Jan 25, 2006, Congressional Research Service, CRS Report for Congress, “Border Security: The Role of the U.S. Border Patrol” (RL32562) (DOJ417081) | 4, 9, 10 |
| D-4 | Jul 20, 2007, Deposition Excerpts, David Wick (DOJ418460) | 5, 32, 36, 37 |
| D-5 | Aerial Pictures, Landiscor Aerial Fotobank | |
| | (a) 1987 (DOJ415977) | 30 |
| | (b) 1990 (DOJ415976) | 30 |
| | (c) 1995 (DOJ415975) | 9, 30 |
| | (d) 1998 (DOJ415973) | 9, 30 |
| | (e) 2000 (DOJ416434) | 5, 9, 30 |
| | (f) 2006 (DOJ415979) | 5, 9, 13, 30 |
| D-6 | Dec 14, 2000, Grant Deed, Rancho Vista Del Mar to D&D Landholdings (San Diego Recorder Doc 2000-0689103, p. 8974-75) (DOJ395301) | 5 |
| D-7 | Map, Aerial View of Otay Mountain Area (DOJ342099) | 5 |
| D-8 | February 21, 2007, Deposition Excerpts, Joseph Granata (DOJ417120) | 30 |
| D-9 | January 1993, Sandia National Laboratories, Systematic Analysis of the Southwest Border (3 Volumes on 1 CD) (To Be Filed Under Seal) | 8, 9, 10, 30, 31 |
| D-10 | Photograph of Primary & Secondary Fences (DOJ415597) | 11 |
| D-11 | Map of Parcel 10 Showing Distances and Sensors (DOJ417445) | 5, 31, 35 |
| D-12(a) | Chula Vista Apprehensions by Fiscal Year, 1992-2007, U.S. Border Patrol (DOJ416092) | 10, 12, 19 |
| D-12(b) | Brown Field Apprehensions by Fiscal Year, 1992-2007, U.S. Border Patrol (DOJ416090) | 10, 12, 19 |

| | | |
|---|---|---|
| D-13 | (a) Apprehensions, Parcel 10, FY2005 (DOJ417108) | 12, 37 |
| | (b) Apprehensions, Parcel 10, FY2006 (DOJ417110) | 12, 37 |
| | (c) Apprehensions, Parcel 10, FY2007 (DOJ417111) | 12, 37 |
| D-14 | Map of Sector Offices, U.S. Border Patrol (DOJ416106) | 12 |
| D-15 | San Diego Sector Officer Corps Staffing Levels, FY94-FY07 (DOJ415577) | 19 |
| D-16 | BPETS, Border Patrol Enforcement Tracking System, San Diego Sector Zone Apprehensions, Zones 7 to 18, Fiscal Years 1999 to 2007 (DOJ370766) | 11 |
| D-17 | U.S. Border Patrol Apprehensions by Sector (DOJ417104) | 12 |
| D-18 | Map of Otay Mesa Area showing Place Names (DOJ370608) | 4 |
| D-19 | Table entitled "Sensors on Parcel 10 (D&D Landholdings) (DOJ417763) | 5, 35 |
| D-20 | (Exhibit Deleted) | |
| D-21 | Jul 7, 2006, Memo, Darren Kerns to Joseph Perez, CBP, re Citizen contact with David Wick (DOJ417084) | 32 |
| D-22 | Jul 7, 2006, Memo, Michael Diaz to Joe Perez, CBP, re Incident with Private Citizen (DOJ417085) | 32 |
| D-23 | Aerial Photo Map Showing Dates on Which Portions of Secondary Fence Were Completed (DOJ417100) | 30 |
| D-24 | July 2003, Excerpts, Final Report, Environmental Impact Statement for the Completion of the 14-mile Border Infrastructure System, San Diego, CA, Volume 1 (DOJ417090) | 8 |
| D-25 | Photo of Sensor Unit (DOJ418169) | 5, 25 |
| D-26 | Nov 2006, Photograph of End of Primary Fence (DOJ417034) | 5, 9, 13, 30 |
| D-27 | Nov 2006, Photograph of Entry Paths at End of Primary Fence (DOJ417035) | 13, 30 |
| D-28 | Nov 2006, Photograph Showing Difference in Density Between Areas to North and South of Primary Fence (DOJ417036) | 5, 9 |

D-29 Oct 19, 2007, Declaration of Steven P. Kean (DOJ417958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 9, 13, 18, 29, 31, 34, 37

D-30 Oct 26, 2007, Declaration of Daniel Ochoa (DOJ418498) . . . . . . . . . . . . . . . . . 12

D-31 Oct 18, 2007, Declaration of Janel Frith (DOJ418344) . . . . . . . . . . . . . . . . . . 11, 12

D-32 Oct 25, 2007, Declaration of Susan Cook (DOJ418405) . . . . . . . . . . . . . . . . . . . 9

D-33 Oct 26, 2007, Declaration of Curtis Weatherred (DOJ418485) . . . . . . . . . . . 34, 35

D-34 Oct 26, 2007, Declaration of Greg Giddens (DOJ418401) . . . . . . . . . . . . . . . . 11

D-35 Jun 13, 2007, Tax Assessor's Plat Maps, Parcel 10, from Amended Complaint (CFC Doc #16) (DOJ417591)

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **D & D LANDHOLDINGS, a limited partnership,** | |
| **Plaintiff,** | **No. 06-877 L** |
| **v.** | |
| **UNITED STATES,** | **Hon. Margaret M. Sweeney** |
| **Defendant.** | |

**DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

**MOTION**

Defendant United States hereby respectfully moves the Court to dismiss Plaintiff's complaint for lack of jurisdiction pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the United States Court of Federal Claims (RCFC).[1] Plaintiff's complaint is subject to a six-year statute of limitations. See 28 U.S.C. § 2501. Because the activities on which the complaint is based have been ongoing for more than six years prior to the filing of this case, the complaint is not timely. Accordingly, the Court does not have the requisite jurisdiction over this action and should dismiss the same with prejudice. See Argument I, infra.

Defendant also moves to dismiss the complaint pursuant to Rule 12(b)(6) on the basis that Plaintiff has failed to state a claim upon which relief may be granted. Should the Court find

[1]/ Defendant believes a motion to dismiss on statute of limitations grounds is properly brought pursuant to Rule 12(b)(1). However, to the extent the Court believes such a motion should be set forth under Rule 12(b)(6), Defendant asks that the Court consider this motion as one raised under that Rule.

that dismissal of Plaintiff's claim is not appropriate pursuant to RCFC 12(b)(1) and 12(b)(6), then Defendant moves, in the alternative, for summary judgment in its favor.

With respect to the merits of Plaintiff's complaint, the complained-of activities do not form a basis upon which Plaintiff can state a legally-cognizable claim of governmental taking under the Fifth Amendment. First, background principles establish that Plaintiff does not have a property right protected by the Fifth Amendment to exclude Border Patrol agents from its property. See Argument II(C), infra.

Second, Plaintiff does not possess a compensable property right to exclude Border Patrol agents from its property because the entry by the Border Patrol under such circumstances is an exercise of the United States' police power which has traditionally not been viewed as giving rise to a claim for compensation. See Argument II(D), infra.

Even if Plaintiff possesses a compensable property right to exclude the Border Patrol from its property, its factual allegations are inaccurate, unsupported, or do not state a claim upon which relief can be granted. See Argument III, infra.

Finally, even if Plaintiff had a compensable property right to exclude the Border Patrol from its property, the governmental intrusions at issue here do not rise to the level of a Fifth Amendment taking. See Argument IV, infra.

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## BACKGROUND

## I. PLAINTIFF'S COMPLAINT

Plaintiff filed its Complaint for Just Compensation on December 22, 2006. On June 13, 2007, Plaintiff filed an Amended Complaint, alleging a physical taking of its property as a result of activities of the Border Patrol on its property. Specifically, Plaintiff alleges a "physical taking of approximately 135 acres of prime development land located in eastern San Diego County, California, near the border with Mexico." Am Comp. at 1.

Plaintiff alleges that the United States, through agents for the Customs and Border Protection ("CBP"), "has physically entered onto Plaintiff's land continuously for several years, and has intentionally channeled illegal immigrants onto Plaintiff's land for roundup and arrest." Am. Comp. at 1, 3. Further, because the border fence terminates near Plaintiff's property, Plaintiff alleges that "the roundup and arrest of illegal aliens takes place on Plaintiff's property almost daily." Id. at 3.

According to the Complaint, Border Patrol activities escalated in 2001 to the extent that "Plaintiff was no longer welcome on its own land." Id. at ¶ 9. Specifically, Plaintiff alleges that Border Patrol agents have chased Plaintiff off of its land. Id. at ¶ 9. As a result of these activities, Plaintiff claims its property "has been taken for public use" in violation of the Fifth Amendment. Id. at ¶¶ 10-11, 14. Plaintiff seeks an unspecified amount of just compensation, prejudgment interest, attorneys' fees and costs. Id. at ¶¶ 12-16.

## II. FACTUAL BACKGROUND

**The Border Patrol**

The United States Border Patrol,[2] part of the Department of Homeland Security (DHS), Bureau of Customs and Border Protection (CBP), is the lead federal agency charged with securing the international border between the United States and Mexico. Border Patrol operations are divided into sectors; relevant here is the San Diego Sector Office of the Border Patrol, which has responsibility for an area located north of Tijuana and Tecate, Mexican cities with a combined population of two million. In this area, the terrain along the international border offers no geographical barriers to entry by unauthorized immigrants, smugglers or terrorists. Ex. D-2 at CRS-2. The mission of the Border Patrol is to prevent, detect or apprehend persons seeking to illegally enter the United States other than at an official Port of Entry. Ex. D-3 at CRS-1.

The property at issue in this case ("subject property") is within the patrol responsibility of the Chula Vista Station, one of the stations under the jurisdiction of the San Diego Sector, and lies within what is administratively designated as Zones 17 and 18. See Exs. D-1, D-29 at ¶ 4.

**The Subject Property and Identity of Plaintiff**

At issue in this litigation is a parcel of land consisting of approximately 135 acres located near the Mexican border in southern San Diego County, California, which the parties refer to as

[2/] Congress established the United States Border Patrol in 1924. Prior to 2003, the Border Patrol was organized under the Immigration and Naturalization Service. As part of a reorganization that created the Department of Homeland Security in March, 2003, Pub. L. No. 104-208, the Border Patrol was reorganized as an office under the Bureau of Customs and Border Protection.

Parcel 10. See Exs. D-1, D-18. The property which comprises Parcel 10 was acquired December 14, 2000 from Rancho Vista Del Mar, a related entity. Ex. D-6.

Plaintiff D&D Landholdings is a California limited partnership. Roque De La Fuente is a principal in both D&D Landholdings and Rancho Vista Del Mar. D-4 at 21. Mr. De La Fuente has either a direct ownership interest in, or control of, Parcel 10 and the 10 other parcels of land at issue in other currently-pending related cases.[3] All 11 parcels are managed by SD Commercial, LLC, owned by David Wick and by three trusts in the names of Mr. De La Fuente's children. Ex. D-4 at 18.

Parcel 10 is located in the East Otay Mesa area of San Diego County. This largely undeveloped and sparsely populated area sits at the base of the Otay Mountains approximately 14 miles east of the Pacific Ocean near the Mexican border. Exs. D-1, D-7, D-11. To the northwest are the highly urbanized cities of San Diego, Chula Vista, and their suburbs. To the south, directly across the border, lies the densely populated city of Tijuana. Exs. D-5 (e), (f); D-28.

Parcel 10 is zoned industrial. A portion is currently under lease to Otay Hills LLC, an entity pursuing a mining permit. Ex. D-4 at 19-20. Parcel 10 has been leased at various points in the past for purposes of dry farming, Ex. D-4 at 37-38, and utility easements over the property have also been granted, including a major electrical transmission line between the United States and Mexico, Exs. D-4 at 25-26; D-1. Other portions of the property are in the process of being

[3/] Two other pending cases raise issues similar to those before this Court. Parcels 1-9 are at issue in the consolidated case of Otay Mesa Property L.P., et al. v. United States, No. 06-167 (Judge Baskir). Parcel 11 is at issue in International Industrial Park, Inc. v. United States, No. 06-876 (Judge Wheeler). Because the parcels are adjacent or near one another, the parties have numbered the parcels sequentially for ease of reference. See D-1.

developed and grading permits have been obtained. Ex. D-4 at 35.

**Early Efforts to Provide Border Security**

In 1907, President Theodore Roosevelt issued which has become known as the Roosevelt Proclamation:

> WHEREAS, it is necessary for the public welfare that a strip of land lying along the boundary line between the United States and the Republic of Mexico be reserved from the operation of the public land laws and kept free from obstruction as a protection against the smuggling of goods between the United States and said Republic;
>
> Now, therefore, I, THEODORE ROOSEVELT, President of the United States, do hereby declare, proclaim and make known that there are hereby ... set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico . . .

35 Stat. 2136 (1907) (emphasis added).

Seventeen years later, Congress appropriated monies to provide for "land-border patrol" including the acquisition of motor vehicles, thereby giving birth to what is now known as the Border Patrol. 43 Stat. 205, 240 (May 28, 1924). Then, in 1925, Congress provided the Border Patrol with statutory authority: "the power without warrant [(1)] to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation . . . ." 8 U.S.C. § 110, 43 Stat. 1049 (Feb. 27, 1925).

**The Border Patrol's Statutory Authority**

In the Immigration and Nationality Act of 1952, Congress specifically granted the Border Patrol the right, without a warrant, to have access to private lands within 25 miles of the border to prevent illegal entry of aliens into the United States:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have the power without a warrant . . . within a

> distance of twenty-five miles from any such external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. . . .

8 U.S.C. § 1357(a)(3). Patrolling the border has been defined as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c).

The House Report discussing this legislation specifically addressed the codification of the authority to enter private lands for the purpose of patrolling the border:

> This would by positive legislative enactment authorize specifically that which must always have been of necessity implied from the time the border patrol was first created.

1952 U.S.C.C.A.N. 1358, 1360 (emphasis added). The House Report explained the need for the specific statutory authority:

> Notwithstanding that the borders of the United States, for the purpose of preventing the smuggling and illegal entry of aliens, have been patrolled continuously since 1903, and that Congress specifically authorized establishment of the border patrol in the Bureau of Immigration in 1924, and annually since that time has appropriated funds for border-patrol purposes, the statutes are silent with regard to the authority of patrol officers to enter upon private lands adjacent to the border so as to prevent the smuggling and illegal entry of aliens into the United States. In recent months the activities of the border patrol have in certain areas been seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries. This action by property owners is creating an increasingly serious situation, one which endangers the national security. It affects the sovereign right of the United States to protect its own boundaries against the entry of aliens, including those of the most dangerous classes.
>
> The language of section 2 would adequately authorize immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.

Id. (emphasis added).

**Historical Patrol Activities in East Otay Mesa**

For well over two decades, the Border Patrol has actively patrolled the property at issue in this litigation. Ex. D-29 at ¶ 4. In the early to mid 1980s, that patrol was done on horseback each evening, and sensors were utilized. Id.

By the late 1980s, illegal entries had increased with the emergence of organized alien and drug smuggling organizations. Id. at ¶ 5. Smugglers began utilizing a "drive-through" method of entry, in which one or more vehicles heavily loaded with aliens or drugs would breach the border at high speed. Id. During the 1980s and early 1990s, an average of more than 200 drive-through attempts occurred daily. Ex. D-24 at 1-3. The area between Brown Field and the mountains – the vicinity of Parcel 10 -- was a popular location for drive-throughs. Ex. D-9 at ES-52. Drive-throughs created a hazard for both agents and the nearby populance when the vehicles reached nearby highways and high speed chases ensued. Ex. D-24 at 1-3 to 1-4.

The high amount of illegal entries in the vicinity of San Diego became a recognized problem. A 1993 Sandia National Laboratories report noted:

> [t]he 13 miles of border east from the coast to the foothills of the San Ysidro Mountains are the most concentrated area of illegal entry on the Southwest Border. Almost this entire length is heavily urbanized on the Mexico side, with buildings and roads running right up to the border.

Ex. D-9 at ES-53.

**Construction of the Primary Fence**

At this time, the Mexican border near San Diego was poorly marked and presented no real barrier to entry. In many areas, the border had only agricultural fences or was totally unfenced. Ex. D-8 at 57. In 1990, the Border Patrol, with the assistance of the National Guard, began erecting a physical barrier. Ex. D-2 at CRS-1. What is now known as the primary fence

began at the Pacific Ocean and continued eastward for approximately 14 miles. It was constructed of surplus welded steel landing mats approximately 10 feet tall, and was completed in March, 1993. Ex. D-2 at CRS-1. What Plaintiff refers to as "channeling" actually began in 1990. The redirection of illegal entries was the main goal of the primary fence: "to force the traffic back to the open terrain of Otay Mesa where cover is relatively sparse so that sensors and night vision can be used much more effectively and pursuit is much easier and more effective." Ex. D-9 at 186.

After construction of the primary fence, the number of drive-throughs was dramatically reduced. Ex. D-2 at CRS-4 n.14. The primary fence was also successful in reducing crime in neighborhoods in close proximity to the border. Exs. D-3 at CRS-11, D-29 at ¶ 6.

The primary fence ends at a point approximately 300 feet short of the eastern-most boundary of Parcel 3.[4] See D-1. Illegal immigrants can, and do, simply walk around the end of the fence, as the paths in the aerial photos document. Exs. D-5(c)-(f), D-26, D-32. In this area, while the land to the north of the border is sparsely populated, the portions of Tijuana lying immediately to the south are densely populated and offer cover for those waiting to attempt illegal entry. Exs. D-5(f), D-28. Once illegal entrants have climbed the fences, or gone around the end of the primary fence, they then generally make their way northward with the goal of reaching a road which will give them rapid transportation out of the area. See Ex. D-29 at ¶ 7.

**Operation Gatekeeper**

---

4/ Parcel 3 is at issue in the consolidated case of Otay Mesa Property L.P., et al. v. United States, No. 06-167 (Judge Baskir). See fn. 3, supra.

In October, 1994, the Border Patrol announced "Operation Gatekeeper" which involved large increases in the number of agents as well as a focus on the stationing of agents directly along the border. Ex. D-2 at CRS-3. It also involved an increase in patrol equipment such as additional night vision goggles and seismic sensors, and portable lighting platforms were utilized for the first time in 1998. D-2 at CRS-3. The patrol activities of Operation Gatekeeper in 1993-1994 marked a high in terms of the physical presence of Border Patrol on property near the border.

First, there was a significant increase in the number of Border Patrol agents, and in the placement of those agents directly on the border. Ex. D-2 at CRS-3, D-12(a), (b). Second, it reflected the Border Patrol's "goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing USBP agents with a tactical advantage over illegal border crossers and smugglers." Ex. D-3 at CRS-10. The goal with construction of the primary fence in 1990-1993, as well as the intensified enforcement efforts of Operation Gatekeeper in 1994, was to direct illegal entry traffic to the east away from the population centers of San Diego and Tijuana. Ex. D-9 at 186.

**Construction of the Secondary Fence**

The concept of the secondary fence, known as the Border Infrastructure System (BIS), grew out of a recommendation of the 1993 Sandia National Laboratories study. Ex. D-9 at ES-1. In 1996, Congress responded to the recommendation, passing the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorized the construction of a second layer of steel mesh fencing near San Diego. Pub. L. No. 104-208, § 102. The BIS included the construction of two roads adjacent to the new fence as well as surveillance cameras and

permanent security lighting. Exs. D-2 at CRS 6-7, D10. In order to expedite construction of the secondary fence, the agency was authorized to waive all requirements imposed by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

Construction of the secondary fence began in 1996, but was halted in February 2004 due to coastal environmental concerns raised by the California Coastal Commission. Ex. D-2 at 6. At that point, approximately 9 miles of secondary fence had been completed. Id. In 2005, Congress passed the REAL ID Act, Pub. L. 109-13, which gave DHS the power to waive all legal requirements to expedite the construction of the border fence. Ex. D-2 at CRS-7-8.

At present, approximately 9 of the planned 14 miles of secondary fence have been constructed, including a 1 1/2 mile section in the vicinity of the subject property. Currently, the secondary fence ends near the western boundary of Parcel 1.[5] See Ex. D-1. CBP does not plan to extend the secondary fence further east than its present terminus. Ex. D-34 at ¶ 3. Instead, various high technology components such as sensors, cameras, radar and communication systems will be installed. Id. at ¶ 4.

**The Trend in Illegal Entries**

While apprehension statistics[6] do not represent perfect data in terms of successful illegal

---

5/ Parcel 1 is at issue in the consolidated case of Otay Mesa Property L.P., et al. v. United States, No. 06-167 (Judge Baskir). See fn. 3, supra.

6/ Prior to 1999, the number of apprehensions was recorded only by station. Ex. D-31 at ¶ 5. In FY1999, the Border Patrol created enforcement zones and began also recording apprehensions by zone. See Ex. D-16 for apprehensions by zone for FY1999 to FY2007.

In FY2003, the Border Patrol began the phasing in of a geospatial method of recording apprehension data. Beginning in FY2005, the number of apprehensions for a specific geographic area can be determined. Ex. D-30. The number of apprehensions for Parcel 10 for FY2005, FY2006 and FY2007 can be found at Exs. D-13(a), (b) and (c). Their significance to this case is

entrants, they do provide one of the few sources of data available to evaluate the Border Patrol's historic presence on property along the border. Ex. D-2 at CRS-10. A review of these statistics reveal that apprehensions in the vicinity of the subject property peaked in FY1992. See Ex. D-12(a), (b). Since that time, the number of apprehensions have declined. Ex. D-2 at CRS-10, CRS-11 Fig. 1, CRS-23 Fig. 2. The Congressional Research Service, in analyzing this data, explained:

> The majority of the decrease occurred in the four year period from FY1995 through FY1998 and coincided with Operation Gatekeeper, which as previously noted combined the construction of fencing along the border with an increase in agents and other resources deployed directly along the border.

Ex. D-2 at CRS-10 (emphasis added).

The number of apprehensions in recent years are far below the FY1992 peak. From FY2001 to FY2006, the average yearly apprehensions for the Chula Vista Station was approximately 1/6 th of the 1992 high. Ex. D-12(a). Statistics from Brown Field Station show the same significant decrease in apprehensions beginning in FY1992. Since the peak in FY1992, the number of apprehensions has declined. Ex. D-12(b). Between FY2001 and FY2006, the average yearly apprehensions for Brown Field Station was 1/8 th of the 1992 high. Id.

However, during this time period, as apprehensions declined in the San Diego Sector, they rose along the Arizona border to the east. Exs. D-2 at CRS-13 and CRS-14 Fig. 4; see also D-14, 17. Thus, the statistics indicate that the border fences have been successful in redirecting illegal entry activity to the east. However, that redirection is not to Plaintiff's property, but to border areas much farther to the east.

---

discussed infra in Arguments I and IV(C).

In addition, analysis reveals the reduction in apprehensions is not merely the result of fencing. As the Congressional Research Service concluded:

> It seems, then, that the installation of border fencing, in combination with an increase in agent manpower and technological assets, has had a significant effect on the apprehensions made in the San Diego sector. This in turn suggests that fewer unauthorized aliens are attempting to cross the border in the San Diego sector as a result of the increased enforcement measures, including fencing, manpower, and other resources, that were deployed to that sector.

Ex. D-2 at CRS-12-13.[7]

Even with the border fences in place, illegal entries still occur. Illegal entrants will climb over or cut through the fence, or construct a tunnel underneath. Ex. D-29 at ¶ 10. Illegal entry can also be made by simply walking around the end of the primary fence. Ex. D-26. The fact that such is occurring is readily apparent from photographs which show the well-worn paths leading from that point. Exs. D-5(f), D-27. Once entry is made around the end of the primary fence, the goal of an illegal immigrant is then to reach a road which will provide the pre-arranged transportation out of the area. Ex. D-29 at ¶ 7.

## STANDARDS OF REVIEW

### I. RULE 12(b)(1)

Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Bond

---

[7] Border Patrol representatives have testified to Congress that "for border control, for border security, we need the appropriate mix. It's not about fences. It's not about Border Patrol agents. It's not about technology. It's about all of those things." Ex. D-2 at CRS-28 and n.90.

v. United States, 47 Fed. Cl. 641, 647 (2000) (quoting Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983)). Subject matter jurisdiction may be challenged at any time by the parties or by the court sua sponte. Fanning, Phillips, Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998).

In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court must accept as true the plaintiff's undisputed factual allegations and construe the facts in the light most favorable to the plaintiff. Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002). However, if a motion to dismiss challenges the truth of jurisdictional facts alleged in the complaints, the allegations in the complaints are not controlling, and the court may consider relevant evidence in order to resolve the factual dispute. Ferreiro v. United States, 350 F.3d 1318, 1324 (Fed. Cir. 2003); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993). Where, as here, the Court lacks jurisdiction over subject matter of the complaint, the correct remedy is dismissal of the action. "[U]nder [Court of Federal Claims] Rule 12(h)(3), this court is mandated to. . . dismiss the action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter. . . ." Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368 (1988) (alteration in original).

"Although subject matter jurisdiction is normally challenged under Rule 12(b)(1), it may also be raised on a motion pursuant to Rule 12(c)." Alanzo v. Chase Manhattan Bank, N.A., 25 F. Supp. 2d 455, 457 (S.D.N.Y. 1998) (citing Formula One Motors, Ltd. v. United States, 777 F.2d 822 (2d Cir. 1985)). In considering a Rule 12(c) motion to dismiss challenging subject matter jurisdiction, the Court should apply the same standard of review as it would under Rule 12(b)(1). Lombardo v. State Farm Mut. Auto. Ins. Co., 800 F. Supp. 208, 211 (E.D. Pa. 1992)

(citing 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, § 1367, p. 515 (1990)).

RCFC 12(c) provides that when matters outside the pleadings are presented and not excluded by the Court, "the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56." RCFC 12(c). That mandate, however, applies to a defense raised under Rule 12(b)(6), not 12(b)(1), because a motion to dismiss for lack of subject matter jurisdiction may rest on matters presented outside the pleadings and cannot be converted into a motion for summary judgment. Toxgon Corp., v. BNFL, Inc., 312 F.3d 1379, 1383 (Fed. Cir. 2002); Lenox Hill Hospital v. Shalala, 131 F. Supp. 2d 136, 140 n.4 (D.C. 2000); accord Vink v. Hendrilus Johannes Schijf, Rolkan N.V., 839 F.2d 676, 677 (Fed. Cir. 1988) ("It has been held that a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may not be used as a basis for awarding summary judgment. The latter is a decision on the merits with res judicata effect.").

**II. RULE 12(b)(6)**

"The Court of Federal Claims may grant a motion to dismiss for failure to state a claim upon which relief may be granted where the plaintiff can prove no set of facts that would support its claim." N.Y. Life Ins. Co. v. United States, 190 F.3d 1372, 1377-78 (Fed. Cir. 1999); see also Kemp v. United States, 65 Fed.Cl. 818, 821 (2005) (citing Bagwell v. United States, 21 Cl. Ct. 722, 725 (1990)). Dismissal is proper under Rule 12(b)(6) when "the facts as alleged in the complaint do not entitle the plaintiff to a legal remedy." Holland v. United States, 59 Fed. Cl. 735, 738 (2004) (citing N.Y. Life Ins. Co., 190 F.3d at 1377). When reviewing a motion to

dismiss under Rule 12(b)(6), the court "must accept as true all the factual allegations in the complaint, and [the court] must indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted); see also Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 443 (2005) ("When considering a motion to dismiss a claim under RCFC 12(b)(6), a court must accept as true all well-pled factual allegations and draw all reasonable inferences in plaintiff's favor.") (citations omitted).

**III. RULE 56**

Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotation marks omitted). In this regard, the summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the 'just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Summary judgment is appropriate under RCFC 56 when there are no genuine issues of material fact in dispute, and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment." Id. at 248-49; see also Knieper v. United States, 38 Fed. Cl. 128, 134 (1997). Despite it's fact-intensive nature, there is no bar to granting summary judgment is a takings case. See Allied General Nuclear Services v. United States, 839 F.2d 1572 (Fed. Cir.) (affirming summary judgment of takings claim), cert. denied, 488 U.S. 819 (1988); Tabb Lakes,

Ltd. v. United States, 10 F.3d 796 (Fed. Cir. 1993) (same).

## ARGUMENT

### I. PLAINTIFF'S TAKINGS CLAIM IS BARRED BY 28 U.S.C. § 2501

The statute of limitations applicable to Plaintiff's takings claim is set forth in 28 U.S.C. § 2501 and provides: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Because this six-year statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity . . . [it] must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988); see also Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978). The failure of a plaintiff to file its claims within this six-year statute of limitations precludes it from invoking the jurisdiction of this Court to adjudicate those claims. Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) cert. denied, 525 U.S. 823 (1998) (citing Borough of Alpine v. United States, 923 F.2d 170, 171 n.1 (Fed. Cir. 1991)). But see John R. Sand & Gravel Co. v. United States, 457 F.3d 1345 (Fed. Cir. 2006), cert. granted in part, 127 S. Ct. 2877 (May 29, 2007).

Plaintiff's Complaint for Just Compensation was filed December 22, 2006. Plaintiff's claim of a physical taking, however, accrued more than six years before the complaint was filed in this Court and therefore must be dismissed. "A claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Bowen v. United States, 292 F.3d 1383, 1385–86 (Fed. Cir. 2002) (quoting Chandler v. United States, 47 Fed. Cl. 106, 113 (2000)); see also

Kemp, 65 Fed.Cl. at 825 (quoting Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d 1478, 1481-82 (Fed Cir. 1994)). This Court has long recognized that "'a cause of action for an unconstitutional taking accrues at the time the taking occurs.'" Hair v. United States, 52 Fed. Cl. 279, 282 (2002), aff'd, 350 F.3d 1253 (Fed. Cir. 2003) (quoting Steel Improvement & Forge Co. v. United States, 174 Ct. Cl. 24, 355 F.2d 627, 631 (1966)). In determining when a claim has accrued, the court applies an objective standard. Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996).

Here, Plaintiff cannot satisfy its burden to establish subject matter jurisdiction because the alleged taking occurred more than six years prior to Plaintiff filing its complaint in this action on December 22, 2006. The Border Patrol has patrolled Plaintiff's property and apprehended aliens attempting to enter the United States on or near Plaintiff's property for more than two decades prior to Plaintiff filing its complaint in this Court. Ex. D-29 at ¶ 4. Specifically, as many as six Border Patrol agents mounted on horseback patrolled Plaintiff's property and adjacent properties every evening. Id. Border Patrol agents also apprehended illegal entrants on the Property as a result of visual observations and sensors located on and near the Property being triggered by illegal entrants. Id. Therefore, regardless of whether the secondary fence has caused illegal immigrants to be channeled onto Plaintiff's property, the Border Patrol's presence on Plaintiff's property has occurred for a substantial number of years.

Indeed, in all likelihood the Border Patrol presence on Plaintiff's property was greater in the past than it is now. During Operation Gatekeeper, which began in 1993-1994, manpower in the San Diego Sector increased by 150%, the vehicle fleet increased by 152%, and seismic sensors deployment increased by 171%. D-2 at CRS-3. Operation Gatekeeper marked a

significant increase in the presence of Border Patrol agents at locations directly along the border. Id. While such a practice was relatively rare up to this time, Border Patrol agents were now assigned to fixed positions along the border, which by necessity placed them on private property located adjacent to, and in the close vicinity of, the border. Id. The number of Border Patrol agents assigned to the San Diego Sector continued to increase through 1999, when it reached its all time peak. Ex. D-15. Indeed, the number of agents assigned to San Diego Sector is lower today than in 1999, id., more than seven years prior to Plaintiff filing its Complaint in this Court.

Moreover, the number of apprehensions by the Chula Vista and Brown Field stations, the two stations relevant to Plaintiff's property, have declined since 1992, more than 14 years prior to Plaintiff filing its complaint. Overall apprehensions reported by the Chula Vista and Brown Field stations decreased significantly between FY 1992 and FY 2002 as a result of increased on-the-border enforcement efforts. In FY1992, the Chula Vista Station recorded 158,952 apprehensions. D-12(a). As Operation Gatekeeper took effect, the number of apprehensions began to decline, reaching its low in FY2002. Id. For FY2001 to FY2006, the average yearly apprehensions for Chula Vista Station was approximately 1/6th of the 1992 high. Id.

Apprehension statistics for the Brown Field Station show a similar trend. After a peak in FY1992, apprehensions declined. Ex. D-12(b). Between FY2001 and FY2006, the average yearly apprehensions for Brown Field Station was less than 1/8th of the 1992 high. Id.

These statistics establish that the number of apprehensions most directly responds to an increase in Border Patrol enforcement presence along the border such as occurred during Operation Gatekeeper. This presence hs caused a decrease in apprehensions in the vicinity of

Plaintiff's property over the years, not an increase. The statistics also confirm that construction of the secondary fence, which did not begin until 1996, has not resulted in an increase in apprehensions, but a decrease.

Accordingly, the statistics do not support Plaintiff's argument, based on anecdotal accounts, that the presence of the Border Patrol on its property is somehow greater now than it has been in the past. Plaintiff's attempt to make its claim appear timely by focusing on the fact that the secondary fence has not yet been completed should be rejected, and the complaint dismissed.

## II. PLAINTIFF DOES NOT POSSESS A COGNIZABLE PROPERTY RIGHT TO EXCLUDE BORDER PATROL AGENTS FROM ITS PROPERTY

### A. The Question of Whether a Cognizable Property Right Exists is a Threshold Inquiry On Which Plaintiff Bears the Burden of Proof

In determining whether the government's actions here constituted an unconstitutional taking, the decisions of this Court require a threshold inquiry into whether the plaintiff has a protected property right, the deprivation of which entitles him to compensation under the Fifth Amendment. Colvin Cattle Co., Inv. v. United States, 468 F.3d 803, 806 (Fed. Cir. 2006); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212 (Fed. Cir. 2005); Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003). The need for a compensable property interest is applicable to both physical takings claims, Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003), and regulatory takings claims, Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1580 (Fed. Cir. 1993).

It is equally well established that it is plaintiff who bears the burden of proving that he possesses a legally-cognizable property interest. Skip Kirchdorfer, Inc. v. United States, 6 F.3d

at 1580.

### B. The Question of Whether the Alleged Property Right is Recognized as Compensable is Determined With Reference to Existing Rules and Understandings

Thus, the threshold inquiry before the court must be to inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, i.e., whether the property interest which Plaintiff alleges has been taken is a "stick in the bundle of property rights" acquired by the owner. M & J Coal Co. v. United States, 47 F.3d 1148, 1153 (Fed. Cir. 1995), citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1029 (1992).

The compensability of a property interest is determined by the property owner's ability to show that the interest was "sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for the Fifth Amendment purposes." Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124-25 (1978). In order to evaluate the compensability of the alleged property interest, a court must look to "existing rules or understandings." Board of Regents v. Roth, 408 U.S. 564, 577 (1972). Absent a finding that the property interest owned by a plaintiff is compensable, a "mere unilateral expectation or an abstract need is not a property interest entitled to protection." Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980). As Justice Jackson observed in United States v. Willow River Power Co., 324 U.S. 499 (1945):

> [N]ot all economic interests are "property rights"; only those economic advantages are "rights" which have the law back of them, and only when they are so recognized may courts compel others to forbear from interfering with them or to compensate for their invasion. The law has long recognized that the right of ownership in land may carry with it a legal right to enjoy some benefits from adjacent waters. But that a closed catalogue of abstract and absolute "property

> rights" in water hovers over a given piece of shore land, good against all the world, is not in this day a permissible assumption. We cannot start the process of decision by calling such a claim a "property right"; whether it is a property right is really the question to be answered.

Id. at 502-503 (emphasis added).

Accordingly, the government may assert that a pre-existing limitation on plaintiff's property title prevents a plaintiff from establishing that the property interest at issue is one which the law recognizes as compensable. Lucas, 505 U.S. at 1028-29. These restrictions, imposed upon a property interest by "background principles," Lucas at 1029, may serve to limit a property owner's ability to establish his property interest is compensable:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logical antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property. It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power."

Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027 (1992) (footnote omitted) (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 (1922)).

Background principles can have as their source state, federal or common law. Lucas, 505 U.S. at 1030. Thus, federal law can serve to limit the compensability of Plaintiff's property interest. American Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1378 (Fed. Cir. 2004).

### C. Background Principles Establish That the Right to Exclude the Border Patrol From its Property Is Not Part of Plaintiff's Bundle of Sticks

#### 1. The Special Status of Property Located in the Vicinity of the United States' Border with Mexico Has Been Recognized Since 1907

In 1907, President Theodore Roosevelt explicitly recognized the special status of land located adjacent to the Mexican border when he issued what has become known as the Roosevelt Proclamation:

> WHEREAS, it is necessary for the public welfare that a strip of land lying along the boundary line between the United States and the Republic of Mexico be reserved from the operation of the public land laws and kept free from obstruction as a protection against the smuggling of goods between the United States and said Republic;
>
> Now, therefore, I, THEODORE ROOSEVELT, President of the United States, do hereby declare, proclaim and make known that there are hereby ... set apart as a public reservation, all public lands <u>within sixty feet</u> of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico . . .

35 Stat. 2136 (1907) (emphasis added).

Subsequent Congressional measures served to reinforce the country's concern with the security of its borders. The Border Patrol was created in 1924. 43 Stat. 205, 240 (May 28, 1924). The next year, Congress authorized the Border Patrol to arrest and interrogate aliens and search railway cars and vehicles for aliens. <u>See</u> 8 U.S.C. § 110, 43 Stat. 1049 (Feb. 27, 1925).

In 1952, Congress codified the right of the Border Patrol to patrol private lands within 25 miles of the border. <u>See</u> 8 U.S.C.§ 1357(a)(3). The 1952 House Report addressed Congress' understanding of the legal regime, noting that the matter "must always have been of necessity implied from the time the border patrol was first created." 1952 U.S.C.C.A.N. 1358, 1360. Nonetheless, Congress believed explicit statutory authority was necessary because of "the refusal

of some property owners along the border to allow patrol officers access to extensive border areas." Id.

### 2. Long-Standing Statutory Authority Establishes The Border Patrol's Right to Enter Onto Property in the Vicinity of the International Border for the Purposes of Enforcement of the Immigration Law

As mentioned, the Immigration and Nationality Act of 1952 specifically granted the Border Patrol the right, without a warrant, to have access to private lands within 25 miles of the border to prevent illegal entry of aliens into the United States:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have the power without a warrant . . . within a distance of twenty-five miles from any such external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . .

8 U.S.C.§ 1357(a)(3).[8]

The existence of this section establishes that the Border's Patrol's entry onto Plaintiff's property without a warrant is lawful. See also United States v. Ochoa, 881 F. Supp. 273, 274 (S.D. Tex. 1995), appeal dismissed, United States v. Chaves-Ochoa, 68 F.3d 468 (5th Cir. 1995) (finding the statute authorizes entry onto private lands within 25 miles of the border for the sole purpose of searching for aliens); United States v. Santa Maria, 15 F.3d 879, 880 (9th Cir. 1994) (holding the statute authorizes entry onto private lands located within 25 miles of the border between the United States and Mexico to search for aliens, but not drugs).

This section was first enacted in 1952, almost 50 years prior to Plaintiff's acquisition of

[8] Agency regulation defines patrolling the border is as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c).

the subject property in 2000. Accordingly, Plaintiff acquired title to its property – its "bundle of sticks" – subject to the existence of the statute and without that "stick" that would suggest it has a compensable right to exclude the Border Patrol. Instead, the statute confirms that there is a longstanding understanding that property owned within 25 miles of an international border is subject to entry by the Border Patrol for law enforcement purposes.[9]

Such does not, however, answer the question of whether the United States' exercise of that power is one which is recognized as being compensable under the Fifth Amendment. For an answer to that question, we turn to an analysis of the relevant takings jurisprudence.

### D. Plaintiff's Property Interest Is Limited by, and Subject to, the Power of the Border Patrol to Enter Onto its Property for Law Enforcement Purposes; The Exercise of this "Police Power" Does Not Give Rise to a Right to Compensation Under the Fifth Amendment

The governmental action at issue here is of the type that has not traditionally been considered to be an appropriation of property for a public use. Instead, the activities of the Border Patrol on Plaintiff's property fall into the category of government intrusions which are traditionally not considered to be a compensable exercise of the government's police power. Acadia Technology, Inc. v. United States, 458 F.3d 1327, 1332 (Fed. Cir. 2006); Amerisource Corp. v. United States, 75 Fed. Cl. 743, 747 (2007).

Few functions are more intrinsic to the purpose and function of a government than the enforcement of its criminal laws – the exercise of the "police power" in its strictest sense. Of

---

[9] The question of whether the Border Patrol's actions were "customary, or reasonable and necessary" is not an issue in this litigation. That is because an uncompensated taking and unlawful government action constitute "two separate wrongs that give rise to two separate actions." Acadia Technology, Inc. v. United States, 458 Fed. 3d. 1327, 1331 (Fed. Cir. 2006).

even greater significance is the conduct at issue in this case – the actions of the sovereign in protecting its citizens from criminal activity from outside its borders – the interdiction of illegal immigrants and drugs.

As the Court of Claims has noted:

> No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy...

In re Mrs. Perrin's Case, 4 Ct. Cl. 543, 1800 WL 685, *4 (Ct. Cl. 1868).

Indeed, once the question is answered as to whether the Border Patrol's entry was lawful, the retention or seizure of property for purposes of enforcing its criminal laws can only be viewed as a clear exercise of the sovereign's police power. As discussed, 8 U.S.C. § 1357(a)(3) provides the Border Patrol with clear authority to enter onto property within 25 miles of the international border for the purpose of preventing the illegal entry of aliens into the United States. Further, it is well established that Plaintiff cannot challenge the lawfulness of the Border Patrol's conduct as part of its Fifth Amendment takings claim. Acadia Technology, 458 F. 3d at 1330. Accordingly, there is no issue in this case concerning the lawfulness of the Border Patrol's activities on Plaintiff's property. Cf. Seay v. United States, 61 Fed. Cl. 32, 35 (2004).

Generally, actions of the United States in carrying out its law enforcement duties have been found not to constitute compensable takings under the Fifth Amendment. The most common factual context for these types of non-compensable police power exercises have been scenarios involving the retention or forfeiture of property related to criminal or civil legal proceedings. See, e.g., Seay v. United States, 61 Fed Cl. at 35 (property damaged during retention for criminal investigation even though the criminal investigation did not result in a

prosecution); One (1) 1979 Cadillac Coupe De Ville, 833 F.2d 994, 1000 (Fed. Cir. 1987) (retention of property for forfeiture even though jury ultimately found vehicle had not been used in criminal transaction); $7,990 in U.S. Currency, 170 F.3d 843, 845 (8th Cir. 1999) (forfeiture of contraband is an exercise of government's police power, not its eminent domain power).

But the realm of non-compensable police power exercises is not limited to property forfeiture or retention cases. See, e.g., Miller v. Schoene, 276 U.S. 272, 279-80 (1928) (government-ordered destruction of red cedar trees to prevent the infection of commercial apple orchards); Mugler v. Kansas, 123 U.S. 623 (1887) (prohibition on manufacturer and sale of alcoholic beverages did not constitute a taking). Nor should this precedent be summarily dismissed on the ground that their age or nuisance character make them less than perfect authority for the arguments advanced herein, particularly given their citation by the Federal Circuit's recent decision in Acadia Technology, 458 F.3d at 1333 (seizure of property to enforce intellectual property provision of the Tariff Act).

The reason that such exercises are customarily believed to be non-compensable is because property "seized by the government under its police power does not constitute property seized for 'public use' within the meaning of the Fifth Amendment." Seay v. United States, 61 Fed. Cl. at 35. Accordingly, the Supreme Court has confirmed that the United States need not compensate an owner for property "which it has lawfully acquired under the exercise of governmental authority other than the power of eminent domain." Bennis v. Michigan, 516 U.S. 442, 452-53 (1996). "If the Government acts to secure a benefit for the public, a taking arises ... Government action aimed at protecting ... its citizens 'traditionally has constituted a non-compensable exercise of the Government's police power." Alde v. United States, 28 Fed. Cl. 26,

34 (1993) (citing Jarboe-Lackey Feedlots, Inc. v. United States, 7 Cl. Ct. 329, 338-39 (1985)).

Defendant is not suggesting that compensation under the Fifth Amendment can be avoided simply by the statement that the government action in question was an exercise of the "police power." The analysis here is different from those cases that may have sought to determine whether the governmental action in question was a legitimate exercise of the government's power, and have characterized the action as an exercise of the "police powers." At issue here is whether the particular government action at issue is the kind or type of police power exercise that has traditionally been recognized as non-compensable. In that sense, the analysis does not differ remarkably from an analysis of "background principles," which seeks to determine whether the property right asserted is recognized as being compensable. Some cases refusing compensability based on a police power analysis might well have used background principles language had they not been decided before Lucas, 505 U.S. at 1029. See, e.g., Atlas Corp. v. United States, 895 F.2d 745, 758 (Fed. Cir. 1990).

A lack of compensability for exercises of the police power have been found in other contexts as well. Measures taken to serve national security interests may negatively effect the value of individual contract rights, but those effects have not been recognized as a taking which is compensable under the Fifth Amendment. Paradissiotis v. United States, 304 F.3d 1271, 1274 (Fed. Cir. 2002).

The actions of the Border Patrol on Plaintiff's property do not give rise to a right to compensation under the Fifth Amendment. This type of government law enforcement activity has not traditionally been considered to constitute an appropriation of property for public use, but is instead a non-appropriative exercise of the sovereign's police power. Acadia Technology,

458 F.3d at 1332.

## III. EVEN IF PLAINTIFF COULD ESTABLISH IT HAD A COMPENSABLE RIGHT TO EXCLUDE THE BORDER PATROL FROM ITS PROPERTY, PLAINTIFF'S FACTUAL ALLEGATIONS ARE EITHER FACTUALLY INCORRECT, FACTUALLY UNSUPPORTED, OR DO NOT STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

### A. The Entry of the Border Patrol Onto Plaintiff's Property For Purposes of Patrol and to Apprehend Illegal Immigrants

Plaintiff alleges that the Border Patrol's entry onto its property, which has been "continuous for several years" and the apprehension of illegal immigrants on the property constitute a physical taking. Am. Comp. at 1. Of course, the Border Patrol readily admits that it has entered onto Plaintiff's property for years. Ex. D-29 at ¶ 4. However, 8 U.S.C. § 1357(a)(3) gives the Border Patrol the right to do just that. Even so, this entry does not give rise to a compensable taking because it is a traditional exercise of the government's police power, as discussed above.

Because active development of the property did not occur until recently, Plaintiff may not have taken particular notice of the Border Patrol presence on the property. However, any cause of action for Border Patrol entry onto Parcel 10 accrued long ago. See Argument I, supra.

### B. Construction of the Secondary Fence Has Not Channeled Illegal Immigrants Onto Plaintiff's Property

Plaintiff's second main factual allegation is that because the United States has not completed construction of the secondary fence, the United States therefore has "intentionally channeled illegal immigrants onto Plaintiff's land for roundup and arrest." Am. Comp. at 1, 3. However, Plaintiff's channeling argument ignores the physical realities of the locations of the primary and secondary fences as well as the statistical apprehension data. At present, the

primary fence extends only 1-1/2 miles farther than the secondary fence. Thus, from the point where the secondary fence ends, the end of the primary fence is readily apparent as the terrain rises to the mountains. Plaintiff's channeling argument apparently posits that illegal immigrants first climb over or cut through the primary fence, but then decide to walk to where the secondary fence ends rather than climb over or cut through the secondary fence.[10] However, it is obviously far easier, see Ex. D-26, for illegal immigrants just to walk around the end of the primary fence located just a short distance away, and the paths present in aerial and ground photos make it clear they do just that. Exs. D-5(a)-(f), D-27.

Plaintiff's channeling argument also ignores the fact that the fence has been constructed in sections with gaps for ports of entry, gates and drainage box culverts. Thus, even though the secondary fence may have been completed to Alta Road in 2000, or to an area near the western boundary of Parcel 1 in 2005, does not support Plaintiff's channeling argument when there remained large gaps in the portions of the fence which had been constructed. For example, a 674 foot section of secondary fence near the CalTrans truck facility was not completed until December 2006. Exs. D-8, D-23. Likewise, the work at drainage culvert BC-3 was not completed until 2006. See Ex. D-23, D-8 at 48. In addition, throughout the length of the secondary fence were numerous gaps where gates would ultimately be installed. Indeed, to this day there still exists a 70 foot gap near the Otay Mesa Port of Entry. Id. at 45.

Historical accounts indicate that it is not the secondary fence, but the construction of the primary fence which was intended to redirect illegal immigrant traffic away from the metropolitan areas of San Diego and Tijuana, to the more sparsely-populated area of Otay Mesa.

---

10/ See D-9 at ES-5 for photograph of aliens cutting through a fence.

As noted in the 1993 Sandia Report, at the time of construction of the primary fence, the intent was "to force the traffic back to the open terrain of Otay Mesa where cover is relatively sparse so that sensors and night vision can be used much more effectively and pursuit is much easier and more effective." Ex. D-9 at 186.

Finally, it must be remembered that Parcel 10 is a significant distance from the border (0.68 to 0.73 miles). See Ex. D-11. Thus, even if the secondary fence were channeling illegal immigrants, a contention we have explained is incorrect, the impact would fall on land located closer to the border than Parcel 10. Immigrants coming around the end of the secondary fence would head immediately for the closest road and transportation out of the area, Ex. D-29 at ¶ 7; in most cases that would not take them across Parcel 10. See D-1.

### C. Plaintiff's Allegation that It Has Been Chased Off Its Land

Plaintiff next alleges that the Border Patrol has "repeatedly chased Plaintiff off its own land, demanding proof that Plaintiff is entitled to be there." Am. Comp. at 1, 3.

During its patrol of property adjacent to the border, if the Border Patrol encounters vehicles of a type, and driving in a manner, which suggests those vehicles might be involved in the entry of illegal immigrants or other illegal activity, the Border Patrol will make a law enforcement stop of the vehicle. The agent will then approach the vehicle on foot and ask the driver to identify himself in an effort to ascertain whether the vehicle is involved in criminal activity.

This law enforcement stop is done in a manner similar to a vehicle stop on a highway. When the agent approaches the vehicle, he may place his hand on his holstered gun, as he is trained to do. However, contrary to the statement of Plaintiff's counsel at the Preliminary Status

Conference, at no time has an agent ever drawn his gun during a contact with any of Plaintiff's representatives. Ex. D-4 at 63.

Indeed, there is no evidence that Plaintiff's representative has ever even been stopped by Border Patrol agents while on Parcel 10. Ex. D-4 at 63. Further, despite the fact that numerous depositions were taken in this case, no evidence ever appeared of incidents where the Border Patrol had chased Plaintiff's representative off Parcel 10. Ex. D-4 at 63, 118.

Instead, it appears that following the filing of the Otay Mesa Property LLP litigation, Plaintiff's representative David Wick engaged in conduct deliberately designed to attract the attention of the Border Patrol by driving at a high rate of speed in a sports utility vehicle without license plates on the Border Patrol maintenance road located to the north of the secondary fence. See Exs. D-21, 22. This road is located directly adjacent to the secondary fence and entirely on property owned by the United States; it is not located anywhere near Parcel 10. See Ex. D-1.

**D. Plaintiff's Allegation that the Border Patrol Agents Stated the United States Owned Plaintiff's Property are Inaccurate; Moreover, Even If Such Accounts Were True, Such Would Not State a Claim for a Taking**

Finally, Plaintiff alleges that "some [Border Patrol] agents have even told Plaintiff's representatives that the United States owns the subject property." Am. Comp. at 3.

It appears that this allegation refers to the David Wick incident recounted above. As explained, at the time Mr. Wick's vehicle was stopped, it was located on property owned by the United States. Exs. D-21, D-22. Accordingly, it would have been perfectly correct for a Border Patrol agent to tell Mr. Wick that he was located on property owned by the United States. Cf. Ex. D-4 at 118.

However, even if a Border Patrol agent had incorrectly stated that the property was

owned by the United States rather than Plaintiff, such would not state a cause of action for a taking. Mere erroneous assertions by an United States' employee as to ownership or title do not rise to the level of a taking. Poorbaugh v. United States, 27 Fed. Cl. 628, 632 (1993), citing Hilkovsky v. United States, 504 F.2d 1112, 1114-15 (Ct. Cl. 1974).

## IV. EVEN IF PLAINTIFF HAD A COMPENSABLE RIGHT TO EXCLUDE THE BORDER PATROL FROM ITS PROPERTY, THE NATURE OF THE PHYSICAL INTRUSIONS AT ISSUE HERE WEIGH AGAINST A FINDING OF A TAKING

### A. The Nature of a Physical Taking

The physical occupation of private property by the government is viewed quite differently from the government's regulation of an owner's use of his property. As explained by the Supreme Court,

> we have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, "the character of the government action" not only is an important factor in resolving whether the action works a taking but also is determinative.

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982).

The Federal Circuit has recognized that "[t]he hallmark of a physical taking is government occupation of real property." Alameda Gateway, Ltd. v. United States, 45 Fed. Cl. 757, 762 (1999). Accordingly, the Circuit's recent decisions have emphasized that there must be an actual physical occupation in order for there to be a Loretto-type physical taking. Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002). Rather than being a rule of broad application, the Circuit in Boise remarked

> [t]he holding of Loretto is quite narrow. It applies only to permanent physical occupations either by the government or by a third party acting under government authority.

Id.

### B. The Installation of Two Sensors on Plaintiff's Property Does Not Constitute a Physical Taking

Seismic intrusion sensors are one of the law enforcement tools used by the San Diego Sector Border Patrol to detect illegal alien foot traffic in undeveloped areas adjacent to the international border. Ex. D-33 at 3. They are utilized as a patrol tool; the use of sensors reduces the number of agents that are necessary to effectively patrol a particular area and thereby reduces the enforcement footprint – the impact that patrol has on private property. Sensors are an extremely effective and useful tool; indeed, the majority of apprehensions are made as a result of sensor alerts. Exs. D-29 at ¶ 9, D-33 at ¶ 3.

The sensor, see Ex. D-25 for photo, is buried in the ground with only approximately a foot of the antenna exposed above the ground. Ex. D-33 at ¶ 4. The sensor is positioned so that the antenna is camouflaged in a manner appropriate to the surroundings. When a sensor detects seismic action, it transmits a signal to the Border Patrol dispatch center; an agent is then dispatched to that location. Id. at ¶ 5.

Because the sensors are seismic, they are commonly used on undeveloped property. Each sensor represents a significant monetary investment, so when the property on which a sensor is located is developed, the sensor is moved to another location. Ex. D-33 at ¶ 6. Some sensors are left in place for many years along paths that are regularly used by illegal entrants because of ease, safety or speed of passage. Id. at ¶ 7. Other sensors are moved in response to changes in illegal entrant traffic patterns. Sensors have been used by the Border Patrol since the

1980s. Ex. D-33 at ¶ 8. Beginning in 1994 with Operation Gatekeeper, the deployment of sensors was increased. Ex. D-2 at CRS-3. As part of its law enforcement efforts, in September, 2004,[11] the Border Patrol placed two sensors on Parcel 10. See Exs. D-11, D-19. At present, there are approximately 30 sensors located in Zones 17 and 18. Exs. D-33 at ¶ 10.

The Supreme Court long ago drew a distinction "between a permanent physical occupation [and] a physical invasion short of an occupation." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 430 (1982). Certainly there can be no question that "'permanent' does not mean forever, or anything like it." Hendler v. United States, 952 F.2d 1364, 1376 (Fed. Cir. 1991). Nonetheless, to be considered permanent, the government intrusion in question must be a "permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002). The Circuit drew its support from the Supreme Court's Loretto decision, and relied on the Court's decision there to define the permanence required to establish a physical taking. First, the owner must have no right to possess the occupied space himself and his right to exclude the occupier from that space. Here, of course, the landowner has every right to possess the occupied space himself and has never objected to the government's placement of a crime-deterrent tool on its property.

Here, Plaintiff's representative has admitted that he knew about the sensors prior to the December 2006 filing of this lawsuit. Ex. D-4 at 42, 70-71. Despite knowledge of the sensors,

---

11/ This is not to suggest that 2004 was the first use of sensors on the property. As mentioned, sensors have been utilized in this area since the 1980s. Ex. D-33 at ¶ 8. The Border Patrol does not maintain historical records of past sensor locations in an effort to keep the locations of current sensors confidential.

Plaintiff has never approached the Border Patrol to complain about their presence on the property or to request their removal so that it might occupy their space.[12] This is so, even though Plaintiff's representative admits that the Border Patrol has responded favorably in other circumstances when he has made complaints. Ex. D-4 at 65.

A second requirement for an occupation to be permanent is that "the permanent physical occupation of property forever denies the owner any power to control the use of the property." Boise Cascade, 296 F.3d at 1353, citing Loretto, 458 U.S. at 436. Here, however, there is no evidence that the Border Patrol would not remove the sensors if Plaintiff so requested. To the contrary, there is positive evidence that when the property is developed, the sensors will be removed. Ex. D-33 at ¶ 6. Plaintiff readily admits that the subject property "is in various stages of grading development," Am. Comp. at 1; see also Ex. D-4 at 31, 35, 39, but has made no allegation that the presence of the sensors has interfered with that development.

Finally, the Circuit noted that to be "permanent," the landowner must be unable to convey the property interest without the burden imposed by the physical occupation. Here, however, there is no evidence that the sensors would not be removed were Plaintiff to request it for the purpose of selling the property. Nor is there any evidence that the presence of sensors on any of these properties near the border has in any way impaired the ability of a landowner to sell or otherwise develop the property. Indeed, the large number of purchases, sales, easement and

---

12/ The presence of sensors on property near the border has a deterrent effect on illegal entries. The "coyotes" -- smugglers who lead groups of illegal entrants across the border -- quickly learn which locations are more likely to be successful than others. Thus, even were a physical taking found in this case, once this case reached the just compensation phase, the end result might be similar to that in Hendler v. United States. 175 F.3d 1374, 1383 (Fed. Cir. 1999) (value of easements taken outweighed by special benefits conferred).

leasing transactions with which Plaintiff's principal has been involved point to the opposite conclusion. Ex. D-4 at 19-20, 25-26, 37-38.

### C. The Entries of Border Patrol Agents onto Plaintiff's Property Does Not Rise to the Level of a Taking

Also at issue in this case is whether the activities of the Border Patrol in patrolling Plaintiff's property and in entering the property to apprehend illegal immigrants rises to the level of a physical taking.

While there is no question that the Border Patrol enters upon Plaintiff's property in the course of its law enforcement duties, as it is statutorily authorized to do, 13 U.S.C. § 1357(a)(3), and has done so for some time, Ex D-29 at ¶ 4, this entry does not constitute a compensable physical occupation. Instead, the entry onto the property is of a transitory nature; its purpose is merely to locate the illegal immigrants and apprehend them. No Border Patrol agents are permanently stationed on Plaintiff's property.

Nor are Plaintiff's allegations concerning the frequency of entry onto Parcel 10 supported by the apprehension statistics. While Plaintiff alleges that "the roundup and arrest of illegal aliens takes place on Plaintiff's property almost daily," Am. Comp. at 3, the statistical data does not support that allegation. During FY2005, an apprehension event[13] occurred only 8 times in that year, or less than once a month. Ex. D-13(a). During FY2006, there were 48 apprehension events for the year, or 4 events a month, Ex. D-13(b); and for FY2007, the frequency was 22 events for the year, or approximately twice a month. Ex. D-13(c).

Thus, far from being the daily event that Plaintiff alleges, the Border Patrol entries at

---

[13]/ An apprehension event is the apprehension of one or more illegal entrants at a single time.

issue here are the sort of infrequent and transitory physical invasions that have been found to lack the permanence and significance necessary to qualify as a per se physical taking. As the Circuit has noted,

> [a] physical occupation, as defined by the [Supreme] Court, is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property.

Boise Cascade, 296 F.3d at 1353. Because transitory, physical invasions do not rise to the level of a permanent physical occupation, "[p]hysical invasions (as distinct from physical occupations) thus fall outside the Loretto rule." Id.

Here, the entries by Border Patrol agents onto the subject property do not operate to exclude the owner from possession of its property, nor do they deny the owner the power to control the use of the property or to dispose of the property, all requirements under the Supreme Court's test for a permanent physical occupation. Indeed, Plaintiff readily admits that it is in the process of developing portions of the property. Further, Plaintiff admits that it has leased portions of the property and received compensation both in the past and at present. Accordingly, Plaintiff cannot establish that the entries by Border Patrol agents constitutes a physical taking.

**CONCLUSION**

For the foregoing reasons, Plaintiff's complaint should be dismissed. In the alternative, summary judgment should be granted in favor of the United States.

Dated: October 26, 2007.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

s/ Susan V. Cook
SUSAN V. COOK, Senior Attorney
KELLE S. ACOCK, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorneys for Defendant

OF COUNSEL:
Melissa Erny
A. Ted Kundrat
U.S. Customs and Border Protection
Indianapolis, Indiana 46278

417280.1