Certified Copy

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

| | |
|---|---|
| INTERNATIONAL INDUSTRIAL PARK, INC., Plaintiff, vs. UNITED STATES, Defendant. | NO. 06-876L |
| D & D LANDHOLDINGS, a Limited partnership, Plaintiff, vs. United States, Defendant. | NO. 06-877 |

Deposition of DAVID WICK,
taken at 5440 Morehouse Drive, Suite 4000,
San Diego, California, at 8:15 a.m., Friday,
July 20, 2007, before Shuri Gray, CSR No. 3786.

Eastwood-Stein
DEPOSITION MANAGEMENT

550 West C Street, Suite 600
San Diego, CA 92101
800-514-2714

APPEARANCES:

FOR PLAINTIFF:
MARZULLA & MARZULLA
BY: GREGORY JAEGER, ESQ.
1350 Connecticut Avenue
Suite 410
Washington, D.C. 20036
(282) 742-1322

FOR DEFENDANT:
UNITED STATES DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
SOUTHERN DISTRICT OF CALIFORNIA
BY: E. KENNETH STEGEBY, ESQ.
WILLIAM SHAPIRO, ESQ.
601 D Street, NW
Washington, DC 20004
(202) 616-4119

# I N D E X

FRIDAY, JULY 20, 2007


| WITNESS | EXAMINATION |
|---|---|
| DAVID WICK | |
| BY MR. STEGEBY | 4 |


## DEPOSITION EXHIBITS


| NUMBER | DESCRIPTION | IDENTIFIED |
|---|---|---|
| A | Map of Parcel 10 | 11 |
| B | Map of Parcel 11 | 15 |
| C | Colored map representing various parcels | 15 |

DAVID WICK,

Having been administered an oath, testified as follows:

EXAMINATION

BY MR. STEGEBY:

Q. Good morning, Mr. Wick. I am Kenneth Stegeby, and I will be taking your deposition this morning. And I know you have been deposed in a case that was filed by entities that were related to the companies that we will be discussing today.

Besides that deposition, have you had your deposition taken before?

A. Yes.

Q. How many times?

A. Many.

Q. Okay. So you are familiar with the process of the deposition, then, how I ask you questions, and you answer the questions, and today it's especially important that you verbalize your answers because your counsel, Greg Jaeger, is participating by telephone, and then, of course, the court reporter will be recording the answers that you provide today.

We are going to talk about two parcels of land today, parcels 10 and parcels 11. And I would like to

A. I don't know.

Q. You are about part of -- what's your position with -- what's your relationship to the lawsuit that we are talking about today, D & D and Internationl Industrial Park?

A. I am the president of the management company that manages those -- manages the assets owned by Internationl Industrial Park as well as D & D.

Q. Are you familiar with them with -- are you familiar with the landholdings of those companies?

A. Yes.

Q. So are you familiar with the lawsuits that we are talking about today?

A. Yes.

Q. Are you familiar with the properties involved in the lawsuits --

A. Yes.

Q. -- that we are talking about today?

A. Yes.

Q. And when you respond to my questions, if you would please wait until I am done with the question so the court reporter will have some time to take it down.

So based on your knowledge on the properties involved in the lawsuit, do you recognize what has been highlighted on these maps?

BY MR. STEGEBY:
Q. Okay. So let's talk about parcel 10, and I am handing you what has been marked as Exhibit A.
Who owns this parcel 10?
A. D & D Landholdings.
Q. And is that the full name of the company?
A. No.
Q. What's the full name of the company?
A. D & D Landholdings, a limited partnership.
Q. Is D & D Landholdings owned by one person or entity, or are there sub interests in D & D Landholdings?
A. It's not owned by one party. I don't know what you mean by sub interest.
Q. So it's owned by multiple parties?
A. Yes.
Q. Who are the owners of D & D Landholdings?
A. The partners of D & D Landholdings are American International Racing, Inc., and La Jolla Farms, LLC.
Q. And those are the only partners?
A. Yes.
Q. What is your position with the company with D & D Landholdings?
A. I have no position with D & D Landholdings.
Q. How are you familiar with D & D Landholdings?

A. I through SD Commercial, LLC, manage the affairs of D & D Landholdings.

Q. Would you spell, S-T --

A. SD --

Q. SD?

A. -- Commercial, LLC.

Q. What is your position with SD Commercial?

A. I am the president.

Q. Who is the president of D & D Landholdings?

A. D & D Landholdings does not have a president.

Q. What is the organization of D & D Landholdings?

A. I don't understand the question.

Q. Does D & D Landholdings have any employees?

A. No.

Q. Does it have a management?

A. No.

Q. Does it have -- are the partners involved in doing any day-to-day activities in D & D Landholdings?

A. Yes.

Q. What sort of activities do they do?

A. Management.

Q. What is the subject of their management?

A. The assets held by D & D.

Q. Is D & D Landholdings a holding company?

A. Yes.

Q. So it has no real activities in and of itself other than holding assets?
A. I don't understand the question.
Q. D & D is a holdings company?
A. Yes.
Q. Does it have any day-to-day activities?
A. Yes.
Q. What does it do?
A. It holds assets and does what a company would do that holds assets.
Q. And what are those activities?
A. Paying expenses and collecting rents.
Q. And are those tasks performed then by the two partners you named earlier?
A. No.
Q. Who performs those tasks on behalf of D & D Landholdings?
A. SD Commercial, LLC.
Q. And who are the owners of the SD Commercial?
A. Myself and three irrevocable trusts.
Q. Are those the three irrevocable trusts that were created on behalf of three of Mr. Wick's -- or Mr. De La Fuente's children?
A. Yes.
Q. With respect to parcel 10, are there any other

interested parties? Do any other parties own interests in parcel 10?

A. Yes.

Q. Who are they?

A. Otay Hills, LLC, has an interest in a portion of parcel 10.

Q. Is that a geographical portion or a fraction of the ownership?

A. Geographic.

Q. Can you identify the geographic interests that Otay Hills, LLC has?

A. Yes.

Q. Can you mark that on the tax assessor's map with the blue pen that you have. And if you can describe for the court reporter how you are marking Otay Hills' interests.

A. I am just putting some crosshatch marks on approximately the area where Otay Hills has a leasehold interest.

Q. Can you describe, approximately, where on the property that is that you have marked?

A. I think the exhibit speaks for itself. I don't think I will need to describe it. If you want, what I'll do --

MR. STEGEBY: Let's go off the record.

(Discussion off the record)

BY MR. STEGEBY:

Q. We are back on the record. So if you can describe then what you are doing now to mark Otay Hills leasehold interest.

A. Okay. I made a little boo-boo here. They have no interest in 41 or 42, and I put a little bit of blue on 41, so that was a little boo-boo on my part.

So I highlighted the balance of the parcel 39 and 40 in blue, and 13 and a portion of parcel 25 as that area that Otay Hills has a leasehold interest.

Q. Can you describe to us what the leasehold interest involves?

A. Yes. Otay Hills is processing a mining permit with the various governing agencies to that portion of the parcel. They are still in the entitlement process, and they have not yet obtained their mining permit.

Q. What are they mining for?

A. Gravel.

Q. When did they acquire this interest?

A. Several years ago.

Q. To?

A. I believe in about 2001 or 2002.

Q. And for how long -- what's the term of the leasehold?

A. The leasehold -- to be very honest with you, I believe it's an option to lease, so they don't actually have -- they have an option to lease on that area in blue that is triggered upon them obtaining a mining permit. The option expires, I believe, in two years if they don't get a mining permit.

Q. Are there any other interests on this property besides Otay Hills and D & D Landholdings?

A. Not that I recall.

Q. When did D & D Landholdings acquire parcel 10?

A. I'm not familiar with the exact date.

Q. To your best abilities?

A. I would suspect they acquired it in the 90 sometime.

Q. The late or early '90s?

A. I don't recall the exact date. They -- they acquired it from Rancho Vista Del Mar, which is an affiliated company. And I forget the year that was done.

Q. And when you say "a related company," can you explain the relationship?

A. The principal in Rancho Vista Del Mar is Mr. De La Fuente's mother, and the principal in D & D Landholdings is Mr. De La Fuente father's estate, Mr. De La Fuente and his ex-wife.

so 16.3 --

Q. Just approximately.

A. So you basically have 15 and a half acres, and then add another 20 for parcel 13, so that's 70 and a half acres. And then you add a little bit of parcel 25 that I am going to estimate is probably 5 acres. So it's probably about 75 acres. Let's run through that real quick. You have 14, 15, 16, 16, and 34 is 50, and 20 is 70. Yeah, about 75 acres.

Q. What is the zoning designation of this parcel?

A. This parcel is in what we call sub area two. The zoning of this parcel is light industrial and residential.

Q. What part of it is residential? Could you point that out?

A. Based on this map, it would be difficult for me to delineate that acreage that is residential and that acreage which is industrial.

Q. What is the split between the two, approximately?

A. I don't quite understand the question.

Q. Part of the parcel is industrial and another part is residential. Would you say that 80 percent of parcel 10 is industrial and 20 percent is residential?

A. Oh, wait, wait, wait. I made a mistake on my

arithmetic on the 75 acres. I was just focusing -- okay. Sorry.

Q. That's okay. Take your time.

A. Parcel 10 is the 75 acres I mentioned plus another 40, so that would be 115, right? And plus another, say, 19, so that's 135 acres. That's more accurate. I didn't pick up the bottom here. So let's go again to make sure. I apologize. So you have basically 14, one and one is 15, 16, and 34 is 50, and then 20 is 70, and then 20 is 90, and then 20 is 110, and then 24.3 is basically 135. Yeah, 135 acres. So my testimony on the 75 was in error. I apologize.

Now, the question is approximately what portion of parcel 10 is industrial percentagewise and what portion is residential? I would say approximately 90 percent of it is industrial and the balance is residential. Eighty-five to 90 percent is industrial, the balance is residential.

Q. Besides the leasehold held by Otay Hills, have there been any other transactions involved with this property where D & D Landholdings has either sold or leased or granted or given away any portion of parcel 10?

A. Yes.

Q. How many?

A. A few.

Q. Do you know the exact number?

A. No.

Q. Three or more?

A. Probably more.

Q. More than five?

A. No. It was probably around five.

Q. Could you describe them to us?

A. And these are just D & D. Obviously, before D & D Rancho Vista Del Mar had a whole handful.

Q. Let me clarify, then, before we go on.

When D & D Landholdings acquired the property from Rancho Vista, did it take it subject to other leases and conveyances?

A. Yes. So the ones I am going to describe are the ones that D & D has done, various easements with SDG&E, various easements --

Q. And when you --

A. -- for utilities.

Q. Pardon me. When you use SDG&E, please, spell it out at least the first time for the court reporter.

A. San Diego Gas and Electric.

Q. Thank you.

A. So various easements for utilities for San Diego Gas and Electric, various easements for utilities

with PG&E, Pacific Gas and Electric, various easements for utilities and access with Cal Pine Corporation.

Q. What sort of easements for Cal Pine?

A. Utilities and access. We have -- D & D in the past has leased the land to be farmed in the past.

Q. Are there any other encumbrances on the property?

A. D & D has entered into a water purchase program with Otay Water District with regards to portions of the property.

Q. Can you explain that a little bit more. What is a water purchase program?

A. If there is water to be found, you know, by drilling on this property, Otay Water District has entered into an agreement with D & D whereby they would sell the water to the Otay Water District.

Q. Any other encumbrances on the property?

A. Well, when we talk about encumbrances, you asked now a different question, which is encumbrances that may have been inherited from Rancho Vista Del Mar that maybe D & D had entered into, but Rancho Del Mar did. This property is part of a landfill site that is -- contains several acres, more than just this parcel.

Q. And how did that encumber the property when

that has been designated a landfill.

A. And I will do this based on an approximate, right?

Q. Yes. Unless you know the exact location.

A. Approximately as I have described it.

Q. And can you, just to clarify, just write down landfill and put your initials right next to it.

A. Okay. And that's an approximate location.

Q. Thank you. Do you have any loans on the property?

A. There are loans on the property.

Q. And any liens on the property?

A. Well, a loan is a lien. Other than the loans that are liens, there are no other liens on the property.

Q. Now, if we go back to the tax map, tax assessor's map, have you done any development on this property?

A. Yes.

Q. Can you describe those to us?

A. Well, in addition to the development that I described earlier, meaning the easements for utilities and various farming that's occurred on the property, some of the subdivision that we have done on the property of 41 and 42, and the race track that is an

A. It would have come through the two streets that I have described on the first page.

Q. And who put in those electrical connections?

A. We did.

Q. And what sort of connections are they?

A. They are connections to water, sewer, electricity.

Q. I was going to get to those later. As far as the electricity, do you have like a transformer that a lessee could hook up to or --

A. Yes.

Q. Okay. So let's talk then about sewage. Do you have sewage hookups to this property?

A. Yes.

Q. Where do you have those hookups?

A. The two streets I just identified.

Q. And do you have any other utility hookups on this property, like telephone, for example?

A. Yes, we have telephone, water.

Q. And where are those located?

A. In the same streets that I have identified.

Q. And when did you put those in?

A. I forget the exact date.

Q. To your best knowledge.

A. 2003, 2002.

A. We got a permit to drill for water. We have a permit to grade on parcels 41 and 42. We have a permit to clear vegetation on parcel 39. We have a permit to blast for rock on certain portions of parcel 40. There may be others, but that's all I can think of right now.

Q. With respect to your permit to grade apartments 41 and 42, have you done that?

A. Yes.

Q. What was the purpose for that?

A. To create a buildable industrial lot.

Q. Do you have a permit to grade anywhere else on the property?

A. The property being parcel 10?

Q. Correct.

A. No.

Q. So is it correct, then, to say that you have graded parcels 41 and 42, and you have brought electricity onto the property in those two places where you marked it in red?

A. That's correct.

Q. And you have done no further improvements to the property?

A. Well, we have gone through a series of questions, and I have answered your questions, and a lot of those questions had to do with improvements, so what

I intend to get into the Border Patrol's action for now, and that will probably be a little bit lengthy, so would you like to take a break before we do that?

A. Sure.

MR. STEGEBY: Thank you.

(Recess)

BY MR. STEGEBY:

Q. So we are back on the record.

So we talked a little by about the development of parcel 10, which is now owned by D & D Landholdings, and I would like to go back and wrap up a couple of questions about the improvements on the property here.

You mentioned that a while back you leased the property for farming. Can you explain that a little bit to us or tell us about the farming lease?

A. Sure. We entered into a lease with a farmer to dry farm certain portions of the property.

Q. And what does dry farming mean?

A. Dry farming means actually mixing sludge in with the dirt of the property.

Q. For what purpose?

A. To get rid of the sludge.

Q. Oh, what sort of produce did they farm?

A. Nothing.

Q. So when you say that you leased it for farming,

it was -- can you explain that? I still don't understand what the farming consisted of.

A. It's a term of -- of -- I guess the better way to -- it's dry farming. You are mixing in the sludge and the soil. You are making the soil more -- more able to nurture, but there is no produce being extracted. You are not planting any produce.

Q. So what is the purpose of dry farming?

A. Dry farming purpose is to have a place to dispose of the sludge.

Q. And where would the sludge come from?

A. San Diego Bay.

Q. When did you lease the property for dry farming?

A. Over a number of years.

Q. Starting when?

A. In the '90s.

Q. Early or late '90s?

A. Probably mid '90s.

Q. And for how long -- what was the term of the lease?

A. It was during particular contracts when the farmer had contracts to remove the sludge from the San Diego Bay.

Q. Where would they put the sludge on parcel 10?

A. Various locations.

Q. Okay. Now, you mentioned that you have graded parcels 41 and 42. What year did you grade those parcels?

A. Those parcels were graded here in the last two years.

Q. So from 2005 and forward?

A. Yes.

Q. And when we first started discussing the boundaries of parcel 10, you initially excluded those pieces of property from parcel 10. What made you rethink that?

A. Well, I remember that they are still owned by D & D Landholdings.

Q. In addition to the permits that you have explained to us that you already hold, do you have any permits pending right now related to parcel 10?

A. Well, only the one I discussed with Otay Hills.

Q. So that is -- when I said "pending," I should have been clearer. Have you applied for any additional permits beyond the permits we have discussed?

A. No.

Q. And when you just responded, you meant when I asked you about pending permits, you meant a permit that is in actual use right now; is that right?

A. Oh, on a daily basis the Border Patrol is utilizing the property to patrol the border between Mexico and the United States and to apprehend illegal aliens coming across the border to put -- they put sensors in the ground on parcel 10 to determine when people are walking on the property. They are driving their vehicles through the property, making roads to drive their vehicles through the property. They are laying in wait on the property, waiting for illegal aliens to come across the border. They are using their horses to cross the property. And their ATVs, they are utilizing those vehicles to transgress the property.

And I said they are doing all of the activities I just described on a daily basis, whether they are in hot pursuit of an illegal alien or whether they are just waiting for an illegal alien or whether they are just patrolling the border and doing the duties that they are responsible to do under their job description.

Q. Anything else?

A. I think that's everything that I can think of at this moment.

Q. So let's talk briefly about sensors. Are you aware of any sensors on the property?

A. Yes.

Q. When did you first become aware of the sensors

on your property or D & D's property?

A. I don't recall.

Q. To your best knowledge?

A. I don't recall. It would be a complete guess.

Q. Did you learn about the sensors as part of this lawsuit?

A. I learned about the location of the sensors as part of this lawsuit, but I knew about the sensors prior to the lawsuit.

Q. Several years prior to the lawsuit?

A. I don't recall.

Q. You mentioned that the Border Patrol makes roads on parcel 10?

A. Yes.

Q. Where have they made roads on parcel 10? Can you point that out?

A. Throughout -- throughout the parcel. I -- I cannot on this tax map delineate where the roads are. Perhaps in this aerial map, which is Exhibit C, you can see the roads. Yeah, you can kind of see the roads in Exhibit C.

Q. Would you point them out?

A. You can see them, but it's by -- they look like wrinkles.

Q. If you can -- are they so small that it's

Q. What development activities on parcel 10 do you observe on a weekly basis?
A. The ones that I testified to earlier today.
Q. And those were the grading of parcels 41 and 42?
A. As well as the other activities we discussed.
Q. Which included obtaining the permits?
A. Yeah. I mean, we talked about a lot of things. Whatever we talked about is --
Q. You mentioned that Border Patrols are lying in wait on parcel 10 --
A. Yes.
Q. -- on a daily basis?
A. Yes.
Q. Do you go out to the property once a week?
A. Yes. I have employees as well that work on it on a daily basis, and they inform me.
Q. Who are those employees?
A. Various employees. As I sit here today, I couldn't even tell you their names.
Q. Are they employees employed directly by you?
A. They are employees of my company. They don't report to me on a daily basis.
Q. SD Commercial?
A. That's correct.

Q. How many employees do you have?
A. SD Commercial has approximately 442 employees.
Q. And does SD Commercial have employees on parcel 10 on a daily basis?
A. No.
Q. How frequently do you have employees on parcel 10?
A. It depends.
Q. So in addition to receiving reports from employees for parcel 10 and being there yourself, what do you base your observation on that Border Patrol are on parcel 10 on a daily basis?
A. Just that is based on my observations and observations of my employees. That's the basis of my statement.
Q. What about ATVs? You mentioned that Border Patrol uses ATVs on a daily basis on parcel 10?
A. Yes.
Q. Is that based on the same -- on your observations and your employees' observations?
A. Yes.
Q. Any other basis for it?
A. Vendors and consultants that are retained that are assisting us in our development activities also say the same thing.

diminish the value of the property?

A. In -- oh, regards -- it's like a war zone. I think that diminishes the value of the property.

Q. Can you explain it any more detail?

A. The Border Patrol is clearly on the property and around the property for the purpose of patrolling the border and making sure that there is no illegal entry into the United States, either people or goods. They are armed. They have used their weapons to apprehend illegals in the area. They are human. They are subject to error.

I personally have had an agent not draw on me, but clearly put his hand on his gun ready to draw, wondering who I was and what I was doing on my property. This was not on parcel 10. It was another property we owned nearby parcel 10. So I do have Hispanic workers in the area and on occasion on parcel 10 working.

I know from my personal experience that if you are on parcel 10, you will be observed by the Border Patrol, and the Border Patrol will take note of what you are doing. That is their responsibility in patrolling the border region.

So if a situation arose where the Border Patrol perceived what you were doing was -- was questionable, they would take action. So I think that develops a

Q. Could you explain that more?

A. Sure. Some of these roads that abut parcel 10 have barricades to keep vehicles from going from the public right-of-way to our properties. These barricades were built by us at the county's request. The Border Patrol, of course, access these properties in performing their duties and will either go through the barricade and remove it or go around the barricade, you know, over the sidewalk and through the landscaping and create a roadway around the barricade to access the property.

So this results in, A, the barricade being destroyed; B, the landscaping and irrigation being destroyed; and, C, bringing dirt and gravel and mud onto the public right-of-way. The county has noticed us in these violations or has issued violations for these -- these items I mentioned where we have to fix them.

Recently I made it the Border Patrol's problem, and they fixed them, which I thought was nice, but that just happened recently that they started to fix them. They shouldn't be doing it in the first place.

Q. Okay. Let's talk a bit about what you said that the Border Patrol speaks out against certain development or permits to be had and that they don't want the property developed. Can you explain that more to us?

property, and I wasn't sure in what context you mentioned the occupation of the property. Can you explain that?

A. Well, their occupation, they are sitting on the property, laying in wait, for all practical purposes enjoying all aspects of the property as though they were the owner.

Q. Anything else --

A. No.

Q. -- on that?

You mentioned earlier that you had learned of the existence of sensors on parcel 10, and you mentioned that you had learned of the location through this lawsuit. How did you become aware of the fact that sensors were on parcel 10?

A. Border Patrol agents in the past have told me that there has been sensors on this property and other properties that we own on Otay.

Q. So they said specifically on parcel 10 you have sensors?

A. Well, they didn't say specifically parcel 10. What they said, in this area, and I know this area is where parcel 10 is depicted on our map.

Q. Okay. Thank you.

About what time frame did they first tell you?

A. Three or four years ago.

Q. Okay. Let's talk briefly about the raceway permit and the conveyor belt plan. In which way did the Border Patrol oppose those two permit applications?

A. They opposed both those applications as part of the process of getting those applications approved. The major use permit for the race track, there is a process in which the public and government agencies can comment. During that comment process, the Border Patrol voiced their objection to the project. The project was approved over their objection, but ultimately the project never was -- was built because the Border Patrol taking certain acreage of other parcels we own that didn't allow us enough contiguous acreage to develop an economically feasible race track.

With regard to the conveyor belt project, they killed it, and we are trying to see if we can resuscitate it.

Q. In which way did they oppose the raceway track? By letter?

A. Yes.

Q. Were their hearings?

A. Yes.

Q. How many letters?

A. Several.

They said they would not support this project.

Q. Did you ever reach a point where you applied for a permit?

A. We have not yet applied for a permit.

Q. So at this point the Border Patrol has not opposed your application for a permit?

A. They have indicated their objection to the project. So based on that, and knowing that would be a hurdle to get around, we are reanalyzing how we can get this done and how we can get their support. To date we have not gotten their support, and they have indicated that they are adamantly opposed to this project.

Q. Thank you. You also mentioned the Fish and Wildlife Services overlay regarding vernal pools and partial tenant. You mentioned that one of the overlays touches upon parcel 10, although you did not know exactly how much of parcel 10 was affected by it. Has this overlay impacted your ability to develop parcel 10 in any way?

A. It has not yet impacted our development of parcel 10, but it's a barrier to future development.

Q. Thank you. You also mentioned that D & D has been required to rehabilitate certain areas and to mitigate areas that were actually caused by the patrol, Border Patrol. Can you describe what sort of mitigation

think that's just a part of their training that's unfortunate.

Q. What specific instances can you tell us about with respect to parcel 11 and 10 where an agent has told you that it's indeed government property?

A. It's very difficult for me to answer that question, because when I have been in confrontations with the agents, or I have had interactions with the agents or my employees have had interactions with the agents, we don't keep a log as to where we were standing or where that conversation took place. So those types of conversations have occurred on several occasions and at various properties that we own throughout the mesa here, and, you know, it is what it is. It's -- I think the agents firmly believe that there is a statute that they can hang their hat on that they can ignore private property when doing their job. That's what's really come out of this whole series of depositions.

Q. Can you point to any specific time where an agent has told you that this is government property when you have been on parcel 10 or 11?

A. I have been on parcel 11 where agents have been on the -- what they thought was the Truck Trail Road here, and on -- and said this is -- we are legally permitted to have access to the Truck Trail here. And

they don't because the road is not built where the easement is, and their access by which they were getting to the road which was a road that they created parallel to Alta Road was through our property with no easement granted.

Q. Would they be correct if they told you that they were on government property, as would you be if you were on the easement?

A. If they were on the easement, they would be, correct.

Q. Okay. Thank you.

As far as the safety goes, how would you put a value on the allegation that Border Patrol agents have guns and they patrol private property, and you may feel like you are unsafe or that your employees are unsafe? How would that diminish the value of the property?

A. I think it diminishes -- I mean, how do you -- your first part of that question is how do you put a value on it? I'm not sure how you do that. It does diminish the value of the property.

You know, if I -- it's like a lot on a golf course. If you have a lot on a golf course that is on a dog leg of a fairway that 20 percent of the golfers hit the house, that lot is going to go for a less price than a lot that oversees the T box behind it. I mean, that

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on__________________, 2007,

at____________________________, California.

______________________________

DAVID WICK

STATE OF CALIFORNIA ) ss:
COUNTY OF SAN DIEGO )

eastwood-stein

I do hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, were thereafter transcribed under my direction and supervision and that the foregoing is a true record of same.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 14th day of August, 2007.

Shuri Gray, C.S.R. NO. 3786