JULY 2003

FINAL REPORT

# ENVIRONMENTAL IMPACT STATEMENT FOR THE COMPLETION OF THE 14-MILE BORDER INFRASTRUCTURE SYSTEM SAN DIEGO, CALIFORNIA

VOLUME I

U.S. DEPARTMENT OF HOMELAND SECURITY
WASHINGTON, D.C.

JULY 2003

FINAL REPORT

# ENVIRONMENTAL IMPACT STATEMENT FOR THE COMPLETION OF THE 14-MILE BORDER INFRASTRUCTURE SYSTEM SAN DIEGO, CALIFORNIA

## VOLUME I

U.S. DEPARTMENT OF HOMELAND SECURITY
WASHINGTON, D.C.

## EXECUTIVE SUMMARY

## PROPOSED COMPLETION OF A 14-MILE BORDER INFRASTRUCTURE SYSTEM SAN DIEGO COUNTY, CALIFORNIA

( ) Draft (X) Final

U.S. Immigration and Naturalization Service
Headquarters, Facilities and Engineering Division
425 I Street, NW (Geraldine Pontius)
Washington, DC 20536

Type of Action: (X) Administrative
( ) Legislative

### PROPOSED ACTION

This Environmental Impact Statement (EIS) analyzes the potential for significant adverse or beneficial environmental impacts of the Immigration and Naturalization Service's (INS) proposed action and alternatives. The EIS was prepared in accordance with provisions of the National Environmental Policy Act (NEPA), the President's Council on Environmental Quality (CEQ), Regulations for Implementing NEPA (40 CFR, part 1500), and INS's Regulations for Implementing NEPA (28 CFR, part 61). The proposed action is located along the international border between the United States and Mexico in San Diego County, California.

The INS proposes to complete a Border Infrastructure System that starts at the Pacific Ocean and extends approximately 14 miles inland, to a point east of Tin Can Hill, near the foothills of the San Ysidro Mountains. The project corridor has been subdivided into six areas to facilitate discussions and project management. Approximately nine miles in Areas II, III, and IV of the infrastructure system have been completed or are currently under construction. These activities were completed as pilot projects for the infrastructure system and were addressed in previous NEPA documents. This EIS, therefore, addresses the completion of the infrastructure system in Areas I, V and VI.

### PURPOSE AND NEED FOR THE PROPOSED ACTION

The proposed Border Infrastructure System is required for compliance with Title I, Subtitle A, Section 102, of the *Illegal Immigration Reform and Immigrant Responsibility Act* (IIRIRA) of 1996. Subsection B (*Construction of Fencing and Road Improvements in the Border Area Near San Diego, California*) specifically states the Attorney General shall provide "...for the construction along the 14 miles of the international land border of the U.S., starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences."

Furthermore, there is a need to halt the continual influx of illegal aliens and smugglers into the San Diego area by creating a permanent deterrence through a certainty of

detection and apprehension. The objective of the proposed action is to provide for integration of infrastructure and technology into the current strategy for border control. The proposed action would develop a safe and effective enforcement zone near the border that would eliminate illegal foot and vehicle traffic within the 14-mile corridor and thus maximize the proactive, deterrent enforcement capability of the United States Border Patrol (USBP), while gaining the necessary and desired permanent status of deterrence. The current road conditions and operational constraints increase risks to the health and safety of USBP agents. Agents and their vehicles are routinely subjected to rocks and other objects being thrown at them. Windshield replacement costs for the three border stations (Imperial Beach, Brown Field and Chula Vista) have routinely exceeded several thousands of dollars each year, due to rocks and other objects thrown from the Mexican side of the border. Furthermore, steep, unimproved roads have resulted in numerous injuries and even fatalities. During the last two years alone, three San Diego Sector agents and one maintenance worker have lost their lives in vehicle accidents caused by unsafe road conditions, including the Smuggler's Gulch area.

Another need is to reduce the current enforcement footprint that will ensure a more efficient and effective control of the border region. Historically, the USBP San Diego Sector, was required to expand their apprehension and enforcement actions up to five miles north of the border. These actions necessitated incursions into residential areas, commercial and industrial developments, parks and open areas, with potential effects on soils, vegetation, cultural resources, and other sensitive resources. The Border Infrastructure System, once complete, would significantly reduce the enforcement actions north of the system and the concomitant effects to the human and natural environments. The purpose, therefore, of the Border Infrastructure System is to lessen the overall impact of the enforcement footprint, maximize the deterrent enforcement profile, and safeguard local neighborhoods, businesses, and environmental resources.

## ALTERNATIVES

Three separate alternatives to complete the infrastructure system in Areas I, V and VI are considered in detail in the Final EIS: the No Action Alternative; the Tactically Optimum Alternative (representing the agency's preferences absent any consideration of environmental impacts); and the Multi-tiered Fence Alternative (which is the Proposed Action). Multiple combinations of environmental design features and alignments have been evaluated as part of the assessment of the Proposed Action. Other alternatives were considered throughout the development of the Draft EIS, but have been eliminated from further consideration as operationally non-effective, environmentally unpalatable, and/or non-responsive relative to the spirit and intent of IIRIRA. Each alternative carried forward for analysis is briefly described in the following paragraphs.

### No Action Alternative

The No Action Alternative consists of the completion of all on-going construction projects with no additional project features in Areas I, V, and VI (in total or in combination.). This alternative would provide completion of the Border Infrastructure System in Areas II, III, and IV, which extend from the International Boundary and Water Commission's (IBWC) wastewater treatment plant to Johnny Wolf Creek. For each location in Areas I, V, and VI, where the No Action Alternative is evaluated, the project corridor would have only the primary fence (installed in 1993) and the existing scattered Integrated Surveillance and Intelligence System (ISIS) components (e.g., lights, sensors, cameras) that have been installed in or near high traffic areas.

Tactically Optimum Alternative

The Tactically Optimum Alternative would involve completion of the Border Infrastructure System that optimizes tactical considerations, including line-of-sight, in such a manner that USBP agents consistently occupy a strategically superior position. These considerations dictate a project alignment that is fairly level and is maintained within a virtually straight and parallel corridor. This alternative would require significant cut and fill activities to minimize hills and canyons. This alternative would provide an enforcement zone that is generally 200 to 250 feet wide between the primary and secondary fences, with a larger project footprint determined by subsequent engineering requirements.

Multi-tiered Fence Alternative (Proposed Action)

The third alternative is the Proposed Action, which involves completing the multi-tiered 14-mile Border Infrastructure System project. Within the Proposed Action Alternative, a number of different designs and alternate alignments were evaluated in an attempt to identify the least environmentally damaging alternative that could satisfy the purpose and need and comply with IIRIRA. These designs and alignments are summarized in Table ES-1 below.

**Table ES-1.**
**Alternate Design Measures Considered for the Proposed Action, by Area**

| Design Measure | Area I | Area V | Area VI |
|---|---|---|---|
| Alternate Alignments (number considered) | 4 | 5 | 5 |
| Road Designs & Construction Methods | Yes | Yes | Yes |
| Drainage Crossing Designs | No | Yes | Yes |
| Fence Designs | Yes | No | Yes |
| Mitigation/Compensation | Yes | Yes | Yes |

The Proposed Action would include the existing primary fence, a secondary fence, the patrol and maintenance roads, lights, ISIS components and a third fence along the entire 14-mile corridor. Within each of the remaining areas (i.e., Areas I, V, and VI), various alternate design measures have been formulated and assessed to identify the least environmentally damaging design (i.e., alignment, construction method, road or fence type) that could be implemented without jeopardizing the effectiveness of the infrastructure components or hindering the operations of the USBP. The minimum width of the corridor created between the primary and secondary fences would typically be 130 feet, and the distance between the secondary and tertiary fence would typically be 20 to 24 feet. This distance would vary depending upon large cut-and-fill activities. Cut activities would occur on higher hills, such as Tin Can Hill and the mesas on either side of Smuggler's Gulch. The materials obtained from these cut areas would be used as fill in the lower elevations, principally Smuggler's Gulch, Goat Canyon and to provide an entrance and exit ramp onto Lichty Mesa. These cut-and-fill activities are required to provide a road surface that does not exceed a 10 percent vertical grade and to avoid the need to purchase construction materials, thus minimizing construction costs. In the major cut- and-fill areas, the third fence would probably be installed at the northern edge of the cut/fill slope.

Alternatives Eliminated From Further Consideration

Several alternatives and alternate designs and alignments were evaluated but eliminated from further consideration due to operational constraints that did not satisfy the purpose and need, potentially significant environmental effects, and/or non-compliance with IIRIRA. These alternatives included fortification of a primary fence in one or all three of the remaining project areas, installation of a fence only with no patrol or maintenance road, a secondary fence only that would have consisted of the same designs and alignment as the Proposed Action (except that it would not incorporate the tertiary fence), various road and bridge designs (particularly in the Smuggler's Gulch area), alternate alignments in the Bunker Hill area, and other alignments of the tertiary fence. A brief description of these alternatives and the reasons for their elimination are briefly discussed below:

- Primary Fences. The south face of any primary fence on the border is completely unprotected and provides limitless opportunity for persons on the south side of the fence to defeat the barrier. Once the primary fence is breached, there would be no barrier to impede further northward movement and the USBP agents would be forced to follow illegal entrants in an attempt to apprehend them. Therefore, the enforcement response required for a primary fence only (in any area) would be identical to that currently employed by the USBP. This alternative would not be in compliance with IIRIRA.

- Fence Only Alternative. A fence without an all-weather patrol road cannot be maintained or defended. Any such barrier would become a *de facto* primary fence located inside U.S. territory and the operational methods would be the same as it currently exists. Therefore, construction of the fence platform without a patrol road cannot meet project objectives. IIRIRA requires a combination of fences, roads and other barriers; so this alternative, too, would not be in compliance with IIRIRA.

- Secondary Fence Only. This alternative would consist of the same designs and alignment as the Proposed Action, except that it would not incorporate the tertiary fence. The impacts associated with this alternative would be the same as that for the proposed action. This alternative was eliminated after release of the Draft EIS since it does not strictly comply with IIRIRA.

- Bridge Designs. A bridge would not provide a barrier to northward illegal traffic since undocumented aliens (UDAs) and smugglers could easily drive, walk or ride under the bridge. As such it would not provide the barrier mandated by IIRIRA. In addition, the disturbance footprint for a bridge design across Smuggler's Gulch would be about 83 acres, which is comparable to the disturbance for the proposed embankment alternative. The estimated cost of the bridge-only option for Smuggler's Gulch was estimated to be $16 to $27 million.

- Switchbacks. A multiple switchback design is extremely poor from an enforcement/functional standpoint due to the poor sight alignments associated with the switchbacks. In order to maintain a safe slope of 10 percent, the road on either side of Smuggler's Gulch would have to provide numerous switchbacks. Even at a 10 percent grade, these roads would be considered steep, and higher vehicle speeds would be prohibited for safety reasons. The curves (switchback)

would require that vehicles slow to less than 10 miles per hour and the curves would prohibit a straight line of visibility. Furthermore, construction of the multiple switchbacks would require a construction and subsequent footprint of about 83 acres, which is not much less than the preferred alternative. Therefore, due to the increased response time, additional maintenance required for roads and vehicles, risks to driver safety, and a similar disturbance footprint, this alternative was eliminated. A single switchback was also evaluated and eliminated due to similar operational constraints and ground disturbances that exceeded the proposed action.

- Third Fence Alignments. Two other alignments for the third fence were considered at various distances north of the proposed second fence, varying from 20 feet to 2,500 feet north of the secondary fence. Approximately 1,293 acres of land between the existing primary fence and the third fence would have to be purchased and/or long-term leases obtained. While these alignments would satisfy the requirements of IIRIRA and the operational needs of the USBP, they were eliminated due to the large enforcement footprint that would result in unnecessary environmental impacts as well as substantial cost increases.

- Bunker Hill Alignments. The option of placing the fence and road platform around Bunker Hill and combining it with the proposed new Border Field State Park road was considered. Because the USBP felt this area—and only this area—could be effectively controlled by traditional means such as foot and horse patrol (after proposed improvements are completed), the USBP conceded the Border Infrastructure System in this specific location would not substantially jeopardize the integrity of the overall system. These decisions were predicated upon the nearly vertical slope on the Mexican side of Bunker Hill, the lack of dense vegetation (and thus concealment opportunities) on the eastern slope of Bunker Hill, the sedimentation ponds proposed by other agencies in Goat Canyon that would serve as a physical barrier, and the proposed improvement (paving) of the access road to the top of Bunker Hill. Thus, this alignment was eliminated from further consideration.

## IMPACTS OF THE PROPOSED ACTION

Environmental

This EIS presents information on the existing conditions of the proposed project areas and analyzes potential impacts to the environment that could occur as a result of the proposed construction activities. Resources that would not be affected by the Proposed Action are not fully analyzed in this EIS. Background information on the existing environmental resources documented in this report was utilized, where appropriate, in developing this EIS and to provide the reader with an understanding of the region's environment.

Implementation of the Proposed Action Alternative and the preferred alignments would result in about 162 acres being altered, of which about 77 acres is classified as disturbed, developed or ruderal. Much of the remaining acreage is considered to be in degraded states or comprised largely of non-native species. Because of the proximity to developed areas on either side of the border, the proposed project corridor supports limited wildlife populations that would be impeded by the construction of the Border

Infrastructure System. No migratory corridors currently exist because the south side of the border is completely developed.

Indirect benefits to vegetation, wildlife, and several threatened or endangered species would result because of the proposed Border Infrastructure System. However, illegal foot and vehicle traffic, as well as the consequent USBP enforcement actions, would be significantly reduced or eliminated upon completion of the Border Infrastructure System.

No significant impacts to surface or groundwater supplies would occur. Approximately 10.2 acres of wetlands or Waters of the U.S. would be permanently impacted by the construction and operation of the Border Infrastructure System. These losses would be mitigated at a ratio of 1:1 to 3:1, as negotiated during the Section 404/401 permitting process.

Endangered Species

The Proposed Action Alternative would affect three endangered species. The least Bell's vireo and coastal California gnatcatcher would be affected by the removal of currently or historically occupied habitat in Areas V and VI. The least Bell's vireo would also be affected by construction noise, depending upon the season and distances between the birds' territories and construction site. Coastal California gnatcatchers are not as susceptible or sensitive to noise. Furthermore, designated critical habitat for the coastal California gnatcatcher and Quino checkerspot butterfly would be altered in Area I. Of the 35 acres of critical habitat affected, about 8 acres are currently disturbed (bare ground) and provide no primary constituent elements for either species. Primary constituent elements are the various resources required by a particular species and should be present within an area designated as critical habitat in order to ensure the preservation and enhancement of the species population. The remainder of the 37 acres is in a degraded state due to human influences and provides little primary constituent elements for either species. Neither the coastal California gnatcatcher nor the Quino checkerspot butterfly have been recorded within the proposed project footprint in Area I.

Mitigation

Several measures have been proposed by the INS to mitigate or compensate for the anticipated losses to jurisdictional wetlands and habitats occupied by or designated as critical habitat for Federally protected species. The INS would transfer approximately 145 acres of lands owned by the INS to a resource agency(s) or conservation organization, or place the land in perpetual conservation in partial fulfillment of mitigation/compensation for the proposed action. The parcel contains a large vernal pool complex that currently supports San Diego fairy shrimp, Riverside fairy shrimp and San Diego button celery. The INS has already committed to transfer or conserve this land upon the completion of the Border Infrastructure System. Other areas that are required to be purchased in order to construct the Border Infrastructure System, but which will ultimately be situated north of the project footprint, will also be transferred or preserved.

Other mitigation measures also proposed include revegetation of cut/fill slopes, abandonment and revegetation of over 100 miles of patrol roads, restoration of coastal sage scrub and maritime succulent scrub habitats on Spooner's Mesa, restoration and enhancement of coastal salt marshes in the Tijuana estuary, and restoration and enhancement of mulefat scrub and southern willow scrub habitats along the Tijuana

River. The latter three measures would be conducted in concert with the City and County of San Diego's restoration plan for the Tijuana Valley Regional Park.

Economic Effects
Minor direct effects to local economies would be experienced, mostly from the purchase of construction materials and supplies from local sources. No houses or commercial/industrial entities would be displaced. Visitors to the Border Field State Park would be affected by the construction activities. If the preferred alignment were implemented in Area VI, access to Friendship Circle, the first international monument, would be limited. The park would remain open during normal hours of operation. The INS/USBP are currently coordinating with the California Department of Parks and Recreation and California Resources Agency to develop designs and alignments at Border Field State Park that are more aesthetically pleasing.

Indirect benefits to socioeconomic resources would also be realized, primarily from the reduction in illegal aliens and smugglers and concomitant decreases in crime, insurance rates, health care costs, and other associated societal costs. Land values would be expected to rise, as has already been experienced in areas where the Border Infrastructure System has been completed. For example, a new shopping mall was constructed in 2002 west of the San Ysidro POE and multiple warehouse complexes have been constructed on Otay Mesa, immediately adjacent to the Border Infrastructure System. No adverse effects, relative to environmental justice or protection of children, are expected. No housing or business would be displaced and thus no disproportionate impacts to low-income or minority families would occur. Dust would be generated during construction, which could affect Hispanic families on the south side of the border. However, these effects would be temporary and dust suppression measures would be implemented to mitigate these potential effects. Furthermore, fugitive dust along the patrol road would be reduced in the long-term during the construction of all-weather surface roads.

Cultural Resources
Some cultural resources sites would need to be tested to determine their eligibility for inclusion to the National Register of Historic Places. Through testing and excavation/data recovery, as needed, no effect to these historic properties would occur. Significant sites on Lichty and Monument Mesas would be capped to avoid adverse impacts to those resources.

Other Physical Resources
Only one alternate alignment (SG-5) would produce air emissions in excess of the *de minimus* thresholds. Since this alignment is not the preferred alignment, a Federal conformity analysis is not required.

No significant impacts to land use, soils, geology or hazardous waste are expected. No prime farmlands would be impacted by the Proposed Action.

Cumulative Impacts
Completion of the Border Infrastructure System would result in the direct alteration of about 332 acres of open rangeland and park/reserve lands to a border enforcement zone. Of these 332 acres, about 65 percent (216 acres) were previously disturbed and provided little or no biological or aesthetic value. The USBP has other ongoing projects within San Diego County, including new USBP stations and support facilities, road

improvement/construction projects, and installation of remote video surveillance (RVS) facilities. These projects would increase the cumulative effects to varying degrees. USBP stations typically require alteration of 20 to 30 acres, while road improvement projects normally remain with the original road right-of-way. RVS towers can impact up to 2,500 square feet each. Currently, 25 RVS towers are proposed in San Diego County, about 19 of which would be installed within the footprint of the Border Infrastructure System.

Numerous other public and private developments have occurred or are planned in the vicinity of the Border Infrastructure System. The National Oceanic and Atmospheric Administration (NOAA) are planning to construct a sedimentation basin within Goat Canyon to trap sediments that are being transported from Mexico into the Tijuana estuary. This system will impact about 42 acres of habitat, some of which is occupied by protected species. This system would work in concert with the Border Infrastructure System. The California Department of Transportation (CalTrans) has plans to extend State Route 125 south to the border and to create a new Port of Entry (POE) on East Otay Mesa. This improvement would likely induce other commercial and private developments throughout the East Otay Mesa area, causing additional cumulative effects to natural and cultural resources, air quality and water supplies. About 25 additional road projects are currently planned in the area.

Other private residential and commercial developments that are ongoing in the project vicinity include West Otay Mesa, Telegraph Canyon Estates, Otay Ranch and East Otay Mesa. All of these developments, and more, will increase the cumulative adverse effects to the region's natural and human environments.

# TABLE OF CONTENTS


**1.0 PURPOSE AND NEED ........ 1-1**
1.1 Introduction ........ 1-1
1.2 Background and History ........ 1-1
1.3 Purpose and Need for the Project ........ 1-7
1.4 Regulatory Compliance Status ........ 1-16
1.4.1 Immigration and Nationality Act ........ 1-16
1.4.2 1996 Illegal Immigration Reform and Immigrant Responsibility Act .. 1-16
1.4.3 The National Environmental Policy Act of 1969 ........ 1-17
1.4.4 Council on Environmental Quality Regulations ........ 1-18
1.4.5 INS Procedures Relating to the Implementation of NEPA ........ 1-18
1.4.6 Endangered Species Act ........ 1-18
1.4.7 Additional Regulatory Guidance ........ 1-19
1.5 Report Organization ........ 1-19

**2.0 ALTERNATIVES INCLUDING THE PREFERRED ALTERNATIVE ........ 2-1**
2.1 Standard Design for the Border Infrastructure System ........ 2-1
2.1.1 Agent Deployment ........ 2-2
2.1.2 Fencing ........ 2-2
2.1.2.1 Primary Fence ........ 2-3
2.1.2.2 Secondary Fence ........ 2-3
2.1.2.3 Tertiary Fence ........ 2-5
2.1.3 Roads ........ 2-5
2.1.3.1 Patrol Road ........ 2-8
2.1.3.2 Maintenance Road ........ 2-8
2.1.4 Lighting ........ 2-9
2.1.5 Integrated Surveillance and Intelligence System (ISIS) ........ 2-9
2.2 Alternatives ........ 2-10
2.2.1 No Action Alternative ........ 2-11
2.2.2 Tactically Optimum Alternative ........ 2-12
2.2.3 Multi-Tiered Fence Alternative ........ 2-12
2.2.3.1 Area I – Tin Can Hill ........ 2-15
2.2.3.1.1 TCH-1 ........ 2-15
2.2.3.1.2 TCH-2 ........ 2-18
2.2.3.1.3 TCH-3 ........ 2-18
2.2.3.1.4 TCH-4 ........ 2-18
2.2.3.2 Area V – Smuggler's Gulch ........ 2-18
2.2.3.2.1 SG-1 ........ 2-20
2.2.3.2.2 SG-2 ........ 2-22
2.2.3.2.3 SG-3 ........ 2-22
2.2.3.2.4 SG-4 ........ 2-22
2.2.3.2.5 SG-5 ........ 2-22
2.2.3.3 Area VI – Bunker Hill to Pacific Ocean ........ 2-25
2.2.3.3.1 BHPO-1 ........ 2-27
2.2.3.3.2 BHPO-2 ........ 2-27
2.2.3.3.3 BHPO-3 ........ 2-29
2.2.3.3.4 BHPO-4 ........ 2-29
2.3 Alternatives Screened from Evaluation ........ 2-30
2.3.1 Primary Fence Alternatives ........ 2-30

2.3.1.1 Primary Fence Only ........ 2-30
2.3.1.2 Primary Fence in Area VI ........ 2-31
2.3.2 Fence Only ........ 2-31
2.3.3 Secondary Fence Only Alternative ........ 2-32
2.3.4 Alternative Design and Alignments ........ 2-32
2.3.4.1 Bridge Alignments ........ 2.32
2.3.4.2 Switchbacks ........ 2-35
2.3.4.3 Third Fence Alignments ........ 2-38
2.3.4.4 Bunker Hill Alignments ........ 2-38
2.4 Construction Activities ........ 2-41
2.4.1 Pre-Construction ........ 2-41
2.4.2 Personnel ........ 2-43
2.4.3 Equipment ........ 2-43
2.4.4 Materials ........ 2-47
2.4.5 Duration ........ 2-47
2.4.6 Summary ........ 2-47

**3.0 EXISTING ENVIRONMENT ........ 3-1**
3.1 Geology ........ 3-1
3.1.1 Area I ........ 3-1
3.1.2 Area V ........ 3-1
3.1.3 Area VI ........ 3-2
3.2 Soils ........ 3-2
3.2.1 Area I ........ 3-2
3.2.2 Area V ........ 3-3
3.2.3 Area VI ........ 3-3
3.2.4 Prime Farmland ........ 3-4
3.3 Land Use ........ 3-4
3.3.1 Area I (Tin Can Hill) ........ 3-5
3.3.2 Area V (Smuggler's Gulch) ........ 3-7
3.3.3 Area VI (Bunker Hill to Ocean) ........ 3-7
3.3.4 Recreation ........ 3-8
3.3.5 Multiple Species Conservation Plan (MSCP) ........ 3-9
3.3.6 Multi-Habitat Planning Area (MHPA) ........ 3-10
3.3.6.1 Area I (Tin Can Hill) ........ 3-10
3.3.6.2 Area V (Smugglers Gulch) ........ 3-10
3.3.6.3 Area VI (Bunker Hill to Ocean) ........ 3-12
3.4 Fish and Wildlife Resources ........ 3-12
3.4.1 Vegetation Communities ........ 3-12
3.4.1.1 Non-Native Grassland ........ 3-12
3.4.1.2 Native Grasslands ........ 3-12
3.4.1.3 Coastal Sage Scrub ........ 3-22
3.4.1.4 Southern Maritime Chaparral ........ 3-22
3.4.1.5 Disturbed ........ 3-22
3.4.1.6 Mulefat Scrub ........ 3-22
3.4.1.7 Coastal Salt Marsh ........ 3-23
3.4.1.8 Maritime Succulent Scrub ........ 3-23
3.4.1.9 Southern Willow Scrub ........ 3-23
3.4.1.10 Ruderal ........ 3-23
3.4.1.11 Coastal Fore Dune ........ 3-24
3.4.1.12 Non-native Woodlands ........ 3-24

3.4.2 Wildlife ........ 3-24
3.4.3 Fish ........ 3-25
3.5 Unique and Environmentally Sensitive Areas ........ 3-25
3.5.1 Tijuana River National Estuarine Research Reserve/Border Field State Park ........ 3-25
3.5.2 Vernal Pools ........ 3-26
3.6 Protected Species and Critical Habitats ........ 3-26
3.6.1 Local Populations and Critical Habitat ........ 3-30
3.6.1.1 Coastal California Gnatcatcher ........ 3-30
3.6.1.2 Least Bell's Vireo ........ 3-31
3.6.1.3 Otay Tarplant ........ 3-31
3.6.1.4 Pacific Pocket Mouse ........ 3-31
3.6.1.5 Quino Checkerspot Butterfly ........ 3-31
3.6.1.6 Salt Marsh Bird's-Beak ........ 3-31
3.6.1.7 Southwestern Willow Flycatcher ........ 3-31
3.6.1.8 San Diego Thornmint ........ 3-32
3.6.1.9 Coastal Dunes Milk-vetch ........ 3-32
3.6.1.10 Orcutt's Spineflower ........ 3-32
3.6.1.11 San Diego Button-celery ........ 3-32
3.6.1.12 Spreading Navarretia ........ 3-32
3.6.1.13 California Orcutt's Grass ........ 3-33
3.6.1.14 Otay Mesa mint ........ 3-33
3.6.1.15 Western Snowy Plover ........ 3-33
3.6.1.16 San Diego Fairy Shrimp ........ 3-33
3.6.1.17 River Fairy Shrimp ........ 3-33
3.6.1.18 Baja California Birdbush ........ 3-33
3.6.1.19 Belding's Savannah Sparrow ........ 3-33
3.6.2 Critical Habitat ........ 3-34
3.6.2.1 Western Snowy Plover ........ 3-34
3.6.2.2 Coastal California Gnatcatcher ........ 3-34
3.7 Cultural Resources ........ 3-34
3.7.1 Area I (Tin Can Hill) ........ 3-43
3.7.1.1 Site CA-SDI-12,718 ........ 3-43
3.7.1.2 Site CA-SDI-15,042 ........ 3-43
3.7.1.3 Site CA-SDI-1 2,730/CA-SDI-1 4,725 ........ 3-45
3.7.1.4 Site CA-SDI-12,713H ........ 3-45
3.7.1.5 Site CA-SDI-12,705 ........ 3-46
3.7.1.6 Site CA-SDI-12,721 ........ 3-47
3.7.1.7 Site CA-SDI-15,040 ........ 3-47
3.7.1.8 Site CA-SDI-12,703 ........ 3-48
3.7.1.9 Site CA-SDI-1 5,041 ........ 3-48
3.7.1.10 Site CA-SDI-8653 ........ 3-48
3.7.1.11 Site CA-SDI-1 4,726 ........ 3-49
3.7.1.12 Site CA-SDI-1 4,727 ........ 3-49
3.7.1.13 Site CA-SDI-8652 ........ 3-49
3.7.2 Area V (Smugglers Gulch) ........ 3-49
3.7.2.1 Site W-1376 ........ 3-51
3.7.2.2 Site CA-SDI-11,947H ........ 3-51
3.7.2.3 Site CA-SDI-8605A ........ 3-52
3.7.2.4 Site CA-SDI-8595 ........ 3-53
3.7.2.5 Site CA-SDI-8773 ........ 3-54

3.7.2.6 Site CA-SDI-8596 ........ 3-54
3.7.2.7 Site CA-SDI-8604 ........ 3-54
3.7.3 Area VI (Bunker Hill to Ocean) ........ 3-55
3.7.3.1 Site CA-SDI-15,039 ........ 3-55
3.7.3.2 Site CA-SDI-15,038 ........ 3-56
3.7.3.3 Site CA-SDI-3627 ........ 3-56
3.7.3.4 Site CA-SDI-4281 ........ 3-60
3.7.3.5 Site CA-SDI-222 ........ 3-61
3.8 Air Quality ........ 3-62
3.8.1 Regional Air Pollution and Climatology ........ 3-62
3.8.2 Federal and State Ambient Air Quality Standards ........ 3-63
3.8.3 Attainment Status ........ 3-67
3.8.4 Local Ambient Air Quality Monitoring ........ 3-67
3.9 Water Resources ........ 3-69
3.9.1 Surface Water Resources ........ 3-69
3.9.2 Flood Peaks ........ 3-70
3.9.3 Groundwater Resources ........ 3-70
3.9.4 Waters of the U.S./Wetlands ........ 3-72
3.9.4.1 Potential Non-Wetland Waters of the U.S. ........ 3-73
3.9.4.2 Potential Waters of the U.S. including Wetlands ........ 3-73
3.9.5 Water Quality ........ 3-86
3.9.5.1 Surface Water Quality ........ 3-86
3.9.5.2 Groundwater Quality ........ 3-86
3.10 Socioeconomics ........ 3-87
3.10.1 Population ........ 3-87
3.10.2 Employment, Poverty Levels, and Income ........ 3-87
3.10.3 Housing ........ 3-89
3.10.4 Environmental Justice ........ 3-90
3.10.5 Executive Order 13045, Protection of Children ........ 3-90
3.11 Hazardous Substances ........ 3-90
3.11.1 Area I (Tin Can Hill) ........ 3-91
3.11.2 Area V (Smuggler's Gulch) ........ 3-91
3.11.3 Area VI (Bunker Hill to Ocean) ........ 3-91
3.12 Noise ........ 3-91
3.13 Aesthetic Resources ........ 3-93

**4.0 ENVIRONMENTAL CONSEQUENCES ........ 4-1**
4.1 No Action Alternative ........ 4-1
4.1.1 Geology ........ 4-2
4.1.2 Soils ........ 4-2
4.1.3 Land Use ........ 4-2
4.1.4 Fish and Wildlife Resources ........ 4-3
4.1.4.1 Vegetation Communities ........ 4-3
4.1.4.2 Wildlife ........ 4-4
4.1.5 Unique and Environmentally Sensitive Areas ........ 4-4
4.1.5.1 MSCP ........ 4-4
4.1.6 Protected Species and Critical Habitats ........ 4-5
4.1.7 Cultural Resources ........ 4-6
4.1.7.1Area I (Tin Can Hill) ........ 4-6
4.1.7.2 Area V (Smuggler's Gulch) ........ 4-6
4.1.7.3 Area VI (Bunker Hill to Ocean) ........ 4-6

4.1.8 Air Quality ........ 4-7
4.1.9 Water Resources ........ 4-7
4.1.9.1 Surface Water ........ 4-7
4.1.9.2 Flood Peaks ........ 4-7
4.1.9.3 Groundwater Resources ........ 4-7
4.1.9.4 Waters of U.S./Wetlands ........ 4-7
4.1.10 Socioeconomics ........ 4-8
4.1.10.1Executive Order 12898, Environmental Justice ........ 4-9
4.1.10.2Executive Order 13045, Protection of Children ........ 4-9
4.1.11 Hazardous Substances ........ 4-9
4.1.12 Noise ........ 4-9
4.1.13 Aesthetic Resources ........ 4-10
4.2 Tactically Optimum Alternative ........ 4-10
4.2.1 Geology ........ 4-10
4.2.2 Soils ........ 4-10
4.2.2.1Area I ........ 4-11
4.2.2.2Area V ........ 4-11
4.2.2.3Area VI ........ 4-11
4.2.3 Land Use ........ 4-13
4.2.3.1Area I (Tin Can Hill) ........ 4-13
4.2.3.2 Area V (Smugglers Gulch) ........ 4-13
4.2.3.3 Area VI (Bunker Hill) ........ 4-13
4.2.4 Fish and Wildlife Resources ........ 4-14
4.2.4.1 Vegetation Communities ........ 4-14
4.2.4.2 Wildlife ........ 4-15
4.2.5 Unique or Sensitive Areas ........ 4-16
4.2.5.1Area I – Tin Can Hill ........ 4-16
4.2.5.2Area V – IBWC to Goat Canyon ........ 4-17
4.2.5.3Area VI – Bunker Hill ........ 4-17
4.2.6 Protected Species and Critical Habitats ........ 4-17
4.2.7 Cultural Resources ........ 4-18
4.2.7.1 Area I –Tin Can Hill ........ 4-18
4.2.7.2 Area V (Smuggler's Gulch) ........ 4-18
4.2.7.3 Area VI (Bunker Hill to Ocean) ........ 4-18
4.2.8 Air Quality ........ 4-19
4.2.8.1 Construction Emissions ........ 4-19
4.2.8.1.1 Area I –Tin Can Hill ........ 4-19
4.2.8.1.2 Area V (Smuggler's Gulch) ........ 4-19
4.2.8.1.3 Area VI (Bunker Hill to Ocean) ........ 4-20
4.2.8.2 Operation ........ 4-20
4.2.9 Water Resources ........ 4-20
4.2.9.1 Surface Water ........ 4-20
4.2.9.2 Flood Peaks ........ 4-21
4.2.9.3 Groundwater Resources ........ 4-21
4.2.9.4 Waters of U.S./Wetlands ........ 4-21
4.2.10 Socioeconomics ........ 4-22
4.2.10.1Area I ........ 4-22
4.2.10.2 Area V ........ 4-23
4.2.10.3 Area VI ........ 4-23
4.2.10.4 Executive order 12898, Environmental Justice ........ 4-23
4.2.10.5 Executive Order 13045, Protection of Children ........ 4-23

4.2.11 Hazardous Substances ........ 4-23
4.2.12 Noise ........ 4-24
4.2.13 Aesthetic Resources ........ 4-25
4.3 Proposed Action ........ 4-25
4.3.1 Geology ........ 4-25
4.3.2 Soils ........ 4-26
4.3.2.1 Area I Soils ........ 4-26
4.3.2.2 Area V Soils ........ 4-27
4.3.2.3 Area IV Soils ........ 4-27
4.3.3 Land Use ........ 4-29
4.3.3.1 Area I – Tin Can Hill ........ 4-29
4.3.3.2 Area V – Smuggler's Gulch ........ 4-30
4.3.3.3 Area VI – Bunker Hill ........ 4-30
4.3.3.3.1 BHPO-1 ........ 4-31
4.3.3.3.2 BHPO-2 ........ 4-31
4.3.3.3.3 BHPO-3 ........ 4-31
4.3.3.3.4 BHPO-4 ........ 4-31
4.3.4 Fish and Wildlife Resources ........ 4-32
4.3.4.1 Vegetation ........ 4-32
4.3.4.2 Wildlife ........ 4-37
4.3.5 Unique and Environmentally Sensitive Areas ........ 4-37
4.3.5.1 MSCP ........ 4-37
4.3.5.1.1Area I – Tin Can Hill ........ 4-37
4.3.5.1.2 Area V – Smuggler's Gulch ........ 4-38
4.3.5.1.3 Area VI –Bunker Hill ........ 4-38
4.3.6 Protected Species and Critical Habitats ........ 4-38
4.3.6.1Area I – Tin Can Hill ........ 4-39
4.3.6.2 Area V –Smuggler's Gulch ........ 4-40
4.3.6.3 Area VI – Bunker Hill ........ 4-40
4.3.7 Cultural Resources ........ 4-41
4.3.7.1 Area I -Tin Can Hill ........ 4-41
4.3.7.2 Area V –Smuggler's Gulch ........ 4-42
4.3.7.3Area VI – Bunker Hill to Pacific Ocean ........ 4-42
4.3.7.3.1 BHPO-1 ........ 4-42
4.3.7.3.2 BHPO-2 ........ 4-42
4.3.7.3.3 BHPO-3 ........ 4-43
4.3.7.3.4 BHPO-4 ........ 4-43
4.3.8 Air Quality ........ 4-43
4.3.8.1 Construction ........ 4-43
4.3.8.1.1 Area I – Tin Can Hill ........ 4-43
4.3.8.1.2 Area V – Smuggler's Gulch ........ 4-44
4.3.8.1.3 Area VI – Bunker Hill to Pacific Ocean ........ 4-44
4.3.8.2 Operation ........ 4-45
4.3.9 Water Resources ........ 4-45
4.3.9.1 Surface Water ........ 4-45
4.3.9.2 Flood Peaks ........ 4-46
4.3.9.3 Groundwater Resources ........ 4-46
4.3.9.4 Waters and Wetlands of the U.S. ........ 4-47
4.3.9.4.1 Area I – Tin Can Hill ........ 4-48
4.3.9.4.2 Area V – Smuggler's Gulch ........ 4-48
4.3.9.4.3 Area VI – Bunker Hill ........ 4-49

4.3.10 Socioeconomics .......... 4-49
4.3.10.1 Area I .......... 4-49
4.3.10.2 Area V .......... 4-50
4.3.10.3 Area VI .......... 4-51
4.3.10.4 Executive Order 12898, Environmental Justice .......... 4-52
4.3.10.5 Executive Order 13045, Protection of Children .......... 4-52
4.3.11 Hazardous Substances .......... 4-52
4.3.12 Noise .......... 4-53
4.3.13 Aesthetic Resources .......... 4-53
4.4 Cumulative Effects .......... 4-53
4.4.1 Federal Projects .......... 4-54
4.4.2 State and Local Government Projects .......... 4-56
4.4.3 Private/Commercial Development .......... 4-56
4.4.4 Cumulative Impacts of Alternatives .......... 4-56
4.4.4.1 No Action .......... 4-56
4.4.4.1.1 Direct Effects .......... 4-56
4.4.4.1.2 Indirect Effects .......... 4-58
4.4.4.2 Tactically Optimum Alternative .......... 4-58
4.4.4.2.1 Direct Effects .......... 4-58
4.4.4.2.2 Indirect Effects .......... 4-58
4.4.4.3 Proposed Action Alternative .......... 4-58
4.4.4.3.1 Direct Effects .......... 4-58
4.4.4.3.2 Indirect Effects .......... 4-59
4.5 Relationship Between Local and Short-term use of Society's Environment and the Maintenance and Enhancement of Long-term Environmental Productivity .......... 4-61
4.6 Irreversible and Irretrievable Commitments of Resources Involved in Implementation of the Proposed Action .......... 4-61

**5.0 MITIGATION .......... 5-1**
5.1 Soils .......... 5-1
5.2 Air Quality .......... 5-3
5.3 Water Resources .......... 5-3
5.4 Biological Resources .......... 5-4
5.4.1 Land Transfer/Preservation .......... 5-5
5.4.2 Revegetation/Restoration .......... 5-8
5.4.3 Scheduling and Avoidance .......... 5-8
5.4.4 Lighting Design .......... 5-14
5.4.5 Noise Abatement .......... 5-14
5.5 Socioeconomics .......... 5-14
5.6 Cultural Resources .......... 5-15
5.7 Aesthetic Resources .......... 5-15

**6.0 PUBLIC INVOLVEMENT .......... 6-1**
6.1 General .......... 6-1
6.2 Public Scoping Meetings .......... 6-1
6.3 Summary of Scoping Meetings .......... 6-1
6.3.1 Imperial Beach, California. December 1999 Meeting .......... 6-3
6.3.2 Imperial Beach, California. April 2000 Meeting .......... 6-4
6.3.3 Imperial Beach, California. January 2001 Meeting .......... 6-4
6.3.4 Summary of Comments .......... 6-6

6.4 Other Coordination Meetings ..... 6-6
6.5 Public Information Meeting ..... 6-7
6.6 Draft EIS Comments ..... 6-7

**7.0 LIST OF PREPARERS ..... 7-1**

**8.0 LIST OF ACRONYMS ..... 8-1**

**9.0 REFERENCES ..... 9-1**

**10.0 INDEX ..... 10-1**

## LIST OF TABLES

Table 1-1 Boundary Coordinates for each Sub-Area ..... 1-7
Table 1-2 Summary of Additional Guidance, Statutes, and Relevant Regulations Including Potential Permits or Licensing Requirements ..... 1-20
Table 2-1 Alternate Design Measures for the Proposed Action, by Area ..... 2-15
Table 2-2 List of Typical Heavy Equipment ..... 2-46
Table 2-3 Alternative Matrix ..... 2-50

Table 3-1 Border Field State Park Annual Visitation Rates 1994 through 2000 .. 3-8
Table 3-2 Federally Protected Species Known or Presumed to Occur Within or Near Project Corridor ..... 3-29
Table 3-3 Species and Number of Individuals Observed in 500 Foot Survey Corridor, By Area ..... 3-30
Table 3-4 Archaeological Sites Within Tin Can Hill, Area I ..... 3-44
Table 3-5 Archaeological Sites Within Area V ..... 3-50
Table 3-6 Archaeological Sites Within Area VI ..... 3-57
Table 3-7 National and State Ambient Air Quality Standards ..... 3-64
Table 3-8 *De Minimum* Emission Thresholds for Nonattainment Areas (NAA) . 3-65
Table 3-9 *De Minimum* Emission Thresholds for Maintenance Areas ..... 3-65
Table 3-10 San Diego County 2000 Estimated Emissions ..... 3-66
Table 3-11 Air Quality Designations (San Diego Air Basin) ..... 3-67
Table 3-12 Recent Monitoring Data for Otay Mesa ..... 3-68
Table 3-13 Summary of San Diego Ozone Monitoring Exceedances ..... 3-68
Table 3-14 Potential Jurisdictional Waters of the U.S. ..... 3-75
Table 3-15 Potential Jurisdictional Wetland/Waters of the U.S. within Areas I, V, and VI ..... 3-85
Table 3-16 Federal and State Database and Minimum Search Distances ..... 3-91
Table 3-17 A-Weighted (dBA) sound Levels of Typical Noise Environments ..... 3-94

Table 4-1 Land Use Acres Impacted in Areas II, III, and IV under the No Action Alternative ..... 4-3
Table 4-2 Soil Types Impacted by Tactically Optimum Alternative for Area I (Acres) ..... 4-12
Table 4-3 Soil Types Impacted by Tactically Optimum Alternative for Area V (Acres) ..... 4-12
Table 4-4 Soil Types Impacted by Tactically Optimum Alternative for Area VI (Acres) ..... 4-12

Table 4-5 Number of Individuals Federal and State-listed Species Affected in Each Area for the Tactically optimum Alternative ............................ 4-17
Table 4-6 Estimated Emissions for Tactically Optimum Alternative (tons) ........ 4-19
Table 4-7 Permanent Impact (Acres) Expected under the Tactically Optimum Alternative .......................................................................................... 4-22
Table 4-8 Acres Impacted in Area I under the Proposed Action....................... 4-30
Table 4-9 Acres Impacted in Area VI under the Proposed Action .................... 4-31
Table 4-10 Summary of Permanent Impacts (Acres) to Vegetation From Alignments of Proposed Action Alternative ........................................................ 4-36
Table 4-11 MSCP Lands (Acres) Impacted in Area VI Under the Proposed Action.............................................................................................. 4-38
Table 4-12 Protected Species and Number of Individuals Affected in Each Alignment in Area I for the Proposed Action Alternative.................... 4-39
Table 4-13 Protected Species and Number of Individuals Affected in Area V for the Proposed Action Alternative ............................................................ 4-40
Table 4-14 Protected Species and Number of Individuals Affected in each Alignment in Area VI for the Proposed Action Alternative ................ 4-41
Table 4-15 Area I – Tin Can Hill Estimated Emissions for Proposed Action Alternative (tons) ............................................................................ 4-44
Table 4-16 Area V – Smuggler's Gulch Estimated Emissions for Proposed Action Alternative (tons) ............................................................................ 4-44
Table 4-17 Area VI – Bunker Hill to Pacific Ocean Estimated Emissions for Proposed Action Alternative (tons) ................................................... 4-45
Table 4-18 Permanent Impacts to Waters of the U.S. including Wetlands in Area I under the Proposed Action .............................................................. 4-48
Table 4-19 Permanent Impacts to Waters of the U.S. including Wetlands in Area V under the Proposed Action .............................................................. 4-48
Table 4-20 Permanent Impacts to Waters of the U.S. including Wetlands in Area VI under the Proposed Action .............................................................. 4-50
Table 4-21 Temporary Construction Impacts to Waters of the U.S. including Wetlands in Area VI under the Preferred Alignment......................... 4-50
Table 4-22 Direct Potential Impacts of 14-mile San Diego Border Infrastructure System............................................................................................. 4-57
Table 4-23 Direct

Table 5-1 Wetland Impacts of the Proposed Action Alternative and Recommended Mitigation Ratios...................................................... 5-4
Table 5-2 Mitigation Ratios and Replacement Amounts for Habitat Impacts by Overall 14-mile Project ........................................................................ 5-6

## LIST OF FIGURES

Figure 1-1 Project Vicinity .............................................................................. 1-2
Figure 1-2 Major Access Routes Used by Illegal Immigrants and Smugglers ... 1-3
Figure 1-3 Six Sub-Areas of Project ................................................................ 1-6
Figure 1-4 Tijuana River Valley Crime Offenses Before and After Construction Of the Secondary Fence.......................................................... 1-8
Figure 1-5 San Diego Sector Assaults on Border Patrol Agents FY-96–FY-03. 1-9
Figure 1-6 Primary Routes of Entry into U.S. and Current Enforcement Footprint ........................................................................................... 1-12

Figure 1-7. Fires within the Tijuana Estuary (1989-1999) ............ 1-12

Figure 2-1 Photograph of Standard Design for Secondary Fence ............ 2-4
Figure 2-2 Typical Cross-sections of Enforcement Platform ............ 2-7
Figure 2-3 Areas Affected by No Action Alternative ............ 2-13
Figure 2-4 Tactically Optimum Alternatives Footprint ............ 2-14
Figure 2-5 Topographic Map of Area I – Tin Can Hill ............ 2-16
Figure 2-6 Area I Alternate Alignment Footprint ............ 2-17
Figure 2-7 Topographic Map of Area V – Smuggler's Gulch ............ 2-19
Figure 2-8 Preferred Alignment Footprint – Area V Smuggler's Gulch ............ 2-21
Figure 2-9 3-Dimensional Topographic Depiction of Proposed Action at Smuggler's Gulch ............ 2-23
Figure 2-10 Photos Providing a Conceptual Depiction of the Proposed Embankment ............ 2-24
Figure 2-11 Topographic Map of Area VI – Bunker Hill to Pacific Ocean ............ 2-26
Figure 2-12 Area VI Alternate Alignment Footprints ............ 2-28
Figure 2-13 Smuggler's Gulch Bridge Alternative Design (adapted from M. Baker Jr. Engineers, 2001) ............ 2-33
Figure 2-14 Area V - Smuggler's Gulch – Bridge Alternative ............ 2-34
Figure 2-15 Area V – Smuggler's Gulch – Multi-Switchback Alternative ............ 2-36
Figure 2-16 Area V – Smuggler's gulch – Single Switchback Alternative ............ 2-37
Figure 2-17 Multi-tiered Fence and Construction Footprint ............ 2-39
Figure 2-18 3-D Topographic Map of Goat Canyon and Smuggler's Gulch ............ 2-42
Figure 2-19 Bivouac Sites at Donovan Correctional Facility & Otay Mesa ............ 2-44
Figure 2-20 Potential Staging Areas and Access Roads ............ 2-45
Figure 2-21 San Diego Border Infrastructure System Project (adapted from M. Baker Jr. Engineers, 2001) ............ 2-48

Figure 3-1 Land Ownership in Areas I, V and VI ............ 3-6
Figure 3-2 MSCP Lands within the Project Footprint ............ 3-11
Figure 3-3 Vegetation Communities in Area VI near Border Field State Park . 3-13
Figure 3-4 Vegetation Communities in Area VI between Bunker Hill and Lichty Mesa ............ 3-14
Figure 3-5 Vegetation Communities in Area V at Bunker Hill and Goat Canyon ............ 3-15
Figure 3-6 Vegetation Communities in Area V on Spooner's Mesa ............ 3-16
Figure 3-7 Vegetation Communities in Area V at Smuggler's Gulch ............ 3-17
Figure 3-8 Vegetation Communities near the Eastern End of Area V ............ 3-18
Figure 3-9 Vegetation Communities in Area I East of Johnny Wolf Creek ............ 3-19
Figure 3-10 Vegetation Communities in Area I at Tin Can Hill ............ 3-20
Figure 3-11 Vegetation Communities at the end of Area I ............ 3-21
Figure 3-12 Approximate Location of Vernal Pools at Arnie's Point (Area III) ... 3-27
Figure 3-13 Critical Habitat for the Western Snowy Plover near Proposed San Diego Border Infrastructure System in Area VI ............ 3-35
Figure 3-14 Critical Habitat for the Coastal California Gnatcatcher near Proposed San Diego Border Infrastructure System in Area I ............ 3-36
Figure 3-15 Critical Habitat for the Quino Checkerspot Butterfly near Proposed San Diego Border Infrastructure System in Area I ............ 3-37
Figure 3-16 Floodplains within Area VI ............ 3-71
Figure 3-17 Potential Non-Wetland Waters of the U.S. ............ 3-74
Figure 3-18 Waters of the U.S./Wetlands in/near Border Field State Park ............ 3-75



33978

Figure 3-19 Waters of the U.S./ Wetlands near Bunker Hill (Area V) ................ 3-76
Figure 3-20 Waters of the U.S./ Wetlands at Bunker Hill and Goat Canyon (Area V) ................ 3-77
Figure 3-21 Waters of the U.S. / Wetlands between Goat Canyon and Spooner's Mesa (Area VI) ................ 3-78
Figure 3-22 Waters of the U.S. /Wetlands at Smuggler's Gulch ................ 3-79
Figure 3-23 Waters of the U.S. /Wetlands East of Smuggler's Gulch ................ 3-80
Figure 3-24 Waters of the U.S./Wetlands on Mesa East of Smuggler's Gulch (Area V) ................ 3-81
Figure 3-25 Waters of the U.S. /Wetlands East of Tin Can Hill (Area I) ................ 3-82
Figure 3-26 Waters of the U.S./ Wetlands at Eastern End of Project Corridor (Area I) ................ 3-83
Figure 3-27 Location of Project Area within South Bay Region ................ 3-88

Figure 5-1 INS Spring Canyon Mitigation Site ................ 5-7
Figure 5-2 USBP Roads to be Abandoned in Spring Canyon Area ................ 5-9
Figure 5-3 USBP Roads to be Abandoned in Areas I and II ................ 5-10
Figure 5-4 USBP Roads to be Abandoned in Areas V and VI ................ 5-11
Figure 5-5 Areas Available for Mitigation at Spooner's Mesa ................ 5-12
Figure 5-6 Potential Tijuana Valley Mitigation Area ................ 5-13

## LIST OF APPENDICIES


| | |
|---|---|
| Appendix A | Title I IIRIRA |
| Appendix B | Correspondence |
| Appendix C | List of Wildlife Species |
| Appendix D | Air Quality Analyses |
| Appendix E | Wetland Delineation Data Forms |
| Appendix F | Public Involvement |
| Appendix G | Other Technical Supporting Documents |
| Appendix H | Biological Opinion |
| Appendix I | Coastal Consistency |
| Appendix J | Conceptual Designs |

## *SECTION 1.0*
## *PURPOSE AND NEED*

# 1.0 PURPOSE AND NEED

## 1.1 INTRODUCTION

This Environmental Impact Statement (EIS) addresses the potential beneficial and adverse effects of the proposed completion of a 14-mile Border Infrastructure System in San Diego County, California (Figure 1-1). The U.S. Immigration and Naturalization Service (INS) and its enforcement branch, the U.S. Border Patrol (USBP), are planning the Border Infrastructure System for construction. This EIS has been prepared in accordance with the National Environmental Policy Act (NEPA) of 1969, the President's Council on Environmental Quality's (CEQ) Regulations for the Implementation of NEPA, INS Regulations for the Implementation of NEPA (28 Code of Federal Regulation [CFR], Part 61), and numerous other Federal and state environmental regulations and Executive Orders (EO). This EIS is tiered from the *Supplemental Programmatic EIS for INS and Joint Task Force Six (JTF-6) Activities along the U.S./Mexico Border* (INS 2001).

## 1.2 BACKGROUND AND HISTORY

The INS and the USBP are charged with the responsibility of protecting the sovereign borders of the United States. The INS has reported that the U.S./Mexico border is breached more than any other international border in the world. It is a large, diverse and difficult boundary to effectively enforce without the use of a complex infrastructure (i.e., fences, lights, roads, and cameras). In spite of stepped-up enforcement efforts, national statistics show a dramatic rise in the number of apprehensions made throughout the southwest border: from 979,101 in 1992 to nearly 1.6 million in 1999 (USBP 2000). The INS estimates that there are currently seven to nine million illegal aliens in the United States, although some studies have indicated that this figure is probably closer to 10 million. Since the terrorist attacks of September 11, 2001, even greater importance has been placed on securing the Nation's borders.

Until the early 1990s, there was limited awareness of the southwest border issues and little national attention was given to illegal trans-boundary activity. As a result, the USBP's growth was nominal, funding for enforcement efforts fell short, and the USBP was forced to function under severe constraints. Recent events related to illegal immigration and narcotics smuggling have increased the Nation's awareness and generated substantial interest in controlling the southwest border. National concern has led to increased funding and staffing and has created new opportunities in the development of proactive border control strategies, as demonstrated in patrol and enforcement operations throughout the southwest border area (e.g., Operations Gatekeeper, Hold-the-Line, Safeguard, and Rio Grande).

Enforcement strategy predating such operations was more reactive in nature and diminished the importance of a formidable infrastructure along the U.S./Mexico border because little emphasis was placed on deterring illegal crossings. Rather, the USBP's efforts focused singularly upon apprehensions once the international boundary was breached. This strategy utilized the "element of surprise" by deploying limited resources away from the international boundary in concealed positions. However, as illicit trafficking increased, so did the area required to be patrolled by USBP, thus spreading the USBP's enforcement resources thinner yet. Furthermore, this increased the geographic footprint and subsequent environmental impacts of both smuggler and USBP activities.




Figure 1-1. Project Vicinity

Date: May 2003

As national attention increased, funding, political support, and resources also increased, enabling the USBP to begin to develop a proactive deterrent strategy designed foremost to prevent illegal entry. This strategy combines the use of a more complex border infrastructure (e.g., roads, lights, fencing) and manpower. Initial efforts to augment operations with such infrastructure yielded promising results, effectively hindering illegal border traffic. In 1993, the installation of the primary border fence along a 14-mile stretch of border separating Tijuana, Baja California, Mexico from San Diego, California, significantly assisted the USBP's efforts in deterring smuggling attempts via drive-throughs using automobiles and motorcycles. This project was addressed in the February 1993 *Final Environmental Assessment (EA) for the JTF-6 Border Fence Construction Project, San Diego, California* (USACE 1993).

Although no statistics were collected at the time, USBP sources indicate that, on the average, more than 200 drive-through attempts occurred daily throughout the 1980s and early 1990s. The prevalence of such activity was a testimony to several factors: a border easily crossed; ready access to highway systems leading north; too few agents; and the belief among aliens and smugglers that such an effort would prove fruitful. Prior to construction of the fence, high-speed pursuits often occurred because many drive-throughs made it to the adjacent freeways that were readily accessible, as illustrated in Figure 1-2.




**Figure 1-2. Major Access Routes Used by Illegal Immigrants and Smugglers**

After construction of the primary fence was completed, the frequency per month of drive-through attempts dropped into the single digit range and for extended time periods, the USBP experienced no drive-through attempts. The reduction in drive-through attempts was the direct result of combining the deterrence factor of the primary fence and Operation Gatekeeper: a manpower intensive initiative meant to restore the sovereignty of the San Diego Sector's border region. It is important to note that using the fence in this manner not only substantially reduced the drive-through problem; it also reduced the enforcement footprint previously necessary to arrest violators.

At Operation Gatekeeper's inception in October 1994, national USBP staffing levels were approximately 4,140 agents—30 percent of which (1,272) were permanently stationed in the San Diego Sector. The San Diego Sector is responsible for patrolling only 66 miles of the approximately 2,000 miles of the U.S./Mexico boundary, but historically has intercepted over 40 percent of the illegal migrants crossing the border. The Imperial Beach and Chula Vista stations of the San Diego Sector, covering the first seven miles of border east of the Pacific Ocean, have been responsible for over 60 percent of the apprehensions made by the Sector. When combined with the Brown Field Station (which patrols the next seven miles of border), the three stations accounted for over 81 percent of the sector apprehensions with only 68 percent of the sector's agents.

At the height of Operation Gatekeeper, management at the Imperial Beach Station routinely deployed upward of 100 agents per 8-hour shift (a level 100 percent above the current deployment level), including assigned station personnel as well as agents that were temporarily detailed to the San Diego Sector from other USBP sectors nationwide. The agents were stationed within an area of border approximately five miles wide in a three-tier configuration, each tier paralleling the border at a specified distance north of the previous tier. After nearly a year and a half of Operation Gatekeeper's intensified effort, apprehensions on average began to drop dramatically.

While the success of Operation Gatekeeper is indisputable, its geographic footprint within the 14-mile border segment was quite large. Building the primary fence as a response to a crisis, with limited resources, resulted in the smugglers exerting undue influence over the geographic footprint and size of the operation. As undocumented aliens (UDAs) and smugglers breached the primary fence and attempted to allude detection and apprehension, USBP agents were forced to chase the illegal entrants into environmentally sensitive areas such as the Tijuana estuary, East Otay Mesa, Spring Canyon, and into residential areas of Imperial Beach, Brown Field and Chula Vista. This was primarily due to the lack of infrastructure that would have allowed the USBP to control the problem at the immediate border and within a substantially smaller footprint. This large enforcement footprint not only created greater impacts on the environment, but it also continues to negatively affect the efficiency of operations by requiring an inordinate number of agents to secure the border. According to the Imperial Beach Station's Intelligence Unit, the following operational impacts resulted from the increased manpower requirements:

- Closure of the San Clemente checkpoint for an extended period of time;
- The reassignment of the Anti-Smuggling Unit (ASU) in its entirety for the first few weeks of Operation Gatekeeper;
- The assignment of the entire San Diego Sector Horse Patrol to a 5-mile section of border;
- The assignment of all all-terrain vehicle (ATV) units from within the Sector to a 5-mile segment of border; and
- Agents from other USBP sectors throughout the United States were temporarily assigned to the San Diego Sector.

Although Operation Gatekeeper was very successful, it was extremely labor intensive and costly. It highlighted the deterrence capability of combining infrastructure and operation strategies. Congress recognized this proactive enforcement strategy when it enacted the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Title 1, Subtitle A, Section 102 of the Act states that the Attorney General, in consultation with the Commissioner of INS, "...shall take such actions as may be necessary to install additional physical barriers and roads in the vicinity of the U.S. border to deter illegal crossings in areas of high illegal entry into the U.S." (Section 102(b)). More specifically, Subsection B states the Attorney General "...shall provide for the construction along the 14

miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences." A copy of Title I of IIRIRA is presented in Appendix A.

In response to this Congressional mandate and to the need to further control the border region, the San Diego Sector began plans to implement an enforcement zone that included a multi-tiered fence, patrol road, maintenance road, and various technologies such as lighting, sensors, and remote video surveillance (RVS) systems. Because of a lack of funding and the fact that the enforcement zone was the first of its kind, the initial segments of the 14-mile system were implemented as pilot projects. These projects were addressed in site-specific NEPA documents as prototypical portions of the overall 14-mile Border Infrastructure System. The potential construction of various fences, roads, lights, and other infrastructures were addressed in the 1994 Programmatic EIS for INS and JTF-6 activities along the U.S./Mexico border (USACE 1994). The previous site-specific EA's prepared include:

- *Record of Environmental Consideration (REC), Multi-tiered Pilot Fence Project (Phase I)*, October 1996. This REC provided the first assessment of a small portion of the Border Infrastructure System as a pilot project near the International Boundary and Water Commission's wastewater treatment plant.

- *Final EA for the INS Multi-Tiered Pilot Fencing Project (Phases IA and II)*, April 1997. This EA addressed the installation of fencing within small portions of the Imperial Beach and Chula Vista USBP stations.

- *Final EA for Area Lighting, Fencing, and Roadways at International Border, San Diego, California*, August 1997. This EA summarized the environmental impacts associated with implementing a combined lighting, fencing, and roadway system along the U.S./Mexico border from Arnie's Point (approximately seven miles east of the Pacific Ocean) to the San Ysidro Mountains.

- *Revised Final EA for Construction of Barrier Systems along a 1.6-Mile Corridor of the U.S. Mexico International Boundary (Spring Canyon)*, July 1998. This EA assessed the environmental impacts associated with proposed infrastructure improvements from Arnie's Point east to San Ysidro Port-of-Entry (POE).

> Although many names have been used for this project from its inception as a pilot project to present, the official name is *San Diego 14-Mile Border Infrastructure System.*

The overall project area (14-mile corridor from the Pacific Ocean inland to the eastern slope of Tin Can Hill) is divided into six sub-areas for purposes of management and evaluation, as depicted in Figure 1-3. The complex infrastructure construction that was addressed in the NEPA documents presented above has either been completed or is currently in progress for approximately nine miles of the 14-mile system (Areas II, III, and IV). The coordinates for the boundaries of each of the sub-areas are shown in Table 1-1.




Figure 1-3. Six Sub-Areas of Project

gsrc

Date: July 2003

**Table 1-1. Boundary Coordinates for each Sub-Area**

| Area | East | | West | |
|---|---|---|---|---|
| | Latitude | Longitude | Latitude | Longitude |
| Area I | 32:33:19 | 116:52:37 | 32:33:14 | 116:53:47 |
| Area II | 32:33:14 | 116:53:47 | 32:33:01 | 116:56:14 |
| Area III | 32:33:00 | 116:56:27 | 32:32:34 | 117:01:36 |
| Area IV | 32:32:32 | 117:01:50 | 32:32:21 | 117:04:09 |
| Area V | 32:32:21 | 117:04:09 | 32:32:11 | 117:06:08 |
| Area VI | 32:32:09 | 117:06:28 | 32:32:04 | 117:07:25 |

Initial success has already been realized in these general areas. A 1-mile segment of the proposed infrastructure system was completed in early 1999 from the Otay Mesa POE to La Media Road (Area III). Prior to its construction, the USBP was charged with a virtually impossible control mandate in an area that proved tremendously advantageous to smugglers.

Industrial development had encroached on the immediate border and smugglers were able to easily use this area for concealment and escape. The resulting enforcement effort was intense, ineffective, and intrusive upon the industrial complex. This area was known as one of the most problematic areas in the 14-mile stretch of border, and the USBP saw no significant decrease in activity until the 1-mile segment was completed. Just as with the primary fence discussed earlier, this infrastructure system was successful because it properly augmented personnel resources with infrastructure. This negated the elements that made the area desirable to traffickers, and simultaneously communicated to the smugglers a certainty of detection and apprehension.

Today the USBP reports that staffing is now more balanced with the requirements of current levels of border activity. This has resulted in a reduced enforcement footprint, increased security for the industrial park, and other developed areas in Areas II, III, and IV, and a safe working environment for its employees. Figure 1-4 demonstrates the reduction in crimes within Area IV after the completion of the secondary fence. As can be seen from this figure, total crime dropped by about 45 percent. Violent crimes, in particular murder, rape, and robbery, have been eliminated. However, if illegal border activity rates rise in the future, staffing will again be inadequate. Figure 1-5 illustrates not only the reduction in assaults on USBP agents within the San Diego Sector since the implementation of the Border Infrastructure System project, but also that assaults are still a problem. In fact, since 2001 USBP agents from Imperial Beach Station, where the Border Infrastructure System has not been completed, have experienced a 17 percent increase in assaults. Without completion of the Border Infrastructure System, these assaults will continue and perhaps increase.

## 1.3 PURPOSE AND NEED FOR THE PROJECT

As indicated in the previous section, the USBP has significantly increased its emphasis on deterrence during recent years. However, developing trends such as the continued urbanization and industrialization of the immediate border, the recognition of environmental preservation concerns, and the increase of criminal trans-boundary activity (including trafficking in people and drugs), continues to pose a challenge. The U.S. Congress acknowledged this continuing problem and, in 1996, passed the IIRIRA. This Act, which is described in more detail in Section 1.4.2, mandated the construction of a Border Infrastructure System starting at the Pacific Ocean and extending 14 miles inland. The infrastructure system directed by IIRIRA was to include multiple fences, roads, lights, other

**Figure 1-4.**
**Tijuana River Valley Crime Offenses Before and After Construction of the Secondary Fence**




| | MURDER | RAPE | ROBBERY | AGGRAVATED ASSAULT | BURGLARY | LARCENY | AUTO THEFT | TOTAL |
|---|---|---|---|---|---|---|---|---|
| 1995 Total | 1 | 1 | 2 | 7 | 7 | 11 | 11 | 40 |
| 1998 Total | 0 | 0 | 0 | 8 | 3 | 8 | 3 | 22 |

**Type of Crime**

**Figure 1-5.**
**San Diego Sector Assaults on Border Patrol Agents**
**FY-96 - FY-03**




| Year | FY-96 | FY-97 | FY-98 | FY-99 | FY-00 | FY-01 | FY-02 | FY-03 (Oct-Feb) |
|---|---|---|---|---|---|---|---|---|
| Weapons | | | | 9 | 13 | 9 | 17 | 7 |
| Physical | | | | 19 | 21 | 14 | 7 | 7 |
| Vehicular | | | | 9 | 10 | 4 | 5 | 2 |
| Unspecified | 19 | 10 | 49 | | | | | |
| Rockings | 268 | 212 | 216 | 127 | 102 | 79 | 88 | 38 |

technology, and the removal of barriers and obstacles that could impede the successful operation of the system.

In addition to the requirement to comply with IIRIRA, the need for the proposed action, therefore, is to halt the continual influx of illegal aliens and smugglers into the San Diego area by effecting a permanent deterrence through a certainty of detection and apprehension. Another need is to reduce the current enforcement footprint that will ensure a more efficient and effective control of the border region. The purpose and objectives of the proposed action is to provide for integration of infrastructure and technology into the current strategy for border control. This will maximize the proactive, deterrent enforcement capability of the USBP while gaining the necessary and desired permanent status of deterrence. The following paragraphs provide further elaboration of the purpose and needs of the proposed action.

Localized efforts have had some success in deterring smugglers from utilizing traditional entry corridors. However, these efforts have the potential to degrade the general environment, because they depend largely upon a massive influx of personnel and equipment. This results in short term successes of the operation because no other physical barriers or deterrence factors are in place and the cover and concealment (e.g., dense brush, houses, close transportation routes) that initially made the area attractive to illegal



33990

border crossings are still present. When the problem returns, so must the vast influx of personnel resources, thus repeating the entire cycle.

The USBP and INS are part of a national focus on border politics in which an effective and permanent solution to the illegal immigration and drug trafficking problem along the southwest border is sought. As mentioned previously, the goal of this project is to integrate infrastructure and technology into the current enforcement strategy to maximize the potential achievement of permanent deterrence. This will in turn provide the necessary flexibility in personnel deployment. Once permanent deterrence is achieved, the protection or preservation of urbanization needs, industrialization needs, and environmental resources will be realized.

In developing a plan to control the border region within San Diego County, the USBP comprehensively gauged the requirements for supportive infrastructure and technology, and devised a strategy that effectively integrates infrastructure components into a border-wide, proactive, operational profile predicated on deterrence and flexibility. The effort recognizes that infrastructure, as well as the need to plan and deploy it, as a system of interdependent components, is a necessity to a permanent and lower-impact border control solution. This solution has drawn upon a number of resources for direction, including:

- The Attorney General's strategy for strengthening the southwest border;
- Previous Government Accounting Office reports (1997 through 2000) on illegal immigration; and
- The USBP's 1994 Strategic Plan.

In addition, the plan also uses knowledge gained through other established/successful infrastructure efforts elsewhere in the southwest that have proven to foster control.

As outlined in the Attorney General's strategy, the USBP is required to address four designated criteria in strengthening the border: (1) allocate additional USBP resources to areas of highest known illegal activity; (2) make maximum use of physical barriers; (3) increase the proportion of time USBP agents spend on border enforcement activities; and (4) identify the appropriate mix of technology, equipment, and personnel needed to allow the USBP to establish and maintain control of the southwest border. This project establishes the foundation to target each criterion and determine how each will be affected or addressed.

In addition to providing a foundation, the proposed action coordinates infrastructure components throughout a three-station area under a common strategy and implementation plan. Whereas most local infrastructure planning initiatives have been limited in scope and effectiveness by a lack of funding and support resources, this undertaking enables the USBP to properly plan and coordinate interdependent infrastructure components (roads, lights, fencing, and cameras) comprehensively, simultaneously, and efficiently as a working system. The purpose of this Border Infrastructure System is to lessen the overall impact of the enforcement footprint, maximize the deterrent enforcement profile, and safeguard local neighborhoods, businesses, and environmental resources.

Although the primary fence was successful in deterring drive-throughs, as discussed in Section 1.2, it did little to stop the flow of illegal pedestrians across the border. Its deficiency in this respect magnified the need to comprehensively plan an infrastructure project as a system (in consideration of all enforcement challenges) that included all necessary components (i.e., lights, RVS, and roads). Such comprehensive planning would maximize operational effectiveness and fulfill the USBP's greater mandate of controlling all illegal entries, regardless of the *modus operandi.*

Research conducted by the Archos Corporation (1999) provided evidence that augmenting an increase in border enforcement hours with border infrastructure

improvements significantly enhances the current USBP operational strategy. Concerning the Imperial Beach, Chula Vista, and Brown Field USBP stations in the San Diego Sector, the study found that:

*"...The combination of increased numbers of agents and completion of border infrastructure improvements has resulted in significant decreases in apprehensions."*

The study further reported that despite an increase in border enforcement hours of nearly 300 percent in the El Centro, Yuma, and Tucson sectors, apprehensions climbed from 61,700 to over 722,000 during the same period. The research concluded in part that for these three sectors, *"Deterrence has not been achieved..."* and that *"...Manpower increases alone, without significant border infrastructure changes seem to have little effect."*

Additional evidence supporting a "systems" approach was recently outlined in a study conducted by the U.S. Army Corps of Engineers, Construction and Engineering Research Laboratory (1999). This study concluded, in part:

> *"Based upon the findings of this investigation it is concluded that Department of Defense (DoD) - funded counter-drug fencing projects have been very effective at deterring the flow of illegal drugs and illegal immigrants. An analysis of interdiction and apprehension statistics showed other beneficial trends correlating with the construction of DoD counter-drug fencing, such as a significant decrease in local urban crime."*
>
> *"It is also concluded that a 'systems' approach to barrier fencing offers* ***strong benefits over a single fence*** [emphasis is added]. *One important benefit is that a more effective barrier system allows the USBP to more efficiently and strategically deploy its agents..."*

Unless properly designed infrastructure "systems" provide rigid boundaries, deterrence-based operations will undoubtedly have a larger than necessary footprint because they will continue to rely on personnel deployments that saturate environments with various patrol resources (including ATV's, horse patrols, 4x4 vehicles, helicopters, infrared scope trucks, and foot patrols) whenever those locations are targeted by smugglers.

For example, the enforcement footprint for the area extending from the Pacific Ocean to about two miles east of the San Ysidro POE has historically encompassed a corridor that is about six miles wide (or about 30 square miles). Figure 1-6 illustrates the primary entry routes in this area and the required enforcement zone. Apprehensions in this area in the mid-1990s represented nearly 30 percent of total arrests nationwide. Illegal entries have been estimated to average as high as 1,750 per night. The Imperial Beach Station estimates that they were successful in apprehending only one out of every three to seven illegal aliens or smugglers due to the terrain, major transportation routes, and concealment opportunities favoring their escape.

Driven by the high illegal traffic, the USBP had to maintain a road network that provided quick access to traditional illegal entry corridors. Many of the roads began as trails worn by illegal entrants and soon the network required to apprehend the illegal aliens developed into a series of hundreds of miles of unimproved roads. Trails and roads, however, are not the only impact illicit-trafficking has had on the local environment. Illegal entrants have destroyed habitat by cutting vegetation for shelter and fire, by causing accidental wildfires, by increasing erosion through repeated use of trails, and by discarding trash upon entry to the United States. Photographs 1-1 through 1-4 illustrate some of the environmental impacts created by the illegal aliens within the Imperial Beach Station's area of operation.



**Figure 1-6. Primary Routes of Entry into U.S. and Current Enforcement Footprint**

It is also significant to note that from 1989 to 1996 there was an average of 20 fires per year within the boundaries of the Tijuana Estuary, with the greatest number occurring between 1993 and 1995. This correlates directly to higher illegal traffic levels. Upon completion of the primary fence and implementation of Operation Gatekeeper, the frequency of fires also fell, as depicted in Figure 1-7.

The creation of a primary enforcement zone composed of a dedicated system of infrastructure (multi-tiered fencing, lighting, cameras, and an all-weather road) that closely, but at a safe distance, parallels the border, reduces the geographic footprint of the operation and the environmental impact. It further enhances control efforts and provides opportunities to balance the overall operation by mitigating intensive manpower requirements. It thereby increases flexibility in personnel deployment and maximizes the USBP's deterrent, proactive enforcement capability.




**Figure 1-7. Fires within the Tijuana Estuary (1989-1999)**



Photo 1-1. Baja California birdbush hewed out by illegal aliens and utilized for cover from searching agents.



Photo 1-2. Trash left behind by smuggled aliens.



Photo 1-3. Trails worn by smuggled aliens in the Tijuana Estuary's salt marsh.



Photo 1-4. Convergence of several trails in the hills of the Tijuana River Valley Regional Park.

Completing the proposed Border Infrastructure System project will also allow the USBP to establish a permanent footprint for enforcement operations. Rapidly developing interests, such as urbanization, industrialization, and environmental preservation along the immediate border need to be balanced with the USBP's need to present an effective deterrent profile and effectively secure the immediate border area.

The completion of the Border Infrastructure System in Areas I, V, and VI would empower the USBP to fully engage the proactive enforcement approach. Maintaining the status quo would allow the smugglers to continue to illegally breach the border. The completion of the Border Infrastructure System would create an opportunity for USBP agents to gain an advantage over smugglers who exploit the U.S./Mexico border. A secure infrastructure system would establish a safe and solid foundation for the continued development of neighborhoods, businesses, parks, and environmental preserves. This strategy is the bedrock for the future of illegal immigration control. It is a strategy emphasizing flexibility that is formulated upon *a state of deterrence achieved through a well-communicated certainty of detection and apprehension*. This EIS, therefore, addresses the completion of the 14-mile Border Infrastructure System.

Continued infrastructure development will result in returning the rule of law to the previously lawless border. Improving the border barrier infrastructure, both preceding and following the 1994 onset of Operation Gatekeeper, contributed to a marked decline in serious crimes along the border. The construction of primary fencing from 1991 through 1993 paralleled a 23 percent reduction in border crimes. As primary fencing was completed and secondary fencing was begun from 1996 through 1998, a further reduction of 45 percent was achieved. In 1997, San Diego District Attorney Paul Pfingst commented on the reduced border crime by saying . . . "that tells us that border enforcement is reducing crime." During this period, an Assistant Chief of the San Diego Police Department indicated that Operation Gatekeeper was a major factor in reducing border area crime. Furthermore, he reported there had been such a significant decrease in border crime that the San Diego Police Department had deployed some of its officers to other areas of concern. Before Gatekeeper, the Department had to maintain a continuous presence in the border area to deal with the excessive levels of crime and violence.

The completion of the Border Infrastructure System Project in the unfinished areas is required to reverse an increase in San Diego Border Corridor Crimes, recorded in these areas in the years 2001 and 2002. In the first six months of FY 2003 the San Diego Sector experienced a 20 percent increase in the number of illegal aliens apprehended. An ongoing survey of aliens apprehended by the USBP illustrates that nearly 18 percent of all aliens apprehended have serious/felony criminal records. Completion of the Border Infrastructure System is necessary to reverse these trends.

The life threatening work environment of USBP agents and border barrier maintenance personnel will vastly improve upon completion of this project. Treacherous roads that are now being used will be replaced. Three USBP agents and one road maintenance worker have lost their lives while performing their duties on these roads. Assaults on USBP agents have steadily declined commensurate with the amount of secondary fencing constructed in the beginning phases. Assaults on USBP agents have steadily declined from a high of 287 in FY 1996 to 117 in FY 2002. Through the first six months of FY 2003, 54 assaults have occurred. However, assaults on USBP agents have increased in those areas where the Border Infrastructure System is not in place (Imperial Beach and Brown Field Stations). Completion of the Border Infrastructure System is necessary to save lives and ensure a safer work environment for all who work on the border.

Impacts that have occurred during the initial pilot projects in Areas II, III, and IV will be included in the cumulative effects discussion.

## 1.4 REGULATORY COMPLIANCE STATUS

This EIS has been prepared to satisfy the regulatory requirements mandated by Congress and implemented by various Federal and state entities. These requirements have been put in place to improve and coordinate Federal plans, functions, programs, and resources (NEPA Section 101 [42 USC § 4331]). Compliance with state statutes and other requirements has been maximized to the extent practicable. For instance, even though the Federal government is not required to avoid or mitigate impacts to state listed species, the INS has implemented several measures to do so.

### 1.4.1 Immigration and Nationality Act

The primary sources of authority granted to officers of the INS are the Immigration and Nationality Act (INA), found in Title 8 of the United States Code (USC) (8 USC), and other statutes relating to the immigration and naturalization of aliens. The secondary sources of authority are administrative regulations implementing those statutes, primarily those found in Title 8 of the Code of Federal Regulations (CFR) (8 CFR Section 287), judicial decisions, and administrative decisions of the Board of Immigration Appeals. Subject to constitutional limitations, INS officers may exercise the authority granted in the INA. Specific statutory provisions related to enforcement authority are found in Sections 287(a), 287(b), 287(c), and 287(e) (8 USC § 1357(a, b, c, e)); Section 235(a) (8 USC § 1225); Sections 274(b) and 274(c) (8 USC.§ 1324(b,c)); Section 274A (8 USC § 1324a); and Section 274C(8 USC § 1324c) of the Act.

In particular, Section 287(a)(3) provides further authority to USBP agents to enter any lands and/or facilities within 25 miles of the international borders, without prior approval of the property owner, in the pursuit of illegal aliens and/or drug traffickers. The USBP attempts to stay on established roads during their apprehension efforts to avoid environmental impacts, increase their own safety, and reduce maintenance costs to vehicles. However, it is within their authority to traverse all lands during apprehension. The Imperial Beach Station, however, has instructed its agents to consider the Tijuana estuary as off-limits. Thus, the USBP must attempt to apprehend the illegal entrants who successfully avoid apprehension at the primary fence when they enter the residential and commercial areas of Imperial Beach, approximately three to five miles north of the border.

### 1.4.2 1996 Illegal Immigration Reform and Immigrant Responsibility Act

Title 1, Subtitle A, Section 102 of the IIRIRA states, "The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." More specifically, Subsection 102(b) states that the Attorney General "shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, and roads between the fences". The same legislation provided the Attorney General with additional authority to contract for or buy any interest in land deemed essential to control and guard the boundaries of the United States. Subsection 102(c) granted authority to the Attorney General to waive provisions of the Endangered Species Act (ESA) of 1973 and the NEPA of 1969, should the Attorney General determine it "necessary to ensure expeditious construction of the barriers and roads under this section." Waiver authority has not been exercised and this EIS reflects compliance with the provisions of the ESA and the NEPA.

Several persons commented that the mandate under Subsection 102(b) to build roads and fences along the first 14 miles of border could not supercede the provisions of NEPA and ESA that are intended to disclose effects and limit activities that would adversely impact certain species or sensitive environment. The statutory language of Subsection 102(b) directs construction in the coastal zone and makes no exception for wetlands or other sensitive environments. The waiver authority granted to the Attorney General is explicit to all provisions of NEPA and ESA. However, the INS/USBP has continued the preparation of the NEPA documentation as well as consultation with the U.S. Fish and Wildlife Service (USFWS) under Section 7 of the ESA. In fact, the Draft EIS was delayed nearly a year in order to provide additional data requested by the USFWS. Furthermore, the USFWS requested the Draft Biological Opinion (BO) and the Draft EIS be submitted concurrently. The INS/USBP has delayed release of the Final EIS pending completion of the BO by the USFWS. This Final EIS describes how this project has proceeded in order to comply with the provisions of NEPA, ESA, and other applicable environmental statutes and regulations.

### 1.4.3 The National Environmental Policy Act of 1969

The NEPA of 1969, as amended (Public Law [PL] 91-190, 42 USC 4321-4347, January 1, 1970, as amended by PL 94-52, July 3, 1975, PL 94-83, August 9, 1975, and PL 97-258, Section [§] 4[b], September 13, 1982), provides for a congressional declaration of a national environmental policy (Title I) and provides for the establishment of a CEQ (Title II). The overriding purposes of the Act are to: (1) declare a national policy that will encourage productive and enjoyable harmony between man and his environment; (2) promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; (3) enrich the understanding of the ecological systems and natural resources important to the Nation; and (4) establish a CEQ (Purpose Section 2 [42 USC § 4321]).

#### Title I

Title I of the Act states that Congress, recognizing the profound impact of humankind's activity on the interrelations of all components of the natural environment, declares that it is the continuing policy of the Federal Government, in cooperation with state and local governments, and other concerned public and private organizations, to use all practicable means and measures to foster and promote the general welfare, to create and maintain conditions under which people and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. In order to carry out the policy set forth in the Act, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources (Section 101 [42 USC § 4331]).

Title I of the Act also directs all agencies of the Federal Government to: (1) utilize a systematic, interdisciplinary approach in planning and in decision-making that may impact the environment; (2) identify and develop methods and procedure to ensure that unquantifiable environmental effects are given appropriate consideration in decision-making; and (3) include in every report on proposals and other Federal actions significantly affecting the quality of the human environment, a detailed statement on: (a) the environmental impact of the proposed action; (b) any adverse effects that cannot be avoided; (c) alternatives to the proposed action; (d) the relationship between local short-term uses and maintenance and enhancement of long-term productivity; and (e) any irreversible and



33997-A

irretrievable commitments of resources should the proposal be implemented (Section 102 [42 USC § 4332]).

**Title II**

Title II of the Act creates, in the Executive Office of the President, a CEQ (Section 202 [42 USC § 4342]). It is the duty and function of the CEQ to: (1) assist and advise the President in the preparation of the Environmental Quality Report required by Section 201 [42 USC § 4341] of this title; (2) gather timely and authoritative information concerning the conditions and trends in the quality of the environment, to analyze and interpret such information for the purpose of determining whether such conditions and trends are interfering, or are likely to interfere with the achievement of the policy set forth in Title I of this Act, and to compile and submit to the President studies relating to such conditions and trends; (3) review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in Title I of this Act for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy; (4) develop and recommend to the President national policies to foster and promote the improvement of environmental quality; (5) conduct investigations, studies, surveys, research, and analyses relating to environmental quality; (6) document and define changes in the natural environment, and to accumulate necessary data and other information for a continuing analysis of these changes or trends; (7) report at least once each year to the President on the state and condition of the environment; and (8) make and furnish such studies, reports thereon, and recommendations with respect to matters of policy and legislation as the President may request (Section 204 [42 USC § 4344]).

### 1.4.4 Council on Environmental Quality Regulations

EO 11991, May 24, 1977, directed the CEQ to issue regulations to implement the procedural provisions of NEPA. Accordingly, CEQ developed and issued final regulations (40 CFR Parts 1500-1508), thus ensuring that Federal agencies act according to the letter and spirit of the Act. The purpose of the regulations is to tell Federal agencies what they must do to comply with the procedures and achieve the goals of the Act (40 CFR Section 1500.1).

### 1.4.5 INS Procedures Relating to the Implementation of NEPA

CEQ Regulations (Section 1507.3) provide that each Federal agency shall, as necessary, adopt implementing procedures to supplement the CEQ Regulations. To this end, the Department of Justice established procedures that supplement and implement the provisions of NEPA (28 CFR, Part 61-Procedures for Implementing the National Environmental Policy Act). Appendix C of 28 CFR Part 61 provides the INS procedures relating to the implementation of NEPA. Specifically these procedures apply to efforts associated with leasing, purchasing, design, construction, and maintenance of new and existing INS facilities.

### 1.4.6 Endangered Species Act

The Endangered Species Act of 1973, as amended (16 USC 1531-1544) and in particular, Sections 7 and 9 (50 CFR 17.11-17.12), require Federal agencies to address the potential impacts of their proposed action on floral and faunal species that have been listed (or proposed for listing) as a threatened or endangered species by the USFWS. Avoidance of impacts to these species should be accomplished, if at all possible. If the proponent (or

USFWS) determines that adverse impacts to listed species are unavoidable, the proponent will enter into formal consultation with the USFWS under Section 7 regulations. This consultation will identify alternatives to the proposed action and conservation measures that can be implemented to reduce or offset the adverse impacts. If it is determined that the proposed action will potentially result in the fatality of a certain number of individuals of the affected species, an incidental take permit will be issued to the proponent under the Section 9 regulations (for Federal agencies).

### 1.4.7 Additional Regulatory Guidance

Table 1-2 lists additional guidance, statutes, and regulations relevant to the proposal, including any permitting and licensing requirements.

## 1.5 REPORT ORGANIZATION

This EIS is divided into 10 major sections, including this chapter. Chapter 2.0 will describe the alternatives that were considered that would satisfy the stated purpose and need. The selection process used in determining the best alternative will be explained in Chapter 2.0. Current environmental conditions within the project area and vicinity are presented in Chapter 3.0. The potential impacts, beneficial and adverse, of all alternatives that are being considered are discussed in Chapter 4.0. This chapter also includes a discussion of the cumulative effects that have occurred and that are anticipated as a result of the completion of the proposed Border Infrastructure System project. Chapter 5.0 presents mitigation measures and plans to reduce, eliminate or compensate for any adverse impacts to the human or natural environment. Chapter 6.0 discusses the public involvement measures that have been utilized throughout the preparation of this EIS in soliciting, obtaining, and incorporating input from the general public and resource agencies.

The list of persons responsible for preparing the EIS is presented as Chapter 7.0, while Chapter 8.0 provides a list of the acronyms used throughout this document. References that were used while preparing the EIS, as cited in the text, are presented in Chapter 9.0. An index of pertinent terms discussed throughout the EIS is included as Chapter 10.0, respectively.

As mentioned previously, Appendix A contains a copy of Title 1 of the IIRIRA that documents the Federal mandate to construct the Border Infrastructure System. With the exception of Appendix A, appendices that were presented in the Draft EIS and did not change during the preparation of the final EIS are not duplicated herein. These appendices included letters/correspondence from resource agencies (Appendix B), air emission computations (Appendix D), and wetland delineation forms (Appendix E). Appendix C of the Final EIS contains a list of the state-protected species that are known or presumed to occur within or near the project corridor. In addition, the public comments and correspondence obtained during the scoping process are omitted from the Final EIS; however, comments (and responses to these comments) that were received on the Draft EIS are presented in Appendix F. Other supporting technical documents, as appropriate, are contained in Appendix G. A copy of the BO received from the USWFS for the completion of the Border Infrastructure System can be found in Appendix H. A Consistency Determination, as required by the Coastal Zone Management Act and the California Coastal Act, is included in Appendix I. Examples of conceptual designs proposed for the fences and gate near Border Field State Park are included in Appendix J.

**Table 1-2. Summary of Additional Guidance, Statutes, and Relevant Regulations Including Potential Permits or Licensing Requirements**

| Issue | Action Requiring Permit, Approval, or Review | Agency | Permit, License, Compliance, or Review/Status | Relevant Laws and Regulations |
|---|---|---|---|---|
| **FEDERAL** | | | | |
| **Sound/ Noise** | Construction and road improvements | United States Environmental Protection Agency (USEPA) | Compliance with surface carrier noise emissions | Noise Control Act of 1972 (42 USC 4901 et seq.), as amended by Quiet Communities of 1978 (P.L. 95-609) |
| **Air** | Construction and road improvements | USEPA | Compliance with National Ambient Air Quality Standards (NAAQS) and emission limits and/or reduction measures | Clean Air Act and amendments of 1990 (42 USC 7401-7671q)<br>40 CFR 50, 52, 93.153(b) |
| **Water** | Construction sites with greater than one acre of land disturbed | USEPA | Section 402(b) National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges for Construction Activities-Storm Water Pollution Prevention Plan (SWPPP) | Clean Water Act of 1977 (33 USC 1342)<br>40 CFR 122 |
| | Construction in or modification of floodplains | Water Resources Council, Federal Emergency Management Agency (FEMA), CEQ | Compliance | Executive Order 11988 (Floodplain Management), as amended by Executive Order 12608. 3 CFR, 1977 Comp. p. 117 |
| | Construction in or modification of wetlands | U.S. Army Corps of Engineers (USACE) and U.S. Fish and Wildlife Service (USFWS) | Compliance | Executive Order 11990 (Protection of Wetlands), as amended by Executive Order 12608.<br>3 CFR, 1977 Comp. p. 121 |
| | Potential discharge into waters of the state (including wetlands and washes) | USACE (and state) | Section 401 Permit | Clean Water Act of 1977<br>(33 USC 1341 et seq.)<br>40 CFR 121 |
| | Discharge of dredge or fill material to a watercourse | USACE | Section 404 Permit (Individual or nationwide) | Clean Water Act of 1977<br>(33 USC 1344)<br>40 CFR 230 |
| | Consistency with approved state coastal management programs | USACE | Compliance | Coastal Zone Management Act of 1972 (16 USC 1456[c])<br>Section 307 |
| **Soils** | Current operation involving hazardous waste and/or remediation of contamination site | USEPA | Proper management, and in some cases, permit for remediation | Resource Conservation and Recovery Act of 1976 (42 USC 6901-6992k), as amended by Hazardous and Solid Waste Amendments of 1984 (P.L. 98-616; 98 Stat. 3221) |

(continued)

**Table 1-2, continued. Summary of Additional Guidance, Statutes, and Relevant Regulations Including Potential Permits or Licensing Requirements**

| Issue | Action Requiring Permit, Approval, or Review | Agency | Permit, License, Compliance, or Review/Status | Relevant Laws and Regulations |
|---|---|---|---|---|
| **FEDERAL (cont.)** | | | | |
| **Soils (cont.)** | Release or threatened release of a hazardous substance | USEPA | Development of emergency response plans, notification, and cleanup | Comprehensive, Environmental Response, Compensation, Liability Act of 1980 (42 USC 9601-9675), as amended by Emergency Planning and Community Right-To-Know-Act of 1986 (42 USC 11001 et seq.) |
| | Prime and unique farmlands | Natural Resource Conservation Service (NRCS) | NRCS determination via Form AD-1006 | Farmland Protection Policy Act of 1981 (7 USC 4201 et seq.)<br>7 CFR 657-658 |
| **Natural Re-sources** | Identification of threatened and endangered species and their habitats | USFWS | Compliance by lead agency and/or consultation to assess impacts and, if necessary, develop mitigation measures | Endangered Species Act of 1973, as amended (16 USC 1531-1544) Sections 7 and 9 50 CFR 17.11-17.12 |
| | Protection of migratory birds | USFWS | Compliance by lead agency and/or consultation to assess impacts and, if necessary, develop mitigation measures | Migratory Bird Treaty Act of 1918 (16 USC 703-712)<br>50 CFR Ch. 1 |
| | Protection of bald and golden eagles | USFWS | Compliance by lead agency and/or consultation to assess impacts and, if necessary, obtain permit | Bald and Golden Eagle Act of 1940, as amended (16 USC 688-688d)<br>50 CFR 22.3 |
| | Endangered species management planning | DoD | Compliance with DoD planning standards for endangered species management | AR 200-1 (Environmental Protection and Enhancement)<br>AR 200-3 (Natural Resources - Land, Forest, and Wildlife Management) |
| **Health and Safety** | Health and safety standards | Occupational Safety and Health Administration (OSHA) | Compliance with guidelines including Material Safety Data Sheets | Occupational Safety and Health Act of 1970 (29 USC 651-678)<br>29 CFR 1975 |
| **Cultural/ Archa-eological** | Disturbance of historic properties | Federal lead agency, State Historic Preservation Officer, Advisory Council on Historic Preservation | Section 106 Consultation | National Historic Preservation Act of 1966 (16 USC 470 et seq.), as amended 36 CFR 800<br>Army Regulation 200-4<br>Cultural Resources Management Presidential Memorandum regarding government to Government Relations (April 29, 1994)<br>Executive Order 13007 – Sacred Sites<br>Native American Graves Protection and Repatriation Act (43 CFR Part 10) |

(continued)

**Table 1-2, continued. Summary of Additional Guidance, Statutes, and Relevant Regulations Including Potential Permits or Licensing Requirements**

| Issue | Action Requiring Permit, Approval, or Review | Agency | Permit, License, Compliance, or Review/Status | Relevant Laws and Regulations |
|---|---|---|---|---|
| **FEDERAL (cont.)** | | | | |
| **Cultural/ Archae-ological (cont.)** | Investigation and excavation of cultural resources | Affected land-managing agency | Permits to survey and excavate/ remove archeological resources on Federal lands; Native American tribes with interests in resources must be consulted prior to issue of permits | Archeological Resources Protection Act of 1979 (16 USC 470aa-470ii) 43 CFR 7 |
| **Social/ Eco-nomic** | Disproportionately high and adverse human health or environmental effects on minority and low-income populations | USEPA | Compliance | Executive Order 12898 (Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations) of 1994 |
| **STATE** | | | | |
| **Air** | Construction or modification of air contaminant source | California Environmental Protection Agency: San Diego Air Pollution Control District | Compliance with state ambient air quality standards (SAAQS) and General Conformity *de minimus* thresholds; Compliance with State Implementation Plan for emissions exceeding *de minimus* levels | California Clean Air Act (1988 California Statue Chapter 1568) Health and Safety Code 39000-44394 |
| **Water** | Construction or modification of a water discharge source | California Regional Water Quality Control Board - San Diego | State 401 Water Quality Certification | Porter-Colgne Water Quality Control Act of 1970 (Water Code 13000-14958) |
| | Reporting and cleanup requirements for hazardous substances and oil/petroleum spills | Office of Emergency Services and California Regional Water Quality Control Board | Compliance | Porter-Colgne Act (Water Code 13271, 13272) Health and Safety Code 5411.5 |
| | Construction or modification of land, structures, or vegetation in the coastal zone | California Coastal Commission | Compliance | California Coastal Act of 1976, as amended (Pub. Res. Code 30000-30900) 14 Coastal Commission's Regulations 13001-13666.4 |