**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **D & D LANDHOLDINGS, a limited partnership,** | |
| **Plaintiff,** | **No. 06-877 L** |
| **v.** | |
| **UNITED STATES,** | **Hon. Margaret M. Sweeney** |
| **Defendant.** | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT IN SUPPORT MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

**The Border Patrol**

1. The United States Border Patrol,[1] part of the Department of Homeland Security (DHS), Bureau of Customs and Border Protection (CBP), is the lead federal agency charged with securing the international border between the United States and Mexico. Border Patrol operations are divided into sectors; relevant here is the San Diego Sector Office of the Border Patrol, which has responsibility for an area located north of Tijuana and Tecate, Mexican cities with a combined population of two million. In this area, the terrain along the international border offers no geographical barriers to entry by unauthorized immigrants, smugglers or terrorists. Ex. D-2 at CRS-2. The mission of the Border Patrol is to prevent, detect or apprehend persons seeking to illegally enter the United States other than at an official Port of Entry. Ex. D-

[1/] Congress established the United States Border Patrol in 1924. Prior to 2003, the Border Patrol was organized under the Immigration and Naturalization Service. As part of a reorganization that created the Department of Homeland Security in March, 2003, Pub. L. No. 104-208, the Border Patrol was reorganized as an office under the Bureau of Customs and Border Protection.

3 at CRS-1.

2. The property at issue in this case ("subject property") is within the patrol responsibility of the Chula Vista Station, one of the stations under the jurisdiction of the San Diego Sector, and lies within what is administratively designated as Zones 17 and 18. See Exs. D-1, D-29 at ¶ 4.

**The Subject Property and Identity of Plaintiff**

3. At issue in this litigation is a parcel of land consisting of approximately 135 acres located near the Mexican border in southern San Diego County, California, which the parties refer to as Parcel 10. See Ex. D-1. The property which comprises Parcel 10 was acquired December 14, 2000 from Rancho Vista Del Mar, a related entity. Ex. D-6.

4. Plaintiff D&D Landholdings is a California limited partnership. Roque De La Fuente is a principal in both D&D Landholdings and Rancho Vista Del Mar. D-4 at 21. Mr. De La Fuente has either a direct ownership interest in, or control of, Parcel 10 and the 10 other parcels of land at issue in other currently-pending related cases.[2] All 11 parcels are managed by SD Commercial, LLC, owned by David Wick and by three trusts in the names of Mr. De La Fuente's children. Ex. D-4 at 18.

5. Parcel 10 is located in the East Otay Mesa area of San Diego County. This largely undeveloped and sparsely populated area sits at the base of the Otay Mountains approximately 14 miles east of the Pacific Ocean near the Mexican border. Ex. D-11. To the

---

[2/] Two other pending cases raise issues similar to those before this Court. Parcels 1-9 are at issue in the consolidated case of Otay Mesa Property L.P., et al. v. United States, No. 06-167 (Judge Baskir). Parcel 11 is at issue in International Industrial Park, Inc. v. United States, No. 06-876 (Judge Wheeler). Because the parcels are adjacent or near one another, the parties have numbered the parcels sequentially for ease of reference. See D-1.

northwest are the highly urbanized cities of San Diego, Chula Vista, and their suburbs. To the south, directly across the border, lies the densely populated city of Tijuana. Exs. D-5 (e), (f); D-28.

6. Parcel 10 is zoned industrial. A portion is currently under lease to Otay Hills LLC, an entity pursuing a mining permit. Ex. D-4 at 19-20. Parcel 10 has been leased at various points in the past for purposes of dry farming, Ex. D-4 at 37-38, and utility easements over the property have also been granted, including a major electrical transmission line between the United States and Mexico, Exs. D-4 at 25-26; D-1. Other portions of the property are in the process of being developed and grading permits have been obtained. Ex. D-4 at 35.

**Early Efforts to Provide Border Security**

7. In 1907, President Theodore Roosevelt issued which has become known as the Roosevelt Proclamation:

> Now, therefore, I, THEODORE ROOSEVELT, President of the United States, do hereby declare, proclaim and make known that there are hereby ... set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico . . .

35 Stat. 2136 (1907) (emphasis added).

8. Seventeen years later, Congress appropriated monies to provide for "land-border patrol" including the acquisition of motor vehicles, thereby giving birth to what is now known as the Border Patrol. 43 Stat. 205, 240 (May 28, 1924). Then, in 1925, Congress provided the Border Patrol with statutory authority: "the power without warrant [(1)] to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation . . . ." 8 U.S.C. § 110, 43 Stat. 1049 (Feb. 27, 1925).

**The Border Patrol's Statutory Authority**

9. In the Immigration and Nationality Act of 1952, Congress specifically granted the Border Patrol the right, without a warrant, to have access to private lands within 25 miles of the border to prevent illegal entry of aliens into the United States:

> Any officer or employee of the Service authorized under regulations prescribes by the Attorney General shall have the power without a warrant . . . within a distance of twenty-five miles from any such external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. . . ."

8 U.S.C. § 1357(a)(3). Patrolling the border has been defined as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c).

10. The House Report discussing this legislation specifically addressed the codification of the authority to enter private lands for the purpose of patrolling the border:

> This would by positive legislative enactment authorize specifically <u>that which must always have been of necessity implied</u> from the time the border patrol was first created.

1952 U.S.C.C.A.N. 1358, 1360 (emphasis added). The House Report explained the need for the specific statutory authority:

> Notwithstanding that the borders of the United States, for the purpose of preventing the smuggling and illegal entry of aliens, have been patrolled continuously since 1903, and that Congress specifically authorized establishment of the border patrol in the Bureau of Immigration in 1924, and annually since that time has appropriated funds for border-patrol purposes, the statutes are silent with regard to the authority of patrol officers to enter upon private lands adjacent to the border so as to prevent the smuggling and illegal entry of aliens into the United States. In recent months <u>the activities of the border patrol have in certain areas been seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries.</u> This action by property owners is creating an increasingly serious situation, one which endangers the national security. It affects the sovereign right of the United States to protect its own boundaries against the entry of aliens,

> including those of the most dangerous classes.
>
> The language of section 2 would adequately authorize immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.

Id. (emphasis added).

**Historical Patrol Activities in East Otay Mesa**

11. For well over two decades, the Border Patrol has actively patrolled the property at issue in this litigation. Ex. D-29 at ¶ 4. In the early to mid 1980s, that patrol was done on horseback each evening, and sensors were utilized. Id.

12. By the late 1980s, illegal entries had increased with the emergence of organized alien and drug smuggling organizations. Id. at ¶ 5. Smugglers began utilizing a "drive-through" method of entry, in which one or more vehicles heavily loaded with aliens or drugs would breach the border at high speed. Id. During the 1980s and early 1990s, an average of more than 200 drive-through attempts occurred daily. Ex. D-24 at 1-3. The area between Brown Field and the mountains – the vicinity of Parcel 10 -- was a popular location for drive-throughs. Ex. D-9 at ES-52. Drive-throughs created a hazard for both agents and the nearby populance when the vehicles reached nearby highways and high speed chases ensued. Ex. D-24 at 1-3 to 1-4.

13. The high amount of illegal entries in the vicinity of San Diego became a recognized problem. A 1993 Sandia National Laboratories report noted:

> [t]he 13 miles of border east from the coast to the foothills of the San Ysidro Mountains are the most concentrated area of illegal entry on the Southwest Border. Almost this entire length is heavily urbanized on the Mexico side, with buildings and roads running right up to the border.

Ex. D-9 at ES-53.

**Construction of the Primary Fence**

14. At this time, the Mexican border near San Diego was poorly marked and presented no real barrier to entry. In many areas, the border had only agricultural fences or was totally unfenced. Ex. D-8 at 57. In 1990, the Border Patrol, with the assistance of the National Guard, began erecting a physical barrier. Ex. D-2 at CRS-1. What is now known as the primary fence began at the Pacific Ocean and continued eastward for approximately 14 miles. It was constructed of surplus welded steel landing mats approximately 10 feet tall, and was completed in March, 1993. Ex. D-2 at CRS-1. What Plaintiff refers to as "chaneling" actually began in 1990. The redirection of illegal entries was the main goal of the primary fence: "to force the traffic back to the open terrain of Otay Mesa where cover is relatively sparse so that sensors and night vision can be used much more effectively and pursuit is much easier and more effective." Ex. D-9 at 186.

15. After construction of the primary fence, the number of drive-throughs was dramatically reduced. Ex. D-2 at CRS-4 n.14. The primary fence was also successful in reducing crime in neighborhoods in close proximity to the border. Exs. D-3 at CRS-11, D-29 at ¶ 6.

16. The primary fence ends at a point approximately 300 feet short of the eastern-most boundary of Parcel 3.[3] See D-1. Illegal immigrants can, and do, simply walk around the end of the fence, as the paths in the aerial photos document. Ex. D-5(c)-(f), D-26. In this area, while the land to the north of the border is sparsely populated, the portions of Tijuana lying immediately to the south are densely populated and offer cover for those waiting to attempt illegal entry. Exs. D-5(f), D-28. Once illegal entrants have climbed the fences, or gone around

---

[3/] Parcel 3 is at issue in the consolidated case of Otay Mesa Property L.P., et al. v. United States, No. 06-167 (Judge Baskir). See fn. 3, supra.

the end of the primary fence, they then generally make their way northward with the goal of reaching a road which will give them rapid transportation out of the area. See Ex. D-29 at ¶ 7.

**Operation Gatekeeper**

17. In October, 1994, the Border Patrol announced "Operation Gatekeeper" which involved large increases in the number of agents as well as a focus on the stationing of agents directly along the border. Ex. D-2 at CRS-3. It also involved an increase in patrol equipment such as additional night vision goggles and seismic sensors, and portable lighting platforms were utilized for the first time in 1998. D-2 at CRS-3. The patrol activities of Operation Gatekeeper in 1993-1994 marked a high in terms of the physical presence of Border Patrol on property near the border.

18. First, there was a significant increase in the number of Border Patrol agents, and in the placement of those agents directly on the border. Ex. D-2 at CRS-3, D-12(a), (b). Second, it reflected the Border Patrol's "goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing USBP agents with a tactical advantage over illegal border crossers and smugglers." Ex. D-3 at CRS-10. The goal with construction of the primary fence in 1990-1993, as well as the intensified enforcement efforts of Operation Gatekeeper in 1994, was to direct illegal entry traffic to the east away from the population centers of San Diego and Tijuana. Ex. D-9 at 186.

**Construction of the Secondary Fence**

19. The concept of the secondary fence, known as the Border Infrastructure System (BIS), grew out of a recommendation of the 1993 Sandia National Laboratories study. Ex. D-9 at ES-1. In 1996, Congress responded to the recommendation, passing the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorized the construction of a

second layer of steel mesh fencing near San Diego. Pub. L. No. 104-208, § 102. The BIS included the construction of two roads adjacent to the new fence as well as surveillance cameras and permanent security lighting. Ex. D-2 at CRS 6-7. In order to expedite construction of the secondary fence, the Secretary of DHS was authorized to waive all requirements imposed by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

20. Construction of the secondary fence began in 1996, but was halted in February 2004 due to coastal environmental concerns raised by the California Coastal Commission. Ex. D-2 at 6. At that point, approximately 9 miles of secondary fence had been completed. Id. In 2005, Congress passed the REAL ID Act, Pub. L. 109-13, which gave DHS the power to waive all legal requirements to expedite the construction of the border fence. Ex. D-2 at CRS-7-8.

21. At present, approximately 9 of the planned 14 miles of secondary fence have been constructed, including a 1 1/2 mile section in the vicinity of the subject property. Currently, the secondary fence ends near the western boundary of Parcel 1.[4] See Ex. D-1. CBP does not plan to extend the secondary fence further east than its present terminus. Ex. D-34 at ¶ 3. Instead, various high technology components such as sensors, cameras, radar and communication systems will be installed. Id. at ¶ 4.

---

[4] Parcel 1 is at issue in the consolidated case of Otay Mesa Property L.P., et al. v. United States, No. 06-167 (Judge Baskir). See fn. 3, supra.

**The Trend in Illegal Entries**

22. While apprehension statistics[5] do not represent perfect data in terms of successful illegal entrants, they do provide one of the few sources of data available to evaluate the Border Patrol's historic presence on property along the border. Ex. D-2 at CRS-10. A review of these statistics reveal that apprehensions in the vicinity of the subject property peaked in FY1992. See Ex. D-12(a), (b). Since that time, the number of apprehensions have declined. Ex. D-2 at CRS-10, CRS-11 Fig. 1, CRS-23 Fig. 2. The Congressional Research Service, in analyzing this data, explained:

> The majority of the decrease occurred in the four year period from FY1995 through FY1998 and coincided with Operation Gatekeeper, which as previously noted combined the construction of fencing along the border with an increase in agents and other resources deployed directly along the border.

Ex. D-2 at CRS-10 (emphasis added).

23. The number of apprehensions in recent years are far below the FY1992 peak. From FY2001 to FY2006, the average yearly apprehensions for the Chula Vista Station was approximately 1/6 th of the 1992 high. Ex. D-12(a). Statistics from Brown Field Station show the same significant decrease in apprehensions beginning in FY1992. Since the peak in FY1992, the number of apprehensions has declined. Ex. D-12(b). Between FY2001 and FY2006, the average yearly apprehensions for Brown Field Station was 1/8 th of the 1992 high. Id.

---

5/ Prior to 1999, the number of apprehensions was recorded only by station. Ex. D-31 at ¶ 5. In FY1999, the Border Patrol created enforcement zones and began also recording apprehensions by zone. See Ex. D-16 for apprehensions by zone for FY1999 to FY2007.

In FY2003, the Border Patrol began the phasing in of a geospatial method of recording apprehension data. Beginning in FY2005, the number of apprehensions for a specific geographic area can be determined. Ex. D-30. The number of apprehensions for Parcel 10 for FY2005, FY2006 and FY2007 can be found at Exs. D-13(a), (b) and (c). Their significance to this case is discussed infra in Arguments I and IV(C).

24. However, during this time period, as apprehensions declined in the San Diego Sector, they rose along the Arizona border to the east. Exs. D-2 at CRS-13 and CRS-14 Fig. 4; see also D-14. Thus, the statistics indicate that the border fences have been successful in redirecting illegal entry activity to the east. However, that redirection is not to Plaintiff's property, but to border areas much farther to the east.

25. In addition, analysis reveals the reduction in apprehensions is not merely the result of fencing. As the Congressional Research Service concluded:

> It seems, then, that the installation of border fencing, in combination with an increase in agent manpower and technological assets, has had a significant effect on the apprehensions made in the San Diego sector. This in turn suggests that fewer unauthorized aliens are attempting to cross the border in the San Diego sector as a result of the increased enforcement measures, including fencing, manpower, and other resources, that were deployed to that sector.

Ex. D-2 at CRS-12-13.[6]

26. Even with the border fences in place, illegal entries still occur. Illegal entrants will climb over or cut through the fence, or construct a tunnel underneath. Ex. D-29 at ¶ 10. Illegal entry can also be made by simply walking around the end of the primary fence. Ex. D-26. The fact that such is occurring is readily apparent from photographs which show the well-worn paths leading from that point. Exs. D-5(f), D-27. Once entry is made around the end of the primary fence, the goal of an illegal immigrant is then to reach a road which will provide the pre-arranged transportation out of the area. Ex. D-29 at ¶ 7.

---

6/ Border Patrol representatives have testified to Congress that "for border control, for border security, we need the appropriate mix. It's not about fences. It's not about Border Patrol agents. It's not about technology. It's about all of those things." Ex. D-2 at CRS-28 and n.90.

Dated: October 26, 2007.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

s/ Susan V. Cook

SUSAN V. COOK, Senior Attorney
KELLE S. ACOCK, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorneys for Defendant

OF COUNSEL:

Melissa Erny
A. Ted Kundrat
U.S. Customs and Border Protection
Indianapolis, Indiana 46278