**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| D & D LANDHOLDINGS, a Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 06-877 L<br>Hon. Margaret M. Sweeney |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Roger J. Marzulla
Gregory T. Jaeger
MARZULLA LAW
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

November 21, 2007

Counsel for Plaintiff

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iv

LIST OF EXHIBITS .......... vii

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 5

General Background .......... 5

The Border Patrol's Overall Strategy – Prevention Through Deterrence .......... 7

Border Patrol Activities on the Subject Property .......... 8

The Increase in Border patrol Activity on Plaintiff's Land Since 2001 .......... 11

LEGAL STANDARDS .......... 12

REASONS FOR DENYING SUMMARY JUDGMENT .......... 13

I. PLAINTIFF'S TAKINGS CLAIM ACCRUED WELL WITHIN THE APPLICABLE SIX-YEAR STATUTE OF LIMITATIONS .......... 13

A. The Border Patrol's Activities on the Subject Property Dramatically Increased in 2001 .......... 14

B. Defendant's Apprehension Statistics Are Inadmissible and Irrelevant .......... 15

II. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS MERITLESS .......... 18

A. Nothing in the 1952 Immigration Act or Its Implementing Regulations Created a Background Principle of Real Property Law .......... 18

B. The Exercise of Police Power May Still Constitute a Taking for Which Just Compensation Is Due .......... 23

C. This Case Is Governed by Takings Precedent. .......... 27

D. Triable Issues of Fact Preclude Summary Judgment in this Case .......... 30

CONCLUSIONS .......... 30

## TABLE OF AUTHORITIES

## CASES

*$7,990 in U.S. Currency*, 170 F.3d 843 (8th Cir. 1999) ....................25

*Acadia Technology, Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006) ....................26

*AFD Fund v. United States*, 61 Fed. Cl. 540 (2004) ....................17

*Alde v. United States*, 28 Fed. Cl. 26 (1993) ....................25

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973) ....................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................13

*Atlas Corp. v. United States*, 895 F.2d 745 (Fed. Cir. 1990) ....................27

*Banks v. United States*, 314 F.3d 1304 (Fed. Cir. 2003) ....................3

*Bannum, Inc. v. United States*, 59 Fed. Cl. 241 (2003) ....................16, 17

*Bennis v. Michigan*, 516 U.S. 442 (1996) ....................25

*Broomall Indus., Inc. v. Data Design Logic Sys., Inc.*, 786 F.2d 401 (Fed. Cir. 1986) ....................17

*Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449 (Fed. Cir. 1997) ....................13

*Brubaker Amusement Co., Inc. v. United States*, 304 F.3d 1349 (Fed. Cir. 2002) ....................12

*Conoco Inc. v. Department of Energy*, 99 F.3d 387 (Fed. Cir. 1996) ....................17

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ....................23

*Hansen v. United States*, 65 Fed. Cl. 76 (2005)....................12, 13

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991)....................18, 27, 28, 29

*In re Mrs. Perrin's Case*, 4 Ct. Cl. 543 (1868) ....................26

*Jarboe-Lackey Feedlots, Inc. v. United States*, 7 Cl. Ct. 329 (1985) ....................................26

*John R. Sand & Gravel Co. v. United States*, 457 1345 (2006) ..........................................14

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ............................................................29

*Long Island Savings Bank FSB v. United States*, 2007 WL 2685460 *7
(Fed. Cir. 2007) .....................................................................................................................13

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ...................28, 29

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)...............................24, 26

*Martin v. District of Columbia*, 205 U.S. 135 (1907) .........................................................24

*Miller v. Schoene*, 276 U.S. 272 (1928) ...............................................................................26

*Mugler v. Kansas*, 123 U.S. 623 (1887) ...............................................................................26

*Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) ..........................................29

*One (1) Cadillac Coupe De Ville*, 833 F.2d 994 (Fed. Cir. 1987) ...................................25

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) ................................................................23

*Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002) ...............................26, 27

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978)..................................24

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ...................................................24

*Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746 (Fed. Cir. 1988) ...............12

*Seay v. United States*, 61 Fed. Cl. 32 (2004) .......................................................................25

*SmithKline Beecham Corp. v. Apotex Corp.*, 64 F.3d. 1531 (Fed. Cir. 1995) ................13

*The Dalles Irrigation Dist. v. United States*, 127 Fed. Cl. 344 (2006) ..........................13

*United States v. Barron-Caberera*, 119 F.3d 1454 (10th Cir. 1997) ...............................20

*United States v. Dickenson*, 331 U.S. 745 (1947) ..............................................................13

*United States v. Ochoa*, 881 F. Supp. 273 (S.D. Tex. 1995) ........................................19

*United States v. Romero-Bustamente,* 357 F.3d 1104 (9th Cir. 2003) ...........................19

*United States v. Santa Maria*, 15 F.3d 879 (9th Cir. 1994) ..........................................20

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983) .........................13

**STATUTES**

8 U.S.C. § 1357 ..............................................................................18, 19, 20, 23

18 U.S.C. § 981 ..........................................................................................25

28 U.S.C. § 2501 ..........................................................................................13

42 U.S.C. § 9604 ..........................................................................................27

42 U.S.C. § 9606 ..........................................................................................27

**REGULATIONS**

8 C.F.R. § 287..........................................................................................3, 20

**RULES**

Fed. R. Evid. 1006..........................................................................................16

RCFC 12(b)(1) ..........................................................................................12

RCFC 12(b)(6) ..........................................................................................12

RCFC 12(c)..........................................................................................12

RCFC 56..........................................................................................12

**SECONDARY SOURCES**

10B Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2738 ......17

## LIST OF EXHIBITS


| Exhibit | Description | Page(s) |
|---|---|---|
| P-1 | Nov. 20, 2007, Declaration of David Wick ................ | 1, 2, 4, 5, 6, 7, 10, 11, 12, 14, 15, 17 |
| P-2 | Oct. 26, 2007, Declaration of Curtis Weatherred III ..... | 2, 4 |
| P-3 | March 27, 2007, Deposition Excerpts, Darryl Griffen .. | 2, 6, 9 |
| P-4 | Feb. 21, 2007, Deposition of Joseph Granata, Pl. Ex. 22 (Map Showing Secondary Fence Dates of Construction) .............................................. | 6 |
| P-5 | Feb. 20, 2007, Deposition Excerpts, Steven Kean ...... | 6 |
| P-6 | Feb. 21, 2007, Deposition Excerpts, Joe Perez ........... | 6, 9, 10 |
| P-7 | Oct. 19, 2007, Declaration of Steven Kean ................ | 6, 15 |
| P-8 | Feb. 22, 2007, Deposition Excerpts, Alex Roozen ....... | 9 |
| P-9 | Feb. 22, 2007, Deposition Excerpts, Ben Davis ........... | 9 |
| P-10 | Transcript of "Legal Update #1: 25-mile patrol access" (Video Training Presentation by U.S. Customs and Border Protection, Assistant Chief Counsel Peggy DeBeliso) ........................... | 24 |
| P-11 | U.S. Border Patrol, "Linewatch Operations" Pamphlet ....................................................... | 24 |

## INTRODUCTION

This is an action for just compensation for the physical taking of Plaintiff's property, D&D Landholdings, LP ("D&D"), an approximately 135-acre parcel of property ("subject property") located less than a mile north of the Mexican and United States' border. Wick Decl. at ¶6 (Ex. P-1). Plaintiff alleges that the Border Patrol's physical presence and occupation of the subject property has so interfered with its beneficial and productive use of the property as to constitute an unconstitutional, physical taking.

Defendant has moved to dismiss this case or for summary judgment in its favor, claiming that the statute of limitations has run on Plaintiff's claims and that the federal statute pursuant to which the Border Patrol has acted forms a background principle that deprives Plaintiff of possessing a property right that includes the right to exclude Border Patrol agents from its land.

Plaintiff opposes Defendant's motion for several reasons. First, the facts establish that these claims are not time-barred. Defendant rests it motion to dismiss almost entirely on the Border Patrol's apprehension statistics (for which the Defendant has failed to lay a proper foundation and which were not timely produced) for the entire border region. These statistics, however, fail to show much of anything other than Defendant's allegations that apprehensions of illegal aliens increased in the area. They certainly do not support Defendant's claim that this lawsuit is time-barred. Such statistics also show nothing about the level of Border Patrol activity on the subject property nor do they show that the Border Patrol has graded roads on the subject

property (without the owner's permission) since 2001, has damaged construction material and landscaping on the subject property, and has engaged in a concerted campaign of 24/7 surveillance on the subject property that is directed not only at illegal aliens but at the property owner and its employees. Wick Decl. at ¶2 (Ex. P-1). Finally, Defendant's apprehension statistics do not reveal that in September 2004, the Border Patrol installed two seismic intrusion sensors on the parcel, used to detect the presence of illegal aliens. Weatherred III Decl. at ¶¶4, 9 (Ex. P-2).

In direct contrast to Defendant's allegations premised on apprehension statistics, David Wick, the manager for the subject property, states that he has personally observed a dramatic increase of Border Patrol activity on the subject property since 2001, which he attributes to two causes: (1) heightened border security after September 11, 2001 and (2) completion of portions of the Secondary Fence in 2001. Wick Decl. at ¶3 (Ex. P-1). Specifically, in 2001, after the United States completed the 1,722-foot portion of the Secondary Fence, Mr. Wick states that the illegal aliens were funneled directly north onto the subject property, to the Border Patrol's benefit. *Id.* Another portion of the secondary fence was completed in 2006; that portion of the fence enhances the funneling effect because it closed a 674-foot gap between two portions of the secondary fence, further directing illegal entrants seeking transportation out of the mesa area east and then north to the subject property. *See* Griffen Dep. at 34-35 (acknowledging that "traffic has shifted eastward as the fence has been completed") (Ex. P-3). The Border Patrol agents have since 2001 taken full advantage of the funneling effect caused by the location of the fencing system, using the subject property as a permanent staging

ground for the capture of illegal aliens, and for other activities that constitute the permanent, physical occupation of the subject property.

Thus, because the government's activities that caused the physical taking in this case did not accrue or stabilize until at least 2001 or later, Defendant's motion to dismiss this lawsuit as untimely is without merit. *See Banks v. United States*, 314 F.3d 1304 (Fed. Cir. 2003) (reversing summary judgment due to court's misapplication of standard for claim accrual).

Defendant also argues that Section 287(a)(3) of the Immigration and Nationality Act of 1952 provides the Border Patrol with unique and sweeping authority to establish itself as a co-tenant of private land in a massive, 25-mile swath along the U.S.-Mexico border (from California to Texas), without incurring takings liability. However, Defendant fails to cite a single case so holding. Moreover, the statute that Defendant relies upon for this proposition merely authorizes Border Patrol agents to exercise normal police power, to enter private property without a warrant for border patrolling activities that are "customary" or "reasonable and necessary." 8 C.F.R. § 287.1(c). That statute does not form a background principle of real property law, allowing Border Patrol agents unfettered use of the D&D parcel as a staging ground for surveillance and patrolling activities. Moreover, that statute provides the Border Patrol with no authority to enter private property without probable cause to search for drugs or terrorists, or to stop vehicles.

Here, for example, the Border Patrol daily enters and accesses all portions of the parcel in all terrain vehicles (ATVs) and SUVs, on horseback, or on foot. Wick Decl. at

¶¶2, 9, 14 (Ex. P-1). Border Patrol agents have cut and graded roads on the subject property, installed underground motion sensors, destroyed materials and improvements on the property, and even destroyed environmental protections required as a condition of a County-issued grading permit, all of which have been repaired or replaced at the owner's expense. Wick Decl. at ¶15, 17 (Ex. P-1). Armed Border Patrol agents have on many occasions, without probable cause, stopped D&D's property manager, David Wick, in his vehicle on the property, asking him to justify why he is on the property. Wick Decl. at ¶20 (Ex. P-1). Mr. Wick explains that such actions of the Border Patrol have destroyed numerous leasing opportunities for the parcel, leaving the owner with land that primarily serves to benefit the Border Patrol, but not the owner. Wick Decl. at ¶¶9-10 (Ex. P-1). Last summer, Border Patrol agents cut through a fence and private property markings that the property had installed on the parcel, the purpose of which was to keep out trespassers from the property. Wick Decl. at ¶13 (Ex. P-1). Moreover, as previously noted, in 2004, the Border Patrol installed two seismic intrusion sensors on the parcel. Weatherred III Decl. at ¶9 (Ex. P-2).

These facts plainly establish that summary judgment is not warranted in Defendant's favor on liability. Indeed, these facts militate the conclusion that the United States is liable for a physical taking of Plaintiff's property.

For all of these reasons, Plaintiff asks this Court to deny Defendant's motion for dismissal or summary judgment.

## FACTUAL BACKGROUND

**General Background**

The subject property is approximately 135 acres of land along the United States–United Mexican States' border east of the San Diego metro area. The subject property is designated on the Regional Plan for San Diego County for light to heavy industrial (90%) and residential (10%) development, for highly valuable uses such as waste disposal, production of concrete, gravel, and asphalt, power generation, and other uses that are usually located outside population centers. The property is very desirable for heavy industrial and manufacturing uses. Wick Decl. at ¶¶6- 8 (Ex. P-1). Plaintiff acquired the subject property in 2000 specifically for the purpose of leasing it to companies engaged in these specialized, industrial uses. Wick Decl. at ¶7 (Ex. P-1).

In the early 1990s, the United States began construction of the San Diego Border Primary Fence that now stretches from the Pacific Ocean 14 miles eastward toward Plaintiff's property. Def. Mot. at 7. The Primary Fence is approximately 10 feet high and is constructed of steel matting. *Id*.

In 2001, the United States completed construction of nine miles of a Secondary Fence, which runs behind and parallel to the Primary Fence. *Id*. at 10. The Secondary Fence, which is made of steel mesh and is located approximately 130-150 feet north of the Primary Fence begins three miles from the Pacific Ocean, and travels eastward. By 2000, a 6,129-foot portion of the Secondary Fence had been constructed, which traveled south of the subject property, with openings at either end that allowed aliens entering the country illegally to travel west to a more populated area or east and north to the

subject property. *See* Granata Dep., Pl. Ex. 22 (Ex. P-4). In 2001, the United States completed construction of a 1,722-foot portion of the Secondary Fence, which cut off the western access to a populated area that allowed easier escape for illegal aliens entering the country, thereby funneling the illegal aliens east, and up to the D&D parcel. *See* Ex. P-4. In 2006, the United States completed construction of another portion of the Secondary Fence to close a 674-foot gap between the portions of the Secondary Fence completed in 2000 and 2001, *see* Ex. P-4, further enhancing the funneling effect onto the subject property. Other portions of the Secondary Fence, extending it further east, completed in 2005 and 2006 maintained the funneling effect. *See* Wick Decl. at ¶¶2, 3 (Ex. P-1); Griffen Dep. at 34-35 (Ex. P-3); Kean Dep. at 35-36 (acknowledging "shift in illegal activity from the western area further east") (Ex. P-5); Perez Dep. at 25 (acknowledging that Border Patrol's responsibilities have shifted eastward to where fence now terminates) (Ex. P-6).

The direct, foreseeable, and intended effect of Defendant's border control fencing system, particularly the completion of the portions of the Secondary Fence in 2001 and 2006, is the channeling of illegal aliens crossing the border from Mexico, eastward away from the city of San Diego, and north onto Plaintiff's property, where Border Patrol agents await to apprehend, arrest, and deport them. Wick Decl. at ¶3 (Ex. P-1); Kean Decl. at ¶¶7, 11 (Ex. P-7). As a result, the Border Patrol uses the subject property for apprehension and arrest on Plaintiff's property on an almost daily basis. *Id.* During these apprehension activities, Border Patrol vehicles speed across roads cut by the Border Patrol agents on Plaintiff's property, and vans or buses are brought in to haul

away the illegal aliens. Border Patrol agents fan out throughout the parcel on ATVs, horseback, or on foot, responding to visual sightings or to underground motion sensors on the parcel, to capture illegal aliens. Wick Decl. at ¶9 (Ex. P-1). In short, Border Patrol agents occupy the subject property on a round-the-clock basis, using it as a staging area for the activities. *Id*. at ¶3.

**The Border Patrol's Overall Strategy—Prevention Through Deterrence**

The fencing system does not operate in a vacuum, and by itself, the fences would not deter illegal aliens from entering into the United States. Thus, Border Patrol has since the mid-1990s applied a "Prevention Through Deterrence" strategy along the Southwest Border, which includes the San Diego sector, of which the subject property is a part. *See* Def. Ex. 3, CRS-3, CRS-3 n.10. This strategy emphasizes the use of personnel and equipment as a means of controlling illegal immigration along the U.S.-Mexico border. *Id.* Shortly after the creation of the Department of Homeland Security, the Border Patrol was directed to formulate a new strategy that would better reflect the realities of the "post-9/11" security landscape which, of course, focused upon the additional goal of preventing terrorists from entering the country. *See id*. at CRS-4. In March of 2005, the Border Patrol unveiled a new strategy, which included as one of its main objectives the deterrence of illegal entries through improved and enhanced enforcement activities. *Id.*

Through its new strategy, the Border Patrol continues to expand the "Prevention Through Deterrence" approach while incorporating rapid response capabilities. *Id.* at CRS-10. Indeed, approximately 90 percent of Border Patrol agents are deployed along

the Southwest Border with Mexico, a deployment that reflects the Border Patrol's goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing the Border Patrol agents with a tactical advantage over illegal border crossers. *Id.* In short, the drastic increase in illegal alien traffic and Border Patrol activity on Plaintiff's land comports precisely with the Border Patrol's overall strategy to reroute such traffic to less populated areas.

**Border Patrol Activities on the Subject Property**

Since the completion of a 1,722-foot portion of the secondary fence in 2001, the Border Patrol has engaged in almost continuous, round-the-clock occupation of the subject property. During this occupation, the Border Patrol has created, taken over and improved roads on the subject property, threatened to cut open a locked gate on the property, driven all over the property (including off-road areas) on virtually a 24/7 basis, installed two seismic intrusion sensors, and harassed D&D employees, including David Wick, the property manager, as well as his contractors, employees, potential customers, and invitees, as they go about their legitimate activities on the property.

These facts are demonstrated by testimony from both Defendant's and Plaintiff's witnesses. Border Patrol agent Stephen Kean confirmed during his deposition that the Border Patrol essentially has taken over existing agricultural dirt roads on the subject property, going so far as to grade them with road graders and to perform other maintenance activities upon them. Kean Dep. at 58. Darryl Griffen, Chief Patrol Agent for the Border Patrol, testified at his deposition that the Border Patrol had a right to gain

access to D&D's land, even if it means cutting through locked gates to do so. In this respect, Mr. Griffen testified that:

> We may cut the [private gate] lock and replace it with a lock of our own. . . . We may provide an additional key to our lock to the property owner or whomever he would like a duplicate. . . . locking of that gate should not deny us access to that private land if it falls within our statutory authority in our effort to patrol the border to prevent the illegal entry of aliens into the United States. . . .

Griffen Dep. at 113 (Ex. P-3); *see also* Def. Ex. 20. Indeed, Mr. Griffen succinctly summarized the Government's position in this case:

> QUESTION: Mr. Wick does not have the right to deny you [] access to his land?
>
> ANSWER: I do not believe he does, sir.

Griffen Dep. at 113 (Ex. P-3).

The Border Patrol's Joseph Perez confirmed that the cutting of locks is an accepted practice for the Border Patrol when it wants access to private land. Mr. Perez testified at deposition that: "I know that locks have been cut off in the past on different gates, not necessarily [Plaintiff's] gates, but I know that in my career, I have seen locks cut off when [] we get locked out. . . ." Perez Dep. at 66 (Ex. P-6).

In addition, Mr. Perez, along with Alex Roozen and Ben Davis of the Border Patrol, testified that, as a matter of regular practice, they drove on or through Subject property in order to access the Otay Mesa Truck Trail. Perez Dep. at 13, 60 (Ex. P-6); Roozen Dep. at 20, 22 (Ex. P-8); Davis Dep. at 12 (Ex. P-9). Mr. Perez confirmed that he and other agents would drive upon the land on virtually a daily basis and that agents are assigned to the Subject property area "on a daily basis 24 hours a day." Perez Dep.

at 13 (Ex. P-6). This constant occupation of Plaintiff's land by Border Patrol agents and their vehicles has resulted in damage to silt screens designed to help protect environmentally sensitive areas, and to Plaintiff's improvements, inlaid pipes, and materials on the property. Wick Decl. at ¶¶17, 18 (Ex. P-1).

In his declaration, David Wick confirmed the Border Patrol agents' account regarding the roads on the subject property and that the Government had both created and taken over the maintenance of such roads for the Border Patrol's use. Wick Decl. at ¶¶11-13 (Ex. P-1). Mr. Wick testified that the Border Patrol's activities take place throughout the subject property, including off-road areas, particularly because the illegal aliens flee the Border Patrol agents in a random, scattered fashion. Wick Decl. at ¶¶9, 14 (Ex. P-1).

Mr. Wick also testified regarding the numerous occasions that he had been stopped by armed Border Patrol agents on D&D's property; indeed, on many such occasions, a Border Patrol agent has questioned Mr. Wick as though it were a criminal traffic stop. Wick Decl. at ¶¶2, 20 (Ex. P-1). Unsurprisingly, Mr. Wick described these stops as being "accosted" by Border Patrol agents. Wick Decl. at ¶2 (Ex. P-1). Mr. Wick also testified that, on those occasions when he has passengers in his car (often clients who are potential buyers of the subject property), he is stopped by the Border Patrol at an almost 90 percent rate. Wick Decl. at ¶9 (Ex. P-1). Mr. Wick testified that these stops have adverse consequences to his efforts to sell or lease the property. *Id.*

**The Increase in Border Patrol Activity on Plaintiff's Land Since 2001**

According to Mr. Kean of the Border Patrol, the subject property is located within the patrol responsibility of the San Diego Sector's Chula Vista Station and is in Zones 17 and 36, as designated by the Border Patrol. Def. Ex. 29 at ¶4. The majority of Subject property is in Zone 17 and the western third of the property is in Zone 36. *Id.* Apprehension statistics for these various areas that were provided by the Government with its combined motion fail to demonstrate that this claim is time-barred.[1] Defendant's statistics, however, do not address the subject matter of this lawsuit, namely, the activity of the Border Patrol on the D&D parcel. As the manager for the subject property has stated, the Border Patrol's activities, on D&D's property drastically increased during the period 2001 to 2007. Wick Decl. at ¶2 (Ex. P-1). Mr. Wick testified to the enormous increase in illegal alien traffic and enforcement activity on D&D's property during the post-2001 time frame. *Id*. This activity closely followed the completion of the Secondary Fence in 2001 and 2006. In this respect, Mr. Wick testified that the Government's actions upon D&D's property began to impair the property in 2002. *Id.* In addition, Mr. Wick testified by declaration regarding an incident in which he was pursued on D&D's property by a Border Patrol agent who, upon stopping Mr.

[1] It further should be noted that Defendant's statistics were "newly discovered" statistics that were produced to Plaintiff almost at the very close of discovery. As a result, Plaintiff has not had a reasonable opportunity to analyze or otherwise test the accuracy of these statistics. Indeed, Defendant's "offer" to provide a witness regarding these "newly discovered" statistics, *see* Def. Mot. at 39 n.14, came so late in the discovery process that Plaintiff did not have a reasonable opportunity to conduct any discovery regarding the statistics. This contravenes the provisions of Fed. R. Evid. 1006 ("The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.").

Wick in his vehicle, demanded proof that Mr. Wick was entitled to be on the property. Wick Decl. at ¶20 (Ex. P-1).

**LEGAL STANDARDS**

To analyze a motion to dismiss for lack of subject matter jurisdiction, the court considers the allegations in the complaint as true. *See Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005) (involving a taking case where the Government filed motions pursuant to RCFC 12(b)(1), 12(b)(6) and 56) (citing *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir. 1988)). When a motion to dismiss challenges the jurisdictional facts alleged in the complaint, the court may consider relevant evidence beyond the pleadings to determine whether jurisdiction is proper. *Id.* Although a plaintiff must prove by a preponderance of the evidence that the court has subject matter jurisdiction, (*id.* at 748), at this point, the court does not decide "whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Hansen*, 65 Fed. Cl. at 94 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

To address a motion to dismiss under Rule 12(b)(6), the court "assumes that all well-pled factual allegations are true and resolves all reasonable inferences in favor of the nonmovant." *Hansen v. United States*, 65 Fed. Cl. 76, (citing *Brubaker Amusement Co., Inc. v. United States,* 304 F.3d 1349, 1355 (Fed. Cir. 2002)). Because the court considers evidence outside of the pleadings, defendant's motion to dismiss under RCFC 12(b)(6) is treated as a motion for summary judgment under RCFC 56. *See id.*; RCFC 12(c). Special care is required in addressing summary judgment motions in a takings case context; indeed, courts should avoid "precipitous grants of summary judgment" in

takings cases due to their "fact-intensive" nature. *See Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983).

Summary judgment is proper only if the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Long Island Savings Bank FSB v. United States*, 2007 WL 2685460 *7 (Fed. Cir. 2007) (citations omitted). If there are factual disputes that could make a difference under the governing law, courts must resolve them in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). *See also SmithKline Beecham Corp. v. Apotex Corp.*, 64 F.3d. 1531, 1539 (Fed. Cir. 1995) (en banc). Thus, the court does not determine the truth of the facts alleged at the summary judgment phase, but instead determines whether a proper jury question has been presented. *Hansen*, 65 Fed. Cl. at 95 (citing *Anderson*, 477 U.S. at 247).

## REASONS FOR DENYING DEFENDANT'S COMBINED MOTION

### I. Plaintiff's Takings Claim Accrued Well Within the Applicable Six-Year Statute of Limitations

This Court may exercise subject matter jurisdiction over a claim if it "is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Within the meaning of the statute of limitations, a claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *The Dalles Irrig. Dist. v. United States,* 71 Fed. Cl. 344, 351 (2006) (citing *Brown Park Estates-Fairfield Dev. Co. v. United States,* 127 F.3d 1449, 1455 (Fed. Cir. 1997)). *See also United States v. Dickenson*, 331 U.S. 745, 749 (1947) (plaintiffs' claims for a taking were not

barred by the statute of limitations "until the situation becomes stabilized," i.e., "until the consequences of [the government action] have so manifested themselves that a final account may be struck.") In addition, the claim accrues only if the plaintiff knew or should have known of the existence of the events fixing the government's liability. *John R. Sand & Gravel Co. v. United States,* 457 1345, 1355-56 (2006) (citations omitted). For purposes of a physical taking, the claim accrues when the Government takes possession of the property or declares itself "to be a co-tenant in possession" of the property. *Id.* at 1358.

The Government's motion to dismiss fails because Plaintiff's action accrued upon the construction of the Secondary Fence beginning in 2001 and the Government's subsequent activities on Plaintiff's property, the construction of roads and their improvements, and the Border Patrol's establishment of a base of interdiction operations on Plaintiff's land. Wick Decl. at ¶¶2, 4 (Ex. P-1). Indeed, it was shortly after this time that the Government began "declaring" to Plaintiff, through its construction efforts and its constant presence that it essentially it was a co-tenant in possession of the subject property. Wick Decl. at ¶9 (Ex. P-1). Because these events occurred well within the six-year statute of limitations period, Plaintiff's complaint was timely filed.

### A. The Border Patrol's Activities on the Subject Property Dramatically Increased in 2001

The facts here confirm that, upon the completion of the 2001 portion of the Secondary Fence in 2001, illegal aliens began using Plaintiff's property as a passageway

into this country and, consequently, the Border Patrol began using Plaintiff's property as a base of operations for interdiction activity. In his declaration, Mr. Wick confirmed that the Border Patrol's activities began dramatically increasing shortly the terrorist attacks on the United States on September 11, 2001, and after the completion of the fence. Wick Decl. at ¶¶2, 3 (Ex. P-1). At that time, the Border Patrol began creating roads upon Plaintiff's property, and increased its operations to virtually around-the-clock. *Id.*

Mr. Wick has testified to the enormous increase in both illegal alien traffic and enforcement activity on D&D's property during the 2002 time frame, which closely followed the completion of the Secondary Fence in 2001. *Id.* Thus, the facts demonstrate that the completion of the fence had the desired effect – to channel the flow of aliens toward the open territory of Plaintiff's land, where the Border Patrol's interdiction efforts could be most effective. Kean Decl. at ¶¶7-8 (Ex. P-7). This, of course, comports precisely with the agency's new interdiction strategy.

As a consequence of these facts, as well as the requirement that the allegations in the complaint be considered as true at this stage, the Government's motion to dismiss must be denied. There plainly is sufficient evidence demonstrating that Plaintiff's claim accrued at the earliest, upon the completion of the secondary fence in 2001. As a result, Plaintiff's December 22, 2006 complaint is timely filed.

**B. Defendant's Apprehension Statistics Are Inadmissible and Irrelevant**

Defendant contends that the Border Patrol has always conducted patrol activities upon Plaintiff's land and, therefore, that Plaintiff's claim accrued outside the limitations

period. In support of this argument, Defendant principally relies upon a protracted presentation of apprehension statistics from the San Diego-Tijuana border area. Def. Mot. at 11-14. The Government's statistical presentation, however, is fatally flawed for several reasons and cannot form the basis for Defendant's dispositive motion.

First, as Defendant admits, the apprehension statistics are "incomplete" and "imperfect," *see* Def. Mot. at 11, 12 n.7; thus, by Defendant's own admission, they lack the reliability necessary for a dispositive motion. Indeed, Defendant specifically admits that, for a key period at issue, the 2003-2004 timeframe, its statistics are not complete. *Id.* at 12 n.7. This alone warrants the denial of Defendant's combined motion.

In addition, Defendant has failed to provide adequate authentication of the statistics to allow the Court to determine whether they are sufficiently reliable and has further failed to provide any expert testimony that would interpret the meaning of the statistics. Although Defendant offers the declaration of Janel D. Frith (Def. Ex. 31) in support of the charts and graphs reflecting apprehension statistics and trends (Def. Exs. 12-A & B, 16, 17), Ms. Frith is obviously working from statistics compiled by others, and has no personal knowledge of the origin, accuracy or authenticity of the data underlying her charts and graphs. As a result, no foundation for the admissibility of the underlying data for the charts and graphs has been established as required by Fed. R. Evid. 1006. *See Bannum, Inc. v. United States,* 59 Fed. Cl. 241, 244-45 (2003) (For a summary to be admissible under Rule 1006, the proponent must lay a proper foundation by establishing that the underlying evidence itself is admissible.). Because the charts and graphs are inadmissible, they may not form the basis for Defendant's

dispositive motion. *See AFD Fund v. United States*, 61 Fed. Cl. 540, 543 (2004) (it is axiomatic that a claimant must establish by admissible evidence that it is entitled to judgment as a matter of law, regardless of whether that showing is made on motion for summary judgment or after trial on the merits); *Broomall Indus., Inc. v. Data Design Logic Sys., Inc.,* 786 F.2d 401, 405 (Fed. Cir. 1986).[2]

Finally, this suit is based upon the Border Patrol's occupation and activities on the subject property which, according to Defendant's own witnesses, is located in Zones 17 and 36. Def. Ex. 29; Keane Decl. at ¶4. Defendant provides no evidence whatsoever for Zone 36.

In stark contrast to Defendant's apprehension statistics, D&D's property manager, David Wick, has stated that Border Patrol activity on the subject property increased dramatically after 2001. Wick Decl. at ¶2 (Ex. P-1). Because this testimony directly contradicts facts material to the statute of limitations issue, Defendant's motion should be denied.

[2] *See also Bannum, Inc. v. United States*, 59 Fed. Cl. at 244 (the Court may not grant summary judgment to a moving party based solely on evidence that arguably may not be adduced and admitted at trial) (citing *Conoco, Inc. v. Department of Energy*, 99 F.3d 387, 393-95 (Fed. Cir. 1996) (vacating a grant of summary judgment based on inadmissible evidence)). *See also* 10B Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2738 at 342 (1998) ("Since the burden is on the party moving for summary judgment to demonstrate that there is no genuine issue of material fact, the movant also must show that the content of his affidavits would be admissible at trial.")

## II. The Government's Motion for Summary Judgment Should Be Denied As Meritless

Contrary to Defendant's contention, no background principle of property law deprives D&D of a cognizable property right which has been taken in this case. Although Border Patrol agents are entitled to access Plaintiff's land to prevent illegal immigration, Defendant's road grading, destruction of gates and construction work, and permanent round-the-clock occupancy of Plaintiff's property constitutes a physical taking for which just compensation is due. Nor is there any police power exemption from the Fifth Amendment's just compensation requirement, as Defendant contends. To the contrary, liability in this case is directly controlled by the Federal Circuit's decision in *Hendler v. United States*, 952 F.2d 1364 (1991), and compels the conclusion that Plaintiff has suffered a compensable physical taking in this case. Finally, Defendant's own assertions of disagreement on material facts makes this case unsuitable for summary judgment.

### A. Nothing in the 1952 Immigration Act or Its Implementing Regulations Created a Background Principle of Real Property Law

Section 287(a)(3) of the Immigration and Nationality Act of 1952 , 8 U.S.C. § 1357, does not create a new background principle of real property law, applicable to a 25-mile wide swath of the United States adjacent to both the Mexican and Canadian borders, as the government contends. Rather, as the text and context of the statute make clear, the cited language merely lists as one of the powers of a Border Patrol agent (together with arrest and interrogation of aliens) the authority to enter ships, trains, cars and private land without first obtaining a search warrant—and nothing more. The statute does not,

as the Government contends, grant it the right to take over and permanently occupy private land without paying for it as the Fifth Amendment requires. The statute is titled "Powers of immigration officers and employees," and it empowers:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General, without warrant-- (1) to interrogate any alien . . . as to his right to be or to remain in the United States; (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law . . . ;(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States; (4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens…; and (5) to make arrests [for other offenses].

8 U.S.C. § 1357(a)(3).

The courts have narrowly construed this right of access, in recognition of the Fourth Amendment's protection against warrantless searches and arrests. In *United States v. Romero-Bustamente*, 337 F.3d 1104, 1109 (9th Cir. 2003), the court held that the right of entry does not extend to the backyard or curtilage of a home, since "[a]side from the obvious constitutional implications of such an interpretation, we seriously doubt that Congress intended to give the Border Patrol such unique and sweeping power." In *United States v. Ochoa*, 881 F. Supp. 273 (S.D. Tex. 1995), the court held the statute authorizes entry into a fenced lot to search for aliens where agents had probable cause, specifically tracked footprints of a person emerging from a river. The courts have imposed similarly strict limitations on the agent's warrantless search of vehicles.

*See Almeida-Sanchez v. United States,* 413 U.S. 266, 268 (1973) (search of a vehicle in area 20 miles north of border violated Fourth Amendment where Border Patrol agent lacked probable cause); *United States v. Barron-Caberera*, 119 F.3d 1454, 1459-60 (10th Cir. 1997) ("Border patrol agents on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that those vehicles' occupants may be involved in criminal activity.").

Moreover, because it is limited to access only to prevent aliens from entering the United States, the statute does not authorize warrantless entry and searches for drugs or other non-immigration purposes. In *United States v. Santa Maria*, 15 F.3d 879, 881 (9th Cir. 1994), the court held 8 U.S.C. § 1357(a)(3) "only authorizes" Border Patrol "to conduct administrative searches for aliens" and "[t]o expand this power to include searches for narcotics is impermissible." Absent probable cause or consent, the court found a drug search was both unauthorized and a violation of the Fourth Amendment.

Defendant's argument that the statute creates a principle of real property law is not aided by the regulatory definition of the phrase "patrolling the border" (defined as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States," 8 C.F.R. § 287.1(c)), for that defined term appears only once, in a regulation listing the classes of government agents entitled to patrol the border—which has nothing to do with property rights. That regulation, 8 C.F.R. § 287.5, is titled "Exercise of power by immigration officers," and it merely

authorizes those who have successfully completed immigration enforcement training to patrol the border:

> (b) Power and authority to patrol the border. The following immigration officers who have successfully completed basic immigration law enforcement training are hereby authorized and designated to exercise the power to patrol the border conferred by section 287(a)(3) of the Act:
> (1) Border patrol agents, including aircraft pilots;
> (2) Special agents;
> (3) Immigration inspectors (seaport operations only);
> (4) Adjudications officers and deportation officers when in the uniform of an immigration inspector and performing inspections or supervising other immigration inspectors performing inspections (seaport operations only);
> (5) Supervisory and managerial personnel who are responsible for supervising the activities of those officers listed in this paragraph; and
> (6) Immigration officers who need the authority to patrol the border under section 287(a)(3) of the Act in order to effectively accomplish their individual missions and who are designated, individually or as a class, by the Commissioner of CBP, or the Assistant Secretary for ICE.

The Border Patrol's own limited interpretation of its access authority is confirmed by the script of a training program presented by U.S. Customs And Border Protection, Assistant Chief Counsel Peggy DeBeliso, who is responsible for training the field agents who occupy Plaintiff's land on the law applicable to performance of their duties. In that program, Ms. DeBeliso instructs Border Patrol Agents that the Border Patrol's authority to access private property does not include road grading or other damage to the property, and that access without the owner's permission is an extreme measure (not a property right). Ms. DeBeliso states:

> It is important to note that the authority to access border lands does <u>not</u> authorize Agents to do things which change the condition of private land, or which affects the value of private land. If Border Patrol access includes any digging, grading, building, for construction of any kind, we must generally negotiate a lease, land use agreement, or some other form of

> permission from the landowner prior to beginning any construction project. . . .
>
> [P]atrolling the border . . . includes activities by the Border Patrol which are both reasonable and necessary to prevent the illegal entry of aliens into the United States.
>
> The first step requires supervisors to make efforts to conduct a personal interview, in order to persuade the landowner to authorize access to the land for our patrol purposes. If that doesn't work, the next step is to place the landowner on notice of the law by registered mail. The Sector Counsel's office will send the landowner a registered letter explaining our legal authority to access border lauds, and we'll confirm the landowner's receipt of this notice.
>
> The Operations Instruction states that "after all methods of persuasion have failed including efforts by personal interview and the placing of the landowner on notice of the law by registered mail, officers may gain access; to areas within the 25-mile area by the most expeditious means, if absolutely necessary. This is an extreme measure and is to be resorted to only on the direction of a supervisory officer after careful consideration. The fences and gates should be immediately repaired and precautions taken to avoid damage to the property."

Transcript of "Legal Update #1: 25-mile patrol access" (video training presentation by U.S. Customs And Border Protection, Assistant Chief Counsel Peggy DeBeliso on the legal requirements of accessing privately owned land), DHS12175-78 (Ex. P-10).

Thus, as the Border Patrol's San Diego sector policy statement to its agents confirms, the Border Patrol respects private property rights:

> We respect the rights of the private landowners and residents who live and work in the border areas which we patrol, and we strive to conduct any necessary law enforcement operations on private property in accordance with the Border Patrol's highest standards of safety and professionalism.

U.S. Border Patrol, San Diego Sector, "Linewatch Operations" (pamphlet), DHS17921, 17923 (Ex. P-11).

Finally, the Government's argument that the Roosevelt Proclamation should be considered part of the background principles for Plaintiff's property is particularly meritless. Def. Mot. at 26. Indeed, as the language quoted by the Government plainly reflects, that Proclamation was intended to reserve a strip of border land from the "public lands." This Proclamation simply does not apply to private land, such as the subject property, and cannot be deemed to contribute to the background principles for that property.

In short, there is no background principle of real property law that allows the Border Patrol to permanently occupy Plaintiff's land without triggering Plaintiff's Fifth Amendment just compensation right. Section 1357 deals with agent authority, not real property law, and no case has ever held that the Border Patrol has the right to occupy and alter private property without paying for it as the government claims here.

### B. The Exercise of Police Power May Constitute a Taking for Which Just Compensation Is Due

Defendant cites no case to support its assertion that an exercise of the police power cannot also be a taking, and D&D is aware of none. To the contrary, a venerable line of Supreme Court cases holds that valid exercises of the police power can be compensable takings under the Fifth Amendment. *See, e.g., Palazzolo v. Rhode Island*, 533 U.S. 606, 635 n.* (2001) (O'Connor, J., concurring) ("The first question is whether the enactment or application of a regulation constitutes a valid exercise of the police power. The second question is whether the State must compensate a property owner for a diminution in value effected by the State's exercise of its police power."); *Dolan v. City of*

*Tigard*, 512 U.S. 374, 390 (1994) ("[I]f the local government cannot demonstrate that its exaction is directly proportional to the specifically created need, the exaction becomes a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations.") (citation and internal quotations omitted); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1026 (1992) ("The South Carolina Supreme Court's approach would essentially nullify Mahon's affirmation of limits to the noncompensable exercise of the police power. Our cases provide no support for this . . . ."); *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 149 (1978) ("A taking does not become a noncompensable exercise of police power simply because the government in its grace allows the owner to make some 'reasonable' use of his property."); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. . . . When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States."); *Martin v. District of Columbia*, 205 U.S. 135, 139 (1907) ("To illustrate: Under the police power, in its strict sense, a certain limit might be set to the height of buildings without compensation; but to make that limit 5 feet would require compensation and a taking by eminent domain.")

Defendant's reliance on asset forfeiture cases is misplaced, for forfeiture is not the exercise of the eminent domain power, but rather imposition of a penalty upon the

owner of the proceeds of illegal activity or the instrumentality of the crime through an entirely different process, which transfers title to the government without eminent domain. As the Supreme Court explained in *Bennis v. Michigan*, 516 U.S. 442, 452 (1996): "[T]he property in the automobile was transferred by virtue of that proceeding from petitioner to the State. The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."

The asset forfeiture proceeding provides the owner with a due process hearing to determine title. *E.g.*, 18 U.S.C. § 981(b)(3) ("Any motion for the return of property seized under this section shall be filed in the district court in which the seizure warrant was issued or in the district court for the district in which the property was seized."). Here, the government has not acquired an interest in D&D's land via any asset forfeiture proceeding, and therefore all of the asset forfeiture cases cited by Defendant are entirely inapposite. *See Seay v. United States*, 61 Fed. Cl. 32 (2004) (involving property seized from owner who was target of a search warrant for unlicensed manufacture of designs protected by trademark and copyright); *One (1)Cadillac Coupe De Ville,* 833 F.2d 994 (Fed. Cir. 1987) (involving seizure of arrested cocaine dealer's car); *$7,990 in U.S. Currency*, 170 F.3d 843 (8th Cir. 1999) (involving cash forfeited by alleged drug dealer); *Bennis v. Michigan,* 516 U.S. 442 (1996) (involving forfeiture of automobile because of criminal conduct by joint owner); *Alde v. United States,* 28 Fed. Cl. 26 (1993) (involving seizure of airplane because of failure to properly request landing rights).

Nor is Plaintiff's land contraband, like the counterfeit computer parts seized in

*Acadia Technology, Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006), on which Defendant relies so heavily:

> When property has been seized pursuant to the criminal laws or subjected to *in rem* forfeiture proceedings, such deprivations are not "takings" for which the owner is entitled to compensation"…. A Customs seizure of goods suspected of bearing counterfeit marks is a classic example of the government's exercise of the police power to condemn contraband or noxious goods, an exercise that has not been regarded as a taking for public use for which compensation must be paid.

*Id.* at 1331-32.

Similarly, the Government's reliance on nuisance cases is misplaced, for D&D's use of its land for development is not a nuisance. As the Supreme Court has held, government may not simply declare land development a nuisance and thus defeat the right to just compensation. *See Lucas v. South Carolina Coastal Council*, 505 U.S. at 1031 ("As we have said, a 'State, by *ipse dixit,* may not transform private property into public property without compensation . . . .'"). *See also Miller v. Schoene*, 276 U.S. 272 (1928) (destruction of red cedar trees to prevent the infection of commercial apple orchards); *Mugler v. Kansas*, 123 U.S. 623 (1887) (involving a state-issued license to sell intoxicants, which court observed had been traditionally legislated as a nuisance); *Jarboe-Lackey Feedlots, Inc. v. United States,* 7 Cl. Ct. 329 (1985) (involving seizure of cattle when owner used disapproved drugs on cattle after the FDA issued ban of drugs, thus threatening beef-consuming public).[3]

---

[3] Two other cases cited by Defendant, *In re Mrs. Perrin's Case*, 4 Ct. Cl. 543 (1868) and *Paradissiotis v. United States*, 304 F.3d 1271 (Fed. Cir. 2002) are equally inapposite to this case. Perrin involved a claim by a woman living in a foreign country seeking Fifth Amendment compensation for the destruction of her property by an American ship of

In short, the exercise of police power can be a taking; there is quite simply no law enforcement exception to the just compensation clause of the Fifth Amendment. Forfeiture cases, in which title is transferred to the government as a penalty for wrongdoing, do not implicate the Fifth Amendment because they are not a "taking" under the power of eminent domain. Since Plaintiff has not committed any unlawful activity, and the government has not acquired title through a forfeiture proceeding, Defendant's permanent occupancy here is a taking which requires just compensation under the Fifth Amendment.

**C. This Case Is Governed By Physical Takings Precedent**

The present case is governed by physical takings cases such as *Hendler v. United States*, 952 F.2d 1364 (1991), in which EPA's exercise of its statutory right to access property to clean up hazardous substances under the Superfund statute, 42 U.S.C. §§ 9606(a), 9604(a), (b), (e), was held to be a physical taking for which just compensation was due under the Fifth Amendment. In that case, "The evidence before the court was that Government vehicles and equipment entered upon plaintiffs' land from time to time, without permission, for purposes of installing and servicing the various wells. They remained on the land for whatever duration was necessary to conduct their activities, and then left, only to return again when the Government desired." 952 F.2d

---

war. *Parridissiotis* involved a Cyprus citizen with ties to Libya seeking compensation for the freezing of his assets. Neither of these cases is remotely analogous to the case at bar. *Atlas Corp. v. United States*, 895 F.2d 745 (Fed. Cir. 1990) a case involving a dispute over the disposal of uranium mill tailings, was a regulatory takings case that provides no guidance for the physical taking that has occurred in this case.

at 1377. Noting that "[i]n the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession – the right to exclude strangers, or for that matter friends, but especially the Government," *id*. at 1374, the court stated:

> The intruder who enters clothed in the robes of authority in broad daylight commits no less an invasion of these rights than if he sneaks in in the night wearing a burglar's mask. In some ways, entry by the authorities is more to be feared, since the citizen's right to defend against the intrusion may seem less clear. Courts should leave no doubt as to whose side the law stands upon.

*Id*. at 1375. Accordingly, the Federal Circuit concluded: "When the governmental intrusion is as substantial a physical occupancy of private property as this is, *Loretto* establishes that there is a taking." Id. at 1377 (citing *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982)).

Importantly, the *Hendler* Court specifically found that the fact that the Superfund statute granted EPA authority to access private property played no part in its finding of a physical taking: "We emphasize that the issue is *not* whether the Government had the right to impose itself and its activities on these plaintiffs. Whatever right the plaintiffs had to be let alone was overcome by the Government's need in the interest of public health and safety to monitor the ground water contamination." 952 F.2d at 1378.

The *Hendler* Court relied on a series of Supreme Court precedents such as *Loretto*, holding the non-consensual attachment of a cable box to a private apartment building pursuant to state statute to be a physical taking. In *Loretto*, in turn, the Supreme Court reiterated its reliance on a long line of physical taking cases to require just compensation for the Government's physical occupation of private land:

> [W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, 'the character of the government action" not only is an important factor in resolving whether the action works a taking, but also is determinative.

458 U.S. at 426.

*Hendler* also relied on *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), in which the Supreme Court held the government's imposition of the navigation servitude on a formerly private pond was a taking for which just compensation was due. The *Hendler* Court quoted the Supreme Court as follows:

> In this case, we hold that the "right to exclude," so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation.... the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina.... And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation (citations omitted).

Finally, the *Hendler* Court relied on *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), quoting the Supreme Court's holding that a taking has occurred, even where no one individual is allowed to remain permanently on the premises:

> We have repeatedly held that, as to property reserved by its owner for private use, 'the right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property." [citing *Loretto* and *Kaiser Aetna* ] . . . We think a 'permanent physical occupation' has occurred ... where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.

952 F.2d at 1377.

Since no background principle of real property law deprived Plaintiff of its right to exclude, Defendant's permanent occupancy of Plaintiff's land is a taking for which just compensation must be paid.

**D. Triable Issues of Fact Preclude Summary Judgment in This Case**

Defendant's entire summary judgment motion is predicated on its untenable argument that Plaintiff had no right to exclude which could be taken. Once that argument is rejected, the case is revealed as one in which the parties apparently disagree on the nature and extent of Defendant's physical occupancy of Plaintiff's property. For that reason, neither party can be granted summary judgment.

That Defendant challenges material facts that Plaintiff relies on in support of its takings claim confirms that the claims are not suceptable to summary disposition. Defendant challenges Plaintiff's contentions regarding the channeling effect of the Secondary Fence, Def. Mot. at 33, the Border Patrol's attempts to access fenced portions of Plaintiff's property, *id.* at 35, the occasions on which Border Patrol agents have harassed Plaintiff on its land, *id.* at 36, and Defendant's statements to Plaintiff that the Government owns the subject property. *Id.* at 37.

**CONCLUSION**

For all of these reasons, Plaintiff respectfully requests this Court to deny Defendant's motion to dismiss and for summary judgment.

Respectfully submitted,

__/s Roger J. Marzulla ____

Roger J. Marzulla
Gregory T. Jaeger
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: November 21, 2007

Counsel for Plaintiff