IN THE UNITED STATES COURT OF FEDERAL CLAIMS

D &D LANDHOLDINGS, a Limited Partnership,

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 06-877 L
Hon. Margaret M. Sweeney

**NOTICE OF FILING DECLARATION OF DAVID WICK**

Pursuant to the November 27, 2007 Order of the Court, Plaintiffs respectfully notify the Court that they are filing the Declaration of David Wick, attached hereto.

Respectfully submitted,

s/ Roger J. Marzulla
Roger J. Marzulla
Gregory T. Jaeger
MARZULLA & MARZULLA
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
202-822-6760
202-882-6774 (fax)

Dated: November 30, 2007

Counsel for Plaintiff

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| D & D LANDHOLDINGS, a Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 06-877 L<br>Hon. Margaret M. Sweeney |

**DECLARATION OF DAVID WICK**

I, David Wick, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am, and have been since 1992, an employee of S.D. Commercial, LLC, a California corporation, or its predecessor, a California property management company, with its principal place of business located at 5440 Morehouse Drive, Suite 4000, San Diego, California 92121. Throughout that time, I have been the person primarily responsible for the management of all of the property owned by Plaintiff, D & D Landholdings, LP ("D & D"), including the approximately 135 acres of land which is the subject of this lawsuit, and which I refer to in this declaration as the "subject property." I am intimately familiar with the history, topography, financing, and development plans for the subject property since 1992, and I can personally testify to the facts set forth in this declaration.

2. Since 1992, I have visited the subject property, together with other properties I manage, on average about once a week in connection with my duties. Commencing in 2001 or 2002, I observed a tremendous increase in Border Patrol

activities on the subject property. D & D owns other property in the area, but I have not seen the level of Border Patrol activities on those parcels as I have seen on the subject property. Whereas I had seen an occasional agent in a vehicle or on horseback before the September 11, 2001, terrorist attack, after the attack there seemed to be a geometric multiplication of Border Patrol presence and activities on D & D's land. After 2001, I was no longer able to visit the subject property without being accosted or under surveillance by heavily armed Border Patrol agents who questioned me regarding my business on the subject property. Around 2002, the Border Patrol started grading new roads across the subject property, detouring around or destroying barricades which D & D had erected to keep the public out, damaging our ongoing construction activities by driving their vehicles through the middle of our construction sites, and scaring away potential customers for the land by their show of overwhelming armed force and round-the-clock use of D & D's land.

3. I attributed this overwhelming Border Patrol presence on the subject property not only to the September 11, 2001 attack, but also to the fact that at about the same time the secondary fence had been completed up to a point immediately south of the subject property. (The attached map, marked Exhibit 1, depicts the relationship between the fence and the subject property.) Until completion of the fence in 2001, illegal aliens who were able to get past the primary fence had several miles of unfenced frontier, which they could use to go north to illegally enter the United States. Completion of the fence squeezed this down to a "gateway" about a mile wide, bounded by the fence to the west and Otay Mountain (a significant obstacle) to the east. The path of least resistance for all of the illegal aliens who were deterred by the new fence was simply to

walk around the end of it and then head north over the subject property. Knowing this, the Border Patrol utilized the subject property as an ideal observation point because of the high ground on the parcel, and as an easy way to access other properties around the area. Border Patrol agents also use the subject property as a location to corral and capture these illegal aliens, who are by reason of the fence now directed north into a far more confined area. In particular, the motion-detection sensors that the Border Patrol has located underground on the property assist in the Border Patrol's efforts to locate illegal aliens on the parcel. Thus, with the completion of the secondary fence in 2001, Border Patrol activities – including new road construction and other use of D & D's land – have dramatically increased over the level of activity that I witnessed on the property prior to 2001.

4. I have had innumerable conversations with Border Patrol officials, from the agents in the field to upper level management at the regional headquarters, protesting Border Patrol activities on D & D's land. In these discussions I have offered to lease the subject property, or portions of it, for Border Patrol activities, to grant easements for access roads, and to develop an agreement which would allow D & D to proceed with its development of the subject property while the Border Patrol accomplishes its mission as well. Although Border Patrol officials have been polite, they have firmly asserted that they have a statutory right to engage in all of the activities on D & D's land described in this declaration, and that they do not require D & D's permission to do so. Accordingly, the Border Patrol has thus far refused to pay for or to limit any of its activities on the subject property, and has claimed the right to use all of the subject property permanently and continuously for its activities, just as if the Border Patrol owned the property.

5. In these conversations over the past several years, Border Patrol officials have repeatedly stated to me that the last mile of the secondary fence would soon be completed, and that this would drastically reduce the Border Patrol activities on the subject property. D & D at first agreed to wait and take no action but, as months dragged into years and no work on the last mile of the fence began, D & D lost confidence that this solution to its concerns would happen in the near future. At present, public statements of the Border Patrol suggest that the fence will be completed five years from now, but no work has begun on the project. In fact, the government has not yet even appraised the land (owned by one of the companies whose land I manage) needed to construct this last mile of the fence. In frustration, after several years of these discussions, I finally recommended that D & D file this lawsuit.

**The Border Patrol Has Blocked D & D's Ability to Develop the Subject Property**

6. The subject property consists of approximately 135 acres of land located east of the city of San Diego, in a sparsely populated portion of San Diego County. It is approximately .75 mile north of the Mexican border. The subject property is zoned by the County for light to heavy industrial (90%) and residential (10%) uses, and is ideally situated for industrial uses that are essential to modern urban life but must be separated from large population centers. In the last couple of years, the subject property has been serviced by paved county roads and contiguous utility services have been made available.

7. D & D acquired the subject property in early 2000. The subject property was not ripe for development until around 2000, when market conditions and infrastructure availability began to make it a very desirable parcel for heavy industrial and manufacturing uses. In the meantime D & D entered into occasional, short term

leases for low value activities such as sludge disposal and heavy equipment storage. These short-term leases barely paid the taxes, and were only intended to fill in until a permanent, major use could be installed on the property. D & D's development plan was to enter into one or two long-term leases for the entire 135 acres, for the construction of a racetrack or similar high-value use. The Border Patrol even vigorously opposed local development approval of a Formula 500 Raceway on the parcel, so as to leave the parcel open for their activities on it.

8. The potential users for the subject property is a relatively small group of highly sophisticated and demanding national companies in businesses such as power generation, building materials, waste disposal, or prison administration. The typical customer is looking for a site which is zoned for its particular use, well located, and physically adaptable to its specific needs. Before visiting the property, a potential customer that would lease the subject property generally undertakes a comprehensive feasibility study to identify potential sites for its plant or facility, since tens or even hundreds of millions of dollars are at stake, and demands that a property fulfill all of its requirements. In my experience, the landowner gets one good shot at selling to such a customer and, if the visit to the property does not go well, the customer does not return.

9. In the last several years, I have, on average, shown the subject property to about five to ten customers per year. The majority of these customer visits were interrupted and ultimately spoiled by the actions of Border Patrol agents. On approximately 90 percent of these sales visits, one or more armed Border Patrol agents accosted the customer and me, requiring that we justify our presence on the subject property. In many cases, the Border Patrol agents questioned our ownership of the land,

and stated their deep suspicion of my sales activities. We would also often observe Border Patrol agents driving all-terrain vehicles and sports utility vehicles on and off roads on the subject property, prompting questions from potential customers about the rights of the Border Patrol to use the land they were considering for their own projects. Many customers directly expressed to me their dismay at the groups of armed Border Patrol agents roving the D & D property, stating that they just could not see building their project in such a war zone atmosphere. As a direct consequence of these encounters with the Border Patrol not a single sale or lease for development of the subject property was consummated, costing D & D millions of dollars in foregone profits from the land.

10. Many of these customers explicitly stated that they did not want to have to contend with Border Patrol interference, and thus were not interested in purchasing or leasing the subject property. Some even asked how any development could possibly take place on the land in the face of the Border Patrol's pervasive and continuous presence. I found it very difficult to answer these questions, and could not assure these customers that their projects could be developed free of Border Patrol interference. They ultimately found other properties on which to build their projects. For example, one such potential customer acquired land in Potrero, California, which is located only 2.14 miles from the border.

**The Border Patrol Has Graded New Roads on the Subject Property**

11. Treating D & D's property as its own, the Border Patrol has created several miles of unpaved roads on the subject property over D & D's vehement protest. Within the past five years the Border Patrol has brought grading equipment onto the subject property to grade and maintain roads for its own access, particularly to reach

Otay Truck Trail from Alta Road. Attached as Exhibit 2 is a map showing the new roads which the Border Patrol has created on D & D's land. This activity has occurred without D & D's permission, and indeed over D & D's vehement protest. Although D & D has expressed a willingness to grant an easement to the Border Patrol for appropriate consideration, the Border Patrol has insisted that it has the right to grade these roads on D & D's land without an easement.

12. During the past five years, the Border Patrol has created and or graded several roads on D & D's property without its permission. Each road is approximately twelve feet wide and has a total combined length of approximately one to two miles. The roads are either dirt or gravel. Border Patrol agents drive on these roads everyday.

13. On or about June 22, 2007, one of our workers informed me that he placed a "No Trespassing" sign along the northern boundary of Energy Center Way, a road that is often used by Border Patrol agents to access the Otay Truck Trail. The purpose of this sign was to put the Border Patrol on notice that the subject property is privately owned. To discourage the Border Patrol from using the D & D parcel, the engineer constructed a fence along the curb to inhibit passage. In addition, he placed a pile of rocks on the existing dirt path, which extends from the north curb of Energy Center Way in a general northeast direction. On June 26, 2007, when our worker visited the site, he noticed the following: (1) the fence was cut and a large section was destroyed, and (2) the pile of rocks were all removed and scattered along the side of the dirt road.

**The Border Patrol Has Damaged Non-Road and Environmentally Sensitive Areas by Continuously Driving over Them**

14. Over the past four or five years, the Border Patrol agents have continuously driven their all-terrain vehicles over non-road portions of the subject

property at all hours of the day and night. These off-road activities of the Border Patrol have several consequences. First, the tracks and ruts created by the Border Patrol gradually develop into primitive roads, which the Border Patrol then grades into more permanent dirt roads.

15. Second, some of these roads traverse environmentally sensitive areas of protected vegetation or wetlands. This environmental damage is unlawful and D & D, as the property owner, is held responsible. The County has required D & D, as a condition of its building and grading permits, to mitigate this environmental damage by dedicating and planting new mitigation lands.

16. Third, the ruts caused by the Border Patrol's off-road vehicles fill with water during the winter, creating so-called "vernal pools" which may be designated as habitat for the endangered fairy shrimp. The result of such a designation is that the property cannot be developed.

17. Fourth, when driving on D & D's private property within the past year or two, the Border Patrol has repeatedly driven its vehicles over silt fences erected to demarcate and protect environmentally sensitive areas as well as areas outside the scope of the County-issued grading permit. The Border Patrol's destruction of these fences has led the County to impose fines on D & D, which is responsible for maintaining these fences and protecting these environmentally sensitive areas. Border Patrol officials assert that this damage has occurred at night, when it is difficult for all-terrain vehicle drivers to see, but they have not paid for the damage done or for the fines incurred. In addition, Border Patrol agents drive their vehicles through landscaping on the property, and track

mud onto the public road, which D & D is left to pay for the cost of clean up and revegetation. D & D is required by its grading permit to maintain certain vegetation in place.

18. Fifth, within the past year, while driving on D & D's private property, the Border Patrol has repeatedly run over and destroyed materials and improvements made by D & D. The Border Patrol has destroyed lain pipes which must then be replaced. The Border Patrol's vehicles have caused dirt to fall into and fill dug trenches, which must then be re-dug. D & D has had to bear the cost of reconstructing the improvements destroyed by the Border Patrol.

**Concerns About the Presence of Armed Agents**

19. The presence of armed Border Patrol agents on the subject property has created an atmosphere of fear and anxiety not only for potential customers, but also for myself, and others who work on the subject property. I am aware of numerous shots being fired on and around the subject property by Border Patrol agents, and other violent confrontations (thus far, only with aliens so far as I am aware).

20. S. D. Commercial, acting on D & D's behalf, employs many construction and caretaker workers of Hispanic descent who have been stopped and questioned by Border Patrol agents as suspected illegal aliens. I myself (not Hispanic) have been stopped more than once by Border Patrol agents, sometimes with a hand on their gun, and asked whether I am transporting illegal aliens in my SUV. These agents have also questioned my right to be on property managed by S. D. Commercial in this area, and even asserted that it is not private property but government-owned land that I have no right to be on.

21. I lost at least one customer, the Blackwater Co., because it needed a site to train armed contractors for deployment in Iraq, and was afraid of an accidental encounter between its armed men and the Border Patrol's. There have also been encounters between the Border Patrol and the equipment storage company on the subject property, arising out of Border Patrol suspicions that illegal aliens might be hiding among the heavy equipment stored there.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 20, 2007

David Wick

11/20/07
Dated

# EXHIBIT 1


Border Fence
ATTRIBUTE
Primary Fence
Secondary Fence
Bureau of Land Management
PARCEL 10
603-1
603-2
644 Trap
Approx .68 MILES
Approx .73 MILES
Approx 1.64 MILES
ALTA
OTAY MESA
OTAY MESA PORT OF ENTRY
N
0 0.15 0.3 0.6 0.9 1.2
Miles

# EXHIBIT 2


Bureau of Land Management
De La Fuente Property
Kuebler Ranch
Otay Truck Trail
Parcel 1
Parcel 2
Parcel 3
Parcel 4
Parcel 5
Parcel 6
Parcel 7
Parcel 8
Parcel 9
Parcel 10
Parcel 12
Alta Road
Alta Road Extension
Otay Mesa Road
Otay Mesa Port of Entry
SD County Detention Facility
Donovan State Prison
Reservoir
O'Niel Canyon
Johnson Canyon
Windmill Canyon
Frenchman's Canyon
No Name Draw
58 Scope site / 18 NG Scope Site
Murphy's Bowl
18 NG Little Murphys
25 Saddle
Goldmind Draw
Well Draw
Tin Can Hill
644 Trap
Johnny Wolf's Draw
670 Hump
Landing Zone
Alta Grove
Old and New
CHP
1445
1425 Scope Site
Wick
EXHIBIT NO. C
7/20/07
S.GRAY, CSR