IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OTAY MESA PROPERTY L.P., et al.,
Plaintiffs,
vs. CASE NO. 06-167 L
06-1670
UNITED STATES, 06-1671
Defendant.
_________________________________/

DEPOSITION OF DARRYL GRIFFEN
Taken at San Diego, California
Tuesday, March 27, 2007

Reported by Shirley J. Swenson, CSR, RPR

Certificate No. 3493

A. It certainly aids in control of traffic, yes, sir.

Q. Okay. Has the construction of the border infrastructure -- and by that, may we agree that it includes the primary fence, the secondary fence, and the various items of technology like the floodlights and cameras that you've described -- how has that construction affected the location at which aliens find it easiest to get across the border in the San Diego Sector?

A. The decision where a particular criminal -- criminal cartel, whether it be an alien smuggling organization or a drug trafficking organization, that is their decision where they believe that they want to effect entry that gives them the greatest probability of success. This is a profit driven enterprise, criminal enterprise.

Q. Okay.

A. And where we are most vulnerable and at risk, that's where we focus on. We always attempt to maintain a balanced perspective so that we don't create additional vulnerabilities or risks elsewhere.

Q. Well, let me ask you this question.

Does the existence of the fence serve as a deterrent so that your average illegal alien or smuggler

is going to try to find a place where there's an opening in the fence, a break in the fence or where the fence ends?

A. I -- I -- I would suspect that would be something that our adversaries would take into consideration. It's a profit driven criminal enterprise, so they're going to attempt to effect entry where they can make the most profit.

Q. So is it fair to say, then, that as the fence has been completed and extended eastward, that the weaker points of protection, easier places for entry across the border have also shifted eastward in San Diego County?

A. Yes. Traffic trends and patterns have shifted. I would -- I would caution you by saying that the border environment is very dynamic, it's very fluid, and traffic patterns and -- can shift at a moment's notice when a vulnerability has been identified or at least perceived to have been identified by our adversaries.

That's why it's critical to maintain as balanced approach as possible, although you give focus to areas that you have determined perhaps to be most at risk.

Q. But, yes, you have observed, the Border Patrol has observed that the traffic has shifted eastward as

the fence has been completed?
A. Yes, sir.
Q. Is it also fair to say that the point at which the secondary fence ends is a point of vulnerability in that it also provides easier access for illegal aliens to enter the country?
A. With respect to -- are you saying in contrast to an area that has secondary fencing?
Q. Yes, in contrast to an area that is now protected by the secondary fence.
A. Would you also be saying in contrast to an area that has no primary fencing or tactical infrastructure whatsoever?
Q. No.
My question --
A. Just with respect to the primary fencing?
Q. -- to you is regarding the secondary fence. I'm talking now only about the secondary fence.
A. Within that -- those first 14 miles of what we call --
Q. Yes.
A. -- the border infrastructure system?
Q. Yes.
MS. COOK: But you're assuming construction of a primary fence. I mean, I think --

MR. MARZULLA: Here's what I'm asking you.
Q. The primary fence extends how far to the east?
A. Approximately 14 miles --
Q. Okay.
A. -- of what we refer to as the border infrastructure system from the Pacific Ocean inland to the foothills of the Otay Mountain.
Q. Doesn't the primary fence, the landing map fence extend farther to the east than that?
A. It's approximately 14 miles.
Q. How far to the east does the secondary fence extend?
A. That's -- we -- we only have roughly nine miles of secondary fencing constructed. The border infrastructure system still has five miles to complete, which is Phase II. Phase I completes the end of April this year. Phase II has already begun construction. We still have three-and-a-half miles to the west to complete out to the ocean, and we also have a mile-and-a-half to complete, roughly a mile-and-a-half, on the east side up into the foothills of Otay Mountain.
Q. Are you familiar with the subject property here, the property that is owned by Mr. De La Fuente and Mr. Wick?
A. To an extent, yes, sir.

memory serves me correct, there had been discussions referencing this, so I was advised that we would forward a letter as would be the normal procedure when a -- for example, if a -- if a private property owner or representative of such was to challenge an agent's authority to access his or her private land, you know, within statutory requirements, then we are supposed to bring that matter to the attention of his or her supervisor. There should be discussions with whomever challenged our authority to include the receipt of registered mail advising the individual or corporation of our statutory right to access said property and the importance of our mission.

Q. And did those discussions take place, to your knowledge?

A. That, I do not know, sir.

Q. So did you request Chief Counsel's Office to write this letter?

A. I do not know if I requested it or if I was advised that we would respond, and the letter would be drafted.

Q. Okay.

A. That, I do not recall, sir.

Q. All right. In the letter, you indicate that unless the Border Patrol is given a key, it may have no

choice but to cut the chain and place a lock of its own on the gate, correct?

A. Yes, sir.

Q. Okay.

A. That's how it's worded.

Q. Did you understand that the Border Patrol had the right to cut that chain and put on a lock of its own?

A. We have the right to access private land within our statutory authority, sir, and if that access is denied and it is deemed that this access is critical as a part of our mission, we do have the authority to gain access. We may cut the lock and replace it with a lock of our own, and we link it in with their lock (indicating).

We may provide an additional key to our lock to the property owner or whomever he would like a duplicate made to. Any time we cut a lock or a chain, we will repair that so that we maintain the integrity, the security of that gate closure.

Q. So at the time you signed this letter, Exhibit 40 --

A. Yes, sir.

Q. -- was it your understanding that Mr. Wick did not have the right to put a lock on this gate?

A. He -- he has the right to place any lock that he deems necessary on his gate, for sake of argument. However, that locking of that gate should not deny us access to that private land if it falls within our statutory authority in our effort to patrol the border to prevent the illegal entry of aliens into the United States, sir.

Q. Okay. So --

A. And this is part of an outreach effort that we try to educate and inform so that we don't have a situation that goes to this extent without resolution so that both parties walk away win/win.

Q. So was it your understanding at the time you signed this letter, Exhibit 40, that Mr. Wick did not have the right to deny the Border Patrol access to his land?

A. No. Based on the location of this particular gate which falls within our statutory authority to access private lands, we do have authority to access that to patrol the border to prevent illegal entry of aliens.

Q. And Mr. Wick does not have the right to deny you that access to his land?

A. I do not believe he does, sir.

Q. And that's what you intended to convey when you

signed this letter?

A. Yes, sir, and that we want to -- if I may defer -- refer you also to the second to the last paragraph, once again, we wanted to work with all individuals cooperatively and collaboratively.

Q. Okay.

A. But --

Q. But?

A. Nothing else.

Q. Okay. What happened with respect to this locked gate?

A. I don't believe anything was ever done to it, but I could be wrong. I would ask you to defer to the station management for the exact --

Q. Okay.

A. -- activities that took place, but I believe the gate was left intact, and the agents actually began to drive around the gate to access Otay Truck Trail.

Q. Okay.

A. I believe, sir.

Q. All right. Fair enough.

To your understanding, does the Border Patrol have an easement or access from Alta Road to the Otay Truck Trail over the plaintiff's land?

A. The Border Patrol itself have an easement?