IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| D & D LANDHOLDINGS, a Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) | No. 06-877 L<br>Hon. Margaret M. Sweeney |

**PLAINTIFF'S CORRECTED RESPONSES TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to RCFC 56(h), Plaintiff responds to Defendant's proposed findings of uncontroverted fact as follows:

**Defendant's Proposed Finding:**

1. The United States Border Patrol,[1] part of the Department of Homeland Security (DHS), Bureau of Customs and Border Protection, is the lead federal

[1] Congress established the United States Border Patrol in 1924. Prior to 2003, the Border Patrol was organized under the Immigration and Naturalization Service. As part of a reorganization that created the Department of Homeland Security in March, 2003, Pub. L. No. 104-208, the Border Patrol was reorganized as an office under the Bureau of Customs and Border Protection.

**Plaintiff's Response to Defendant's Footnote**: Plaintiff disagrees that the statute cited, Pub. L. No. 104-208, was part of a reorganization that created the Department of Homeland Security. That statute was, in fact, a 1996 appropriations bill. Rather, according to Defendant's exhibit D-2 at CRS-1:

The Homeland Security Act of 2002 (P.L. 107-296) merged most interior and border enforcement functions of the Department of Agriculture, the INS, and the U.S. Customs Service to form the Directorate of Border and Transportation Security (BTS) within the Department of Homeland Security (DHS). Using the authority given by Congress in the Homeland Security Act, the Administration sub-divided BTS and placed the border enforcement functions, including the USBP, within the Bureau of Customs and Border Protection (CBP). This consolidated all the agencies charged with border enforcement duties with the overarching goal of enhancing security by allowing for the freer sharing of information and resources between all the organizations with a presence on the border. While CBP is charged with overall border enforcement, within the bureau a distinction is made concerning border enforcement *at* and *between* points of entry. As currently comprised, the USBP's primary mission is to detect and prevent the entry of

agency charged with securing the international border between the United States and Mexico. Border Patrol operations are divided into sectors; relevant here is the San Diego Sector Office of the Border Patrol, which has responsibility for an area located north of Tijuana and Tecate, Mexican cities with a combined population of two million. In this area, the terrain along the international border offers no geographical barriers to entry by unauthorized immigrants, smugglers or terrorists. Ex. D-2 at CRS-2. The mission of the Border Patrol is to prevent, detect or apprehend persons seeking to illegally enter the United States at a place not officially designated as a Port of Entry. Ex. D-3 at CRS-1.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the exhibits cited, including the CRS and Sandia reports, (Defendant's Exhibits D-2, D-3, and D-9), cited as the evidentiary support for this finding, are inadmissible hearsay and opinion testimony.

This proposed finding is also incorrect in several respects. First, the operations of the Sand Diego sector, which covers a 60-mile section of the border, are not relevant here; rather, what is relevant are the activities of Border Patrol agents which permanently occupy and alter Plaintiff's property. Second, Defendant's assertion that "[i]n this area, the terrain along the international border offers no geographical barriers to entry by unauthorized immigrants, smugglers or terrorists" is not true. In fact, geographical barriers to entry include Otay Mountain directly to the east of the subject property, the desert beyond the mountains, as well as the Pacific Ocean to the west. The border infrastructure system, consisting of barrier fences and associated video cameras,

---

terrorists, weapons of mass destruction, and unauthorized aliens into the country, and to interdict drug smugglers and other criminals *between* official points of entry.

spotlights, roads, etc. are also geographic features which inhibit illegal entry. The combined effect of these geographic features is to create a single entry point, between the end of the secondary fence and Otay Mountain, which is free of geographic barriers. Located .68 miles north of at that entry point is Plaintiff's property. *See* Wick Decl. (Ex. P-1).

**Defendant's Proposed Finding:**

2. The property at issue in this litigation ("subject property") is within the patrol responsibility of the Chula Vista Station, one of the stations under the jurisdiction of the San Diego Sector Office of the Border Patrol and lies within what is administratively designated as Zones 17 and 18. *See* Ex. D-1, D-29 at ¶ 4.

**Plaintiff's Response:**

This proposed finding is misleading to the extent it fails to reveal that Plaintiff's property was not included in the area patrolled by the Chula Vista station only since March 2004. Consequently, the apprehension statistics for the Chula Vista station prior to 2004, on which Defendant relies, do not reflect apprehensions occurring on the subject property.

**Defendant's Proposed Finding:**

3. At issue in this litigation is a parcel of land consisting of approximately 135 acres located near the Mexican border in southern San Diego County, California, which the parties refer to as Parcel 10. *See* Ex. D-1. The property which comprises Parcel 10 was acquired December 14, 2000 from Rancho Vista Del Mar, a related entity. Ex. D-6.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, Plaintiff objects that the cited map (Defendant's Exhibit D-1) lacks a foundation and is inadmissible hearsay.

**Defendant's Proposed Finding:**

4. Plaintiff D&D Landholdings is a California limited partnership. Roque De La Fuente is a principal in both D&D Landholdings and Rancho Vista Del Mar. D-4 at 21. Mr. De La Fuente has either a direct ownership interest in, or control of, Parcel 10 and the 10 other parcels of land at issue in other currently-pending related cases.[2] All 11 parcels are managed by SD Commercial, LLC, owned by David Wick and by three trusts in the names of Mr. De La Fuente's children. Ex. D-4 at 18.

**Plaintiff's Response:**

Plaintiff does not object to this proposed finding, except to note that it has no relevance to this lawsuit.

**Defendant's Proposed Finding:**

5. Parcel 10 is located in the East Otay Mesa area of San Diego County. This largely undeveloped and sparsely populated area sits at the base of the Otay Mountains approximately 14 miles east of the Pacific Ocean near the Mexican border.

---

[2] Two other pending cases raise issues similar to those before this Court. Parcels 1-9 are at issue in the consolidated case of *Otay Mesa Property L.P., et al. v. United States*, No. 06-167 (Judge Baskir). Parcel 11 is at issue in *International Industrial Park, Inc. v. United States*, No. 06-876 (Judge Wheeler). Because the parcels are adjacent or near one another, the parties have numbered the parcels sequentially for ease of reference. *See* D-1.

**Plaintiff's Response to Defendant's Footnote:** Plaintiff objects to this proposed finding on the grounds that it is not a proposed finding of material fact at all, but rather legal argument. Furthermore, in bifurcating the cases, the Judge Baskir has already ruled on the legal issue presented. *See* Order, *Otay Mesa Property, L.P. v. United States*, No. 06-167L (Fed. Cl. Nov. 1, 2006).

Ex. D-11. To the northwest are the highly urbanized cities of San Diego, Chula Vista, and their suburbs. To the south, directly across the border, lies the densely populated city of Tijuana. Exs. D-5 (e), (f); D-28.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the map and photographs (Defendant's Exhibits D-5 (a)–(f) and D-28) lack a foundation, and constitute inadmissible hearsay. Without testimonial evidence, the statements made in this Proposed Finding are merely a characterization by counsel and not facts supporting summary judgment.

**Defendant's Proposed Finding:**

6. Parcel 10 is zoned industrial. A portion is currently under lease to Otay Hills LLC, an entity pursuing a mining permit. Ex. D-4 at 19-20. Parcel 10 has been leased at various points in the past for purposes of dry farming, Ex. D-4 at 37-38, and utility easements over the property have also been granted, including a major electrical transmission line between the United States and Mexico, Exs. D-4 at 25-26; D-1. Other portions of the property are in the process of being developed and grading permits have been obtained. Ex. D-4 at 35.

**Plaintiff's Response:**

Plaintiff objects to the Proposed Finding because it mischaracterizes the nature of the subject property. In fact, Parcel 10 is zoned 90% industrial and 10% residential. Ex. D-4 at 24. While Plaintiff agrees that a portion of Parcel 10 is leased for dry farming and that there are utility easements across other portions of the subject property, Defendant's

Exhibit D-4 at 25-26 does not support its contention that the subject property contains, "a major electrical transmission line between the United States and Mexico." Moreover, Plaintiff notes that more leasing activity would have occurred on the subject property if the Border Patrol were not on the property every day of the year, at all hours of the day, and using the subject property as if it were public property, as opposed to privately owned property. *See* Wick Decl. at ¶¶ 8-10 (Ex. P-1).

**Defendant's Proposed Finding:**

7. In 1907, President Theodore Roosevelt issued which has become known as the Roosevelt Proclamation:

> Now, therefore, I, THEODORE ROOSEVELT, President of the United States, do hereby declare, proclaim and make known that there are hereby ... set apart as a public reservation, all public lands *within sixty feet of the international boundary* between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico . . .

35 Stat. 2136 (1907) (emphasis added).

**Plaintiff's Response:**

Plaintiff objects to this proposed finding on the grounds that (1) it is not a proposed finding of material fact at all, but rather legal argument; (2) since the proclamation deals only with government-owned lands, it is irrelevant to and has no application to the private lands which are the subject of this lawsuit; (3) since the subject property is not located within 60 feet of the border, this proclamation could have no effect on it whatever.

**Defendant's Proposed Finding:**

8. Seventeen years later, Congress appropriated monies to provide for "land-border patrol" including the acquisition of motor vehicles, thereby giving birth to what is

now known as the Border Patrol. 43 Stat. 205, 240 (May 28, 1924). Then, in 1925, Congress provided the Border Patrol with statutory authority: "the power without warrant [(1)] to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation . . . ." 8 U.S.C. § 110, 43 Stat. 1049 (Feb. 27, 1925).

**Plaintiff's Response:**

Plaintiff objects to this proposed finding on the grounds that (1) it is not a proposed finding of material fact at all, but rather legal argument; (2) the statute cited, 8 U.S.C. § 110 was repealed June 27, 1953; and, (3) the statute has no application to the subject property, both because it was repealed and also because the authority to arrest is not a material issue of fact in this case.

Moreover, Plaintiff objects to this proposed finding on the ground that it is misleading. Although Border Patrol agents may indeed possess authority to arrest illegal aliens, nothing in this quoted provision, which speaks for itself, has anything to do with the takings allegations at issue in this lawsuit. Nothing in the quoted provision authorizes the Border Patrol to permanently occupy private property without paying just compensation to the landowner. *See also* Plaintiff's Opposition to Defendant's Motion for Summary Judgment at 23-27.

**Defendant's Proposed Finding:**

9. In the Immigration and Nationality Act of 1952, Congress specifically granted the Border Patrol the right, without a warrant, to have access to private lands within 25 miles of the border to prevent illegal entry of aliens into the United States:

> Any officer or employee of the Service authorized under regulations prescribes by the Attorney General shall have the power without a warrant

> . . . within a distance of twenty-five miles from any such external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. . . ."

8 U.S.C. § 1357(a)(3). Patrolling the border has been defined as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c).

**Plaintiff's Response:**

Plaintiff objects to this proposed finding on the grounds that (1) it is not a proposed finding of material fact at all, but rather legal argument; (2) the authority of the Border Patrol is not an issue of material fact in this taking case, as Plaintiff concedes the government's authority.

Moreover, Defendant's selective quotation from this statute is misleading, for the context of the statute (as well as its explicit text) merely identifies who (persons designated by the Attorney General) shall have certain authority, and it does not purport to establish a new rule of real property law.

**Defendant's Proposed Finding:**

10. The House Report discussing this legislation specifically addressed the codification of the authority to enter private lands for the purpose of patrolling the border:

> This would by positive legislative enactment authorize specifically *that which must always have been of necessity implied* from the time the border patrol was first created.

1952 U.S.C.C.A.N. 1358, 1360 (emphasis added). The House Report explained the need for the specific statutory authority:

> Notwithstanding that the borders of the United States, for the purpose of preventing the smuggling and illegal entry of aliens, have been patrolled continuously since 1903, and that Congress specifically authorized

> establishment of the border patrol in the Bureau of Immigration in 1924, and annually since that time has appropriated funds for border-patrol purposes, the statutes are silent with regard to the authority of patrol officers to enter upon private lands adjacent to the border so as to prevent the smuggling and illegal entry of aliens into the United States. In recent months the activities of the border patrol have in certain areas been seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries. This action by property owners is creating an increasingly serious situation, one which endangers the national security. It affects the sovereign right of the United States to protect its own boundaries against the entry of aliens, including those of the most dangerous classes.
>
> The language of section 2 would adequately authorize immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.

*Id.* (emphasis added).

**Plaintiff's Response:**

Plaintiff objects to this proposed finding on the grounds that (1) it is not a proposed finding of material fact at all, but rather legal argument; (2) the authority of the Border Patrol is not an issue of material fact in this taking case, as Plaintiff concedes the government's authority.

Plaintiff further notes that nothing in this report suggests that Congress intended to create a new background principle of real property law, as Defendant contends. *See* Plaintiff's Opposition to Summary Judgment at 25-30.

**Defendant's Proposed Finding:**

11. For well over two decades, the Border Patrol has actively patrolled the property at issue in this litigation. Ex. D-29 at ¶ 4. In the early to mid 1980s, that patrol was done on horseback each evening, and sensors were utilized. *Id.*

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the declaration contains hearsay, and even fails to identify the source of the declarant's claimed facts.

To the extent Defendant alleges that the Border Patrol's occupation of Plaintiff's property has been essentially the same for the past two decades, it is untrue. *See* Plaintiff's Proposed Additional Findings of Fact, ¶¶ 1-2.

**Defendant's Proposed Finding:**

12. By the late 1980s, illegal entries had increased with the emergence of organized alien and drug smuggling organizations. *Id.* at ¶ 5. Smugglers began utilizing a "drive-through" method of entry, in which one or more vehicles heavily loaded with aliens or drugs would breach the border at high speed. Id. During the 1980s and early 1990s, an average of more than 200

drive-through attempts occurred daily. Ex. D-24 at 1-3. The area between Brown Field and the mountains – the vicinity of Parcel 10 – was a popular location for drive-throughs. Ex. D-9 at ES-52. Drive-throughs created a hazard for both agents and the nearby populance when the vehicles reached nearby highways and high speed chases ensued. Ex. D-24 at 1-3 to 1-4.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the CRS report (Defendant's Exhibit D-2), the Sandia report (Defendant's Exhibit D-9), and EIS report

(Defendant's Exhibit D-24) all contain inadmissible hearsay and opinion testimony. Moreover, portions of this proposed finding are contradicted by the exhibits cited.

Defendant's proposed finding states that "The area between Brown Field and the mountains – the vicinity of Parcel 10 – was a popular location for drive-throughs ," and cites Exhibit D-9 at ES-52, but that exhibit discusses drug smuggling between the Tijuana Airport in Mexico and the San Ysidro Mountains, not illegal entries and not at the subject property. *See* Ex. D-9 at ES-52 ("There is drug-related drive-through traffic in the 5.5 miles of relatively rural area between the Tijuana Airport and the foothills of the San Ysidro mountains to the east of the Brownfield station.").

Plaintiff further objects to this proposed finding to the extent that it erroneously suggests that Border Patrol agents have the authority to enter onto private land in search of drugs and drug smugglers without probable cause. They do not have such authority. In *United States v. Romero-Bustamente*, 337 F.3d 1104, 1109 (9th Cir. 2003), the court held that the right of entry does not extend to the backyard or curtilage of a home, since "[a]side from the obvious constitutional implications of such an interpretation, we seriously doubt that Congress intended to give the Border Patrol such unique and sweeping power." In *United States v. Ochoa,* 881 F. Supp. 273 (S.D. Tex. 1995), the court held the statute authorizes entry into a fenced lot to search for aliens only because agents had probable cause, specifically tracked footprints of a person emerging from a river. The courts have imposed similarly strict limitations on the agent's warrantless search of vehicles. *See United States v. Barron-Caberera*, 119 F.3d 1454, 1459-60 (10th Cir. 1997) ("Border patrol agents on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that

reasonably warrant suspicion that those vehicles' occupants may be involved in criminal activity."); *Almeida-Sanchez v. United States*, 413 U.S. 266, 268 (1973) (search of a vehicle in area 20 miles north of border violated Fourth Amendment where Border Patrol agent lacked probable cause). Moreover, because it is limited to access only to prevent aliens from entering the United States, the statute does not authorize warrantless entry and searches for drugs or other non-immigration purposes. In *United States v. Santa Maria*, 15 F.3d 879, 883 (9th Cir. 1994), the court held 8 U.S.C. § 1357(a)(3) "only authorizes" Border Patrol "to conduct administrative searches for aliens" and "[t]o expand this power to include searches for narcotics is impermissible." Absent probable cause or consent, the court found a drug search was both unauthorized and a violation of the Fourth Amendment.

**Defendant's Proposed Finding:**

13. The high amount of illegal entries in the vicinity of San Diego became a recognized problem. A 1993 Sandia National Laboratories report noted:

> [t]he 13 miles of border east from the coast to the foothills of the San Ysidro Mountains are the most concentrated area of illegal entry on the Southwest Border. Almost this entire length is heavily urbanized on the Mexico side, with buildings and roads running right up to the border.

Ex. D-9 at ES-53.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the Sandia report (Defendant's Exhibit D-9) contains inadmissible hearsay and opinion testimony.

**Defendant's Proposed Finding:**

14. At this time, the Mexican border near San Diego was poorly marked and presented no real barrier to entry. In many areas, the border had only agricultural fences or was totally unfenced. Ex. D-8 at 57. In 1990, the Border Patrol, with the assistance of the National Guard, began erecting a physical barrier. Ex. D-2 at CRS-1. What is now known as the primary fence began at the Pacific Ocean and continued eastward for approximately 14 miles. It was constructed of surplus welded steel landing mats approximately 10 feet tall, and was completed in March, 1993. Ex. D-2 at CRS-1. What Plaintiff refers to as "chaneling" actually began in 1990. The redirection of illegal entries was the main goal of the primary fence: "to force the traffic back to the open terrain of Otay Mesa where cover is relatively sparse so that sensors and night vision can be used much more effectively and pursuit is much easier and more effective." Ex. D-9 at 186.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the CRS report (Defendant's Exhibit D-2) contains inadmissible hearsay and opinion testimony.

Moreover, to the extent this proposed finding is meant to assert that the channeling of illegal aliens onto to the subject property began in the 1990's, it is untrue. First, as Defendant's own Exhibit D-2 states at CRS-3, "The primary fence, by itself, did not have a discernible impact on the influx of unauthorized aliens coming across the border in San Diego."

Second, the channeling of illegal aliens of which Plaintiff complains began in 2001-2002, with the completion of the secondary fence in the vicinity of the subject

property, as well as heightened security following the September 11 terrorist attack. *See* Plaintiff's Proposed Additional Findings of Fact, ¶¶ 1-2.

**Defendant's Proposed Finding:**

15. After construction of the primary fence, the number of drive-throughs was dramatically reduced. Ex. D-2 at CRS-4 n.14. The primary fence was also successful in reducing crime in neighborhoods in close proximity to the border. Exs. D-3 at CRS-11, D-29 at ¶ 6.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the CRS reports (Defendant's Exhibit D-2 and D-3) and Kern Declaration (Defendant's Exhibit 29) contain inadmissible hearsay and opinion testimony. Moreover, portions of this proposed finding are contradicted by the exhibits cited.

For example, Defendant mischaracterizes Exhibit D-2, CRS-4 footnote 14, to support a proposed finding that "After construction of the primary fence, the number of drive-throughs was dramatically reduced." In fact, the document refers to smuggling using automobiles and motorcycles (not an issue on the subject property), stating: ["C]onstruction of the primary fence significantly assisted the USBP's efforts in deterring smuggling attempts via drive-throughs using automobiles and motorcycles."

Finally, Exhibit D-3 at CRS-11 does not support Defendant's proposed finding that "In addition, many believe that construction of the primary fence was successful in reducing crime in San Diego County neighborhoods in close proximity to the border." In fact, that exhibit says nothing about San Diego neighborhoods in proximity to the border,

but only mentions in passing a decline in crime in the cities of San Diego and El Paso (which does not have a border fence):

> There is some evidence that border related crimes have diminished as the USBP has increased its enforcement along the SW border. For example, the crime rate along the SW border was 30% higher than the national average in 1990 but only 12% higher in 2000, with property crimes dropping 40% over the decade. The bulk of this improvement occurred in San Diego and El Paso, the most populous of the border communities. However, most border counties' crime rates did not decline as much as the national average between 1990 and 2000 and were thus actually more crime ridden relative to the rest of the country in 2000. Thus, the overall reduction in crimes along the border was driven by the declining crimes in population centers. Some argue that the overall decrease in crime rates along the border is tangible proof that the "Prevention Through Deterrence" policy is achieving its goal of reducing illegal immigration. Others note that the policy has merely shifted illegal immigration away from population centers, pointing out that crime rates have increased compared to the rest of the nation in less populated areas of the border.

**Defendant's Proposed Finding:**

16. The primary fence ends at a point approximately 300 feet short of the easternmost boundary of Parcel 3.[3] *See* D-1. Illegal immigrants can, and do, simply walk around the end of the fence, as the paths in the aerial photos document. Ex. D-5(c)-(f), D-26. In this area, while the land to the north of the border is sparsely populated, the portions of Tijuana lying immediately to the south are densely populated and offer cover for those waiting to attempt illegal entry. Exs. D-5(f), D-28. Once illegal entrants have climbed the fences, or gone around the end of the primary fence, they then generally make their way northward with the goal of reaching a road which will give them rapid transportation out of the area. *See* Ex. D-29 at ¶ 7.

---

[3] Parcel 3 is at issue in the consolidated case of *Otay Mesa Property L.P., et al. v. United States*, No. 06-167 (Judge Baskir). *See* fn. 3, *supra*.

**Plaintiff's Response to Defendant's Footnote**: Plaintiff objects to this proposed finding on the ground that it presents a legal issue, not a factual finding. *See* Response to FN 2.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, no foundation has been established for the photographs, Defendant's Ex. D-26, D-27, and D-28. Additionally, Defendant's Ex. D-29 is based on inadmissible hearsay and opinion testimony.

**Defendant's Proposed Finding:**

17. In October, 1994, the Border Patrol announced "Operation Gatekeeper" which involved large increases in the number of agents as well as a focus on the stationing of agents directly along the border. Ex. D-2 at CRS-3. It also involved an increase in patrol equipment such as additional night vision goggles and seismic sensors, and portable lighting platforms were utilized for the first time in 1998. D-2 at CRS-3. The patrol activities of Operation Gatekeeper in 1993-1994 marked a high in terms of the physical presence of Border Patrol on property near the border.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The CRS report, Defendant's Exhibit D-2, contains inadmissible hearsay and opinion testimony.

**Defendant's Proposed Finding:**

18. First, there was a significant increase in the number of Border Patrol agents, and in the placement of those agents directly on the border. Ex. D-2 at CRS-3, D-12(a), (b). Second, it reflected the Border Patrol's "goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing USBP agents with a tactical advantage over illegal border crossers and

smugglers." Ex. D-3 at CRS-10. The goal with construction of the primary fence in 1990-1993, as well as the intensified enforcement efforts of Operation Gatekeeper in 1994, was to direct illegal entry traffic to the east away from the population centers of San Diego and Tijuana. Ex. D-9 at 186.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The CRS reports, Defendant's Exhibits D-2 and D-3, contain inadmissible hearsay and opinion testimony.

Moreover, Plaintiff disagrees with this proposed finding to the extent it is intended to state that Border Patrol activity on the subject property reached its current level in the 1990's, which is directly contradicted by the testimony of the property manager, David Wick:

> Whereas I had seen an occasional agent in a vehicle or on horseback before the September 11, 2001, terrorist attack, after the attack there seemed to be a geometric multiplication of Border Patrol presence and activities on IIP's land. After 2001, I was no longer able to visit the subject property without being accosted or under surveillance by heavily armed Border Patrol agents who questioned me regarding my business on the subject property. Around 2002, the Border Patrol started grading new roads across the subject property, detouring around or destroying barricades which IIP had erected to keep the public out, damaging our ongoing construction activities by driving their vehicles through the middle of our construction sites, and scaring away potential customers for the land by their show of overwhelming armed force and round-the-clock use of IIP's land.

Wick Decl. at ¶ 2 (Ex. P-1).

**Defendant's Proposed Finding:**

19. The concept of the secondary fence, known as the Border Infrastructure System (BIS), grew out of a recommendation of the 1993 Sandia National Laboratories

study. Ex. D-9 at ES-1. In 1996, Congress responded to the recommendation, passing the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), which authorized the construction of a second layer of steel mesh fencing near San Diego. Pub. L. No. 104-208, § 102. The BIS included the construction of two roads adjacent to the new fence as well as surveillance cameras and permanent security lighting. Ex. D-2 at CRS 6-7. In order to expedite construction of the secondary fence, the Secretary of DHS was authorized to waive all requirements imposed by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., and the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The Sandia report, Defendant's Exhibit D-9, and the CRS report, Defendant's Exhibit D-2, both contain inadmissible hearsay and opinion testimony.

**Defendant's Proposed Finding:**

20. Construction of the secondary fence began in 1996, but was halted in February 2004 due to coastal environmental concerns raised by the California Coastal Commission. Ex. D-2 at 6. At that point, approximately 9 miles of secondary fence had been completed. *Id.* In 2005, Congress passed the REAL ID Act, Pub. L. 109-13, which gave DHS the power to waive all legal requirements to expedite the construction of the border fence. Ex. D-2 at CRS-7-8.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The CRS report, Defendant's Exhibit D-2, contains inadmissible hearsay and opinion testimony.

**Defendant's Proposed Finding:**

21. At present, approximately 9 of the planned 14 miles of secondary fence have been constructed, including a 1 1/2 mile section in the vicinity of the subject property. Currently, the secondary fence ends near the western boundary of Parcel 1.[4] *See* Ex. D-1. CBP does not plan to extend the secondary fence further east than its present terminus. Ex. D-34 at ¶ 3. Instead, various high technology components such as sensors, cameras, radar and communication systems will be installed. Id. at ¶ 4.

**Plaintiff's Response:**

Plaintiff is unable to agree to this proposed finding, as Defendant has until now contended that it intends to complete the secondary fence. Specifically, in the case of *International Industrial Park, LLC v. United States,* No. 06-876 L (Fed. Cl. 2006), now pending before Judge Wheeler, the government has submitted the following proposed finding in support of its Motion for Summary Judgment:

> 22. The remaining approximately 1.5 miles on the eastern end of the fence is scheduled to be completed by Fiscal Year (FY) 2011. Ex. D-25. Currently, the secondary fence ends at a point approximately 300 feet to the east of the westernmost boundary of Parcel 1; completion of the fence

---

[4] Parcel 1 is at issue in the consolidated case of *Otay Mesa Property L.P., et al. v. United States*, No. 06-167 (Judge Baskir). *See* fn. 3, *supra*.

**Plaintiff's Response to Defendant's Footnote**: Plaintiff objects to this proposed finding on the ground that it presents a legal issue, not a factual finding. *See* Response to FN 2.

> will extend it to where the primary fence currently ends, approximately 300 feet to the west of the most eastward boundary of Parcel 3. *See* D-1.

*See also* Plaintiff's Proposed Finding ¶ 4.

Border Patrol officials have repeatedly told D&D that the last mile of the Secondary Fence would soon be completed, and that this would drastically cut Border Patrol activities on the subject property. At present, no work has begun on the project to complete the last mile of the Secondary Fence. In fact, the government has not yet even appraised the land needed to construct this last mile of the fence. Wick Decl. at ¶ 5 (Ex. P-1).

**Defendant's Proposed Finding:**

22. While apprehension statistics[5] do not represent perfect data in terms of successful illegal entrants, they do provide one of the few sources of data available to evaluate the Border Patrol's historic presence on property along the border. Ex. D-2 at CRS-10. A review of these statistics reveal that apprehensions in the vicinity of the subject property peaked in FY1992. *See* Ex. D-12(a), (b). Since that time, the number of apprehensions have declined. Ex. D-2 at CRS-10, CRS-11 Fig. 1, CRS-23 Fig. 2. The Congressional Research Service, in analyzing this data, explained:

> The majority of the decrease occurred in the four year period from FY1995 through FY1998 and coincided with Operation Gatekeeper,

---

[5] Prior to 1999, the number of apprehensions was recorded only by station. Ex. D-31 at ¶ 5. In FY1999, the Border Patrol created enforcement zones and began also recording apprehensions by zone. *See* Ex. D-16 for apprehensions by zone for FY1999 to FY2007.

In FY2003, the Border Patrol began the phasing in of a geospatial method of recording apprehension data. Beginning in FY2005, the number of apprehensions for a specific geographic area can be determined. Ex. D-30. The number of apprehensions for Parcel 10 for FY2005, FY2006 and FY2007 can be found at Exs. D-13(a), (b) and (c). Their significance to this case is
discussed infra in Arguments I and IV(C).

**Plaintiff's Response to Defendant's Footnotes:** Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, no evidentiary foundation has been laid for the introduction of Exhibits D-13, D-16, and D-30.

> which as previously noted combined the construction of fencing along the border with an increase in agents and other resources deployed directly along the border.

Ex. D-2 at CRS-10 (emphasis added).

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The CRS report, Defendant's Exhibit D-2, contains inadmissible hearsay and opinion testimony.

Moreover, to the extent Defendant suggests that these imperfect statistics correlate in any way to Border Patrol activity on the subject property, that suggestion is unsupported by the CRS report and refuted by the testimony of Mr. Wick. The CRS report cautions that the statistics may be misleading, and makes no indication that these statistics correlate with the amount of Border Patrol activity on a particular property:

> [T]he number of apprehensions may be a misleading statistic for several reasons, including the data's focus on events rather than people (if the same person is apprehended multiple times attempting to enter the country in one year, each apprehension will be counted separately by the USBP in generating their apprehension statistics. This means that apprehension statistics may overstate the number of aliens apprehended each year.) and the fact that there are no reliable estimates for how many aliens successfully evade capture. This makes it difficult to establish a firm correlation between the number of apprehensions in a given sector and the number of people attempting to enter through that sector. While caution should be taken when attempting to draw conclusions about the efficacy of policy initiatives based solely on apprehension statistics, they remain the most reliable way to codify trends in illegal migration along the border.

Mr. Wick testifies in his declaration that, contrary to the apprehension statistics, Border Patrol activities on the subject property dramatically increased in 2001:

> I attributed this overwhelming Border Patrol presence on the subject property not only to the September 11, 2001, attack, but also to the fact that at about the same time the secondary fence had been completed up to a point immediately south of the subject property. Until completion of the

> fence in 2001, illegal aliens who were able to get past the primary fence had several miles of unfenced frontier which they could use to go north to illegally enter the United States. Completion of the fence squeezed this down to a "gateway" about a mile wide, bounded by the fence to the west and Otay Mountain (a significant obstacle) to the east. The path of least resistance for all of the illegal aliens who were deterred by the new fence was simply to walk around the end of it and then head north over the subject property. Knowing this, the Border Patrol utilized the subject property as an ideal place to corral and capture these illegal aliens, who were, by reason of the fence, now directed north into a far more confined area. Thus, the completion of the secondary fence in 2001 generated a large increase in Border Patrol activities—including new road construction and other use of our land—than had existed prior to 2001.

Wick Decl. at ¶ 3 (Ex. P-1) (Exhibit notation omitted).

Moreover, this proposed finding is misleading because the subject property was at no time within the jurisdiction of the Imperial Beach station, and only came under the jurisdiction of the Chula Vista station in April 2004, according to Defendant. *See* Ex. D-31 at ¶ 3. Accordingly, whether apprehensions went up or down in those districts has no correlation to Border Patrol activity on the subject property. In fact, the increase of activity on the subject property began around 2001. *See* Declaration of David Wick, ¶ 2**:**

> Since 1992 I have visited the subject property, together with other properties I manage, on average about once a week in connection with my duties. Commencing in 2001 or 2002, I observed a tremendous increase in Border Patrol activities on the subject property. Whereas I had seen an occasional agent in a vehicle or on horseback before the September 11, 2001, terrorist attack, after the attack there seemed to be a geometric multiplication of Border Patrol presence and activities on IIP's land. After 2001, I was no longer able to visit the subject property without being accosted or under surveillance by heavily armed Border Patrol agents who questioned me regarding my business on the subject property. Around 2002, the Border Patrol started grading new roads across the subject property, detouring around or destroying barricades which IIP had erected to keep the public out, damaging our ongoing construction activities by driving their vehicles through the middle of our construction sites, and scaring away potential customers for the land by their show of overwhelming armed force and round-the-clock use of IIP's land.

**Defendant's Proposed Finding:**

23. The number of apprehensions in recent years are far below the FY1992 peak. From FY2001 to FY2006, the average yearly apprehensions for the Chula Vista Station was approximately 1/6th of the 1992 high. Ex. D-12(a). Statistics from Brown Field Station show the same significant decrease in apprehensions beginning in FY1992. Since the peak in FY1992, the number of apprehensions has declined. Ex. D-12(b). Between FY2001 and FY2006, the average yearly apprehensions for Brown Field Station was 1/8th of the 1992 high. *Id.*

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, no evidentiary foundation has been laid for the introduction of Exhibit D-12. Moreover, this proposed finding is misleading because the subject property was at no time within the jurisdiction of the Imperial Beach station, and only came under the jurisdiction of the Chula Vista station in April 2004, according to Defendant. *See* Ex. D-31 at ¶ 3.

Accordingly, whether apprehensions went up or down in those districts has no correlation to Border Patrol activity on the subject property. In fact, the increase of activity on the subject property began around 2001. *See* Declaration of David Wick, ¶ 2:

> Since 1992 I have visited the subject property, together with other properties I manage, on average about once a week in connection with my duties. Commencing in 2001 or 2002, I observed a tremendous increase in Border Patrol activities on the subject property. Whereas I had seen an occasional agent in a vehicle or on horseback before the September 11, 2001, terrorist attack, after the attack there seemed to be a geometric multiplication of Border Patrol presence and activities on IIP's land. After 2001, I was no longer able to visit the subject property without being accosted or under surveillance by heavily armed Border Patrol agents who questioned me regarding my business on the subject property. Around

> 2002, the Border Patrol started grading new roads across the subject property, detouring around or destroying barricades which IIP had erected to keep the public out, damaging our ongoing construction activities by driving their vehicles through the middle of our construction sites, and scaring away potential customers for the land by their show of overwhelming armed force and round-the-clock use of IIP's land.

Wick Decl. at ¶ 2 (Ex. P-1).

**Defendant's Proposed Finding:**

24. However, during this time period, as apprehensions declined in the San Diego Sector, they rose along the Arizona border to the east. Exs. D-2 at CRS-13 and CRS-14 Fig. 4; *see also* D-14. Thus, the statistics indicate that the border fences have been successful in redirecting illegal entry activity to the east. However, that redirection is not to Plaintiff's property, but to border areas much farther to the east.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, the CRS report (Defendant's Exhibit D-2) contains inadmissible hearsay and opinion testimony. Moreover, nothing in the cited document suggests that apprehensions (let alone Border Patrol activity) on the subject property has decreased.

To the contrary, the closure of the gap in the fence to the west of Plaintiff's property, which occurred in 2001, geometrically increased the channeling of illegal aliens onto Plaintiff's property, where they can be rounded up by the Border Patrol which lies in wait, around the clock, on Plaintiff's land. *See* Plaintiff's Proposed Additional Findings of Fact, ¶¶ 1-2.

**Defendant's Proposed Finding:**

25. In addition, analysis reveals the reduction in apprehensions is not merely the result of fencing. As the Congressional Research Service concluded:

> It seems, then, that the installation of border fencing, in combination with an increase in agent manpower and technological assets, has had a significant effect on the apprehensions made in the San Diego sector. This in turn suggests that fewer unauthorized aliens are attempting to cross the border in the San Diego sector as a result of the increased enforcement measures, including fencing, manpower, and other resources, that were deployed to that sector.

Ex. D-2 at CRS-12-13.[6]

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The CRS report, Defendant's Exhibit D-2, contains inadmissible hearsay and opinion testimony. Moreover, this proposed finding is misleading, as it says nothing about the Border Patrol's activity on the subject property.

**Defendant's Proposed Finding:**

26. Even with the border fences in place, illegal entries still occur. Illegal entrants will climb over or cut through the fence, or construct a tunnel underneath. Ex. D-29 at ¶ 10. Illegal entry can also be made by simply walking around the end of the primary fence. Ex. D-26. The fact that such is occurring is readily apparent from

---

[6] Border Patrol representatives have testified to Congress that "for border control, for border security, we need the appropriate mix. It's not about fences. It's not about Border Patrol agents. It's not about technology. It's about all of those things." Ex. D-2 at CRS-28 and n.90.

**Plaintiff's Response to Defendant's Footnote:** Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). The CRS report, Defendant's Exhibit D-2, contains inadmissible hearsay and opinion testimony. Moreover, the cited congressional testimony is also inadmissible hearsay and opinion testimony. Finally, this proposed finding is misleading, as it says nothing about the Border Patrol's activity on the subject property.

photographs which show the well-worn paths leading from that point. Exs. D-5(f), D-27. Once entry is made around the end of the primary fence, the goal of an illegal immigrant is then to reach a road which will provide the prearranged transportation out of the area. Ex. D-29 at ¶ 7.

**Plaintiff's Response:**

Plaintiff objects that this Proposed Finding is not based on admissible evidence, and is therefore not adequately supported. RCFC 56(H). Specifically, no foundation has been laid for the introduction of the maps and photographs, Exhibits D-5(f), D-26 and D-27 as to when they were created and what they depict, and the Kern Declaration (Defendant's Exhibit-29) contains inadmissible hearsay and opinion testimony. Moreover, there is no correlation between these statistics and the Border Patrol's activities on Plaintiff's land. In fact, the increase of activity on the subject property began around 2001. *See* Declaration of David Wick, ¶2:

> Since 1992 I have visited the subject property, together with other properties I manage, on average about once a week in connection with my duties. Commencing in 2001 or 2002, I observed a tremendous increase in Border Patrol activities on the subject property. Whereas I had seen an occasional agent in a vehicle or on horseback before the September 11, 2001, terrorist attack, after the attack there seemed to be a geometric multiplication of Border Patrol presence and activities on IIP's land. After 2001, I was no longer able to visit the subject property without being accosted or under surveillance by heavily armed Border Patrol agents who questioned me regarding my business on the subject property. Around 2002, the Border Patrol started grading new roads across the subject property, detouring around or destroying barricades which IIP had erected to keep the public out, damaging our ongoing construction activities by driving their vehicles through the middle of our construction sites, and scaring away potential customers for the land by their show of overwhelming armed force and round-the-clock use of IIP's land.

Wick Decl. at ¶ 2 (Ex. P-1).

Respectfully submitted,

__/s Roger J. Marzulla ____

Roger J. Marzulla
Gregory T. Jaeger
Marzulla & Marzulla
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: November 30, 2007

Counsel for Plaintiff