IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| D & D LANDHOLDINGS, a Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | No. 06-877 L<br>Hon. Margaret M. Sweeney |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

1. Commencing in 2001 or 2002, the Border Patrol dramatically increased its activities on the subject property. After the September 11, 2001 attack, there was a geometric multiplication of Border Patrol presence and activities on D&D's land. After 2001, Border Patrol agents put the parcel and everyone who entered onto it under close surveillance and routinely questioned people on the property regarding their business on the subject property. Around 2002, the Border Patrol started grading new roads across the subject property, detouring around or destroying barricades which D&D had erected to keep the public out, damaging ongoing construction activities by driving their vehicles through the middle of construction sites, and round-the-clock use of D&D's land. Wick Decl. at ¶ 2 (Ex. P-1).

2. This increased Border Patrol presence on the subject property resulted not only from heightened border security do to the September 11, 2001 attack, but also to the fact that at about the same time the secondary fence had been completed up to a point immediately south of the subject property. Until the completion of the fence in 2001,

illegal aliens who were able to get past the primary fence had several miles of unfenced frontier which they could use to go north to illegally enter the United States. Completion of the fence squeezed this down to a "gateway" about a mile wide, bounded by the fence to the west and Otay Mountain (a significant obstacle) to the east. The path of least resistance for all of the illegal aliens who were deterred by the new fence was simply to walk around the end of it and then head north over the subject property. Knowing this, the Border Patrol utilized the subject property as an ideal observation point because of the high ground on the parcel, and as an easy way to access other properties around the area. Border Patrol agents also use the subject property as a location to corral and capture these illegal aliens, who are by reason of the fence now directed north into a far more confined area. Thus, the completion of the secondary fence in 2001 generated a large increase in Border Patrol activities—including new road construction and other use of the D&D land—more than had existed prior to 2001. Wick Decl. at ¶ 3 (Ex. P-1).

3. Border Patrol officials have refused D&D's offers to lease the subject property, or portions of it, for Border Patrol activities, to grant easements for access roads, and to develop an agreement which would allow D&D to proceed with its development of the subject property while the Border Patrol accomplishes its mission as well. Border Patrol officials believe that their agents currently have a statutory right to engage in all of the activities on D&D's land, and that they do not require D&D's permission to do so. Accordingly, the Border Patrol has thus far refused to pay for or to limit any of its activities on the subject property, and has claimed the unfettered right to use all of the subject property permanently and continuously for its activities. Wick Decl. at ¶ 4 (Ex. P-1).

4. Border Patrol officials have repeatedly told D&D that the last mile of the secondary fence would soon be completed, and that this would drastically cut Border Patrol activities on the subject property. At present, no work has begun on the project to complete the last mile of the secondary fence. In fact, the government has not yet even appraised the land needed to construct this last mile of the fence. Wick Decl. at ¶ 5 (Ex. P-1).

5. The subject property consists of approximately 135 acres of land located east of the city of San Diego, in a sparsely populated portion of San Diego County. It is approximately .75 mile north of the Mexican border. The subject property is zoned by the County for light to heavy industrial (90%) and residential (10%) uses, and is ideally situated for industrial uses that are essential to modern urban life but must be separated from large population centers. In the last couple of years, the subject property has been serviced by paved county roads and contiguous utility services have been made available. Wick Decl. at ¶ 6 (Ex. P-1).

6. The potential users for the subject property is a relatively small group of highly sophisticated and demanding national companies in businesses such as power generation, building materials, waste disposal, or prison administration. The typical customer is looking for a site which is zoned for its particular use, well located, and physically adaptable to its specific needs. Before visiting the property, a potential customer that would lease the subject property generally undertakes a comprehensive feasibility study to identify potential sites for its plant or facility, since tens or even hundreds of millions of dollars are at stake, and demands that a property fulfill all of its requirements. Wick Decl. at ¶ 8 (Ex. P-1).

7. Numerous potential customer visits to the subject property have been interrupted and ultimately spoiled by the actions of Border Patrol agents. On approximately 90 percent of these sales visits, one or more armed Border Patrol agents have accosted the customer and D&D employees, requiring that they justify their presence on the subject property. In many cases, Border Patrol agents have questioned D&D's ownership of the land in front of potential customers, and stated their deep suspicion of the landowner's sales activities. Border Patrol agents also drive all-terrain vehicles and sports utility vehicles on and off roads on the subject property, in plain view of potential customers. As a direct consequence of these encounters with the Border Patrol, not a single sale or long-term lease for development of the subject property was consummated, costing D&D millions of dollars in foregone profits from the land. Wick Decl. at ¶ 9 (Ex. P-1).

8. The Border Patrol has treated D&D's property as its own, since 2001, and has created several miles of unpaved roads on the subject property over D&D's vehement protest. Within the past five years the Border Patrol has brought grading equipment onto the subject property to grade and maintain roads for its own access, particularly to reach Otay Truck Trail from Alta Road. This activity has occurred without D&D's permission, and indeed, over D&D's vehement protest. Although D&D has expressed a willingness to grant an easement to the Border Patrol for appropriate consideration, the Border Patrol has insisted that it has the right to grade these roads on D&D's land without an easement. Wick Decl. at ¶ 11 (Ex. P-1).

9. During the past five years, the Border Patrol has created and or graded several roads on D&D's property without its permission. Each road is approximately

twelve feet wide and has a total combined length of approximately one to two miles. The roads are either dirt or gravel. Border Patrol agents drive on these roads everyday. Wick Decl. at ¶ 12 (Ex. P-1).

10. Over the past four or five years, the Border Patrol agents have continuously driven their all-terrain vehicles over non-road portions of the subject property at all hours of the day and night. These off-road activities of the Border Patrol have several consequences. First, the tracks and ruts created by the Border Patrol gradually develop into primitive roads, which the Border Patrol then grades into more permanent dirt roads. Wick Decl. at ¶ 14 (Ex. P-1).

11. Second, some of these roads traverse environmentally sensitive areas of protected vegetation or wetlands. This environmental damage is unlawful and D&D, as the property owner, is held responsible. The County has required D&D, as a condition of its building and grading permits, to mitigate this environmental damage by dedicating and planting new mitigation lands. Wick Decl. at ¶ 15 (Ex. P-1).

12. Third, the ruts caused by the Border Patrol's off-road vehicles fill with water during the winter, creating so-called "vernal pools" which may be designated as habitat for the endangered fairy shrimp. The result of such a designation is that the property cannot be developed. Wick Decl. at ¶ 16 (Ex. P-1).

13. Fourth, when driving on D&D's private property within the past year or two, the Border Patrol has repeatedly driven its vehicles over silt fences erected to demarcate and protect environmentally sensitive areas as well as areas outside the scope of the County-issued grading permit. The Border Patrol's destruction of these fences has led the County to impose fines on D&D, which is responsible for maintaining these

fences and protecting these environmentally sensitive areas. Border Patrol officials assert that this damage has occurred at night, when it is difficult for all-terrain vehicle drivers to see, but they have not paid for the damage done or for the fines incurred. In addition, Border Patrol agents drive their vehicles through landscaping on the property, and track mud onto the public road, which D&D is left to pay for the cost of clean up and revegetation. D&D is required by its grading permit to maintain certain vegetation in place. Wick Decl. at ¶17 (Ex. P-1).

14. Fifth, within the past year, while driving on D&D's private property, the Border Patrol has repeatedly run over and destroyed materials and improvements made by D&D. The Border Patrol has destroyed lain pipes which must then be replaced. The Border Patrol's vehicles have caused dirt to fall into and fill dug trenches, which must then be re-dug. The Border Patrol has not borne the cost of reconstructing any of the improvements they destroyed. Wick Decl. at ¶ 18 (Ex. P-1).

15. At times, Border Patrol agents have fired guns on and around the subject property. Wick Decl. at ¶ 19 (Ex. P-1).

16. Border Patrol agents, sometimes with a hand on their gun, have stopped D&D employees as the drive across the subject property, and even asserted that the subject property is not private property but government-owned land that they have no right to be on. Wick Decl. at ¶ 20 (Ex. P-1).

Respectfully submitted,

_s/_Roger J. Marzulla _____

Roger J. Marzulla
Gregory T. Jaeger
Marzulla & Marzulla
1350 Connecticut Ave., N.W.
Suite 410
Washington, DC 20036
(202) 822-6760
(202) 822-6774 (facsimile)

Dated: November 30, 2007

Counsel for Plaintiff