IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OTAY MESA PROPERTY L.P., et al.,

Plaintiffs,

vs. CASE NO. 06-167 L
06-1670
UNITED STATES, 06-1671

Defendant.

_________________________________/

DEPOSITION OF JOE PEREZ
Taken at Chula Vista, California
Wednesday, February 21, 2007

Reported by Shirley J. Swenson, CSR, RPR
Certificate No. 3493

MS. COOK: In yellow.

BY MR. MARZULLA:

Q. -- on Exhibit 11?

A. Right.

Q. Okay?

A. Okay.

Q. Do you sometimes drive over the subject properties?

A. Yes, sir.

Q. And how often do you do that?

A. Well, the last time that I actually drove over his property -- well, let's go backwards.

This may happen on a daily basis. One particular area behind Kuebler's Ranch, you get up to Otay Mountain. The last time I drove up there is when the helicopter crashed here about a month ago up on the top of Otay Mountain and had to drive around Kuebler's to hit the Otay Truck Trail to drive to the top. These other areas, I haven't driven out there in a week because it's been raining.

Q. I see.

A. When it rains, we can't access any of this property because it's all mud. Our containment zone actually falls back to the streets of Otay Mesa around Alta Road. We can't drive off beyond that because it's

too muddy and wet.
Q. How about when it's not raining, how regularly would you drive over the subject property?
A. Again, it depends on our activity. I mean, sometimes it might be on a daily basis.
Q. Okay.
A. Then it may not be for two or three days because the activity would be not on this property, but elsewhere.
Q. Right.
A. But if I'm not driving on the property, then there is agents that drive on this property every single day.
Q. Okay.
A. If we're not patrolling the area that's not wet, then I assign people to these zones on a daily basis 24 hours a day.
Q. So you make the actual assignments?
A. I do not.
Q. You don't?
A. I -- I -- I send the morning order out to the watch commanders, and they know what our area of responsibility is.
Q. Okay.
A. If you're ordering watch -- watch commanders, I

would tell you, "I want you to control Zone 16 and 17." How you do it is up to you. Just make sure that it gets done.

Q. I see.

A. And yours could be different from hers or anyone else's, but they assign people to work those areas, and the activity is different.

On the daytime, you don't need all the people that you require on the swing shift when it gets dark or that you're going to need at midnights when it's totally dark. Midnights you --

MS. COOK: I need you to slow down a little bit --

THE WITNESS: Sorry.

MS. COOK: -- so the court reporter is sure to get everything.

Okay?

THE WITNESS: I'll slow down.

MS. COOK: I'm sorry. I didn't mean to interrupt you.

BY MR. MARZULLA:

Q. So is it true that as long as their vehicles can drive on the land, there are Border Patrol vehicles on the subject property virtually every day?

A. I don't know if that's a hundred percent true.

school. These things were previously not even a dream because you couldn't give the property away, so we've improved the quality of life in that immediate border area. So that's what the fence does. It will improve what the combination of the three things I talked about, the -- the quality of life in the immediate border area in some areas where it's feasible, and then there's other areas where that won't apply.

Q. It appears that your responsibilities have sort of moved eastward --

A. Correct.

Q. -- from your description?

A. Correct.

Q. Is that right?

A. Yes.

Q. So now your area of responsibility is to the east of the Otay Mesa Port of Entry?

A. (Witness nods head.)

Q. I note that the fence also terminates within your area of responsibility.

Is that right?

A. That's correct.

Q. How will extension of the fence or how would extension of the fence impact the way in which you attempt to control the part of the border that you're

now responsible for?

A. It would depend on if I had access to the border. You gotta have eyes on the border and access to the border, and the reason -- I don't know the -- I don't know the total reason that the fence ends there, but it ends there because that's probably the easiest place to end it. The rest of it is a mountain.

If you put a secondary fence up that mountain where I don't even have the roads to drive up that mountain, what do we do? You can't just put up a fence up Tin Can or further up on Otay Mountain because we don't have access to it, but we can drive down some of those canyons. They take three hours to walk up and down. Like Copper Canyon and all those canyons, they're hours just to walk up and down these canyons, so I don't know how much of an impact a secondary fence would have there.

As a matter of fact, in my plan, my orbit plan where I go out to 2008 --

Q. Yes.

A. -- I don't call for a secondary fence out there to control that area of the border.

Q. I see.

And why is it that you don't call for the extension of the fence?

with that culvert?

A. I wouldn't be aware of if there was or wasn't. I'm not sure. What was this property?

Q. Well, I'm really just asking what you saw, whether anything that you saw involved grading on --

A. There was grading down in that -- around that culvert. There was grading, and there was earth moving, a bunch of things happening. I'm just not aware if that was the subject's property.

Q. Right.

You just don't know where the property --

A. Correct.

Q. -- lines are --

A. Exactly.

Q. -- right?

A. Right.

Q. Fair enough.

MS. COOK: Joe Granata this afternoon can probably answer some of your questions about that.

MR. MARZULLA: Great. We'll ask him.

Q. I'd like you now to take a look at Exhibit 4, if you would.

MS. COOK: It should be in that pile right there (indicating).

THE WITNESS: Okay.

BY MR. MARZULLA:

Q. Do you see the Otay Truck Trail on that map?

A. I do.

Q. What color is that marked?

Oh, I'm sorry. I've given you the wrong exhibit. It's Exhibit 2 --

A. Okay.

Q. -- if you would.

A. The map is highlighted in pink -- I mean, the trail.

Q. The trail?

A. The trail is highlighted in pink.

Q. Now, would you agree with me that part of that trail is on property owned by the plaintiffs?

A. I guess the base of it is right here (indicating).

Q. And the access to it?

A. Correct.

Q. To get to that trail from the west side, you have to traverse a road that is on the subject property, right?

A. Correct.

Q. Do you see the gate, the locked gate that we had talked about earlier?

A. Uh-huh.

Q. Okay.

MS. COOK: There's actually two gates on the exhibit, Counsel.

THE WITNESS: It says "new gate" and "new gate."

MR. MARZULLA: Right.

THE WITNESS: Both those are locks. If you go through there, yes, you would have to go through his property, but you don't necessarily have to drive through those two gates to get to his property.

BY MR. MARZULLA:

Q. Would you please explain that answer?

A. Down here (indicating) at -- at Calpine --

Q. Yes.

A. -- at Calpine, you can actually drive around off the pavement, Calpine around the base of -- and behind Kuebler's and get onto the Otay Truck Trail behind the Kuebler property, the Kuebler Ranch to get to the Truck Trail. The power lines that are actually shown, there's two here (indicating), and the one that says 5440 Morehead -- Morehouse Drive, No. 4000, you actually drive up around that area (indicating) to get to the Truck Trail.

Q. Okay.

A. Maybe I'm looking at this wrong. Actually,

it's over here (indicating). It's still the -- it's the same one, No. 4000, but it's -- I can show you. Right here (indicating) --

MS. NEL: Okay.

THE WITNESS: -- you can drive on Calpine, get off the pavement and go around and get onto the property back here (indicating). This (indicating) is how we get onto it anymore. We don't have access anymore.

MS. NEL: So you don't drive on that portion of the pink anymore?

THE WITNESS: Over here (indicating)?

MS. NEL: Right.

THE WITNESS: Right, because he locked us out, so we come in off this side (indicating) underneath this -- where the road ends here (indicating), there's a cul-de-sac.

MS. NEL: Okay.

THE WITNESS: It actually ends as a jump onto the dirt. You drive around this road (indicating) that's here (indicating), the SDG&E road that's here to get on the Truck Trail.

MS. NEL: All right.

BY MR. MARZULLA:

Q. Do you know whether the Border Patrol has an easement to use that so-called SDG&E road?

A. I do not, sir.

Q. Do you know whether the Border Patrol vehicles actually also go around the gate itself?

A. You're talking about back here (indicating) --

MS. NEL: Yes.

THE WITNESS: -- by the Kuebler Ranch?

MR. MARZULLA: Yes.

THE WITNESS: No. I mean, if they do -- I mean, it's possible.

BY MR. MARZULLA:

Q. Have you observed signs on the ground that show that there are vehicles going around that gate?

A. I'm not sure that they're Border Patrol vehicles.

Q. But there is now sort of a truck track, if you will, going around that gate, isn't there?

A. I've seen signs of where people have driven around some of these gates. I just don't know if -- if it's Border Patrol personnel. I haven't visually observed any Border Patrol person driving around these gates. They're not supposed to. Whether they have or not, I mean, I have no idea. They may have.

Q. Now, you say, "They're not supposed to."

Have you given instructions in that regard?

Do they have orders?

A. That is a standing order at the station with all personnel with regards to the gates. Normally we have access to these -- to these gates. If we get a -- we place our own lock on -- on there. We always have access to all these gates.

We just resolved an issue down in Otay Mesa of the same thing. Somebody didn't know that it was a Border Patrol lock on there, and it was a combination lock. They didn't know the combination. Then next thing you know, we see people driving around. Well, immediately we suspect who's been driving around? Because it's up to us to -- if we go up and we start fixing the property -- this is the day before yesterday, a guy came out and said, "Hey, thanks a lot for you guys coming out here. Guys with ATV's have been coming out here on the weekends, not our ATV's, private people and doing that. We thought it was Border Patrol personnel." But we went ahead, and we fixed it anyway. And he said, "Yeah, I appreciate it." He said, "You guys are not the violators of that," but we addressed that issue anyway. My agents know not to do that.

Q. They do?

A. Yeah.

Q. Okay. Do you know whether the Border Patrol actually threatened to cut those locks off?

A. No, I don't.
Q. And I'm speaking now of the subject property --
A. Right.
Q. -- not the property --
A. Right.
Q. -- that you were just describing.
A. I don't know the negotiations between the subject and the Border Patrol at all.
Q. Okay.
A. Because I have -- personally, that's -- that's beyond my control. I -- I don't negotiate into those.
Q. Right.
A. That's got to be with him and Mr. Hance or our attorneys over there.
Q. But as far as you're aware, does the Border Patrol have a policy of cutting off locks that have been placed by property owners?
A. I don't know whether we have a policy. I know that locks have been cut off in the past on different gates, not necessarily these gates, but I know that in my career, I have seen locks cut off when either we get locked out, and sometimes it happens on accident where somebody will unlock a lock off the Border Patrol, but they lock it back. Our lock is -- is hanging, so it doesn't really lock anything, so if we need access to

it, so we'll actually cut off locks to go through.
Q. Right.
A. And then go back and -- and replace the lock that was cut, but I don't know what the policy is for cutting off locks.
Q. One other topic, are your agents armed?
A. Yes, sir.
Q. What are they armed with?
A. With semiautomatic handguns, shotguns, and then in some cases, long arms. Semiautomatic could be full automatic, M-4's, M-14's. It depends.
Q. And are those weapons sometimes discharged throughout the course of patrols?
A. We had a shooting just yesterday.
Q. So I take it your answer is "yes"?
A. Yes, sir.
Q. What kinds of precautions should a property owner such as the plaintiffs in this case take when they go onto their property in order to avoid getting in the way of harm?
A. I'd just be very diligent to, you know -- any -- any other vehicle up there other than -- than a Border Patrol vehicle or Border Patrol personnel, when we're up there working, I mean, if he -- if he has an issue or anybody from his staff or -- or people that