UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| D&D LANDHOLDINGS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) | No. 06-877 L<br><br>Hon. Margaret M. Sweeney |

DECLARATION OF STEVEN P. KEAN

I, STEVEN P. KEAN declare:

1. I am presently employed by United States Customs and Border Protection (CBP), a bureau of the Department of Homeland Security, as an Assistant Chief Patrol Agent. I joined the United States Border Patrol (Border Patrol) in 1978. Prior to becoming an Assistant Chief Patrol Agent in January of 1999, I was an Assistant Patrol Agent in Charge. On March 1, 2003, Border Patrol became a legacy component of CBP as part of the creation of the Department of Homeland Security.

2. As an Assistant Chief Patrol Agent, my official duties require me to possess and apply knowledge concerning a wide range of matters related directly and indirectly to patrol operations, including the day-to-day operational activities and the personnel and administrative processes necessary to direct the organization. I plan, organize, coordinate and manage through subordinate supervisors, the wide range of programs and activities of Border Patrol Stations and Sector Headquarters over which I am assigned managerial responsibility. From May 8, 2005 through July 5, 2007, these responsibilities included overseeing the Imperial Beach and Chula Vista Border Patrol Stations, Communications, Comparative Statistics, and various task forces and details. The Chula Vista Station is under the jurisdiction of the San Diego Sector Office. My current responsibilities include overseeing the Training Department and the Professional Standards Division.

3. As a result of my official duties as Assistant Chief Border Patrol Agent, I have acquired considerable historical knowledge of Border Patrol and CBP patrol and related activities in the San Diego Sector. I have an official need to know of this history and related trends in order to situate and coordinate the operations for which I am responsible within the San Diego Sector.

4. For well over two decades, Border Patrol and CBP have actively patrolled Plaintiff's approximately 135 acres ("the Property") that are the subject of the above-captioned case as well as the surrounding area. The Property is located within the patrol responsibility of Chula Vista Station and is in zones 17 and 18, with the majority of the property in zone 17. In the early to

mid 1980's, as many as a half-dozen Border Patrol agents mounted on horseback would patrol the Property as well as adjacent properties every evening. At that time, illegal entrants encountered on or near the Property were generally respectful of authority and, therefore, willing to surrender themselves to agents when detected. Border Patrol activities on the Property included apprehending illegal entrants as a result of visual observations and sensors located on and near the Property being triggered by illegal entrants

5. By the late 1980's, the increase in illegal entrants involved in organized alien and drug smuggling resulted in increased violence and "drive-throughs." In a drive-through," one or more vehicles loaded with illegal entrants or drugs would drive across the border from Mexico into the United States in an attempt to reach a road with the ultimate goal of quickly disappearing into a populated area.

6. Border Patrol informally refers to the approximately 10-year period from 1987 to 1997 as "the Drive-Through Wars" due to the frequency and intensity of the activity. The last 4 or 5 years of the "war" were rather calm due to the completion in 1993 of a fence beginning at the Pacific Ocean (the fence extends two hundred feet into the ocean) and continuing along the border of the United States for approximately 14 miles ("Primary Fence"). Before the completion of the Primary Fence especially, many drive-throughs were successful despite the fact that those involved were traveling over undeveloped property with or without unimproved roads.

7. Whether illegal entry is attempted at day or at night, illegal entrants share the same goal. They want to obtain ground transportation out of the area. The majority of the transportation is pre-arranged by a "coyote." Due to that goal, at some point, most illegal entrants move toward paved roads or highways that allow for rapid entry into areas of high population density or they move toward areas of high population density where ground transportation often awaits them. If entry proves difficult due to the possibility of detection, they hide until they can make their way to a paved road or highway.

8. The time of day affects the number of illegal entrants who attempt illegal entry. Fewer of them attempt entry during the day, and more of them attempt entry during the night. Whether night or day, illegal entrants gravitate toward areas that might provide them with some degree of cover, such as terrain features or buildings that can shield them from view.

9. Approximately 50 percent of apprehensions of illegal entrants ("Apprehensions") are the result of responding to in-ground seismic sensors. The Border Patrol has maintained sensors in the area of the Property for well over 10 years. Two sensors, referred to internally as 603-1 and 603-2, were installed on the Property in September 2004. The remaining approximately 50 percent of Apprehensions are due largely to visual sightings.

10. Illegal entrants cross the border along the entire 14-mile or so stretch of the border from the Pacific Ocean eastward to Otay Mountain. This includes portions of the border where the primary fence, the secondary fence immediately to the north, and the all-weather road between the two fences are operationally effective. Some illegal entrants have attempted to climb over or

cut through the two fences while others have utilized tunnels. In addition, illegal entrants also cross the border along the approximately 52 miles of border to the east of the end of the primary fence, an area for which the San Diego Sector office is also responsible.

11. Consistent with the matters set forth above, illegal entrants generally cross the international border between the United States and the Republic of Mexico to the south and southeast of the Property. From there, illegal entrants traverse the Property in a north to northwesterly direction and continue northward through Otay Valley or head west to Alta Road. Alta Road provides rapid egress and ground transportation from the area through the commercially developed Otay Mesa area.

12. From the Otay Truck Trail, which winds to the top of the San Ysidro Mountains, a wide area can be controlled at night using infrared vision unless the fog or heavy rain renders it ineffective.

13. In sum, the extent of Border Patrol activity was and is determined largely by the illegal entrants because Border Patrol must go to where illegal entrants are spotted.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing is true and correct.

This 19th day of October, 2007.

STEVEN P. KEAN