**UNITED STATES COURT OF FEDERAL CLAIMS**

(E-Filed: December 21, 2007)

| | |
|---|---|
| **D & D LANDHOLDINGS, a limited partnership,** | |
| **Plaintiff,** | **No. 06-877 L** |
| **v.** | |
| **UNITED STATES,** | **Hon. Margaret M. Sweeney** |
| **Defendant.** | |

**DEFENDANT'S REPLY**
**IN SUPPORT OF ITS MOTION TO DISMISS**
**OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

December 21, 2007

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

SUSAN V. COOK, Senior Attorney
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorneys for Defendant

OF COUNSEL:
Melissa Erny
A. Ted Kundrat
U.S. Customs and Border Protection
Indianapolis, Indiana 46278

# TABLE OF CONTENTS

I. PLAINTIFF'S COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS . . . . . 1

A. Plaintiff's Claim That the Border Patrol Has Constructed Roads on Its Property Is Barred by the Statute of Limitations . . . . . 2

B. Plaintiff's Assertion That Construction of the Secondary Fence Has Channeled Illegal Aliens Onto Its Property Is Not Timely . . . . . 4

C. The Apprehension Statistics Proffered by Defendant Are Reliable, Properly Supported, and Were Timely Produced . . . . . 8

II. REASONABLE BORDER PATROL ENTRY ONTO PLAINTIFF'S PROPERTY FOR THE PURPOSES OF PATROL AND THE APPREHENSION OF ALIENS ARE NON-COMPENSABLE . . . . . 11

A. Background Principles Establish That the Right to Exclude the Border Patrol Is Not Part of Plaintiff's Property Right . . . . . 11

B. The Border Patrol's Exercise of its Right to Enter onto the Subject Property Does Not Give Rise to a Right to Compensation Under the Fifth Amendment . . . . . 12

III. PLAINTIFF'S MISCELLANEOUS CLAIMS OF DAMAGE TO ITS PROPERTY ARE NOT PROPERLY SUPPORTED . . . . . 16

IV. CONCLUSION . . . . . 18

## TABLE OF AUTHORITIES

**CASES**

Acadia Technology, Inc. v. United States
458 F.3d 1327 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Alde Terrance, Inc. v. United States
161 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Alde v. United States
28 Fed. C1. 26 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Amerisource Corp. v. United States
75 Fed. C1. 743 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ariadne Financial Services Pty. Ltd. v. United States
133 F.3d 874 (Fed. Cir. 1998), cert. denied, 525 U.S. 823 (1998) . . . . . . . . . . . . . . . . . . 2

Bennis v. Michigan
516 U.S. 442 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Boise Cascade Corp. v. United States
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Borough of Alpine v. United States
923 F.2d 170 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ferreiro v. United States
350 F.3d 1318 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Hendler v. United States
952 F.2d 1364 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hopeland Band of Pomo Indians v. United States
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Jarboe-Lacky Feedlots, Inc. v. United States
7 Cl. Ct. 329 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

John R. Sand & Gravel Co. v. United States
457 F.3d 1345 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Loretto v. Teleprompter Manhattan CATV Corp.
458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Owen Equip. & Erection Co. v. Kroger
437 U.S. 365 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Seay v. United States
61 Fed. C1. 32 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Dickinson
331 U.S. 745 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATUTES**

8 U.S.C. § 1357 (a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
8 U.S.C. § 1357 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**REGULATIONS**

8 C.F.R. § 287.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**RULE**

RCFC 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

## LIST OF EXHIBITS


| Exhibit | Description |
|---|---|
| D-1 | Map of All Parcels (1-11) including zone designations (DOJ416376) . . . . 4, 5, 7, 8, 16 |
| D-2 | Jun 27, 2007, Congressional Research Service, CRS Report for Congress, "Border Security: Barriers Along the U.S. International Border" (RL33659) (DOJ408669) . . . . 6 |
| D-3 | Jan 25, 2006, Congressional Research Service, CRS Report for Congress, "Border Security: The Role of the U.S. Border Patrol" (RL32562) (DHS19241-80) (DOJ417081) |
| D-4 | Jul 20, 2007, Deposition Excerpts, David Wick (DOJ418460) . . . . 15, 16, 17 |
| D-5 | Aerial Pictures, Landiscor Aerial Fotobank |
| | (a) 1987 (DOJ415977) . . . . 3, 6, 15 |
| | (b) 1990 (DOJ415976) . . . . 3, 6, 15 |
| | (c) 1995 (DOJ415975) . . . . 3, 6, 15 |
| | (d) 1998 (DOJ415973) . . . . 3, 6, 15 |
| | (e) 2000 (DOJ416434) . . . . 3, 6, 15 |
| | (f) 2006 (DOJ415979) . . . . 3, 4, 15 |
| D-6 | Dec 14, 2000, Grant Deed, Rancho Vista Del Mar to D&D Landholdings (San Diego Recorder Doc 2000-0689103, p. 8974-75) (DOJ395301) |
| D-7 | Map, Aerial View of Otay Mountain Area (DOJ342099) |
| D-8 | February 21, 2007, Deposition Excerpts, Joseph Granata (DOJ417120) . . . . 6 |
| D-9 | January 1993, Sandia National Laboratories, Systematic Analysis of the Southwest Border (3 Volumes on 1 CD) (To Be Filed Under Seal) . . . . 7 |
| D-10 | Photograph of Primary & Secondary Fences (DOJ415597) |
| D-11 | Map of Parcel 10 Showing Distances and Sensors (DOJ417445) . . . . 4, 7 |
| D-12(a) | Chula Vista Apprehensions by Fiscal Year, 1992-2007, U.S. Border Patrol (DHS20846) (DOJ416092) |

D-12(b) Brown Field Apprehensions by Fiscal Year, 1992-2007, U.S. Border Patrol (DHS20847) (DOJ416090)

D-13 (a) Apprehensions, Parcel 10, FY2005 (DOJ417108) . . . . . . . . . . . . . . . . . 15

(b) Apprehensions, Parcel 10, FY2006 (DOJ417110) . . . . . . . . . . . . . . . . . 15

(c) Apprehensions, Parcel 10, FY2007 (DOJ417111) . . . . . . . . . . . . . . . . . 15

D-14 Map of Sector Offices, U.S. Border Patrol (DOJ416106)

D-15 San Diego Sector Officer Corps Staffing Levels, FY94-FY07 (DOJ415577) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D-16 Zones Apprehension Trend Analysis by Fiscal Year, FY1999 to FY2006 (partial year) (2 pages) (DHS28024-25) (DOJ370766)

D-17 U.S. Border Patrol Apprehensions by Sector (DOJ417104)

D-18 Map of Otay Mesa Area showing Place Names (DOJ370608)

D-19 Table entitled "Sensors on Parcel 10" (DOJ417763)

D-20 (Exhibit Deleted)

D-21 Jul 7, 2006, Memo, Darren Kerns to Joseph Perez, CBP, re Citizen contact with David Wick (DOJ417084) . . . . . . . . . . . . . . . . . . . . . . . . . 16

D-22 Jul 7, 2006, Memo, Michael Diaz to Joe Perez, CBP, re Incident with Private Citizen (DOJ417085) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D-23 Aerial Photo Map Showing Dates on Which Portions of Secondary Fence Were Completed (DOJ417100) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D-24 July 2003, Excerpts, Final Report, Environmental Impact Statement for the Completion of the 14-mile Border Infrastructure System, San Diego, CA, Volume 1 (DOJ417090)

D-25 Photo of Sensor Unit (DOJ428755)

D-26 Nov 2006, Photograph of End of Primary Fence (DOJ417034) . . . . . . . . . . . . . . 6

D-27 Nov 2006, Photograph of Entry Paths at End of Primary Fence (DOJ417035)

D-28 Nov 2006, Photograph Showing Difference in Density Between Areas to North and South of Primary Fence (DOJ417036)

D-29 Oct 19, 2007, Declaration of Steven P. Kean (DOJ417958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 14

D-30 Oct 26, 2007, Declaration of Daniel Ochoa (DOJ418498) . . . . . . . . . . . . . . . . . . 9

D-31 Oct 18, 2007, Declaration of Janel Frith (DOJ418344) . . . . . . . . . . . . . . . . . . . . . 9

D-32 Oct 25, 2007, Declaration of Susan Cook (DOJ418405)

D-33 Oct 26, 2007, Declaration of Curtis Weatherred (DOJ418485)

D-34 Oct 26, 2007, Declaration of Greg Giddens (DOJ418401)

D-35 Jun 13, 2007, Tax Assessor's Plat Maps, Parcel 10, from Amended Complaint (CFC Doc #16) (DOJ417591)

<u>**Exhibits Filed with Reply Brief:**</u>

D-36 1998, Aerial Photo of Parcel 10 (close up of Ex. D-5(d)) (DOJ428405) . . . . . . . 3

D-37 2006, Aerial Photo of Parcel 10 (close up of Ex. D-5(f)) (DOJ428408) . . . . . . . . 4

D-38 Dec 21, 2007, Second Declaration of Janel Frith (DOJ428850) . . . . . . . . . . . 8, 9

D-39 Dec 19, 2007, Declaration of Juanell Bottroff (DOJ428521) . . . . . . . . . . . . . . . 17

D-40 Dec 21, 2007, Declaration of Silvestre M. Vasquez (DOJ428805) . . . . . . . . . . 18

D-41 Mar 1, 2002, Immigration & Naturalization Service, INS Firearms Policy (DOJ427402) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D-42 Oct 15, 2007, Index of Documents Produced by Defendant in Otay Mesa Property <u>L.P. v. United States</u> and related cases (DOJ366508) . . . . 10

D-43 Mar 27, 2007, Excerpts, Deposition of Darryl Griffen (DOJ428779) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14, 16

D-44 Feb 21, 2007, Excerpts, Deposition of Joe Perez (DOJ428780) . . . . . . . 5, 6, 9, 11

D-45 Feb 20, 2007, Excerpts, Deposition of Steven Kean (DOJ428782) . . 3, 4, 5, 9, 11

D-46 Feb 20, 2007, Deposition Exhibit 2, from Deposition of Steven Kean (DOJ428565) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D-47 Dec 20, 2007, Second Declaration of Daniel Ochoa (DHS428732) . . . . . . . . 2, 9

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **D & D LANDHOLDINGS, a limited partnership,** | ) | |
| | ) | **No. 06-877 L** |
| **Plaintiff,** | ) | |
| | ) | **Hon. Margaret M. Sweeney** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S REPLY**
**IN SUPPORT OF ITS MOTION TO DISMISS**
**OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

## I. PLAINTIFF'S COMPLAINT IS BARRED BY THE STATUTE OF LIMITATIONS

The statute of limitations applicable to Plaintiff's takings claim is set forth in 28 U.S.C. § 2501 and provides: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Because this six-year statute of limitations "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity... [it] must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988); see also Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978).

Under current Federal Circuit precedent, the failure of a plaintiff to file its claim within this six-year statute of limitations precludes it from invoking the jurisdiction of this Court to

adjudicate those claims. Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) cert. denied, 525 U.S. 823 (1998) (citing Borough of Alpine v. United States, 923 F.2d 170, 171 n.l (Fed. Cir. 1991)).

Plaintiff’s argument that the statute of limitations does not run “until the situation becomes stabilized” advocates an incorrect legal standard. Pl. Brf.[1/] at 12, citing United States v. Dickinson, 331 U.S. 745, 749 (1947). As the Federal Circuit recently explained, the Dickinson line of cases is “only applicable in cases involving gradual physical processes,” not when the case involves allegations of physical entry and occupation as is true here. John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1359 (Fed. Cir. 2006).

**A. Plaintiff's Claim That the Border Patrol Has Constructed Roads on Its Property Is Barred by the Statute of Limitations**

Plaintiff alleges that after September 11, 2001, or “around 2002,” the Border Patrol began creating roads upon Plaintiff’s property ... .” Pl. Brf. at 13, citing Wick Decl. at Para 2 (Doc #47-2). However, a review of the undisputed historical area photographs contradicts this contention.[2/]

Exhibit 2 to the Wick Declaration illustrates the roads, outlined in red, which Mr. Wick

---

[1/] “Pl. Brf.” refers to Plaintiff’s Corrected Opposition to Defendant’s Motion for Summary Judgment filed November 30, 2007.

[2/] Plaintiff cautions that "the allegations in the complaint [must] be considered as true at this stage ...". P1. Brf. at 13. While Plaintiff correctly states the general rule, Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Alde Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998). Further, when a RCFC 12(b)(1) motion to dismiss challenges the truth of jurisdictional facts alleged in the complaint -- precisely what Defendant's motion does here -- the allegations in the complaint are not controlling and the Court may consider relevant evidence outside the pleadings in order to resolve the factual dispute. Ferreiro v. United States, 350 F.3d 1318, 1324 (Fed. Cir. 2003).

alleges the Border Patrol has constructed on Parcel 10 beginning "around 2002." Wick Decl. at Para. 2. However, comparing those roads to a 1998 aerial photograph indicates that the roads identified by Mr. Wick as allegedly newly constructed were already in existence in 1998, well more than six years prior to the filing of the complaint in December, 2006. See Ex. D-5(d). The task of comparison is made easier by reference to Ex. D-36, a cropped closeup of Ex. D-5(d).[3/]

Nor did the deposition testimony of Steven Kean contradict these photographs. Plaintiff is correct that Mr. Kean stated that the Border Patrol had maintained existing agricultural roads on the "subject property" over the years. Pl. Brf. at 7; see Ex. D-45 at 59-60. However, the "subject property" being discussed at the deposition was all 11 parcels,[4/] and the roads being discussed were those depicted on Deposition Exhibit 2 which Plaintiff did not include in its exhibits. A review of Deposition Exhibit 2, attached hereto as Defendant's Ex. D-46, reveals that only one of the several roads highlighted on the photograph is located on the northern corner of Parcel 10. In addition, Mr. Kean indicated the "I don't know if these specific roads [depicted on Deposition Exhibit 2] have been graded and maintained by us, or if we just utilize them. I can't answer that." Ex. D-45 at 59-60.

As clearly appears from the 1998 historical aerial photograph, the roads which Plaintiff

---

[3/] Plaintiff has not challenged Defendant's Exhibits D-5(a)-(f).

[4/] Discovery in the three related cases was handled jointly. Defendant served its Initial Disclosures and document production in the first-filed case of Otay Mesa Property L.P.v. United States, Ct. Fed. C1. No. 06-167 (Baskir, J.) (Parcels 1-9). Following the subsequent filing of the factually-related cases of International Industrial Park, Inc. v. United States, Ct. Fed. C1. No. 06-876 (Wheeler, J.) (Parcel 11), and the instant case of D&D Landholdings v. United States, Ct. Fed. CI. No. 06-877 (Sweeney, J.) (Parcel 10), Defendant advised Plaintiff there were no additional relevant documents or information that had not already been produced as part of the Initial Disclosures or the document production in the Otay Mesa case. Discovery depositions were also jointly conducted.

claims were not constructed until "around 2002" were in already in existence in 1998. Accordingly, Plaintiff's claim of a physical taking based on the construction of roads on Parcel 10 must be dismissed.

**B. Plaintiff's Assertion That Construction of the Secondary Fence Has Channeled Illegal Aliens Onto Its Property Is Not Timely**

Plaintiff next argues that the Declaration of David Wick (Doc. 47-2) establishes that completion of the Secondary Fence in 2001 caused an increase in both illegal alien traffic and Border Patrol enforcement activity on its property in 2002. P1. Brf. at 13. However, David Wick's Declaration provides little basis for the Court to conclude that Mr. Wick's statement is based on anything other than conjecture and speculation.

Indeed, Mr. Wick admits that he visits the property relatively infrequently. His declaration states that he visits Parcel 10, "together with other properties I manage, on average about once a week ...." Wick Decl. at ¶ 2 (emphasis added). Thus, Mr. Wick does not even represent that he visits Parcel 10 once a week -- itself far less frequent than the Border Patrol observations of Parcel 10. Mr. Wick manages a large number of parcels, 10 of which are currently being litigated, some in the stage of active development, that undoubtedly command his primary attention. See Def. Exs. D-l, D-5(f). Parcel 10, on the other hand, is isolated, without direct road access, and currently in an undeveloped state. See Exs. D-1, D-11, D-37.

Mr. Wick's declaration provides this Court with little basis on which to conclude that Mr. Wick has the required personal knowledge, RCFC 56(e), on which to state that illegal alien traffic first climbs over the Primary Fence, and then goes around the end of the Secondary Fence, rather than the easy route of merely walking around the nearby end of the Primary Fence. Ex. D-45 at 47. Indeed, Mr. Wick's hypothetical route asks us to believe that illegal aliens, once around

the end of the Secondary Fence, head north rather than heading for the closest road to the west-northwest. See Ex. D-1.

In contrast, Border Patrol officers who are out there every day, and who observe alien traffic patterns first hand, do not attribute any increase in illegal alien traffic to the secondary fence. Exs. D-45 at 43, 46, D-44 at 32. Instead, the opinion of the Border Patrol agents who patrol the East Otay area is that any shift of illegal alien traffic to the east is the result of improved staffing and scopes. Ex. D-45 at 35-36. And when the Border Patrol refers to a shift to the east, they are referring to the east side of Otay Mountain and beyond. Exs. D-45 at 37, D-44 at 59.

In fact, illegal aliens have been transiting Plaintiff's property as a passageway into the United States for many years. Ex. D-9 at ES-52. The Border Patrol has patrolled Plaintiff's property since it began law enforcement activities after its formation in 1924, and Border Patrol agents have patrolled Plaintiff's property on a frequent basis since at least the 1980s. Ex. D-29 at ¶ 4. Therefore, regardless of whether the secondary fence has caused illegal immigrants to be channeled onto Plaintiff's property, the Border Patrol's presence on Plaintiff's property has not only occurred for a substantial number of years, but was in all likelihood greater in the past than it is now.

Quite apart from Plaintiff's challenge to Defendant's apprehension statistics, a review of the undisputed staffing numbers supports Defendant's arguments. Between October 1994 and June 1998, during Operation Gatekeeper, manpower in the San Diego Sector increased by 150%, the vehicle fleet increased by 152%, and seismic sensors deployment increased by 171%. Permanent lighting was increased from 1 mile to 6 miles, and for the first time, portable lighting

platforms were deployed. See D-2 at CRS-3. Operation Gatekeeper marked a significant increase in the presence of Border Patrol agents at locations directly along the border. Id. The number of Border Patrol agents assigned to the San Diego Sector continued to increase through 1999, when it reached its all time peak. Ex. D-15. Indeed, the number of agents currently assigned to San Diego Sector is lower today than in 1999, id., well more than six years prior to Plaintiff filing its complaint.

Plaintiff's channeling argument also ignores the physical realities of the locations of the primary and secondary fences. At present, the primary fence extends only 1-1/2 miles farther than the secondary fence. Thus, from the point where the secondary fence ends, the end of the primary fence is readily apparent as the terrain rises to the mountains. Plaintiff's channeling argument apparently posits that illegal immigrants first climb over or cut through the primary fence, but then decide to walk to where the secondary fence ends rather than climb over or cut through the secondary fence. However, it is obviously far easier, see Ex. D-26, for illegal immigrants just to walk around the end of the primary fence located just a short distance away, and the paths present in aerial and ground photos make it clear they do just that. Exs. D-5(a)-(f), D-27.

Plaintiff's channeling argument also ignores the fact that the Secondary Fence is not a complete linear barrier even today. Instead, it was constructed in sections; between the sections were gaps for ports of entry, gates, and drainage box culverts. Those gaps in the fence prevent it from serving as the channeling force that Plaintiff hypothesizes. Ex. D-44 at 28-29. For example, a 674-foot section of secondary fence near the CalTrans truck facility as well as the work at drainage culvert BC-3 were not completed until 2006. See Exs. D-8 at 48, D-23. In

addition, throughout were numerous gaps where gates were to ultimately be installed. Indeed, to this day there still exists a 70-foot gap near the Otay Mesa Port of Entry. Id. at 45. Thus, the undisputed Secondary Fence construction facts do not support Plaintiff's conjecture that there has been a "geometric multiplication of Border Patrol presence and activities" after 2001. Wick. Decl. at ¶ 2.

Historical accounts indicate that it was construction of the primary, not the secondary, fence which was intended to redirect illegal alien traffic away from the metropolitan San Diego area and to the east instead. As noted in the 1993 Sandia Report, at the time of construction of the primary fence, the intent was "to force the traffic back to the open terrain of Otay Mesa where cover is relatively sparse so that sensors and night vision can be used much more effectively and pursuit is much easier and more effective." Ex. D-9 at 186. Thus, illegal alien traffic has been redirected toward the Otay Mesa area since the early 1990s. Since Plaintiff did not acquire Parcel 10 until 2000, its frame of reference on the level of customary patrols is undoubtedly affected.

Finally, it must be remembered that Parcel 10 is a significant distance from the border (0.68 to 0.73 miles). See Ex. D-11. Thus, even if the secondary fence were channeling illegal immigrants, a contention we have explained is incorrect, the impact would fall on land located closer to the border than Parcel 10. Immigrants coming around the end of the secondary fence would head west-northwest to reach the closest road and transportation out of the area, not to the north toward Parcel 10. Exs. D-29 at ¶ 7; see also D-1.

**C. The Apprehension Statistics Proffered by Defendant Are Reliable, Properly Supported, and Were Timely Produced**

In an effort to rebut Defendant's statute of limitations argument, Plaintiff attacks both the credibility and admissibility of Defendant's apprehension statistics. P1. Brf. at 14. First, contrary to Plaintiff's statement, P1. Brf. at 14, Defendant certainly did not mean to suggest that the apprehension statistics that are maintained by the Border Patrol as an official public record are somehow incomplete or imperfect. Perhaps Plaintiff has misunderstood some portion of Defendant's description, Def. Op. Brf.[5/] at 11 n. 6.

To clarify, prior to Fiscal Year 1999, the Border Patrol maintained apprehension statistics according to which Border Patrol station was responsible for the apprehension. Plaintiff's property is currently within the patrol responsibility of the Chula Vista Station. Ex. D-29 at ¶ 4. Beginning in Fiscal Year 1999, the Border Patrol created administrative enforcement zones; thereafter, the Border Patrol maintained apprehension statistics by both station and by zone. The majority of Plaintiff's property is located within Zone 17, with a smaller portion in Zone 18. See Ex. D-1.

Beginning in Fiscal Year 2003, the Border Patrol began phasing in the addition of geospatial coordinates to the apprehension data. Ex. D-38 at ¶ 10. For Fiscal Years 2003 and 2004, latitude and longitude coordinates were added to some, but not all, of the data entries. In other words, some data entries have a precise geospatial location associated with the apprehension event in the computer database; others do not. Beginning with Fiscal Year 2005, all apprehension event data has latitude and longitude coordinates associated with each

---

[5/] "Def. Op. Brf." refers to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment and Memorandum in Support Thereof, filed October 26, 2007.

apprehension event. Id. This improvement in the precision of data is neither startling nor surprising and merely reflects the increasing sophistication of computer databases which has occurred in both the private and public sector.

Plaintiff also attacks the apprehension statistics on the ground that Defendant has allegedly failed to meet the requirements of Federal Rule of Evidence 1006. P1. Brf. at 14. To the contrary, Defendant provided two declarations with its opening brief which provided background into the exhibits related to apprehension statistics. Exs. D-30, D-31. So that there is no question concerning the reliability of the data, Defendant attaches hereto additional declarations responding specifically to the requirements of Rule 1006. See Exs. D-38 (Second Declaration of Janel Frith), D-47 (Second Declaration of Daniel Ochoa).

Finally, Plaintiff attacks the apprehension statistics on the ground that Defendant allegedly did not disclose the apprehension statistics in a timely manner. P1. Brf. at 1. To the contrary, Defendant fully disclosed not only the existence of the apprehension statistics, but provided Plaintiff during discovery with the charts, graphs and maps used as exhibits to its opening brief. In addition, during the joint depositions Plaintiff questioned several Border Patrol witnesses concerning the apprehension data. See Exs. D-45 at 6, 19-21, D-44 at 31-41, D-43 at 23-30, 102-05. Plaintiff was also offered a deposition of a Border Patrol statistical expert, but repeatedly declined.

Beginning with its Initial Disclosures, Defendant has fully disclosed the existence of, and relevance of, the relevant apprehension statistics. With reference to the exhibits to Defendant opening brief, the relevant production information is as follows:

- Defendant's Exhibit D-2 (Congressional Report): earlier versions of Defendant's

Ex. D-2 were produced on December 29, 2006 (DHS 19206-19240.[6] ) and January 23, 2007 (DHS21449-93). And updated version of the publically-available report was obtained for the filing of Defendant's opening brief.

- Defendant's Exhibit D-3 (Congressional Report): this publically-available document was produced to Plaintiff on December 29, 2006 (DHS 19241-80).
- Defendant's Exhibits D-12(a),(b) (Apprehension Charts): these charts were produced on January 8, 2007 (DHS2082646-47). Ex. D-12(a) was also Exhibit 39 to the Deposition of Darryl Griffin taken March 27, 2007. At that deposition, Plaintiff questioned the witness concerning apprehension statistics. Ex. D-43 at 23-20, 102-05.
- Defendant's Exhibits D-13(a),(b),(c) (Apprehension Event Maps): on December 29, 2006, Defendant produced early versions of these maps showing apprehensions for various fiscal years (DHS 19154-19156) for the East Otay Mea area including what is now known as Parcel 10. Later versions of the maps were produced by email on February 16, 2007 and in hard copy on March 26, 2007 (DHS23095-100).
- Defendant's Exhibit D-16 (Zone Apprehension Trend Analysis, 2 pgs): produced January 7, 2007 (DHS20824-25).
- Defendant's Exhibit D-17 (Apprehensions by Sector): an earlier version (through May 31, 2006) was produced on October 13, 2006 as part of Defendant's Initial

[6] "DHS" followed by numbers refers to the relevant pages of the Otay Mesa document production, which ranges from DHS0001 to DHS23338. In addition, 24 CDs were produced. Plaintiff was provided with a detailed index to the documents produced. See Ex. D-42.

Disclosures (Disk D-16).

On June 29, 2007, Defendant filed an unopposed motion for enlargement of the discovery deadline for the specific purpose of completing depositions scheduled in San Diego. Defendant initially scheduled the deposition of a Border Patrol statistics expert for July 19, and the continued deposition of David Wick for July 20, 2007, both in San Diego. As the date for the depositions neared, Plaintiff declined to travel to San Diego. The continued deposition of David Wick occurred on July 20 as planned, but Plaintiff appeared telephonically. Plaintiff declined to take the deposition of the Border Patrol statistics expert on July 19, either in person or by telephone. Thereafter on July 27, Defendant again offered Plaintiff a telephonic deposition of the statistics expert; Plaintiff again declined.

Accordingly, Plaintiff's complaint that apprehension statistics were not timely produced is without merit. All of Defendant's statistical exhibits were produced early in the discovery process. Plaintiff has questioned several Border Patrol witnesses concerning apprehension statistics, Exs. D-43 at 23-20, 102-105; D-45 at 6, 19-21; D-44 at 31-41, and specifically and repeatedly declined to depose a Border Patrol statistical expert. Accordingly, Defendant's apprehensions statistical data is clearly reliable, properly supported and was timely produced.

## II. REASONABLE BORDER PATROL ENTRY ONTO PLAINTIFF'S PROPERTY FOR THE PURPOSES OF PATROL AND THE APPREHENSION OF ALIENS IS NON-COMPENSABLE

### A. Background Principles Establish That the Right to Exclude the Border Patrol Is Not Part of Plaintiff's Property Right

In 1907, President Theodore Roosevelt explicitly recognized the special status of land located adjacent to the Mexican border when he issued what has become known as the Roosevelt Proclamation. 35 Stat. 2136 (1907). In 1924, the Border Patrol was created. 43 Star. 205,240

(May 28, 1924). Since 1952, almost 50 years prior to Plaintiff's acquisition of the subject property, the Border Patrol has been authorized to enter onto private lands within 25 miles of the international border for the purpose of patrolling the border. 8 U.S.C.§ 1357(a)(3).

This right is one which Congress has noted "must always have been of necessity implied from the time the border patrol was first created." 1952 U.S.C.C.A.N. 1358, 1360. Agency regulation defines patrolling the border as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1 (c). This section establishes that the Border Patrol's entry onto Plaintiff's property without a warrant is lawful. 8 U.S.C. § 1357(a) ("Powers Without Warrant"), which Plaintiff admits at page 3, but then challenges on page 16 of its brief. Pl. Brf. at 3, 16.

Accordingly, when Plaintiff acquired title to its property, it did so subject to the existence of the Border Patrol's right to access the property to patrol for illegal aliens and such forms a background principle which limits and defines Plaintiff's property rights.

**B. The Border Patrol's Exercise of its Right to Enter onto the Subject Property Does Not Give Rise to a Right to Compensation Under the Fifth Amendment**

The governmental action at issue here is of the type that has traditionally not been considered to be an appropriation of property for a public use. Instead, the activities of the Border Patrol on Plaintiff's property fall into the category of government intrusions which are traditionally considered to be a non-compensable exercise of the government's police power. Acadia Technology, Inc. v. United States, 458 F.3d 1327, 1332 (Fed. Cir. 2006); Amerisource Corp. v. United States, 75 Fed. C1. 743,747 (2007). Few functions are more intrinsic to the purpose and function of a government than the enforcement of its criminal laws - the exercise of the "police power" in its literal sense. Of even greater significance is the conduct at issue in this

case -the actions of the sovereign in protecting its borders.

The most common factual context for these types of non-compensable police power exercises have been scenarios involving the retention or forfeiture of property related to criminal or civil legal proceedings. The reason that such exercises are customarily believed to be non-compensable is because property "seized by the government under its police power does not constitute property seized for 'public use' within the meaning of the Fifth Amendment." Seay v. United States, 61 Fed. C1. 32, 35 (2004).

Accordingly, the Supreme Court has confirmed that the United States need not compensate an owner for property "which it has lawfully acquired under the exercise of governmental authority other than the power of eminent domain." Bennis v. Michigan, 516 U.S. 442, 452-53 (1996). This is because “[g]overnment action aimed at protecting ... its citizens 'traditionally has constituted a non-compensable exercise of the Government's police power." Alde v. United States, 28 Fed. C1. 26, 34 (1993) (citing Jarboe-Lacky Feedlots, Inc. v. United States, 7 C1. Ct. 329, 338-39 (1985)).

Defendant is not suggesting that compensation under the Fifth Amendment can be avoided simply by characterizing the action in question as an exercise of the police power. Similarly, Defendant is also not arguing that every exercise of the police power is non compensable. Rather, the United States' argument is that the actions of the Border Patrol in patrolling private property within 25 miles of the border is the type of exercise of governmental power that has not traditionally been viewed as compensable. See Def. Op. Brf. at 25-29.

Indeed, it is the criminal activities of illegal aliens, and not the Border Patrol, who determine and control whether entry on private lands adjacent to the border will be necessary.

The Border Patrol has not established a "base of operations" on Parcel 10, as Plaintiff alleges. Pl. Brf. at 13. When and where the Border Patrol enters onto private property is determined not by the Border Patrol but by the independent criminal activity of illegal aliens who the Border Patrol is charged by statute with pursuing. Ex. D-43 at 33, 120.

The Supreme Court long ago drew a distinction "between a permanent physical occupation [and] a physical invasion short of an occupation." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 430 (1982). Certainly there can be no question that "'permanent' does not mean forever, or anything like it." Hendler v. United States, 952 F.2d 1364, 1376 (Fed. Cir. 1991). Nonetheless, to be considered permanent, the government intrusion in question must be a "permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002). The Circuit drew its support from the Supreme Court's Loretto decision, and relied on the Court's decision there to define the permanence required to establish a physical taking. First, the owner must have no right to possess the occupied space himself and his right to exclude the occupier from that space. Here, of course, the landowner has every right to possess the occupied space himself and prior to this lawsuit never objected to the government's placement of a crime-deterrent tool on its property.

While the Border Patrol readily admits that it enters upon Plaintiff's property in the course of its law enforcement duties, and has done so for some time, Ex. D-29 at ¶ 4, this entry does not constitute a compensable physical occupation. Instead, the entry onto the property is a transitory pursuit of illegal aliens; no Border Patrol agents are permanently stationed on Plaintiff's property.

Nor are Plaintiff's allegations concerning the frequency of entry onto Parcel 10 supported by the apprehension statistics. While Plaintiff alleges that "the roundup and arrest of illegal aliens takes place on Plaintiff's property almost daily," Am. Comp. at 3, the statistical data does not support that allegation. During Fiscal Year 2005, an apprehension event[7/] occurred only eight times in that year, or less than once a month. Ex. D-13(a). During Fiscal Year 2006, there were 48 apprehension events for the year, or only four events a month, Ex. D-13(b); and for Fiscal Year 2007, the frequency was 22 events for the year, or approximately twice a month. Ex. D-13(c).

A second requirement for an occupation to be permanent is that "the permanent physical occupation of property forever denies the owner any power to control the use of the property." Boise Cascade, 296 F.3d at 1353, citing Loretto, 458 U.S. at 436. Here, however, once Plaintiff's property is developed, the nature of the patrol function being performed by the Border Patrol will change. Despite Plaintiff's protestations, see generally Wick Declaration, Plaintiff states that Parcel 10 "is in various stages of grading development," Am. Comp. at 1; see also Ex. D-4 at 31, 35, 39. Of course, Plaintiff's property is not the only property that has been extensively patrolled by the Border Patrol. These patrols do not seem to have affected other landowners judging by the extensive development that has occurred along the border in the vicinity of Plaintiff's property. See Ex. D-5(a)-(f).

Plaintiff is also incorrect when it contends that the Border Patrol "cut through a fence." Pl. Brf. at 4, 8. The incident to which Defendant believes Plaintiff is referring occurred on Parcel 11 (the International Industrial Park property), not Parcel 10. More importantly, the

[7/] An apprehension event is the apprehension of one or more illegal entrants at a single time.

Border Patrol did not cut through any fence – instead they just drove around it in order to reach their easement access to the Otay Truck Trail. Ex. D-43 at 116.

Plaintiff also argues that the fact Mr. Wick has been stopped by the Border Patrol while touring the property establishes that there has been a physical taking. Pl. Brf. at 9-10. However, when specifically asked at his deposition, Mr. Wick admitted that he could not recall any specific incident when he was stopped while actually on Parcel 10. Ex. D-4 at 63, 118-19. Other than Mr. Wick's undocumented and non-specific allegations, the only incident which came to light during discovery was when Mr. Wick apparently deliberately sought to attract the attention of the Border Patrol by driving at a high rate of speed in a style of vehicle customarily used to smuggle illegal aliens, and not bearing license plates, on a Border Patrol maintenance road located directly to the north of the secondary fence. See Exs. D-21, 22. This road is located entirely on property owned by the United States and it is not located anywhere near Parcel 10. See Ex. D-1.

Finally, the Federal Circuit noted that for a physical invasion to be "permanent," the landowner must be unable to convey the property interest without the burden imposed by the physical occupation. Here, however, there is no evidence that Plaintiff is unable to sell his property. In fact, the active leasing history as well as and Plaintiff's relatively recent 2000 purchase of the property would suggest to the contrary. Ex. D-4 at 19-20, 25-26, 37-38.

## III. PLAINTIFF'S MISCELLANEOUS CLAIMS OF DAMAGE TO ITS PROPERTY ARE NOT PROPERLY SUPPORTED

Plaintiff alleges that the Border Patrol has "destroyed materials and improvements on the property and even destroyed environmental protections required as a condition of a County-issued grading permit." Pl. Brf. at 3. However, if Plaintiff indeed suffered these miscellaneous

incidents of damage,[8] Plaintiff's should have made a specific documented complaint to the Border Patrol and/or filed an administrative claim with the agency under the Federal Torts Claims Act, 28 U.S.C. § 1346. As the attached Declaration of Juanell Bottroff establishes, no such claims have been made. Ex. D-39 at ¶ 8. A prompt complaint makes it possible for the agency to investigate the incident in a timely fashion. The area of Plaintiff's property is extremely popular with riders of recreational off-road vehicles. Plaintiff's assumption that every damage incident (the majority of which he does not have personal knowledge of) is attributable to the Border Patrol ignores the possibility that third parties might be responsible.

Indeed, Plaintiff's complaints concerning the Border Patrol's conduct on its property is replete with hidden hearsay. As Mr. Wick admitted at his deposition that a number of his statements, including his statement that the Border Patrol are present on Parcel 10 on a daily basis, are based on hearsay reports from various employees. Ex. D-4 (Wick Depo. at 48). However, RCFC 56(e) requires that all declarations shall be made on personal knowledge, shall set forth only admissible facts, and shall demonstrate that the declarant is competent to testify regarding the matters contained therein.

However, Mr. Wick's statement in his declaration that he is "aware of numerous shots being fired on and around the subject property by Border Patrol agents," Wick. Decl. at ¶ 19 (emphasis added), suggests the statement is based on hearsay and not the required personal knowledge. In any event, the statement is in error. The Border Patrol has established procedures

---

[8] Plaintiff's complaint that the Border Patrol's off road activities have created vernal pools must be rejected outright. Wick Decl. at ¶ 16. Mr. Wick admitted at his deposition that he does not even know if there are any vernal pools on Parcel 10; in any case, there is no evidence that the presence of vernal pools has impacted his development efforts. Ex. D-4 at 55, 74.

that must be followed any time an agent's firearm is discharged. Ex. D-41. This policy requires immediate notification of supervisors and the launching of an investigation by the Office of Internal Audit within the Border Patrol. Id. at 23, 25. If there is a death or serious injury, the incident must be reported to local law enforcement authorities. Id. at 25. Despite a search for reports relating to parcel 10, however, none could be located. Ex. D-40 at ¶ 3.

## CONCLUSION

For the foregoing reasons, Plaintiff's complaint should be dismissed. In the alternative, summary judgment should be granted in favor of the United States.

Dated: December 21, 2007.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

/s/ Susan V. Cook
______________________________
SUSAN V. COOK, Senior Attorney
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P. O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 305-0470
Fax: (202) 305-0506
Email: susan.cook@usdoj.gov

Attorneys for Defendant
(428381.1)

OF COUNSEL:
Melissa Erny
A. Ted Kundrat
U.S. Customs and Border Protection
Indianapolis, Indiana 46278