IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OTAY MESA PROPERTY L.P., et al.,
Plaintiffs,

vs. CASE NO. 06-167 L
06-1670
06-1671

UNITED STATES,
Defendant.
_________________________________/

DEPOSITION OF DARRYL GRIFFEN
Taken at San Diego, California
Tuesday, March 27, 2007

Reported by Shirley J. Swenson, CSR, RPR

Certificate No. 3493

On Tuesday, March 27, 2007, commencing at the hour of 1:55 p.m., at 5440 Morehouse Drive, Suite 4000, in the City of San Diego, County of San Diego, State of California, before me, Shirley J. Swenson, Certified Shorthand Reporter, in and for the State of California, personally appeared:

DARRYL GRIFFEN,

called as a witness by the Plaintiffs, who, being by me first duly sworn, was thereupon examined as a witness in said cause.

A P P E A R A N C E S

FOR PLAINTIFFS:

MARZULLA & MARZULLA
BY: ROGER J. MARZULLA, ESQ.
1350 Connecticut Avenue, N.W.
Suite 410
Washington, DC 20036
(202) 822-6760

FOR DEFENDANTS:

U.S. DEPARTMENT OF JUSTICE
BY: SUSAN V. COOK, ESQ.
601 D Street, N.W.
Washington, DC 20004
(202) 305-0470

///

classify those that wish to do harm to our country.
Q. Fine.
You mentioned that one of your three key responsibilities included -- I'll get the phrasing wrong -- coordination with other law enforcement agencies.
Do I have that correct?
A. Coordinated border enforcement.
Q. Yes.
A. What -- what we -- what we want to do is we advocate a collaborative enforcement approach. We want to extend our borders outward, and we also want to strengthen the defense and enforcement posture.
Q. What other agencies would be included in that coordinative effort?
A. Well, within the Customs And Border Protection Department, for sake of argument, there's the Office Of Field Operations which are the Ports of Entry.
Moving away from Customs And Border Protection, you'd be working with Immigration And Customs Enforcement which is ICE.
With respect to marine enforcement efforts, you're speaking to the Coast Guard within the Department of Homeland Security.
Q. Okay.
A. We may have reason to engage with the Drug

Enforcement Agency, with the Federal Bureau of Investigation, many key partnerings both in the federal, state, and local level depending on what that joint collaboration may involve --

Q. Okay.

A. -- with respect to perhaps assignment to task force.

Q. Do your responsibilities include liaison with those other agencies?

A. Yes, sir.

Q. Where does the country stand at this point in its effort to gain control of our border?

A. I believe that we have raised the level of border security, and I will speak directly just to the southwest border --

Q. Yes.

A. -- since I have recently had the opportunity to direct operations from position of chief of southwest border operations, and we are continuing to improve those levels of security.

Currently, we have what's referred to as Operation Jump Start which is a deployment of 6,000 National Guard troops to the southwest border which certainly has contributed.

We have implemented a number of enforcement

initiatives along the southwest border, and I think with respect to today compared to a year ago or perhaps maybe even two years ago, the level of border security is higher today than it was at that time, but we need to continue to advance those efforts until we have control of the entire border along the southwest border.

Q. Is it true to say that there are still many incursions by illegal aliens across the southwest border in San Diego Sector?

A. Yes, sir.

Q. What efforts is the Border Patrol undertaking to stop those illegal incursions?

A. Staffing levels in San Diego Sector since September of 2005 -- let me make sure I have my dates correct here -- have increased from roughly 1500 officer core positions to, as I mentioned earlier in my testimony, 1735, and that number will continue to grow.

We are continuing to develop the border infrastructure system which is a 14-mile border barrier project intended to provide a secure and safe border environment in San Diego, Tijuana and greater border region.

We have brought on new technology in support of the border infrastructure system called remote video surveillance system which is a camera system that has

daytime and nighttime imaging systems that greatly fast-forwards our ability to detect and then respond in a more timely manner to incursions.

Q. Okay.

A. We have partnered, as I said, with various other entities to act as a force multiplier to expand our enforcement capacity.

We have expanded the program which would be again in El Centro Sector called OASIS which is Operations Against Smuggler Initiative for a Safe and Secure border, and that's where if you were to apprehend a foot guide and you did not meet current United States attorney guidelines domestically, you would have the opportunity to present that person for prosecution to the PGR which is the equivalent of the attorney general's office here in the United States for prosecution. So we are always trying to be creative and look for new enforcement tools to expand our enforcement capacity.

San Diego Sector apprehensions this year are down nine percent compared to a year ago as we speak to you today, March 20th something.

Q. They're down from --

A. The previous year.

Q. -- the previous --

A. Year to date.

Q. Year to date?

A. Yes, sir.

Q. What do you attribute this nine percent decrease in apprehensions to?

A. I think a combination of factors. As I mentioned, we certainly have National Guard deployment here in San Diego Sector, as we do along all the southwest border with all the nine sectors. It certainly has provided -- it has expanded our eyes and ears on the border better to detect and then respond to known incursions and entries.

We have certainly matured into more of an intelligence driven operational planning organization. We have the ability to do some predictive modeling where we can project traffic trends and patterns so we can more economically deploy our resources to maximize their operational effectiveness.

I think not just one single factor has contributed to a increase in operational effectiveness, but I think the cumulation of a multifaceted approach, a very layered approach has promoted or at least raised the level of our security here in San Diego during this year, but there is still much to be done, sir.

Q. Is it fair to say that in recent years -- let's

just pick a figure, three years, four years -- that the number of agents of the United States who are actually physically patrolling the border has increased along the San Diego Border? I'm speaking now only of the San Diego Sector.

A. Well, if -- if I may go back a little bit further --

Q. Sure.

A. -- than that to give you a little bit better perspective --

Q. I mean, I just picked a random date.

A. -- if I may?

Q. If you have a better date, please do.

A. And I'm sure our guests here this morning can support this. If you go back to the 1980's and early to mid-1990's, the San Diego border region was generally considered the gateway for illegal immigration into the United States.

Q. Okay.

A. During that period of time, we were apprehending roughly 50 percent of all the apprehensions that were effected along the southwest border. The entire southwest border roughly is 2,000 miles. If you can visually picture that San Diego Sector, only 60 linear miles of that border responsibility, 50 percent

of all -- all the apprehensions were being affected in those first 60 miles, roughly between anywhere from 500 to 600,000 apprehensions, perhaps as low as 400, but to give you an idea of the volume of traffic coming across our border.

Q. All right.

A. The -- if you take our 16 miles of border and start from the ocean and go over to, say, the east face of Otay Mountain 14 to 15 to 16 miles inland, approximately 85 to 90 percent of all those apprehensions were being effected in that particular corridor, if you can visually picture that.

Q. The 16-mile corridor --

A. Yes.

Q. -- that you've just described?

A. Yes, 14 to 15 to 16 miles --

Q. Okay.

A. -- working up the west face of the Otay Mountain, which is called the San Ysidro Mountain Range.

Q. All right.

A. The border certainly was not under control at the time. It was chaotic. Areas such as Washer Woman, Smuggler's Gulch were considered a no-man's land. There were crimes occurring almost daily, whether it be an assault, a robbery, shootings or even people losing

their life.

During the mid-1990's, we adopted a new enforcement posture, a deterrent based enforcement posture which is a research driven strategic plan that brought an infusion and influx of new resources to San Diego Sector, including personnel, equipment, technology, and --

THE COURT REPORTER: Wait, wait.

MS. COOK: You're going to have to speak more slowly for the --

THE WITNESS: Uh-huh.

MS. COOK: -- court reporter, please.

THE WITNESS: -- equipment, technology, and tactical infrastructure, and through an intelligence driven operational planning deployment of our resources, we were able to reduce the level of activity that was occurring within the San Diego Border region as the mid-1990's played out to the end of the decade of over 80 percent. Apprehensions were, as I said, as high as almost 600,000 dropped to relatively around a hundred-thousand.

During the peak of this decline, if you can picture a slide coming down hill as apprehensions would down-trend --

MR. MARZULLA: All right.

THE WITNESS: -- we reached a staffing level of in excess of 2200 officers. Now, if you go back a few minutes ago, we had attrited, for sake of argument, down to roughly 1500 agents.

Part of the goal, the national strategy for the Border Patrol, as well as the goal here for the San Diego Sector is to gain, maintain, expand operation and control of the border, but you cannot think just parochially just for the San Diego Border region. You need to consider the entire southwest border region with respect to deployment of resources.

On the southwest border wide risk assessment, other areas were identified to be more at risk, more vulnerable for incursions, whether it be human beings, narcotics, contraband or whatever. As a result, some of those areas that were more vulnerable than San Diego Sector received additional resources, and San Diego Sector's tasking at this time, if you think back, gain, maintain, and expand control, the middle component was to maintain a semblance of border control.

In 2002 to 2004, apprehensions increased here thirty-eight percent. In 2004, we were able to reverse that, and we had a reduction of eight percent. Last year, it went back up twelve percent. This year, it's back down nine percent, so as you can see, we're

maintaining a level of control that had been established here in San Diego Sector.

As we now continue to staff up with personnel, additional technical infrastructure and technology, along with what is going to be brought to us with SBI Net Solution, that will -- that level of border security will continue to rise --

MR. MARZULLA: Okay.

THE WITNESS: -- correspondingly.

MR. MARZULLA: Right.

Q. I perhaps misunderstood something you said earlier. You had talked about apprehensions being at a rate of about 6,000.

That was 6,000 per what time period?

A. No. You mean yearly apprehensions?

Q. Yes.

A. Well --

Q. Or did I miss that?

A. Apprehensions raised and were quite voluminous in the San Diego Border region during the 1980's to early and mid-1990's where they reached in excess of 500 to 600,000.

Q. Oh, 600,000?

A. Up to.

Q. Yes, understood.

To what degree did the construction of the border fence assist in reducing the number of apprehensions over the 1990's?

A. As I mentioned, in a -- in a -- in an urban area such as San Diego, especially in what we would consider our western corridor, border barriers significantly contribute to our ability to gain control, a semblance of control within that specific target area.

Through the border infrastructure system which includes primary fencing, secondary fencing, all-weather roads, stadium lighting, and eventually detection capability which currently we now only have in five miles of the fourteen miles, with the mobile surround system, that certainly has aided our efforts along with the influx of new agents and intelligence driven operational planning.

As I mentioned before, sir, this would be a theme with respect to any of my comments, not only today or in the future or in the past is it's the appropriate mix. It's a balance enforcement approach where it's some tactical -- tactical infrastructure, some technology and some personnel based on the terrain analysis and the features unique to that particular area that you're trying to gain control of.

Q. Okay. During what time period was the primary

A. It certainly aids in control of traffic, yes, sir.

Q. Okay. Has the construction of the border infrastructure -- and by that, may we agree that it includes the primary fence, the secondary fence, and the various items of technology like the floodlights and cameras that you've described -- how has that construction affected the location at which aliens find it easiest to get across the border in the San Diego Sector?

A. The decision where a particular criminal -- criminal cartel, whether it be an alien smuggling organization or a drug trafficking organization, that is their decision where they believe that they want to effect entry that gives them the greatest probability of success. This is a profit driven enterprise, criminal enterprise.

Q. Okay.

A. And where we are most vulnerable and at risk, that's where we focus on. We always attempt to maintain a balanced perspective so that we don't create additional vulnerabilities or risks elsewhere.

Q. Well, let me ask you this question.

Does the existence of the fence serve as a deterrent so that your average illegal alien or smuggler

Q. And one more question before the break.
A. Okay.
Q. What efforts did you take to initiate working together or working cooperatively with Mr. Wick to resolve the problems that he was concerned about as expressed in this letter, Exhibit 37?
A. That, I do not know, sir.
MR. MARZULLA: Fair enough. Let's take a break.
(Recess.)
MR. MARZULLA: Back on the record.
Q. Once again, Mr. Griffen, I'll give you a chance to amend or correct any of the testimony that you gave so far today.
Do you care to take that opportunity?
A. No, sir.
MR. MARZULLA: Okay. Will you mark this next, please?
(Exhibit No. 39 was marked for Identification.)
BY MR. MARZULLA:
Q. Mr. Griffen, you've been handed Exhibit 39?
A. Yes, sir.
Q. And I'll ask you if you recognize that document?

A. It appears -- and please correct me if I'm wrong -- to be a graph depicting apprehensions credited to perhaps the Chula Vista Station from 1992 through 2006 perhaps.

Q. And is that part of the backup information for your slide number -- what was that? Exhibit 35? Was that your --

MS. COOK: Exhibit 34.

MR. MARZULLA: Thirty-four.

THE WITNESS: It certainly would be a supporting document. I personally do not use this particular slide because I speak more from a sector perspective versus a individual station perspective, per se, when I provide an overview of sector operations.

MR. MARZULLA: Okay. Well, here's what I wanted to ask you about.

THE WITNESS: Yes, sir.

BY MR. MARZULLA:

Q. What does that slide indicate about apprehensions in the Chula Vista sector from 2002 to 2006?

A. Increase, sir.

Q. And it's a fairly substantial increase, wouldn't you say?

MS. COOK: By "slide," are you referring to

Deposition Exhibit 39?

MR. MARZULLA: Yes.

MS. COOK: Okay. It's an illustration. It was never a slide.

BY MR. MARZULLA:

Q. Is that correct?

This was never a slide?

MS. COOK: This was something that I had San Diego Sector put together for me, and I did one for Chula Vista and one for Brown Field showing apprehensions.

MR. MARZULLA: Okay.

MS. COOK: So it was never a slide, and --

MR. MARZULLA: Okay.

MS. COOK: -- it's not part of the power point.

MR. MARZULLA: It's not part of the --

MS. COOK: No.

MR. MARZULLA: Okay. Thank you for clarifying that.

MS. COOK: It was done when we were doing discovery.

MR. MARZULLA: Okay.

THE WITNESS: The one comment that I would -- I believe that the data, although I'm going to take at face value that it's correct. However, it depicts, I

believe, different areas of responsibility. The area of responsibility that Chula Vista Station had in 2002 was smaller than the area of responsibility that they had in FY '06.

MR. MARZULLA: Okay.

THE WITNESS: In 2002, I believe their area of responsibility was bordered by the San Ysidro Port of Entry to the west and the Otay Mesa Port of entry to the east, sir, with the full benefit of almost a full compliment of the BIS.

We then expanded it -- Chief Griffen did -- to extend over in Zone 17, 16 and 17. As we moved, Brown Field flexed then further to the east. So they -- their area of responsibility increased, so it stands to reason there's going to be an increase in apprehensions, sir.

It's a little bit skewed how this data is being presented, sir, because I believe their area of responsibility changed from the time you're suggesting to 2006.

MR. MARZULLA: Okay. And that's very helpful.

Q. So is it your testimony that it's your understanding that the larger apprehension numbers commencing with 2003 result from the fact that Chula Vista --

A. No, no. I would say sometime post-FY '04.

you have the right to create a new road on private property without going through the process of purchasing it?

MS. COOK: Without going through the what?

MR. MARZULLA: The process of purchasing it.

THE WITNESS: On a new road versus a road that is already established?

MR. MARZULLA: Yes.

THE WITNESS: I would think, based on my experience with the BIS, that a similar process would have to be initiated.

MR. MARZULLA: Okay.

Q. Do all-terrain vehicles stay on the road?

A. I would like to think they make every effort to do so, but at times, in response to traffic, as we chase it, there may be occasions when ATV's or the horse patrol may go off road onto a trail or otherwise.

Q. Okay.

A. As much as we try to control and contain illegal entry traffic, at times we're in a chase mode, and we are simply following the track that they decide to take.

Q. Did the Border Patrol purchase the easement to go around the gate, the locked gate that was erected by Mr. Wick?

signed this letter?
A. Yes, sir, and that we want to -- if I may defer -- refer you also to the second to the last paragraph, once again, we wanted to work with all individuals cooperatively and collaboratively.
Q. Okay.
A. But --
Q. But?
A. Nothing else.
Q. Okay. What happened with respect to this locked gate?
A. I don't believe anything was ever done to it, but I could be wrong. I would ask you to defer to the station management for the exact --
Q. Okay.
A. -- activities that took place, but I believe the gate was left intact, and the agents actually began to drive around the gate to access Otay Truck Trail.
Q. Okay.
A. I believe, sir.
Q. All right. Fair enough.
To your understanding, does the Border Patrol have an easement or access from Alta Road to the Otay Truck Trail over the plaintiff's land?
A. The Border Patrol itself have an easement?