IN THE UNITED STATES COURT OF FEDERAL CLAIMS

OTAY MESA PROPERTY L.P., et al.,

Plaintiffs,

vs. CASE NO. 06-167 L
06-1670
06-1671

UNITED STATES,

Defendant.

_______________________________________/

DEPOSITION OF JOE PEREZ

Taken at Chula Vista, California

Wednesday, February 21, 2007

Reported by Shirley J. Swenson, CSR, RPR

Certificate No. 3493

# I N D E X

DEPOSITION OF: JOE PEREZ
February 21, 2007


| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Marzulla | 5 |
| By Ms. Cook | 72 |


## INDEX OF EXHIBITS


| FOR PLAINTIFFS | | MARKED |
| --- | --- | --- |
| 15 | Copy of the Notice Of Taking Deposition Of Joe Perez Upon Oral Examination dated February 9, 2007, five pages | 31 |
| 16 | Copy of a map, one page | 31 |
| 17 | Color copies of blue dot maps marked 17A, B, and C, three pages | 32 |
| 18 | Copy of a memorandum from Mr. Wallace to the deponent dated January 10, 2007, two pages | 54 |

| | |
| --- | --- |
| Witness signature page | 83 |
| Certificate/Stipulation page | 84 |

On Wednesday, February 21, 2007, commencing at the hour of 8:21 a.m., at 2411 Boswell Road, in the City of Chula Vista, County of San Diego, State of California, before me, Shirley J. Swenson, Certified Shorthand Reporter, in and for the State of California, personally appeared:

JOE PEREZ,

called as a witness by the Plaintiffs, who, being by me first duly sworn, was thereupon examined as a witness in said cause.

A P P E A R A N C E S

FOR PLAINTIFFS:

MARZULLA & MARZULLA
BY: ROGER J. MARZULLA, ESQ.
and
SASHA L. NEL, ESQ.
1350 Connecticut Avenue, N.W.
Suite 410
Washington, DC 20036
(202) 822-6760

FOR DEFENDANTS:

U.S. DEPARTMENT OF JUSTICE
BY: SUSAN V. COOK, ESQ.
and
F. KENNETH STEGEBY, ESQ.
601 D Street, N.W.
Washington, DC 20004
(202) 305-0470

///

A P P E A R A N C E S (Cont'd)

ALSO PRESENT:

DAVID L. WICK

CHULA VISTA, CALIFORNIA; FEBRUARY 21, 2007; 8:21 A.M.

JOE PEREZ,

having been sworn, testified as follows:

EXAMINATION

BY MR. MARZULLA:

Q. Would you please give us your full name, sir?

A. Joe Louis Perez.

Q. And what is your business address, Mr. Perez?

A. It's 3752 Beyer Boulevard in Chula Vista, California.

Q. And is that the headquarters of one of the entities that is associated with the Border Patrol?

A. Correct. That's the address for the compound where the Chula Vista station sits.

MR. MARZULLA: I see. Okay. Great.

Counsel, do you have a statement to make for us this morning?

MS. COOK: Surely. Mr. Perez is on the list as speaking to the topics of apprehension statistics and operation, and I actually think Steve Kean was probably your better witness on apprehensions statistics. We can

always bring him back if this witness doesn't know all the answers because the San Diego sector does more of the data collection work.

MR. MARZULLA: Right.

MS. COOK: And as Steve mentioned yesterday, Joe has an excellent perspective. He is the patrol agent in charge of Chula Vista, so he's directly aware of ongoing operations on the subject property and in the vicinity of the subject property, how the patrols are conducted, what's out there, lights, scopes, whatever, so --

MR. MARZULLA: Okay.

MS. COOK: -- I think the operational patrol standpoint will be his primary areas where we can be most informative.

MR. MARZULLA: Thank you.

Q. Mr. Perez, have you had your deposition taken before?

A. Negative.

Q. Do you understand that you've just taken an oath similar to the one that you would take in a court of law?

A. Yes, sir.

Q. Okay. And do you understand that your testimony today can, in fact, be used in the pending

between the Otay Port of Entry and the California Highway Patrol lot.

Q. Okay.

A. Usually I start my day there and then drive the border fence all the way down to the base at Tin Can, but it depends on what's going on.

Q. Sure.

A. I listen to the radio. If the activity is north of that area or up at Otay Lakes or, as it was yesterday, just behind the sector here, I mean, just -- we're sitting actually in my area of responsibility right now.

Q. I see.

A. East Lake actually belongs to me.

Q. Okay.

A. So I may drive, like I did yesterday, down Telegraph Canyon to get to the back side of this Otay Lakes area.

Q. I see.

Calling your attention then again to Exhibit 11 and the subject properties, do you sometimes drive over the -- can we use the term "subject property"?

A. Yes, sir.

Q. Will you understand that to mean the property here that is outlined in yellow --

MS. COOK: In yellow.

BY MR. MARZULLA:

Q. -- on Exhibit 11?

A. Right.

Q. Okay?

A. Okay.

Q. Do you sometimes drive over the subject properties?

A. Yes, sir.

Q. And how often do you do that?

A. Well, the last time that I actually drove over his property -- well, let's go backwards.

This may happen on a daily basis. One particular area behind Kuebler's Ranch, you get up to Otay Mountain. The last time I drove up there is when the helicopter crashed here about a month ago up on the top of Otay Mountain and had to drive around Kuebler's to hit the Otay Truck Trail to drive to the top. These other areas, I haven't driven out there in a week because it's been raining.

Q. I see.

A. When it rains, we can't access any of this property because it's all mud. Our containment zone actually falls back to the streets of Otay Mesa around Alta Road. We can't drive off beyond that because it's

too muddy and wet.

Q. How about when it's not raining, how regularly would you drive over the subject property?

A. Again, it depends on our activity. I mean, sometimes it might be on a daily basis.

Q. Okay.

A. Then it may not be for two or three days because the activity would be not on this property, but elsewhere.

Q. Right.

A. But if I'm not driving on the property, then there is agents that drive on this property every single day.

Q. Okay.

A. If we're not patrolling the area that's not wet, then I assign people to these zones on a daily basis 24 hours a day.

Q. So you make the actual assignments?

A. I do not.

Q. You don't?

A. I -- I -- I send the morning order out to the watch commanders, and they know what our area of responsibility is.

Q. Okay.

A. If you're ordering watch -- watch commanders, I

would tell you, "I want you to control Zone 16 and 17." How you do it is up to you. Just make sure that it gets done.

Q. I see.

A. And yours could be different from hers or anyone else's, but they assign people to work those areas, and the activity is different.

On the daytime, you don't need all the people that you require on the swing shift when it gets dark or that you're going to need at midnights when it's totally dark. Midnights you --

MS. COOK: I need you to slow down a little bit --

THE WITNESS: Sorry.

MS. COOK: -- so the court reporter is sure to get everything.

Okay?

THE WITNESS: I'll slow down.

MS. COOK: I'm sorry. I didn't mean to interrupt you.

BY MR. MARZULLA:

Q. So is it true that as long as their vehicles can drive on the land, there are Border Patrol vehicles on the subject property virtually every day?

A. I don't know if that's a hundred percent true.

Q. Okay. Make that statement true for me, if you would.
A. I'll explain it.
Q. Okay.
A. I'll explain it.
Q. Please do.
A. There may be agents assigned to zones that are within the subject's property, but if the activity is not there, then they won't be on that property.
Q. Okay.
A. They may be down in the immediate border area between the fences or responding to traffic that is already north of the subject's property.
Q. Okay. Fair enough.
Talk to me about areas of high traffic.
Again with reference to the two exhibits you have, Exhibit 11 and Exhibit 8, are there areas of particular high traffic with illegal aliens coming northward in the areas shown on those maps?
A. Zone -- Zone 16 which is the -- the very end of the road at the beginning of road and the end of urban areas where you have a lot of high vehicle activity, the latter part of this year was the busiest border zone in the country for activity levels. Obviously, we're talking about apprehensions. People turn back south,

chase back into Mexico in their get-aways, and 17 and 18 were close behind. In the last month or so, the traffic has increased out in Zones 18, 19, and 20 which is -- 18 is right in the middle of the subject's property.

Q. Okay.

A. There's been an increase in activity out in those zones, but, I mean, all of that area, 16, 17, and 18, is very, very busy for illegal entry.

Q. You said Zone 16 was actually the busiest in the country last year?

A. It was, and I want to say it was October, September or October when I was in Washington, D.C. For activity, we're talking about over 2,000 people chased back into Mexico and over a thousand apprehensions just in that border zone which is Zone 16, which is not on the subject's property, but right at the Otay Mesa Port of Entry.

Q. Is that per year --

A. That was --

Q. -- the figures you used?

A. -- for that month.

Q. Oh, just for the month --

A. Uh-huh.

Q. -- of October?

A. Uh-huh.

Q. And did you also say that Zone 17 and particularly Zone 18 are close behind, similar in traffic to Zone 16?

A. That's correct.

Q. Okay.

A. They're -- they're attractive zones because the traffic can circle back and get back to the Port of Entry where you have these transportation hubs, taxis, buses, and as we experience growth further east as Mr. De La Fuente sells his stuff off and this construction happens, you're going to see even more activity trying to get over into these commercialized businesses and work. There's vehicles.

Q. I see.

Can you please explain that to me just a little bit more?

How would development of the subject property impact your ability to keep illegal aliens from accessing the United States?

A. If you look out onto the subject's property where there is no -- no lighting, no stores or any -- no vehicles moving, well, then, that means that there's nobody picking up illegal aliens out there.

When you commercialize this area and you have vehicles moving, vans moving, and there's a rhyme or

reason for people to be out there, that makes it attractive because now they can just run across the border and jump into a vehicle, and then they're going down the road.

So as you give them access to vehicles, trucks, buildings, the possibility of smuggling, tunnelling into these buildings, as we've experienced on Otay Mesa over the last two years, is going to increase, so a lot -- a lot of things are going to happen.

It's my job right now to try to control this entire area and suppress it before Highway 125 comes in, before Mr. De La Fuente sells off the rest of that property so it's unattractive to the smuggler to try to control this border area is what I project out that I want to accomplish.

Q. Right, yes.

Has the Border Patrol engaged in any efforts to work in planning development for this property so that it would discourage the illegal traffic?

A. We have what's called an orbit plan. That is my -- my plan for controlling the border, for elevating the levels of control along the border in my areas of responsibility. This is thought out in levels, at Level 1, Level 2 up to Level 5.

Q. Okay.

A. And we do. We do this. Last year in 2006, I was doing the 2008 plan. This year in 2007, I'll be doing the 2009 plan.

Q. Okay.

A. And what it is is I say that if you give me this many agents, this many roads, access to the border here, lighting, cameras, this is the level of control I can establish. It's an accountability tool.

If you give me that money, say whatever millions of dollars that is, then you have an expectation that I'm going to be able to provide what I said I could do, the level of control I could raise, so we do have a planning process for that.

But independent of the Border Patrol, we have no control over what the state does. When they put in Route 125 all the way down to the bottom there to the Otay Mesa Port of Entry, that's going to give these guys, the smugglers, another artery basically to drive in and further illegal entry into the United States, so we have to work with our planning process and then take into account what's happening around us.

It's like Mr. De La Fuente or whomever buying up this property and putting in warehouses, that is a problem for me, but it's something I have to work around and work with.

Q. Okay.

MS. COOK: I'm not sure the witness fully understood your question, Roger, because I think your question actually was directed at involvement with local planning processes?

MR. MARZULLA: Yes, but that was very helpful. Let me just pursue what I was asking.

Q. Do you or anybody at the Border Patrol get involved in helping to design development so that it, in fact, does make your job a little easier?

A. You know, Chief Aguilar asked us the same question in Washington, D.C. back in October. He said, "Joe, were you involved in the planning of 125?"

I said, "Sir, when 125 started being built, I was a GS-9 Border Patrol agent in El Cajon. I had nothing to do with that."

Q. Okay.

A. But he raised a good question, and so do you. We should be involved a little bit more in the planning process when it comes to the buildup of immediate border area. I think the government is going that way, but, no, I am not personally involved.

Q. Do you know whether the Border Patrol itself has any participation in the design or planning process for this property?

MS. COOK: So if you lead a witness to talk about that, that's actually something that would be overseen in Washington.

MR. MARZULLA: Got it.

MS. COOK: Because, indeed, you can't just put in a Port of Entry anywhere.

MR. MARZULLA: Right.

MS. COOK: So when you get into Ports of Entry, that's a whole other question.

MR. MARZULLA: Interesting.

Q. Do you have any input or have you offered comments on the role of the border fence in deterring illegal immigration?

A. I have not offered any input.

Q. Okay. Well, now is your chance.

What is the impact of the border fence both the primary fence and the secondary fence, in your opinion, on deterring illegal immigration?

A. Well, if you put up a fence, if you think that that's going to stop illegal immigration, it's not going to stop it. They're going to come right over that fence, cut through it or knock it down. They're going to use that fence to build their homes down in Mexico. They're going to drag it back across the border.

When you use a combination of infrastructure,

personnel and technology, then you can start making an impact, but it's gotta be a combination of all three. It's like intelligence without actions. You use this information. Well, infrastructure without somebody actually down there to patrol that area is wasted material because they're going to knock it down. We've experienced this in the past.

Q. Okay.

A. It's not up to me to decide where the fence goes or how much fence we're going to put up.

I know that in areas where I was previously responsible for, five miles of border between San Ysidro/Otay Mesa Port of Entry, between agents, lighting, fence, cameras, where it could control that border and bring control to an area of the border that was previously the biggest border crossing area in the country.

Q. Okay.

A. Once we start putting that stuff up, it is not a -- we have five miles of border that are labeled control together, and that's the only place in the country we can say that, and we, Chula Vista station, brought that control to that area of the border.

Now, north of us, there's homes being built that are worth $700,000 to $800,000. There's a new high

school. These things were previously not even a dream because you couldn't give the property away, so we've improved the quality of life in that immediate border area. So that's what the fence does. It will improve what the combination of the three things I talked about, the -- the quality of life in the immediate border area in some areas where it's feasible, and then there's other areas where that won't apply.

Q. It appears that your responsibilities have sort of moved eastward --

A. Correct.

Q. -- from your description?

A. Correct.

Q. Is that right?

A. Yes.

Q. So now your area of responsibility is to the east of the Otay Mesa Port of Entry?

A. (Witness nods head.)

Q. I note that the fence also terminates within your area of responsibility.

Is that right?

A. That's correct.

Q. How will extension of the fence or how would extension of the fence impact the way in which you attempt to control the part of the border that you're

now responsible for?

A. It would depend on if I had access to the border. You gotta have eyes on the border and access to the border, and the reason -- I don't know the -- I don't know the total reason that the fence ends there, but it ends there because that's probably the easiest place to end it. The rest of it is a mountain.

If you put a secondary fence up that mountain where I don't even have the roads to drive up that mountain, what do we do? You can't just put up a fence up Tin Can or further up on Otay Mountain because we don't have access to it, but we can drive down some of those canyons. They take three hours to walk up and down. Like Copper Canyon and all those canyons, they're hours just to walk up and down these canyons, so I don't know how much of an impact a secondary fence would have there.

As a matter of fact, in my plan, my orbit plan where I go out to 2008 --

Q. Yes.

A. -- I don't call for a secondary fence out there to control that area of the border.

Q. I see.

And why is it that you don't call for the extension of the fence?

A. Because I have a mountain there. I have Otay Mountain, and it does no good to put the -- the fence there because I can't even get up to the top of that mountain.
Q. I see.
A. So like I said, if it's just the infrastructure you think is going to deter them, they can go over it or cut through it on Otay Mesa right there on Zone 16, 17. You gotta have a combination of everything.
Q. Right.
Do the illegals tend to go around the end of the fence where it terminates?
MS. COOK: The primary fence or the secondary fence?
MR. MARZULLA: The secondary fence.
MS. COOK: Because I think he has been actually talking about the primary fence.
MR. MARZULLA: Oh.
MS. COOK: And I don't know if there's any confusion there.
MR. MARZULLA: Maybe we ought to clarify that.
Q. In your discussion right now about your orbit plan --
A. I was talking about the secondary fence.
Q. You were?

A. Yeah.
Q. Okay.
A. The primary fence does extend along the border all the way through.
Q. That was my understanding.
A. It does extend to the top of Otay Mountain.
Q. Okay.
A. It does not go down to the Copper because it's a cliff, but in Zone 17 and 18 and even up to part of 19, there is a fence --
Q. Okay.
A. -- a primary fence.
Q. Right.
A. The secondary fence ends at the base of Tin Can.
Q. Okay.
A. I do not call for a secondary fence on top of Otay Mountain. I do not.
Q. All right. So the fact that the fence terminates where it does now, how does that impact the traffic of the illegals?
A. Well, there again is -- is a problem. They put the fence up, but they weren't ready to finish the project.
Q. Okay.

A. We had 660, 670 gaps in the gates in the fence that were left open. There was no lighting, no stadium lighting, permanent stadium lighting put up on -- in between the two fences.

Q. Okay.

A. So they put the fence up, and now we can drive out and look at every single patch on that secondary fence. These guys have come through with these portable saws, and they've cut right through the fence and gone right through it.

And if you look back in our records for apprehensions, it's -- only 16 and 17 where it's fenced in was my highest traffic area, even though the fence was there. Over the last -- the latter parts of the last months of 2006, for highest activity, Zone 16 and 17 where the fence is actually at had more traffic than Zone 18 where there is no fence.

Q. And that was because of these gaps left in the fence?

A. Well, we finally closed the gates off in -- in October and November to try to stop some of that, and then they start cutting through it or going over the fence.

Q. My goodness.

A. So because we have -- you can't see them.

There's no lighting down there, so, you know, we need to get the permit on lighting down in that area. We don't have it.

Q. I see.

A. So that's why I said it's gotta be a combination. If you think that's a cure-all, you know, it's not.

Q. Right.

A. Uh-huh.

Q. Counsel indicated that you have some information relating to the arrest patterns, and you've described that a bit for me now.

A. Uh-huh.

Q. Can you talk a little bit about the arrest patterns particularly in Zone 18?

A. Well --

MS. COOK: I have a zone --

MR. MARZULLA: You may look at a document, if you like.

MS. COOK: I have a zone map.

MR. MARZULLA: Is this the blue dot map?

MS. COOK: No.

MS. NEL: No. Are there zones on the blue dot map?

MS. COOK: No, the zones are not marked on the

blue dot map.

THE WITNESS: This (indicating) is the Truck Trail right --

MS. COOK: This is the zone map.

THE WITNESS: This is the Truck Trail here (indicating). This (indicating) is the Otay Truck Trail right here (indicating).

MS. COOK: Right.

THE WITNESS: And this is all Zone 18 right here (indicating).

MS. COOK: Okay.

THE WITNESS: Okay.

MS. COOK: I'll get a copy of this during the break, but why don't we go ahead and put a sticker on this page.

MR. MARZULLA: Let's do that.

MS. COOK: What's our next number?

THE COURT REPORTER: Exhibit 16.

MS. NEL: The notice was Exhibit 15.

MS. COOK: All right.

(Exhibit No. 15 was marked for Identification.)

(Exhibit No. 16 was marked for Identification.)

MS. COOK: Then I also have copies of the blue

dot map if you want to mark --

MR. MARZULLA: Yes.

MS. COOK: -- some of those, Roger.

MR. MARZULLA: I think we might want to do that, as well, please.

MS. COOK: Okay. I have a set of colors for '04, '05, and '06.

Do you want to mark them?

MR. MARZULLA: Should we mark them as a single --

MS. COOK: Yes.

MR. MARZULLA: -- exhibit?

MS. COOK: Let's mark them as 17A, B, and C.

MR. MARZULLA: That sounds great.

(Exhibit No. 17 was marked for Identification.)

MS. COOK: Let me mark the pages so that the witness can refer as he's talking. Okay. We have 16 and 17 also in front of the witness.

BY MR. MARZULLA:

Q. Mr. Perez, would you please describe arrest patterns over, say, the last two or three years? And feel free to use Exhibits 16 and 17 to illustrate.

A. Okay. I'm going to just take a quick look at these.

Q. Please do.
A. Well, I'm looking at the patterns for '04, and they're kind of spread out. These dots all represent events. Every one of these dots could be one person, or it could be fifty people. It could be a hundred people. There could be multiple dots on top of a dot, so just because you see one dot doesn't mean that there's not fifty dots on top of that.
Q. Okay.
A. This is the geospatial technology that we use to track all events that occur in our area.
Okay?
Q. Okay.
A. So if you look at '04, they're kind of spread out, but you see that there's definitely a pattern down around the Alta Road area where the CHP lot is. That's Zone 16. These are attractive areas, and the reason Alta Road is because that's the road that goes north and south, and people can drive there and pick the aliens up, so a lot of apprehension is happening there. That's '04.
Q. Okay.
A. But it's kind of all over the place, you know, when I look at this.
Q. What can you tell me about Zone 18 in the year

2004?

A. It's not as busy as Zone 16.

Q. Okay.

A. There's not that much activity out there. Well, not -- I take that back. There's not as much activity in Zone 18 as there is in Zone 16, but there is a lot of activity on top of Zone 18 which is like 19, and that traffic -- all that traffic there would be dropping back down into Zone 18, and that's coming out of Copper Canyon.

Q. Okay.

A. When I look at 2005 --

MS. COOK: Which is 17B for the record.

THE WITNESS: -- it looks like there is a lot of apprehensions happening north of the border zones. This is -- this is the beginning of when Chula Vista started flexing over to the east from our original area. We actually started to flex in 2004 where we took a piece, and then in 2005, I believe we took up to Zone 18. There's a lot of apprehensions happening north of us right now. All those -- all that area north, all those are Brown Field arrests. These are Brown Field agents actually working north of the Chula Vista agents --

MR. MARZULLA: Okay.

THE WITNESS: -- making those -- those apprehensions because they own those northern border zones. We didn't, and we weren't as familiar with patterns and anything else.

So you see that there's not a lot of apprehensions down in the immediate border area. Everything is way north down around Donovan and East Mesa.

BY MR. MARZULLA:

Q. What do you attribute the lack of arrests right along the border area in 2005 to?

A. Probably a combination of everything, lack of personnel and lack of familiarity with the area.

Q. That's because Chula Vista station had just recently taken over responsibility for Zone 18?

A. Correct.

Q. Okay.

A. Then we go over to 2006, and there's definitely an increase in activity, and Zone 16 is worse -- is the worst of all of them, Zone 16 and 17 right behind it.

Q. Okay.

A. And this is when we had the fence there. We actually had the secondary fence there and the primary fence, and yet we still have all this activity north of us. I had to bring a rhyme or reason to what was going

on here and -- and stop chasing -- I mean, just going out there and deploying aimlessly and have a rhyme or reason as to deployment strategies and actually changing what we're doing, and it doesn't look anything like this anymore (indicating). They've been able to make a considerable impact in the activity going on in those zones, but Zone 16 and 17 are definitely the most busiest. Zone 18 still has a little bit of traffic, but mostly it's coming out of 19. It's not even coming from 18.

Q. I see.

A. So --

Q. Now, when you say it doesn't look like this anymore, you mean for the year 2007?

A. In 2007 and just in the last -- the last months, some of the changes that we made and the things we've done is independent of -- of SBI project and the lighting going up.

MS. COOK: You're going to need to explain what SBI means.

THE WITNESS: Secure Border Initiative where they're going to bring basically the star wars of technology to the border to help us control the border, the contract that Boeing was awarded to help us control the border with ground radar, you know, satellite

technology.

Independent of that, in order to bridge the gap between the time that that comes to San Diego and now, what was happening is they're cutting the secondary fence because there's no lighting down there, so we have all this activity in Zones 17 and 18. So I'm talking about a fence that costs thousands of dollars, hundreds of thousands of dollars to build, and they're cutting right through it.

MR. MARZULLA: Okay.

THE WITNESS: So we put up six portable lights on the easement, the government easement north of the secondary fence on the government road between Zone 16 and the end of the fence at 17 to actually just light it up, just shine a light on it, and we've seen a decrease from 600 or 700 apprehensions in Zone 16, 17 to 79 in December and 125 in January.

BY MR. MARZULLA:

Q. And do you attribute that to the presence of the lights?

A. That's what -- that's what made a significant impact.

Q. Okay.

A. And actually, assigning one or two persons down in between the lights now to run the fence back and

forth whenever possible. By just having the light on, it's not going to get these guys out there cutting these things with a hacksaw or electric saw. If they can be seen, they're not going to do it.

Q. Right.

Have the floodlights been extended into Zone 18 at this point?

A. No.

Q. And why not?

A. We have that -- that mountain up there. Okay? If I put a light up there, I'd have to set an agent right at the light because the moment that he moved, somebody could come up and roll that light off the hill and knock it off the mountain and destroy it.

Q. I see.

A. So there's no way to actually access part of that border, so if you put the light there, you have to actually go guard it. There has to be somebody there with it.

Q. All right. Events, apprehensions, arrests, chasing people back, do they occur on the subject property?

A. Yes, sir.

Q. And do they occur on the subject property on a fairly regular basis?

A. Yes, sir.
Q. So is the subject property one of the areas that you concentrate on along with the rest of the ten-mile border to deter illegal immigration?
A. Correct.
Q. I didn't want to cut you short.
Is there anything else that you can tell me about arrest patterns?
MS. COOK: Let me just clarify for the record.
MR. MARZULLA: Sure.
MS. COOK: You've used the word "arrest." You really should use the word "apprehensions."
MR. MARZULLA: Yes.
MS. COOK: Because the majority of these contacts do not result in arrest procedures --
MR. MARZULLA: Or perhaps even --
MS. COOK: -- unless the person is a repeat violator.
MR. MARZULLA: You actually used the word "event" earlier.
MS. COOK: "Event" and now we're using the word "apprehension."
MR. MARZULLA: Right.
THE WITNESS: Event when I was referring to geospatial technology, the dots, the blue dots, those

are events. That's what we actually call them.

MR. MARZULLA: Okay.

THE WITNESS: It's not necessarily an apprehension because it doesn't really tell you the true picture. Like I said, it could be multiple events on top of each other.

MR. MARZULLA: Yes.

THE WITNESS: And one event could be one person or multiple people.

MR. MARZULLA: Right.

MS. COOK: So I think the way it works is the blue dots are events, but to the extent we have produced statistics on apprehensions, those are actual body counts.

MR. MARZULLA: Right.

MS. COOK: People counts.

THE WITNESS: Yes.

BY MR. MARZULLA:

Q. So how have you seen changes in the apprehensions over recent years?

A. Well --

Q. What differences have you seen?

A. Well, I got to the Chula Vista station in 1999. They were just beginning the secondary fence project, and the all-weather road didn't extend into our area.

So we experienced the same thing out in San Ysidro that we're experiencing in Otay. When we can't drive out on the border road, our containment road is actually back sometimes half a mile, sometimes a mile because you couldn't drive onto this property because it's wet and muddy, and you're gonna get stuck, so we're having to push back.

As the secondary fence went along and -- and the road and lights went up, then we're able to get access to the border. Our apprehensions were still high, but then we could control the immediate border area. Our containment zone went from a mile-and-a-half to less than half a mile for controlling illegal entry along the border.

We've seen the same thing happen over the last month at Otay Mesa. We put in the six portable lights. We had the fence, and we had the road, but we didn't have the lights. We really don't have the personnel, but we've adjusted it and made it a priority to try to get that property -- that -- all these entries and minimize the entries in Zone 16 and 17 and Mr. De La Fuente's property where we do have the fence, minimize it so when you use a combination of infrastructure, lighting, technology, personnel, it's a force multiplied where now one guy can do the job of, you know, five

Q. You don't really know whether it was on condemned property or not?
A. I do not.
Q. Okay.
A. I know which one you're talking about, though, yes, sir.
Q. What's the purpose of that culvert?
A. It's to not impede the flow of water when it -- when it rains. We experienced that same thing in between the Ports of Entry. Whenever we build up lands or -- or start moving dirt, you can't -- you can't hold back water.
Q. Right.
A. It's part of the agreement between the BLM and Waste Water Management that the water cannot be impeded in any way. It needs to flow freely either into Mexico or back out of Mexico the way that it naturally did before we did any construction.
Q. Do you know who ordered the construction of that culvert?
A. No, sir.
Q. You didn't have anything to do with it?
A. I did not.
Q. And do you know whether there was any grading done on property owned by the plaintiffs in connection

But you need to know that when you own property that butts up to a country like Mexico out in the middle of nowhere where historically, thousands and thousands of people have been crossing the border illegally, you're going to have issues. You may not want to be out there at nighttime. One gun may not solve -- resolve the issue because they -- they may have some, too. I mean, I don't know.

MS. NEL: Do you want to take a break?

MR. MARZULLA: Just a minute.

(Discussion off the record.)

MR. MARZULLA: I don't think we have anything further with this witness.

Thank you very much, Mr. Perez.

THE WITNESS: Thank you.

MS. COOK: Just a few questions.

THE WITNESS: Okay.

EXAMINATION

BY MS. COOK:

Q. You described yesterday an incident that occurred out at the subject property, correct?

A. It actually occurred north of the subject property, but it came -- it started on the subject's

property, and it occurred north of the subject's property, and then it started going back to the subject's property again.

Q. Tell me where it started.

You said it started on the subject property, and then went off and then came back?

A. Correct.

Q. Where did it start on the subject property?

A. Down in Zone 18.

Q. And particularly looking at Deposition Exhibit 8, can you tell me which parcel of land it started on?

A. Parcel 3.

Q. And what was the initial contact?

A. The initial contact actually occurred down up around Otay Lakes, but after interviewing and debriefing everybody involved, the group actually crossed out around the Tin Can area, proceeded north to Otay -- around the Otay Lakes area (indicating).

When the encounter then happened with the agent and the group, a group of eleven, one of the subjects picked up a rock and tried to hit the agent. He fired off one round at that subject, the group dispersed and then started going back towards where they came from back towards --

Q. Back to --

A. -- the border.
Q. -- the south?
A. Correct. I came and then checked out a group of three and caught them and --
Q. Okay. Hang on a second.
Where did you come from?
A. From the Otay Lakes area (indicating) down around -- it's not on this map, but it's going to be north of here (indicating). We were heading back up towards the border coming south.
Q. And how did you happen to become involved in this incident?
A. I respond to all shootings or any significant incidents in my area of responsibility, and when one of my officers is involved in a officer involved shooting where somebody may be hurt or injured, I respond to the scene.
Q. So as you responded to the scene, where was your first contact with any members of the group?
A. East of the Otay -- east of Otay Lakes going back towards, like, the Frenchmen Canyon area. I actually stopped. From where the shooting happened, I stopped about a mile -- a mile south of the shooting incident because the group had went south and with a helicopter overhead, and he thought he saw something up

around that area. I got up on top, followed some tracks, and caught the group.

Q. How many people were in the group?

A. My group was four. It was three adults and an infant.

Q. Where was the group when you contacted them?

A. South of the Otay Lakes Road about 300 yards east of the Otay Lakes about half a mile.

Q. And is that shown on any of these maps in front of you?

A. It is not, but it would be zone -- probably closer to Zone 38.

Q. And what was the nature of your contact?

A. I just went up, and I saw the group. And they saw me, and they didn't move, and I went up and addressed them and apprehended them and brought them back down.

Q. Okay. Now, prior to this incident yesterday, what was your most immediate preceding incident on the subject property involving the apprehension of illegal aliens?

A. Approximately two weeks ago, we had a box truck actually drive out onto the subject's property down around --

Q. I'm sorry. A what?

A. A box truck, like a small U-Hall truck, a pickup truck with a big box through the back, like, for moving stuff, around 4:15 in the morning, drive out around the base of Tin Can Hill. When agents saw a vehicle out there that obviously wasn't a Border Patrol vehicle, wouldn't answer to the radios, they approached. There was a vehicle out there that was later determined was going to go out and pick up 18 people.

A pursuit began out around the Tin Can area back to the Otay Mesa Port of Entry area up around 905 where the vehicle stopped as agents approached this vehicle, then turned towards two agents and attempted to run over two Border Patrol agents. There was an officer involved shooting, three shots fired at the vehicle.

I happened to be leaving the gym at 4:30 in the morning. I hear the things going on in the radio, and I'm getting phone calls. I'm responding to them from the gym, and we made the apprehension up around I-15 and Ted Williams Parkway in Poway, and it was a U.S. citizen that was down to pick up approximately 18 undocumented aliens.

Q. Were they in the truck?

A. They were not. We encountered the vehicles before he was able to pick them up.

Q. How do you know it was 18 aliens?

A. That's what the subject told us.

Q. Prior to that time, what was your most immediately preceding contact with illegal aliens on the subject property?

A. I don't remember any specific incident that stands out, but on a nightly basis or even on a daily basis, we have apprehensions out in those zones. Those two stick out and stand out in my mind because they involve officer involved shootings. That's two shootings within two weeks.

Q. Now, how do groups of aliens customarily attempt to illegally enter the country in the area of Zone 18, in what fashion?

A. They walk around the canyons and then up over the -- the mountain, either around the base of Tin Can one way or the other. They walk north until they get up into the Kuebler's Ranch, draws, any of these (indicating) draws at Windmill Canyon, and then try to head back towards Alta Road around the Donovan Prison area. The reason is that that's the first road accessible to them when they could actually get into a vehicle and load up and drive on.

Q. Now, are these customarily groups or single persons?

A. No, customarily groups.

Q. And what's the average size of the group?
A. Four or five.
Q. And what's the largest group you've encountered?
A. Last year, I think the largest group I remember was 11:00 in the morning, and it was 48.
Q. Now, are these groups usually led by someone?
Does someone serve as a guide?
A. Correct.
Q. And what's the terminology for that kind of guide?
A. That's exactly what he is. He's a guide. He's not necessarily -- he's an alien smuggler, but he is a guide, and that's the way we look at him. We call them guides or -- and then we prosecute him under the Coyote ASID Program. That's the specific program for prosecuting guides.
Q. And so are guides sometimes referred to as coyotes?
A. They would be.
Q. When there's a group of aliens being led by a guide or coyote, is the coyote customarily armed?
A. Not customarily, but we did have an encounter in Zone 17 a year before last where the guide actually had a -- I want to say it was a nine-millimeter handgun.

The horse patrol came out, encountered the group, the guy threw the -- the gun down and ran, and they caught him and came back and found the weapon. That's just in my area. We do have armed encounters in other parts of border. I'm just talking about my area.

Q. Now, are drugs ever smuggled across the border in area of Zone 18?

A. Yes.

Q. And how are drugs smuggled across the border?

A. They backpack it in and walk with it on their backs.

Q. And are those usually single persons or smaller groups of persons or what?

A. Those are usually smaller groups of people for the most part. I personally have encountered groups of 18 people all carrying duffel bags up across the top of Otay Mountain.

The larger groups, I've found through my experience, cross through the hardest place it is to cross where it might take them a day just to get from the face of Mexico to the top of Otay Mountain. Because it is harder to cross, it's less possibility that anybody is going to use that area. It's not the easiest place to cross. It's also harder for us to make an apprehension down here (indicating).

Q. So by "down here," the record should reflect that you're referring to Zone 18 --
A. Correct.
Q. -- Parcels 1, 2, 3, and 4?
A. Correct.
Q. Now, when they cross through the mountains, how long will it make them to make that passage?
A. With backpacks or without backpacks?
Q. Assuming --
A. Are we talking just regular people?
Q. No, assuming they're carrying drugs.
A. A day or two.
Q. And --
A. That's just to get to the top of the mountain. That doesn't count for the next day it takes them to get off the mountain because they -- they take a lot of rests in between and just move in small increments. Strategically, they send scouts up to see where we're at and come back down. It's not just walking across the border. There's -- there's a lot of planning that goes into it.
Q. And in your opinion, why do they go across the mountains?
A. It's harder to cross, and it's also harder for -- for us to -- to encounter them. They have a lot of

more coverup on that mountain, places to hide, you know, and so that makes it harder for us to make the apprehension.

When we get up on the top of that mountain, there's just so many places to go, you know, so it's just hard to cross. You won't get any older females or males across that area. That's usually the young -- young males, you know, that cross through those areas and the backpackers. Down in this area (indicating) here, this (indicating) is where you get the regular people.

Q. Now, do the persons smuggling drugs tend to be armed more of the time than the aliens crossing?

A. That's correct.

Q. And what are they armed with?

A. The last encounter I remember with drugs was an AK-47 and a leaf blower.

Q. And did they attempt to use the leaf blower in any fashion?

A. They did. They were -- there was a gentleman walking in the back. As they moved north, the guy with the leaf blower would blow out their tracks behind them as they moved, and the guy in -- in the front had the AK-47.

Q. And how large was that group?

A. I think it was eight.
MS. COOK: I have no further questions.
MR. MARZULLA: No further questions.
MS. COOK: Thank you very much for your time.
MR. MARZULLA: Thank you, Mr. Perez.
THE WITNESS: You have a great day.
(The deposition was concluded at 10:10 a.m.)

* * *

Declaration Under Penalty of Perjury

I, Joe Perez, the witness herein, hereby declare under penalty of perjury that I have read the foregoing deposition and that the testimony contained therein is a true and correct transcript of my testimony given at said time and place.

Dated this ______ day of ________________________

20___ at ________________________, ___________________.

______________________________________

JOE PEREZ

STATE OF CALIFORNIA)
:
COUNTY OF SAN DIEGO)

I, Shirley J. Swenson, Certified Shorthand Reporter, in and for the State of California, Certificate No. 3493, and Registered Professional Reporter, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was then taken before me on Wednesday, February 21, 2007, at 2411 Boswell Road, in the City of Chula Vista, State of California; that said deposition was reported by me in shorthand and transcribed, through computer-aided transcription, under my direction; and that the above and foregoing pages, numbered 5 to 82, inclusive, is a true record of the testimony elicited and proceedings had at said deposition.

I do further certify that I am a disinterested person and am in no way interested in the outcome of this action, or connected with or related to any of the parties in this action or to their respective counsel.

It was stipulated that the original deposition be delivered to Mr. Marzulla for the purpose of having the witness read, correct, and sign his deposition under penalty of perjury; said original thereafter to be maintained by Roger J. Marzulla until the time of trial.

In witness whereof, I have hereunto set my hand on this 28th day of February 2007.

______________________________________
Shirley J. Swenson, CSR No. 3493, RPR