UNITED STATES COURT OF FEDERAL CLAIMS

OTAY MESA PROPERTY L.P.,
et al.,

Plaintiffs, CASE NO. 06-167L
vs. 06-1670
06-1671

UNITED STATES,

Defendant.
_______________________/

DEPOSITION OF STEVEN KEAN

Taken at Chula Vista, California

February 20, 2007

Reported by Tatiana A. Kouprianova - RPR, CSR

Certificate No. 11759

I N D E X

Deposition of STEVEN KEAN
February 20, 2007


| EXAMINATION | PAGE |
|---|---|
| BY MR. MARZULLA | 4, 86 |
| BY MS. COOK | 84 |


INDEX OF EXHIBITS

(Provided in Master Exhibit Book)


| FOR PLAINTIFFS | | MARKED |
|---|---|---|
| 1 | Notice of Taking Deposition of Steven Kean; 1 pages | 15 |
| 2 | Map | 51 |
| 3 | Document entitled, "San Diego Sector Officer Corps Staffing Levels FY-94 through FY-06"; 16 pages | 39 |
| 4 | Map, Bates-stamped DHS22889 | 52 |
| 5 | Mr. Kean's memo, Bates-stamped DHS520831; 1 page | 64 |
| 6 | Mr. Kean's memo; 1 page | 64 |
| | Witness signature page | 87 |
| | Reporter certificate page | 88 |

On Tuesday, February 20, 2007, commencing at the hour of 9:14 a.m., at 2411 Boswell Road, in the City of Chula Vista, County of San Diego, State of California, before me, Tatiana A. Kouprianova, Certified Shorthand Reporter, in and for the State of California, personally appeared:

STEVEN KEAN,

called as a witness by the plaintiffs, who, being by me first duly sworn, was thereupon examined and testified in said cause.

A P P E A R A N C E S

FOR PLAINTIFFS:

MARZULLA & MARZULLA
BY: ROGER J. MARZULLA, ESQ.
- AND -
BY: SASHA L. NEL, ESQ.
1350 Connecticut Avenue, N.W., Suite 410
Washington, DC 20036
(202) 822-6760

FOR DEFENDANTS:

U.S. DEPARTMENT OF JUSTICE
ENVIRONMENT & NATURAL RESOURCES DIVISION
BY: SUSAN V. COOK, ESQ.
- AND -
BY: E. KENNETH STEGEBY, ESQ.
601 "D" Street, N.W.
Washington, DC 20004
(202) 305-0470

ALSO PRESENT:

DAVID L. WICK

CHULA VISTA, CALIFORNIA; February 20, 2007; 9:14 A.M.

STEVEN KEAN,
having been sworn, testified as follows:

EXAMINATION

BY MR. MARZULLA:
Q. Why don't you state your full name, please.
A. Steven Kean.
Q. And your business address?
A. 2411 Boswell Road, Chula Vista, California, 91914.
MR. MARZULLA: All right. Ms. Cook, you had a statement for the record.
MS. COOK: Yes. I thought I would give you an overview of our understanding of the factual knowledge possessed by this witness. This witness currently is assistant chief patrol agent in the San Diego sector. He began with the Border Patrol in 1979 and has worked his way up through the ranks. So you'll have an opportunity for a broad overview of, in general terms, all aspects of being a Border Patrol agent as you work up through the ranks into management.
He has knowledge of operations in the field, but not as specific a knowledge as you are going to be

able to get from Joe Perez, who is scheduled for first thing tomorrow and who is now the patrol agent in charge of the Chula Vista station. He will have more specific knowledge with respect to precise -- more precise, detailed knowledge with respect to activities on the subject parcels.

And since we now have anywhere between 9 and 12 parcels, depending on how many complaints you are looking at, I actually have reverted to calling them "subject parcels," as opposed to "subject property," because, I think, as you question the different witnesses, you may need to delineate which particular parcel they are talking about --

MR. MARZULLA: Right.

MS. COOK: -- because we have so many different parcels now.

He also has knowledge about the issue of the access to the Otay Truck Trail. And in the course of prepping him yesterday -- I'm going to show Sasha a map that talks about -- this will -- when you get to the portion of his testimony relating to the Otay Truck Trail -- and we can mark this as deposition Exhibit 1, if you want, Counsel. This outlines some of the routes you will be discussing and, hopefully, makes it a little clearer.

MS. NEL: Okay.

MS. COOK: We also have other maps here that can be utilized, and it probably will be helpful for them to be in front of the witness. And specifically, I'm talking about the packet that I e-mailed out on Friday afternoon, one with the 9 parcels, and the other with the 12 parcels.

He can talk about what we've called in our topic index "border crossing points," that is how aliens customarily attempt to illegally enter the United States in the San Diego area.

He has familiarity with the statistics. We produced some statistical charts. That statistical program is called Compstat, C-o-m-p-s-t-a-t, and he has familiarity with that.

He also has been trained on the authority of a border property agent to enter private property, and so he can talk about what we've called "training received." As you know, we have somebody else who will be talking about training given, or from the instructor's viewpoint, but he will be talking about what training he has received in the course of his career.

And then, of course, he can talk generally about operations. We also have him listed as

"lights," but I think there may be more specific information that you'll be able to glean from other witnesses, such as Joe Perez and Michael Hans.

And with respect to all the witnesses, we followed the guidelines in your interrogatories. You might want to specify a time frame, but generally speaking, the document production and the interrogatory responses have been dealing with that six-year period immediately prior to the first complaint, or March 2000 to March 2006.

And in that respect, that's why I say that Joe Perez may have more detailed knowledge of the activities on the property within that six-year time period, because Mr. Kean has been in management in the San Diego sector and a bit more removed, although still familiar with it.

And hopefully, with that introduction -- you are welcome, of course, to ask him anything you want, but that is how -- what our understanding is of how he fits into the general picture.

MR. MARZULLA: Very good. Thank you. It's been very helpful.

Q. So Mr. Kean, have you ever had your deposition taken before?

A. Yes.

MS. COOK: Now, he just gave Sasha two pages, but -- my memory is that I produced those two pages but because I'm not in my office and my index is not that specific, I can't be sure. So we are giving them to you again, but we'll match them up with page numbers when we get back to Washington. I think they've already been produced.

MS. NEL: I think one of them definitely has been.

MS. COOK: And if they haven't, we'll get the new page number. Those are the only ones that we weren't totally sure that we produced.

BY MR. MARZULLA:

Q. I just wanted to make sure we have all the documents that are requested in that notice. And it's your testimony, Mr. Kean, that we do?

A. Yes.

MS. COOK: Now, the one exception would be item No. 6. And we actually may need to provide you -- he is not the person that would have possession of that information, but we may need to provide you with an additional witness on that. There is a whole computer database that maintains the apprehension records.

So this is the one request, No. 6 -- let me

read it into the record. "All roundups, detentions, arrests, or other actions involving persons located on the subject properties." That is the one item which seemed to me not to have been encompassed within your previous discovery requests, although we did produce apprehension information because we thought it was relevant. There is also underlying arrest reports, or apprehension reports, if you will, that are maintained in the database. So we can provide someone who can probably educate both of us on that while we are here.

MR. MARZULLA: Do you have any idea which witness that might be?

MS. COOK: Not yet, because I haven't had a chance to talk to everybody today. I was here yesterday, but they weren't. So I will follow up over lunch.

MR. MARZULLA: Okay.

MS. COOK: And Steve might know a little bit about it. But there is actually a statistical unit here that maintains those records. I've met with them before, and I would go back to them for more information.

BY MR. MARZULLA:

Q. Mr. Kean, who do you think is most likely to have the information called for in item 6, dealing

with apprehension records of arrests or apprehensions occurring on the subject property?

A. Well, it's contained in a computer system called IDENT, and the custodian of that system is the Border Patrol headquarters in Washington DC. We have access to it here locally, as well, through our intelligence office and statistical unit. A particular person, though, will be difficult for me to identify.

Q. Okay. All right. Thank you.

You described several levels of responsibility that you passed through during your career. I'd like to go back and explore those briefly, if I might.

First, you talked about being a Border Patrol agent. What are the duties -- what were your duties as a Border Patrol agent?

A. Primary responsibility is for safeguarding the border. I performed patrol activities, which we often call "line watch" or sometimes "still watch," in which we patrol the immediate border to prevent the illegal entry and smuggling of aliens into the country.

Q. And what does that entail? What does patrolling entail?

A. Well, largely, we are issued a vehicle. We have binoculars and a radio. We respond to our area

of assignment in the field. We observe that area. We listen for radio traffic from other Border Patrol agents, including scope operators. We also listen for sensors that are activated, and we respond to any incursions across the border to make apprehensions of people illegally entering the country.

Q. Okay. And is it fair to say that agents are assigned to different areas along the border that they are responsible for covering?

A. Yes.

Q. Okay. And as a Border Patrol agent, did you have one area that you covered, or more than one area?

A. It's usually identified as one area.

Q. And what was that area?

A. Well, there's different areas out there. Each one is identified differently. It's sort of like a beat in the police department. You are assigned to a specific area, and you are responsible for that. And there are adjoining assignments where all the Border Patrol agents are working. So the assignments are sort of interlocking, and they support one another.

Q. So during your time as a Border Patrol agent, were you assigned to one particular beat, if you will, or did you, over the years, get assigned to different beats?

A. Well, I was assigned first to Chula Vista Station; then, to the Imperial Beach Station. And while at each of those stations, my daily assignment would change. It could be W-2; it could be W-6; it could be Dairy Mart Road; it could be the loading docks; it could be Dillon tree line; W-15, which is also known as the beach. Any assignment such as that, I would be assigned to, and that would be my patrol responsibility for the shift.

Q. Right. So you actually had different beats --

A. Each day.

Q. Okay. Different beats each day. So it's not the case that you would get assigned back to the same place day after day, generally?

A. Correct.

Q. Okay. Now, you also then described that you became a supervisory agent; is that right? Is that the next level?

A. Yes.

Q. What's a supervisory agent?

A. He is a first-line supervisor to agents who are patrolling the border. He schedules the assignments, schedules days off, reviews paperwork, responds to situations in the field, and does performance appraisals.

Q. How long were you a Border Patrol agent before you made supervisory agent?
A. Six years.
Q. Okay. And does a supervisory agent go out on the beat, as well?
A. He goes out in the field. He is not given a specific assignment. He may be given either -- you know, a general assignment to the east or the west side, or if there's just one supervisor, to the entire station area.
Q. Okay. Is there generally more than one supervisor on duty at a Border Patrol station?
A. Generally, but not always.
Q. Okay. What stations were you assigned to as a supervisory Border Patrol agent?
A. Imperial Beach.
Q. Okay. And what area does the Imperial Beach cover?
A. It covers from the Pacific Ocean to the San Ysidro Port of Entry, approximately 5 linear miles of international boundary.
Q. Okay. And what are the principal entry points there? Does it include the San Ysidro station?
A. The San Ysidro Port of Entry?
Q. Yes.

A. No. The San Ysidro Port of Entry is the responsibility of field operations, and they control that. The primary points of entry, however, were the I-5 southbound lanes to Mexico. People run up through the southbound lanes, northbound, into traffic, and then cross the freeway into San Ysidro. Another primary point of entry was in the Tijuana River bottom, all throughout the Tijuana River bottom; Dairy Mart Road; across Spooners Mesa, Smugglers Canyon, Goat Canyon, and the beach.

Q. What years were you a supervisory agent?

A. From 1988 to 1994.

Q. Okay. During the time you were a supervisory agent, was any part of the border fence constructed?

A. Yes.

Q. What part?

A. From the beach -- I don't think the beach had been completed at that time. Let me say from the San Ysidro Port of Entry over to Smugglers Canyon.

Q. Okay. Was this construction -- prior to 1994, during the time you were a supervisory agent, was that construction of what we now refer to as the primary fence?

A. Yes.

Q. Would you describe the primary fence, please.

A. The primary fence is built out of steel landing mat. It's surplus material that we obtained from the military. And it's installed on six-inch beams that are erected vertically, and the steel landing mat is welded to those six-inch beams.

Q. About how tall is it?

A. It's about ten feet tall.

Q. And about how thick are these steel mats?

A. I'd say they are about 1/8-inch thick.

Q. What, from a functionality point of view, is the purpose of the primary fence?

A. Its primary purpose is to prevent vehicles from driving into the country, and its secondary purpose is to prevent people from entering the country.

Q. Okay. Was it possible at that time for people to go around the end of the fence?

A. Yes. Over at the beach.

Q. And as a supervisory Border Patrol agent, did you, in fact, identify the beach as a place where people could make entry despite the existence of the primary fence?

A. Yes, but the primary fence was -- during that time, it was a chain-link fence, and there were holes in it in certain places. The fence did not go all the

way out into the surf, so they could cross down at the beach itself, or they could cross through one of the holes. I might add that they would also climb over the top of the fence in other areas.

Q. So as a supervisory agent, did you try to ensure that there were Border Patrol agents at those known points of entry -- at the end of the fence, at places where there were holes in the fence -- to apprehend illegals who might try to get through?

A. Yes, as well as other places, where the fence wasn't in existence, such as the Tijuana River bottom.

Q. And why was the Tijuana River bottom a problem, despite the fence?

A. It was always a highly active area for illegal crossings. We had to assign people there in order to maintain control.

Q. What was the strength of the Border Patrol during the period -- and I'm just trying to break it up based on your career. Say, up to 1994, about how many agents, if you know, were on patrol in the San Diego area at that time?

MS. COOK: We've provided you specific information. Do you want us to break and get that information, or --

MR. MARZULLA: No. I'm just testing this

witness's recollection.

MS. COOK: Because I'm not sure he can give you a precisely accurate number.

MR. MARZULLA: He can tell me that.

THE WITNESS: To the best of my recollection, there were 500 agents when I entered on duty in 1978 and through much of the 1980s. There was a gradual buildup of Border Patrol agents towards the second half of the 1980s. And I believe by 1994, the date that you mentioned, we had around 800 to 900 agents in the San Diego sector, but I do not recall the exact numbers. I can't be more specific than that.

BY MR. MARZULLA:

Q. Fair enough. And you referenced the San Diego sector. Is that a unit of organization for the Border Patrol?

A. Yes. San Diego sector includes all of San Diego County, parts of Riverside and Orange counties.

Q. Okay. Post-1994, what was your next level of responsibility with the Border Patrol?

A. I was a field operations supervisor at the Chula Vista Station.

Q. What is a field operations supervisor?

A. He is a second-line supervisor. He supervises

Q. Right. What caused the shift in illegal activity from the western area further east?

A. I believe it was the additional staffing and scopes that were brought into the sector to be able to monitor the border and make apprehensions.

Q. Okay. What is a scope?

A. It's a night-vision scope, to be able to see during the night. It uses thermal images to identify heat signatures.

Q. Uh-huh. And are these actually used by an individual, like a spyglass or binoculars?

A. It's more like a large camera, used by an individual operator.

Q. Okay. Is it a remote camera, or is it one that's actually held or controlled by a person who is right there with the camera?

A. It's mounted either on a tripod or in the back of a pickup truck and operated by a person.

Q. Okay. Could you describe for me a little bit, if you would, with a little bit of detail, how operations changed during this time period from, say, the mid-1990s into the 2000s. What was different?

A. Well, again, it was largely staffing. We brought in additional agents into the border. We put them where the aliens were crossing the border, which

is the 14 miles from the Pacific Ocean to the Otay Mountain. And we concentrated our efforts there, where the illegal entries were occurring. As a result of that, the illegal entries shifted over to the east of the Otay Mountain, and we began staffing up in the east side of the Otay Mountain, as well, in order to control those entries.

Q. Had the entries decreased toward the ocean, in the western portion of the sector?

A. I don't have those specific numbers now, but I have a recollection, and my sense is that yes, they did decrease. You know, over the '80s, or the '90s, the apprehensions actually increased considerably and then tapered off towards the end of the '90s and into the 2000s. But eventually, yes, the number of entries occurring on the western half of the sector decreased.

Q. And at the same time, did the pressure of illegal entry increase in the eastern part of the sector?

A. Yes. From Otay Mountain to the east. Yes.

Q. Okay. How did the Border Patrol respond to this increased pressure in the eastern portion of the sector?

A. By assigning more agents to those stations that are responsible for it.

Q. Okay. Does it also have any electronic devices attached to it?

A. No. It has electronic doors, or gates, but no electronic devices other than that.

Q. What is the purpose of the secondary fence?

A. The secondary fence is to prevent the illegal entry of persons into the country.

Q. How does it function with relation to the primary fence?

A. Well, agents are assigned between the primary and the secondary fence, to control those areas. And the fences have served as a deterrent to illegal entries in those places where they've been placed. However, they have not completely stopped the number of persons crossing over, either.

Q. Which is harder to get through: the primary fence or the secondary fence?

A. I'd say the -- probably the secondary fence.

Q. Uh-huh. And why is that?

A. Well, when persons cross over through the primary fence, there's no one on the south side to try to stop them from crossing. They have all day long to stand there and wait and watch and see whether there are patrol agents nearby. And then they cross, and there's nobody there to stop them from crossing that

primary fence.

Q. Right.

A. Once they cross the primary fence, they have to dash a good 130 feet to reach the secondary fence. And in order to climb over that, they also have to bridge the 45-degree angle at the top of that fence in order to get to the other side. So in order to do that, they have to bring a ladder with them or boost each other up on shoulders in order to reach the top and scale the fence. And then, they have the added pressure of Border Patrol agents coming and making apprehensions to prevent them from crossing the secondary fence.

Q. When was the secondary fence constructed?

A. I don't have those dates, and I don't know.

Q. Okay. Where does the secondary fence terminate?

A. At which end?

Q. Well, I guess one end terminates at the ocean; right?

A. The secondary fence does not extend all the way to the ocean. I believe it only goes over to about -- well, to the west end of the Tijuana River bottom. I would say right around Dairy Mart Road.

Q. Okay. And how about eastward?

A. The east side terminates -- I'm not sure, but I think it's about one mile --

MS. COOK: Well, we provided precise information. If you want precise information from this witness, we can stop and get him the documents that have that precise information.

MR. MARZULLA: I just asked the witness for a description.

Q. Do you know where the fence terminates?

A. I know where it terminates, but I couldn't give a physical description of where it terminates. I don't know.

Q. Okay. Do you know where it terminates with relation to the property that is at issue in this lawsuit?

A. I believe it terminates just to the west of the subject properties.

Q. Okay. Great. And let's define --

MS. COOK: And let's identify for the record what -- because he is referring to a document, and then, to also be specific as to which parcel you are referring to, Mr. Kean.

THE WITNESS: Is this --

MS. COOK: First of all, for the record, he is looking at our document, page No. 20827.

THE WITNESS: Is this the secondary fence right here (indicating), Susan?

MS. COOK: Yes.

THE WITNESS: All right. Then, the secondary fence terminates, according to this map, 300 feet east of Parcel 1 of the subject properties.

BY MR. MARZULLA:

Q. Okay. How, if at all, does that secondary fence affect illegals who are in the area of the subject property, trying to get through?

A. Well, illegals cross all through the border, whether there's a primary -- or a secondary fence or not. So they cross through the areas where there's the secondary fence, as well as through the area where there's not a secondary fence. I don't know if that answers your question.

Q. Not really. If an illegal is near the end of the secondary fence, is it easier for him to go around it, rather than to climb over?

A. Well, they go through the gaps in the fence, and certainly we know that they go through this area of the subject property where there is no secondary fence.

MR. MARZULLA: Excuse me a minute.

(Brief recess.)

BY MR. MARZULLA:

Q. So Mr. Kean, it would seem to be common sense, at least -- and you can just tell me whether this is your experience -- that if someone is faced with either climbing over the fence or going around the end of the fence, that, all other things being equal, it'd be easier to go around the fence, wouldn't it?

A. Yes.

Q. Okay. And for that reason, do you see -- as one who supervises Border Patrol agents, do you see a need to put more agents near the end of the fence where the illegals can go around the end of the fence?

A. Well, we assign a number of agents to that area, that are necessary in order to respond to those crossing the border, as we do in other places along the border.

Q. I mean, you identified places, I think you've testified, that you notice aliens -- illegal aliens can get through or around or are able to make their way into the United States; right? You identified the weak spots in the border; right?

A. When we were talking earlier of the Chula Vista Station, when I was assigned there, yes. We did.

Q. And the Border Patrol still identifies weak

spots in border protection, doesn't it?

A. Yes.

Q. Okay. Isn't one of those weak spots the place where the secondary fence ends and aliens can simply go around the end of it?

A. I don't know that I'd call it a weak spot so much as -- we go where the alien traffic goes. When the alien traffic crosses through, we respond there, and we assign agents there to respond to it, as to the other places along the border.

Q. And is the subject property a place where the alien traffic particularly goes, one of the places?

A. Yes. It's one of the places.

Q. Okay. And it's one of the places, then, where agents are assigned; right?

A. Yes.

Q. Okay. Good.

Now, are agents assigned to the area of the subject property pretty much every day?

A. Yes.

Q. Okay. And why are agents assigned there pretty much every day?

A. Because there are illegal entries made there every day.

Q. Are there other spots along the border where

MR. MARZULLA: Why don't we mark that as Exhibit 4.

(Plaintiffs' Exhibit 4 was marked.)

BY MR. MARZULLA:

Q. I'll ask you to look at Exhibit 4. Do you recognize that document?

A. Yes. I do.

Q. What is that?

A. Well, it's an aerial map, which includes the outlines of the subject parcels.

Q. And is that a map that was created by the Border Patrol?

A. Yes.

Q. Are you able to identify the areas of assignment on that map, Exhibit 4?

A. No. There's only two of them here, that I see, and I'm not familiar with all of the areas of assignment. But I see Johnny Wolf's Draw, and I also see Goldmine Draw, and those are typical assignments that are given on a daily basis.

MS. COOK: And I'm also going to show the witness document DHS20828, which is what we've referred to as the "Place Names Map." It only has the original four parcels on it, but it actually has -- ultimately, we'll get the names put on this new map,

Q. I'm sorry. I didn't quite understand that.
A. They serve as a backup unit to the agents that are assigned to their regular assignment.
Q. So the agents with regular assignments don't have ATVs?
A. Correct.
Q. Are they on foot?
A. They are in four-wheel-drive vehicles. Sometimes, vans; other times, sedans.
Q. And then, these ATVs are assigned as backup or reserves to those primary-assignment agents?
A. That's a good way to describe it. Yes.
Q. Okay. Earlier this morning, you talked about -- you mentioned Otay Mountain. Would you describe Otay Mountain for me.
A. Otay Mountain is about 3,000 feet tall at its top, and it extends from -- it's about 5 miles long, to my knowledge. It extends from an area that we call Well Draw over to Marron Valley.
Q. Okay. Is it something of an obstacle to an illegal trying to get into the country?
A. One might think that, but surprisingly, we get a lot of people who cross through Otay Mountain.
Q. When you say "through," do they actually climb --

A. They climb the mountain. That's correct.
Q. They do. Okay.
Do you have any notion of how many or how often they climb this mountain?
A. Well, they climb pretty frequently. The Otay Mountain is the responsibility of the Brown Field Station, and the Brown Field Station is the station with the greatest number of apprehensions within the San Diego sector. So I would say that it's quite frequent that they cross over Otay Mountain.
Q. Does the Brown Field Station have an area of responsibility in addition to the mountain?
A. It's primarily the mountain and the areas immediately to the north and to the east of it.
Q. Okay. Could I ask you to take a look now at the map that's been marked as Exhibit 2. Do you have that in front of you?
A. Yes.
Q. Did you bring that map, or did your counsel bring this map?
A. Yes. I gave it to my counsel yesterday.
Q. Could you describe what that map, Exhibit 2, is.
A. Well, it covers the areas to include the subject parcels, and it also has the roads by which we

A. It's like gravel and -- I think it's sap, that's used as the glue to create a hard surface.
Q. Okay. Has the Border Patrol constructed other roads that are shown on that map?
A. I don't know that we've constructed these roads, but they were existing agricultural roads, that have been maintained over the years.
Q. Who has maintained them?
A. We have maintained them.
Q. What kind of surface do those roads have?
A. They are dirt.
Q. How have you maintained them?
A. Primarily driving our vehicles on them. We'd bring a grader out every now and again, and we'd grade them.
Q. Okay. So you've graded and maintained the roads shown in what color on Exhibit 2?
A. Orange. But I think the grading operator would be the one more appropriate to come in and speak about what roads have been graded and maintained by us, because I don't know.
Q. I understand. But you at least recognize that there's some roads on Exhibit 2 that are graded and maintained by the Border Patrol?
A. I don't know if these specific roads have been

graded and maintained by us, or if we just utilize them. I can't answer that.

Q. Who gave you this map?

A. I believe Mike Hans gave me this map.

Q. So perhaps he will know a little bit more about this map?

A. He may.

Q. Okay. Counsel did indicate at the beginning of your deposition that you knew something about the Otay Truck Trail. Would you please describe what you know about that trail and how it's used.

A. Otay Truck Trail expands the length of Otay Mountain, starting near Alta Road, continuing up and over the mountain, and exiting on the east side of the mountain, at Marron Valley.

Q. How does the Border Patrol use Otay Truck Trail?

A. On our daily patrols.

Q. And is that the daily patrols that you described of the mountain and trying to keep illegals from using it?

A. Yes.

Q. Is it used for access, as well, to the lands to the west of the mountain?

A. No. It's used for access to Otay Mountain

itself. The lands west of it are accessed through other means.

Q. Okay. Do you have knowledge of the easement rights that the Border Patrol might have to the use of that road?

A. Some.

Q. Would you please describe your knowledge of that subject.

A. It's an easement extending -- oh, I don't know -- just to the west side -- or the east side of Alta Road, across Otay Mountain, and terminating somewhere before Marron Valley.

Q. Okay. So is it your understanding that the Border Patrol has an easement to do what it's doing on that road?

A. Yes.

Q. At some point, was a locked gate placed across that road?

A. Yes.

Q. When did that occur?

A. In July of this year, 2006 (sic).

Q. It's even last year now; right? July of --

A. Oh, that's correct. July 2006.

Q. Okay. Would you please describe your knowledge relating to that locked gate on the

use of cameras to surveil the subject property.

MS. COOK: I don't think cameras have ever been placed or used to surveil -- the cameras are only placed on property owned by the United States, in locations of primary and secondary fence. Secondary fence has been constructed only in that one segment adjacent to the subject property.

MR. MARZULLA: Let's get the witness's understanding, at least.

MS. COOK: Sure.

BY MR. MARZULLA:

Q. Are there -- should we use the word "scopes" instead of "cameras"? Are there any scopes?

MS. COOK: And that's a good question, Counsel, because I think they are different, and maybe that's my confusion.

MR. MARZULLA: It's certainly mine.

Q. Are scopes and cameras the same thing, or are they different?

A. I think we use the words interchangeably sometimes, but we do have -- I think there is a distinction. The cameras are mounted on poles and are monitored remotely, whereas the scopes are taken out in the field and are operated by an operator who sits at a console and surveils the area.

Q. Are there scopes or cameras that are placed on any of the property owned by the plaintiff in this case, to your knowledge?

A. There is a scope site located on top of Otay Mountain, that overlooks the subject property.

Q. Okay. Are there any other scopes or cameras that are used to surveil the subject property?

A. Not to my knowledge.

Q. Okay. You mentioned a third telephone call with Mr. Wick, and I believe you have a memorandum summarizing that. Would you please describe that telephone call.

A. I don't have a memorandum summarizing that. I called him more recently based upon the complaint that the Border Patrol vehicles are tracking -- in fact, I received a letter from Mr. Wick that Border Patrol agents were tracking mud and rocks into the county streets in an area where he is conducting grading as he is developing the properties. And I went out and inspected the area.

First, I called him and asked him if he could be more specific as to what specific streets were involved. He said any streets where we have access to the subject property. I told him that I would look into it. And I did subsequently go out and view the

else would have more information on that. But what can you tell us here about the use of floodlights in and around the subject property?

A. Currently, there's no floodlights on that property. In the past, I believe there has been floodlights on the property, but currently, they are only being utilized in Zone 17, and there's nothing on the property.

Q. And why is that? Why have the floodlights been removed from the subject property?

A. I don't know.

Q. Okay. I have no further questions, Mr. Kean. Is there any part of your testimony that you would like to clarify, expand on, or change in any way?

A. Not at this time.

MR. MARZULLA: Counsel?

MS. COOK: Thank you. I have a few questions.

EXAMINATION

BY MS. COOK:

Q. Mr. Kean, you were speaking earlier this morning about road grading that occurred on some roads, and I believe you weren't sure exactly which ones, but -- road grading that occurred on roads in the area of the subject property?

A. Yes.

Q. When was it that that road grading occurred, that you were talking about?

A. During the time that I was assigned to the Brown Field Station, from October 1995 to January of 1999.

Q. And a moment ago, you were talking about the shelter that was taken down, that was utilized by the ATV unit?

A. Yes.

Q. Why was that shelter taken down, to your knowledge?

A. Because that particular ATV unit moved its operations over to the east side of Otay Mountain.

Q. Why did they move their operation?

A. Because the Chula Vista Station assumed the responsibility for the subject properties on the East Mesa, and the Brown Field Station flexed to the east and moved their operations further eastward.

Q. So was this a change in the zone assignment system?

A. Yes.

MS. COOK: Thank you. I have no further questions.

///

Declaration Under Penalty of Perjury

I, STEVEN KEAN, the witness herein, declare under penalty of perjury that I have read the foregoing in its entirety; and that the testimony contained therein, as corrected by me, is a true and accurate transcription of my testimony elicited at said time and place.

Executed this ____ day of __________ 2007, at
__________________________, ___________________________.
(city) (state)

________________________________
STEVEN KEAN

REPORTER'S CERTIFICATION

I, Tatiana A. Kouprianova, Registered Professional Reporter and Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the witness named in the foregoing deposition was, before the commencement of the deposition, duly administered an oath in accordance with the Code of Civil Procedure Section 2094; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony elicited and proceedings had at said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this __ day of ______________, 2007.

Tatiana A. Kouprianova, RPR, CSR No. 11759