# In the United States Court of Federal Claims

No. 06-877 L
(Filed Under Seal: June 25, 2008)
(Reissued: June 30, 2008)[1]

| | | |
|---|---|---|
| D & D LANDHOLDINGS, a limited partnership, Plaintiff, v. THE UNITED STATES, Defendant. | * | Fifth Amendment Takings Claim; Motion to Dismiss; Motion for Summary Judgment; Genuine Issue of Material Fact; National Security; RCFC 12(b)(1); RCFC 12(b)(6); RCFC 56; Fisher; Statute of Limitations; 28 U.S.C. § 2501 |

Roger J. Marzulla, Washington, DC, for plaintiff.

Susan V. Cook, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment. Plaintiff, D & D Landholdings, LP, brings a Fifth Amendment takings claim alleging that defendant, acting through agents for the Department of Homeland Security, Bureau of Customs and Border Protection ("CBP"), and the United States Border Patrol ("Border Patrol"), has effectuated the taking of its property for public use, Am. Compl. ¶ 13, and without just compensation, id. ¶¶ 14-16. Specifically, plaintiff claims that defendant's construction of a border fence between the United States and Mexico resulted in the channeling of illegal immigrants onto its property "where they can be rounded up, arrested, and deported." Id. ¶ 8. According to plaintiff, Border Patrol agents utilize its property for these purposes on an "almost daily" basis. Id. Defendant moves to dismiss plaintiff's amended complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") or, alternatively,

[1] The court issued this Opinion and Order under seal on June 25, 2008, and directed the parties to submit proposed redactions by June 30, 2008. The parties filed a status report on June 30, 2008, in which they indicate that no material contained in the court's decision requires redaction.

for summary judgment pursuant to RCFC 56.[2] Defendant argues, inter alia, that plaintiff's claim is barred by the statute of limitations, or, assuming arguendo that plaintiff possesses a cognizable property right to exclude Border Patrol agents from its property, that plaintiff either fails to state a claim upon which relief can be granted or has not demonstrated that the nature of the physical intrusions upon its land constitutes a taking. The court deems oral argument unnecessary. For the reasons set forth below, defendant's motion is denied.

## I. BACKGROUND[3]

### A. Plaintiff's Property

The property involved in this action ("subject property") consists of a 135-acre parcel of land located in a sparsely populated portion of San Diego County called East Otay Mesa. Def.'s PFUF ¶ 5; Pl.'s PFUF ¶ 5. East Otay Mesa is a "largely undeveloped" area "at the base of the Otay Mountains approximately 14 miles east of the Pacific Ocean." Def.'s Mot. 5; Def.'s PFUF ¶ 5. The subject property, which is located near the cities and suburbs of San Diego and Chula Vista to the northwest, is approximately 0.75 miles north of the international border between the United States and the Republic of Mexico and the densely populated city of Tijuana. Def.'s PFUF ¶ 5; accord Def.'s Ex. 30 at 1 (Decl. Daniel Ochoa ¶ 2 (stating that the approximate distance between the subject property and the international border is 0.68 to 0.83 miles)). Although the parties agree that the subject property is zoned by San Diego County for industrial uses, see Def.'s PFUF ¶ 6; Pl.'s PFUF ¶ 5, they disagree about the extent to which the subject property may be used for these and other purposes. Compare Def.'s PFUF ¶ 5 (stating that the subject property "is zoned industrial," that it has been leased "at various points in the past for purposes of dry farming," and that utility easements have been granted across the property), with Pl.'s Resps. ¶ 6 (stating that defendant "mischaracterizes the nature of the subject property," which is zoned for light to heavy industrial (90%) and residential (10%) uses). According to

---

[2] Defendant states that it "believes a motion to dismiss on statute of limitations grounds is properly brought pursuant to Rule 12(b)(1). However, to the extent the Court believes such a motion should be set forth under Rule 12(b)(6), Defendant asks that the Court consider this motion as one raised under that Rule." Def.'s Mot. Dismiss Alternative Summ. J. ("Def.'s Mot.") 1 n.1.

[3] The facts set forth in this Opinion and Order do not constitute findings of fact by the court. They are derived mainly from defendant's motion, Plaintiff's Corrected Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") and accompanying exhibits ("Pl.'s Ex."), Defendant's Reply in Support of Its Motion to Dismiss or in the Alternative for Summary Judgment ("Def.'s Reply"), exhibits accompanying defendant's motion and reply ("Def.'s Ex."), Defendant's Proposed Findings of Uncontroverted Fact in Support [of Its] Motion to Dismiss or in the Alternative for Summary Judgment and Memorandum in Support Thereof ("Def.'s PFUF"), Plaintiff's Corrected Responses to Defendant's Proposed Findings of Uncontroverted Fact ("Pl.'s Resps."), and Plaintiff's Proposed Findings of Uncontroverted Fact ("Pl.'s PFUF"). Unless otherwise noted, the facts recited herein are undisputed by the parties.

plaintiff, the subject property is "very desirable for heavy industrial and manufacturing uses" such as waste disposal; concrete, gravel, and asphalt production; power generation; and other uses "that are usually located outside population centers." Pl.'s Opp'n 4.

Plaintiff acquired the subject property in early 2000 for the purpose of leasing it to companies engaged in the industrial uses stated above. Id. Roque De La Fuente is a principal in D & D Landholdings, LP and possesses either a direct ownership interest in, or control of, the subject property as well as several adjacent parcels that are implicated in other, currently pending litigation in the United States Court of Federal Claims ("Court of Federal Claims").[4] Def.'s PFUF ¶ 4. The subject property is managed by SD Commercial, LLC ("SD Commercial"), which is co-owned by David Wick and three irrevocable trusts in the names of Mr. De La Fuente's children. Id.; Def.'s Ex. 4, at 18.

**B. The United States Border Patrol**

The Border Patrol was established by Congress in 1924. Def.'s Mot. 4 n.2. Until recently, the Border Patrol formed part of the Immigration and Naturalization Service ("INS") and was charged with "prevent[ing] unauthorized aliens from entering into the country." Def.'s Ex. 3 at 1. Following passage of the Homeland Security Act of 2002, border enforcement functions of the INS and other agencies were merged to form the Directorate of Border and Transportation Security ("BTS") within the Department of Homeland Security ("DHS"). Id. The BTS placed border enforcement functions, including the Border Patrol, within the CBP. Id.

The Border Patrol, which is "the lead federal agency charged with securing the international border between the United States and Mexico," Def.'s Mot. 4, is assigned the primary mission of "detect[ing] and prevent[ing] the entry of terrorists, weapons of mass destruction, and unauthorized aliens into the country, and . . . interdict[ing] drug smugglers and other criminals between official points of entry."[5] Def.'s Ex. 3 at 1. Its operations are divided into sectors. Def.'s Mot. 4. For example, the San Diego Sector Office is responsible for an area north of the Mexican cities of Tijuana and Tecate, which contain a combined population exceeding two million people. Id. The San Diego sector "extends along the first 66 miles from the Pacific Ocean of the international border with Mexico, and covers approximately 7,000

---

[4] Nine parcels that are either adjacent to or near the subject property are at issue in Otay Mesa Property, L.P. v. United States, No. 06-167 (filed Mar. 3, 2006), and an additional near or adjacent parcel is at issue in International Industrial Park, Inc. v. United States, No. 06-876 (filed Dec. 22, 2006). Def.'s Mot. 5 n.3.

[5] Border Patrol agents "have no official role at points of entry," where CBP inspectors "are responsible for conducting immigrations, customs, and agricultural inspections on entering aliens." Def.'s Ex. 3 at 1.

square miles of territory."[6] Def.'s Ex. 2 at 2. The Chula Vista Station, which is under the jurisdiction of the San Diego sector, is responsible for patrolling the area in which the subject property is located. Def.'s Mot. 4. But see Pl.'s Resps. ¶ 2 (suggesting that because plaintiff's property "was not included in the area patrolled by the Chula Vista station [until] March 2004," "the apprehension statistics for the Chula Vista station prior to 2004 . . . do not reflect apprehensions occurring on the subject property").

### C. Relevant History of Border Patrol Activities on the United States-Mexico Border

Prior to 1990, the international border "near San Diego was poorly marked and presented no real barrier to entry. In many areas, the border had only agricultural fences or was totally unfenced." Def.'s Mot. 8. Beginning in 1990, the Border Patrol, with the assistance of the United States National Guard, began erecting what is now termed the San Diego primary fence ("primary fence"), id., which was built directly on the border in an effort to deter illegal entries and drug smuggling into the San Diego sector, Def.'s Ex. 2 at 1. Constructed of surplus welded steel army landing mats, the ten-foot high primary fence covers the first fourteen miles of the border from the Pacific Ocean and was completed in March 1993. Id. at 1-2.

Although construction of the primary fence "dramatically reduced" the number of drive-through encroachments into the United States and reduced crime in neighborhoods near the international border, Def.'s Mot. 9, the primary fence "by itself[] did not have a discernible impact on the influx of unauthorized aliens coming across the border in San Diego," Def.'s Ex. 2 at 3. Consequently, the Border Patrol initiated Operation Gatekeeper, which involved large increases in the overall manpower of the San Diego sector and deployment of Border Patrol agents "directly along the border to deter illegal activity."[7] Id. Operation Gatekeeper "reflected

---

[6] Approximately 65.7 linear border miles are contained within the San Diego sector. Def.'s Ex. 9 at 52. According to a report issued by the Congressional Research Service, the San Diego sector "features no natural barriers to entry by unauthorized migrants and smugglers." Def.'s Ex. 2 at 2; see also Def.'s PFUF ¶ 1 (stating that in the area located north of Tijuana and Tecate, "the terrain along the international border offers no geographical barriers to entry by unauthorized immigrants, smugglers or terrorists"). But see Pl.'s Resps. ¶ 1 (characterizing defendant's assertion that no geographical barriers exist in this area as "not true" and explaining that the Otay Mountains directly to the east, the desert beyond the mountains, and the Pacific Ocean to the west serve as geographical barriers to entry by illegal aliens); Def.'s Ex. 9 at 52 (indicating that the 65.7 linear border miles are composed of mountains (37.5 miles), rolling brushland (9.9 miles), "urban hilly" (7.8 miles), canyons (4.5 miles), farmland (2.4 miles), flat desert (1.8 miles), and "urban flat" (1.8 miles)).

[7] The strategic plan for Operation Gatekeeper called for three tiers of Border Patrol agent deployment. Def.'s Ex. 2 at 3. Agents in the first tier were deployed to fixed positions on the border and "were charged with preventing illegal entry, apprehending those who attempted to enter, and generally observing the border." Id. Agents in the second tier were deployed north of the border in corridors that were heavily used by illegal aliens. Id. These agents "had more

the Border Patrol's 'goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing [Border Patrol] agents with a tactical advantage over illegal border crossers and smugglers.'" Def.'s Mot. 10 (quoting Def.'s Ex. 3 at 10); see also id. ("The goal with construction of the primary fence in 1990-1993, as well as the intensified enforcement efforts of Operation Gatekeeper in 1994, was to direct illegal entry traffic to the east away from the population centers of San Diego and Tijuana."). In order to accomplish this goal, Border Patrol agents deployed during Operation Gatekeeper were equipped with more sophisticated equipment, including night vision goggles, seismic sensors, and portable lighting platforms.[8] Def.'s Ex. 2, at 3.

In 1991, the Office of National Drug Control Policy, through the INS Research and Development Program, assigned to Sandia National Laboratories the task of conducting a systematic analysis of security along the United States-Mexico border between ports of entry and recommending measures by which border control could be improved. Def.'s Ex. 9 at ES-1. In 1993, Sandia National Laboratories issued its report, see generally Def.'s Ex. 9 (containing a three-volume study entitled "Systematic Analysis of the Southwest Border"), which recommended implementing a "strategy for multiple barriers," which "will result in a significant decrease in the success rate for illegal entry into the [United States]," id. at 9. Noting that illegal aliens "have shown that they will destroy or bypass any single measure (one fence, one set of lights, etc.) placed in their path," the report proposed that a three-fence system "with vehicle patrol roads between the fences and lights will provide necessary discouragement."[9] Id. The

---

freedom of movement than [those agents in] the first tier and were charged with containing and apprehending those aliens who made it past the first tier [of agents]." Id. Agents in the third tier "were typically assigned to man vehicle checkpoints further inland to apprehend the traffic that eluded [agents in] the first two tiers." Id.

[8] In his declaration, appended to plaintiff's opposition, Border Patrol agent Curtis J. Weatherred III described the nature and use of seismic intrusion sensors, which "are one of the law enforcement tools used by the San Diego Border Patrol to detect illegal alien foot traffic in undeveloped areas adjacent to the international border." Pl.'s Ex. 2 at 1-2 (Decl. Curtis J. Weatherred III ("Weatherred III Decl.") ¶ 3). The use of seismic intrusion sensors "dramatically increased" during Operation Gatekeeper. Id. at 2 (Weatherred III Decl. ¶ 8).

[9] The Sandia National Laboratories report specifically recommended construction of a "three-fence barrier system with vehicle patrol roads between the fences . . . ." Def.'s Ex. 9 at 9; see also Def.'s Ex. 2 at 4 (noting that the three-tiered fence system was first recommended in the 1993 Sandia National Laboratories report). The first fence, which the report indicated was currently being installed in the San Diego sector, "should be installed on a concrete sill to discourage tunneling." Def.'s Ex. 9 at 9. The second fence, which the report recommended be built as a fifteen-foot high outward-curved, anti-climb fence constructed out of fabric that provided a delay for cutting, "should be far enough inland to allow construction of a safe patrol road . . . ." Id. The report recommended that construction of a third fence, a standard ten-foot high chain link fence with no top rail, would discourage climbing, and that sufficient space be

report suggested that use of multiple barriers "would increase the [Border Patrol's] ability to discourage a significant number of illegal border crossers, to detect intruders early and delay them as long as possible, and to channel a reduced number of illegal border crossers to geographic locations where the [Border Patrol] was better prepared to deal with them." Def.'s Ex. 2 at 4.

Congress responded to the report by enacting section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-630 to 3009-631 (codified at 8 U.S.C. § 1103 (2000)), which authorized construction of a second layer of steel mesh fencing near San Diego. Def.'s Mot. 10; see also Def.'s Ex. 2 at 5 (noting that the IIRIRA "expressly authorized the [Attorney General] to construct barriers at the border for the first time"). Section 102 of the IIRIRA "directed the [Attorney General] to construct a three-tiered barrier along the 14 miles of the international land border of the U.S., starting at the Pacific Ocean and extending eastward." Def.'s Ex. 2 at 5. A secondary fence, known as the Border Infrastructure System ("BIS"), would include "the construction of two roads adjacent to the new fence as well as surveillance cameras and permanent security lighting." Def.'s Mot. 10-11 (citing Def.'s Ex. 2 at 6-7).

The Border Patrol commenced construction of the secondary fence in 1996. Id. at 11. Composed of steel mesh and located approximately 130-150 feet north of the primary fence, the secondary fence begins three miles from the Pacific Ocean, Pl.'s Opp'n 5, and "was to parallel the fourteen miles of primary fence already constructed on land patrolled by the Imperial Beach Station of the San Diego sector," Def.'s Ex. 2 at 6. Approximately nine miles of the secondary fence was completed in 2001, Pl.'s Opp'n 5; cf. Def.'s Ex. 2 at 6 (stating that by the end of fiscal year 2005, nine of the fourteen miles of triple fencing that was authorized to be constructed in the IIRIRA had been completed); Pl.'s Ex. 3 at 5 (Griffin Dep. 36:13-16, Mar. 27, 2007 (stating that "we only have roughly nine miles of secondary fencing constructed" and that the BIS "still has five miles to complete")), including a one and one-half mile section near the subject property, Def.'s Mot. 11. Two sections of the secondary fence, including the final three-mile stretch leading to the Pacific Ocean, have yet to be completed. Def.'s Ex. 2 at 6.

According to plaintiff, the Border Patrol constructed the secondary fence in phases. Pl.'s Opp'n 5; accord Pl.'s Ex. 3 at 5 (Griffin Dep. 36:14-21 (indicating that the BIS is being completed in phases)). By 2000, the Border Patrol completed a 6,129-foot section traveling south of the subject property with openings at either end. Pl.'s Opp'n 5. In 2001, the Border Patrol completed construction of a 1,722-foot section "which cut off the western access to a populated area that allowed easier escape for illegal aliens entering the country . . . ."[10] Id. In

---

reserved between the second and third fences to enable construction of a second patrol road. Id.

[10] According to defendant, construction of the secondary fence was halted in February 2004 due to environmental concerns raised by the California Coastal Commission ("CCC"), Def.'s Mot. 11, which determined that the CBP "had not demonstrated, among other things, that the project was consistent 'to the maximum extent practicable' with the policies of the California

2005, the Border Patrol completed construction of a 674-foot section that bridged a gap between portions of the secondary fence completed in 2000 and 2001. Id. Plaintiff states that additional portions of the secondary fence, which extended it further east, were completed by the Border Patrol in 2005 and 2006.[11] Id. Plaintiff alleges that construction of the secondary fence has created a "funneling effect" whereby illegal immigrants are channeled eastward away from San Diego and northward onto the subject property, id., "where Border Patrol agents await to apprehend, arrest, and deport them," id. at 6.

In 1994, the Border Patrol implemented its first National Strategic Plan ("NSP"), which adopted an operational strategy known as Prevention Through Deterrence.[12] Def.'s Ex. 3 at 3. The NSP's goal was aimed to place Border Patrol agents and resources "directly on the border in order to deter the entry of illegal aliens, rather than attempting to arrest aliens after they have already entered the country." Id. Following the terrorist attacks of September 11, 2001, the Border Patrol "refocused its priorities to place greater emphasis on protecting against terrorist penetration" and, at the direction of the DHS, formulated a new National Border Patrol Strategy ("NBPS") "that would better reflect the realities of the post 9/11 security landscape." Id. at 4. In March 2005, the Border Patrol unveiled the NBPS, "which places greater emphasis on interdicting terrorists . . . ."[13] Id. The NBPS builds upon the Prevention Through Deterrence

---

Coastal Management Program–a state program approved under the federal Coastal Zone Management Act," Def.'s Ex. 2 at 6. The CCC concluded that the CBP failed to demonstrate that less environmentally damaging alternative projects it did not choose to implement would have prevented compliance with the IIRIRA. Id. In response to the CCC's findings, Congress passed the REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 231 (codified in scattered sections of 8 U.S.C.), which gave the Secretary of the DHS "broad authority to waive legal requirements that might otherwise delay the construction of the security barriers described under § 102 of [the] IIRIRA." Def.'s Ex. 2 at 6.

[11] Defendant indicates that the CBP "does not plan to extend the secondary fence further east than its present terminus. Instead, various high technology components such as sensors, cameras, radar and communication systems will be installed." Def.'s Mot. 11 (citation omitted). Specifically, the CBP anticipates that the "eastern most portion of the BIS, known as Tin Can Hill, will receive a . . . technology suite consisting of the approximate mix of technology components . . . ." Def.'s Ex. 34 at 1 (Decl. Gregory L. Giddens ¶ 4).

[12] The NSP was implemented in three phases. Phase I involved a "Hold the Line" program in El Paso, Texas and Operation Gatekeeper, discussed above, in San Diego. Def.'s Ex. 3 at 3. Phase II involved the expansion of Operation Safeguard in Arizona, Operation Rio Grande in portions of Texas, and an increased emphasis upon securing the northern border. Id. Phase III was designed to focus upon remaining areas in the Southwest as well as coastal waters around Florida and Puerto Rico. Id.

[13] The NBPS features five main objectives: (1) establishing the substantial probability of apprehending terrorists and their weapons as they attempt to enter illegally between ports of

strategy by adding emphasis to "enhancing [the] ability to rapidly deploy [Border Patrol] agents to respond to emerging threats. Tactical, operational, and strategic intelligence is critical to this new emphasis on rapid deployment . . . ." Id. at 5; see also id. at 10 ("The new Border Patrol National Strategy for the Southwest border continues to expand the Prevention Through Deterrence strategy while incorporating rapid response capabilities."). Approximately ninety percent of Border Patrol agents are deployed along the southwest border with Mexico, and a majority of these Border Patrol agents are concentrated in border corridors that account for over eighty percent of the illegal immigrant traffic. Id. at 10. Ultimately, both the Prevention Through Deterrence strategy and increased deployment of Border Patrol agents under the NBPS "reflects the [Border Patrol's] goal of rerouting the illegal border traffic from traditional urban routes to less populated and geographically harsher areas, providing [Border Patrol] agents with a tactical advantage over illegal border crossers and smugglers." Id.; accord id. at 15 (stating that the Prevention Through Deterrence strategy "has pushed unauthorized migration away from population centers and funneled it into more remote and hazardous border regions"). According to defendant, the Border Patrol's strategies and the construction of the border fences "have been successful in redirecting illegal entry activity to the east." Def.'s Mot. 12.

**D. Border Patrol Activities on the Subject Property**

Defendant acknowledges that the Border Patrol has entered onto the subject property for several years. Id. at 29; Def.'s Ex. 29 at 1 (Decl. Steven P. Kean ("Kean Decl.") ¶ 4 (stating that "[f]or well over two decades, [the] Border Patrol and [the] CBP have actively patrolled Plaintiff's approximately 135 acres" because the subject property "is located within the patrol responsibility of Chula Vista Station")); Def.'s Ex. 29 at 2 (Kean Decl. ¶ 9 (stating that the Border Patrol has maintained sensors "in the area of the Property" for over ten years)); see also Def.'s Reply 5 ("[I]llegal aliens have been transiting Plaintiff's property as a passageway into the United States for many years."). Plaintiff, however, argues that the Border Patrol's recent activity on its land "comports precisely with [its] overall strategy to reroute [illegal alien] traffic to less populated areas." Pl.'s Opp'n 7; Pl.'s Ex. 1 at 1-2 (Decl. David Wick ("Wick Decl.") ¶ 2 ("Commencing in 2001 or 2002, I observed a tremendous increase in Border Patrol activities on the subject property.")). It alleges that the Border Patrol's actions since September 11, 2001, coupled with completion of the 1,722-foot portion of the secondary fence in 2001, have resulted in a "geometric multiplication of Border Patrol presence and activities" upon the subject property, Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 2), and, consequently, an "almost continuous, round-the clock occupation of the subject property," Pl.'s Opp'n 7; accord Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 3 (attributing an increased presence of Border Patrol agents on the subject property "not only to the September 11, 2001 attack, but also to the fact that at about the same time the secondary fence had been completed up to a point immediately south of the subject property")). Plaintiff

---

entry; (2) deterring illegal entries through improved enforcement; (3) detecting, apprehending, and deterring smugglers of humans, drugs, and other contraband; (4) leveraging "Smart Border" technology to multiply the deterrent and enforcement effects of Border Patrol agents; and (5) reducing crime in border communities, thereby improving the quality of life and economic vitality of those areas. Def.'s Ex. 3 at 4-5.

maintains that "with the completion of the secondary fence in 2001, Border Patrol activities–including new road construction and other use of [plaintiff's] land–have dramatically increased over the level of activity that I witnessed on the property prior to 2001." Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 3).

According to Mr. Wick, the increase in Border Patrol activity on the subject property is the direct result of funneling illegal immigration traffic toward the subject property:

> Until completion of the fence in 2001, illegal aliens who were able to get past the primary fence had several miles of unfenced frontier . . . . Completion of the fence squeezed this down to a "gateway" about a mile wide, bounded by the fence to the west and Otay Mountain (a significant obstacle) to the east. The path of least resistance for all of the illegal aliens who were deterred by the new fence was simply to walk around the end of it and then head north over the subject property. Knowing this, the Border Patrol utilized the subject property as an ideal observation point because of the high ground on the parcel, and as an easy way to access other properties around the area. Border Patrol agents also use the subject property as a location to corral and capture these illegal aliens, who are by reason of the fence[,] now directed north into a far more confined area.[14]

Id. at 2-3 (Wick Decl. ¶ 3) (footnote added). Plaintiff claims that these activities have resulted in the Border Patrol's "occupation of the subject property." Pl.'s Opp'n 7. For example, plaintiff alleges that the Border Patrol "has created, taken over and improved roads on the subject property,"[15] id., and that these activities have had environmental consequences, see Pl.'s Ex. 1 at

---

[14] Defendant, however, argues to the contrary:

> [I]t must be remembered that [the subject property] is a significant distance from the border (0.68 to 0.73 miles). Thus, even if the secondary fence were channeling illegal immigrants, a contention we have explained is incorrect, the impact would fall on land located closer to the border than [the subject property]. Immigrants coming around the end of the secondary fence would head west-northwest to reach the closest road and transportation out of the area, not to the north toward [the subject property].

Def.'s Reply 7.

[15] In support of its contention that defendant has taken over and maintained roads–in addition to creating new roads–on the subject property, plaintiff offers testimony from CBP Assistant Chief Border Patrol Agent Steven P. Kean. Mr. Kean states that the Border Patrol has utilized and maintained existing agricultural roads, which the Border Patrol grades "every now and again." Pl.'s Ex. 5 at 7 (Kean Dep. 59:5-15, Feb. 20, 2007); see also Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 2 ("Around 2002, the Border Patrol started grading new roads across the subject property . . . .")). According to Mr. Wick, each road that the Border Patrol has created or graded

8 (Wick Decl. ¶ 15 ("Some of these roads [created by the Border Patrol] traverse environmentally sensitive areas of protected vegetation or wetlands. . . . The County has required [plaintiff,] as a condition of its building and grading permits, to mitigate this environmental damage by dedicating and planting new mitigation lands.")).

Additionally, plaintiff argues that the Border Patrol has "threatened to cut open a locked gate on the property, driven all over the property (including off-road areas) on virtually a 24/7 basis, installed two seismic intrusion sensors, and harassed [its] employees . . . as well as [SD Commercial's] contractors, employees, potential customers, and invitees, as they go about their legitimate activities on the property." Pl.'s Opp'n 7. It asserts that the Border Patrol has "detour[ed] around or destroy[ed] barricades which [plaintiff] had erected to keep the public out, damaging our ongoing construction activities by driving their vehicles through the middle of our construction sites, and scaring away potential customers for the land by their show of overwhelming armed force . . . ." Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 2). Plaintiff also claims that the Border Patrol has declined offers to lease the subject property, or portions thereof, or to grant easements for access roads across the subject property. Id. at 3 (Wick Decl. ¶ 4 (stating that Border Patrol agents "have firmly asserted that they have a statutory right" to engage in the activities alleged in this action and do not require plaintiff's permission)).

Although "[t]he impact of the 'Prevention Through Deterrence' strategy has been difficult to gauge," Def.'s Ex. 3 at 11; accord Def.'s Ex. 2 at 10 (noting that although apprehension statistics have been utilized as a performance measure for the Border Patrol, the number of apprehensions "may be a misleading statistic," which "makes it difficult to establish a firm correlation between the number of apprehensions in a given sector and the number of people attempting to enter through that sector"), defendant represents that "they do provide one of the few sources of data available to evaluate the Border Patrol's historic presence on property along the border," Def.'s Mot. 12. Defendant offers apprehension statistics from the Chula Vista and Brown Field stations, "the two stations relevant to Plaintiff's property," as evidence that overall apprehensions reported by both stations have "decreased significantly" between 1992 and 2002. Id. at 19; see also Def.'s Reply 5 ("[T]he Border Patrol's presence on Plaintiff's property . . . was in all likelihood greater in the past than it is now."). According to defendant, Border Patrol "apprehensions in the vicinity of the subject property peaked in FY1992" and declined to a low in 2002 after Operation Gatekeeper took effect. Def.'s Mot. 12; see also id. at 19 (stating that "[o]verall apprehensions reported by the Chula Vista and Brown Field stations decreased significantly between FY 1992 and FY 2002 as a result of increased on-the-border enforcement efforts"); id. at 12 (indicating that between fiscal years 2001 and 2006, apprehensions for the Chula Vista and Brown Field stations averaged approximately one-sixth and one-eighth of the 1992 highs, respectively); Def.'s Ex. 2 at 12 (containing a graph indicating that apprehensions at

---

"is approximately twelve feet wide and has a total combined length of approximately one to two miles. The roads are either dirt or gravel. Border Patrol agents drive on these roads [every day]." Pl.'s Ex. 1 at 7 (Wick Decl. ¶ 12).

the Chula Vista station decreased between 1992 and 2002).[16] According to defendant, these statistics "establish that the number of apprehensions most directly responds to an increase in Border Patrol enforcement along the border" and "do not support Plaintiff's argument, based on anecdotal accounts, that the presence of the Border Patrol on its property is somehow greater now than it has been in the past."[17] Def.'s Mot. 19.

Defendant's contention–that the apprehension statistics for the Chula Vista and Brown Field stations, which indicate a substantial decrease in the number of apprehensions, support its argument that the Border Patrol's activities on the subject property have similarly decreased–assumes that a correlation exists between apprehensions and the amount of Border Patrol activity. Yet, defendant's own exhibits suggest that the general decline in apprehensions recorded by the Chula Vista and Brown Field stations is not representative of the number of apprehensions on the subject property. Compare Def.'s Ex. 13A (indicating that during fiscal year 2005, the Border Patrol apprehended thirty-seven people during eight apprehension events on the subject property), with Def.'s Ex. 13B (indicating that during fiscal year 2006, the Border Patrol apprehended 229 people during forty-eight apprehension events on the subject property), and Def.'s Ex. 13C (indicating that during fiscal year 2007, the Border Patrol apprehended 112 people during twenty-two apprehension events on the subject property). As these exhibits indicate, although the number of apprehensions on the subject property decreased between 2006 and 2007, there was a net increase in both the number of apprehensions and apprehension events on the subject property between 2005 and 2007. Additionally, defendant's apprehension statistics for zones 17 and 18 within the Chula Vista station, see Pl.'s Ex. 7 at 1 (Kean Decl. ¶ 4 ("The [subject] property is located within the patrol responsibility of Chula Vista Station and is in zones 17 and 18, with the majority of the property in zone 17)); accord Def.'s Reply 8 ("The majority of Plaintiff's property is located within Zone 17, with a smaller portion in Zone 18."), suggest that the number of apprehensions in zones 17 and 18 significantly increased during fiscal years 2004 and 2005,[18] see Def.'s Ex. 16. Consequently, the court does not draw the causal connection that defendant suggests exists from general apprehension statistics for the areas surrounding the subject property. Instead, the court finds that the relevant inquiry is to determine the extent of the Border Patrol's activities on the subject property itself.

---

[16] These statistics, however, also indicate that apprehensions at the Chula Vista station increased between fiscal years 2002 and 2004 and that the number of apprehensions made in 2004 was greater than the number of apprehensions made in 2001. See Def.'s Ex. 2 at 12.

[17] According to defendant, as apprehensions declined in the San Diego sector and increased along the Arizona border, the Border Patrol has been successful in diverting the traffic of illegal immigrants "not to Plaintiff's property, but to border areas much farther to the east." Def.'s Mot. 12. Nevertheless, Border Patrol agents have acknowledged that illegal aliens "were still utilizing the area [surrounding the subject property] . . . ." Def.'s Ex. 22 at 2.

[18] Defendant maintains that "there is no question concerning the reliability of the data." Def.'s Reply 9.

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Subject matter jurisdiction is "an inflexible threshold matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006). "Without jurisdiction, the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex Parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, or on appeal. Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005).

The Court of Federal Claims is a court of limited jurisdiction. United Keetoowah Band of Cherokee Indians of Okla. v. United States, 480 F.3d 1318, 1326 n.5 (Fed. Cir. 2007). The scope of this court's jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity. United States v. King, 395 U.S. 1, 4 (1969). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." Id. Unless Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States." United States v. Sherwood, 312 U.S. 584, 587-88 (1941).

The Tucker Act, 28 U.S.C. § 1491 (2000), confers upon the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Id. § 1491(a)(1). While the Tucker Act waives the sovereign immunity of the United States for claims for money damages, it "'itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.'" Greenlee County, Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir. 2007) (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in part)).

The separate source of substantive law must constitute a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994). A constitutional provision is money-mandating where it "grants the claimant, expressly or by implication, a right to be paid a certain sum." Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967), abrogated in part on other grounds by Malone v. United States, 849 F.2d 1441, 1444-45 (Fed. Cir. 1988); see also id. at 1009 ("Under Section 1491 what one must always ask is whether the constitutional clause . . . which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.").

The Court of Federal Claims "may not entertain claims outside [its] specific jurisdictional authority." Adams v. United States, 20 Cl. Ct. 132, 135 (1990). Consequently, it must, "at the outset," determine whether the constitutional provision upon which a claim is based is one that is money-mandating. Fisher, 402 F.3d at 1173 (en banc in part). As the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has stated,

> [i]f the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, [then] the court shall declare that it has jurisdiction over the cause, and shall then proceed with the case in the normal course. For purpose of the case before the trial court, the determination that the source is money-mandating shall be determinative both as to the question of the court's jurisdiction and thereafter as to the question of whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.

Id. (en banc in part). The Court of Federal Claims possesses jurisdiction over takings claims, Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987), and "[i]t is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction," Jan's Helicopter Serv., Inc. v. FAA, 525 F.3d 1299, 1309 (Fed. Cir. 2008); see also Moden v. United States, 404 F.3d 1335, 1341 (Fed. Cir. 2005) ("[T]he Takings Clause of the Fifth Amendment is money-mandating. Thus, to the extent [plaintiff has] a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper."[19]); Russell v. United States, 78 Fed. Cl. 281, 289 (2007) ("The Takings and Just Compensation Clauses of the Fifth Amendment do constitute a money-mandating source and claims under these clauses are within the jurisdiction of the court.").

**B. Statute of Limitations**

The Court of Federal Claims possesses subject matter jurisdiction to adjudicate cases arising under the Tucker Act "regardless of the timeliness of [a plaintiff's] actions. . . . [U]ntimeliness can, however, bar its eligibility to invoke that jurisdiction." Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998). The applicable statute of limitations, 28 U.S.C. § 2501 (2000), provides: "Every claim of which the United States Court of

---

[19] Whereas the Moden court concluded that it had jurisdiction to reach the merits of plaintiffs' case because plaintiffs' claim was "neither frivolous, nor so insubstantial, implausible, foreclosed by prior decisions, or otherwise completely devoid of merit as not to involve a federal controversy," 404 F.3d at 1341-42, the Federal Circuit subsequently held in Jan's Helicopter Service, Inc. that the jurisdictional requirement of a nonfrivolous claim did not apply to complaints filed in the Court of Federal Claims, see 525 F.3d at 1309 (explaining that once the court determines that a claim is founded upon a money-mandating source and that a plaintiff has "made a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source[, t]here is no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits"). Plaintiff's complaint survives the application of either approach.

Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Because section 2501 "is a jurisdictional requirement for a suit in the Court of Federal Claims," John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir. 2006), aff'd, 128 S. Ct. 750 (2008), and serves "as a condition of the government's waiver of sovereign immunity[,] . . . [it] must be strictly construed," Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988).[20] "Consequently, compliance with 28 U.S.C. § 2501 is a prerequisite to the Court's subject matter jurisdiction in takings cases." Int'l Indus. Park, Inc. v. United States, 80 Fed. Cl. 522, 525 (2008).

**C. Motion to Dismiss–RCFC 12(b)(1)**

The court's "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999). When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it. See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936). That party "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Hansen v. United States, 65 Fed. Cl. 76, 94 (2005). The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the nonmoving party. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982); Reynolds, 846 F.2d at 747. Where a motion to dismiss challenges the truth of the jurisdictional facts alleged in the complaint, "the allegations in the complaint are not controlling, and only uncontroverted factual allegations are accepted as true for purposes of the motion." Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted); cf. Land v. Dollar, 330 U.S. 731, 735 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, the court may inquire, by affidavits or otherwise, into the facts as they exist." (citations omitted)). Under these

---

[20] While "[m]ost statutes of limitations seek primarily to protect defendants against stale or unduly delayed claims" and therefore permit the law to "typically treat[] a limitations defense as an affirmative defense . . . that is subject to rules of forfeiture and waiver," John R. Sand & Gravel Co., 128 S. Ct. at 753-54, section 2501 is "more absolute [in] nature," id. at 754. In John R. Sand & Gravel Co., the United States Supreme Court ("Supreme Court") explained that section 2501 is properly classified within a group of "jurisdictional" statutes of limitations because it "seek[s] not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as . . . limiting the scope of a governmental waiver of sovereign immunity." Id. at 753. Because section 2501 "has long [been] interpreted . . . as setting forth [a] more absolute[] kind of limitations period," id. at 753-54, it is not susceptible to equitable considerations, id. at 755 (citing Soriano v. United States, 352 U.S. 270, 273-74, 277 (1957)). Therefore, this limitations period is jurisdictional. Id.; see also Mola Devel. Corp. v. United States, 516 F.3d 1370, 1375 n.1 (Fed. Cir. 2008) ("The Supreme [Court] recently held that this limitations period is jurisdictional." (citing John R. Sand & Gravel Co., 128 S. Ct. at 750)).

circumstances, because "[a]ll other facts underlying the controverted jurisdictional allegations are in dispute[, they] are subject to fact-finding by the district court." Cedars-Sinai Med. Ctr., 11 F.3d at 1584.

If either the defendant or the court questions jurisdiction, then the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction. See McNutt, 298 U.S. at 189. In deliberating on a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes. See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction, then it must dismiss the claim. Matthews, 72 Fed. Cl. at 278; see also RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

### D. Motion to Dismiss–RCFC 12(b)(6)

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court "must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail." Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer, 416 U.S. at 236). The Supreme Court recently clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive a Rule 12(b)(6) motion. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007). It stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (citation & quotation marks omitted). Further, the Supreme Court noted that while a complaint does not need to contain "detailed" factual allegations, those "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."[21] Id. (citation & footnote omitted). Thus, in reviewing an RCFC 12(b)(6) motion, this court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (citations & quotation marks omitted). A failure to allege a cause of action upon which relief can be granted warrants a judgment on the merits rather than a dismissal for want of jurisdiction. Litecubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1361 (Fed. Cir. 2008).

Courts "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record" when deciding a motion to dismiss. Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If matters outside the pleadings are presented to and not excluded by the court on an RCFC

[21] In so holding, the Supreme Court determined that the "no set of facts" language set forth in Conley v. Gibson, 355 U.S. 41, 45 (1957), "has earned its retirement." Bell Atl., 127 S. Ct. at 1969.

12(b)(6) motion, then the motion "shall be treated as one for summary judgment and disposed of as provided in RCFC 56 . . . ." RCFC 12(b). Like its counterpart, current Rule 12(d) and former Rule 12(b) of the Federal Rules of Civil Procedure ("FRCP"), RCFC 12(b) "is mandatory; consequently, if documents outside the pleadings are placed before a district court, and not excluded, the court must convert the defendant's 12(b)(6) motion to one for summary judgment and afford the plaintiff an opportunity to submit additional evidentiary material of his or her own." Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993) (interpreting FRCP 12(b)); District of Columbia v. United States, 67 Fed. Cl. 292, 301 (2005) ("Once the court decides to accept extra-pleading material, it must convert the Rule 12(b)(6) motion into a Rule 56 motion."). Courts have "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion" and rely upon that material. 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed. 2004). Such discretion generally is exercised when the proffered material is "likely to facilitate the disposition of the action." Id.

### E. Motion for Summary Judgment–RCFC 56

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323, and may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case," id. at 325. The moving party is not required to support its application with affidavits, but instead may rely solely on the pleadings, depositions, answers to interrogatories, and admissions. Id. at 324. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial, id., and must come forward with "specific facts showing that there is a genuine issue for trial," RCFC 56(e). To that end, the nonmoving party must go beyond the pleadings and support its opposition with affidavits or with depositions, answers to interrogatories, and admissions. Celotex Corp., 477 U.S. at 324.

The court must view inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the nonmoving party produces sufficient evidence to raise a genuine issue of fact material to the outcome of the case, then the motion for summary judgment should be denied. Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002). Even where the facts are not disputed, the moving party still must demonstrate that it is entitled to judgment as a matter of law. Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253,

289 (1968)). Following "adequate time for discovery," entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

## III. DISCUSSION

### A. Plaintiff's Takings Claim Is Not Barred by the Statute of Limitations

Defendant asserts that plaintiff cannot establish subject matter jurisdiction "because the alleged taking occurred more than six years prior to Plaintiff filing its complaint in this action . . . ." Def.'s Mot. 18. Specifically, defendant argues that "for more than two decades prior" to the date upon which plaintiff instituted this action, the Border Patrol "has patrolled Plaintiff's property and apprehended aliens attempting to enter the United States on or near Plaintiff's property . . . ." Id. Plaintiff does not dispute that the Border Patrol may have entered onto its property prior to 2001. Indeed, Mr. Wick states in his declaration that prior to the September 11, 2001 terrorist attacks, he "had seen an occasional agent in a vehicle or on horseback" on the subject property. Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 2). According to Agent Kean, the Border Patrol and the CBP "have actively patrolled Plaintiff's approximately 135 acres" since the mid-1980s, during which time "as many as a half-dozen Border Patrol agents mounted on horseback would patrol [plaintiff's] Property as well as adjacent properties every evening." Pl.'s Ex. 7, at 2 (Kean Decl. ¶ 4). Defendant, however, contends that Mr. Wick lacks the personal knowledge to opine on how illegal immigrants unlawfully enter the country. Def.'s Reply 4. Furthermore, defendant maintains that aerial photographs dating back to 1998, which defendant emphasizes are "well more than six years prior to the filing of the complaint in December, 2006," depict the existence of the roads that Mr. Wick claims were only recently graded and cleared by the Border Patrol. Id. at 3; see also id. at 3-4 ("As clearly appears from the 1998 historical aerial photographs, the roads which Plaintiff claims were not constructed until 'around 2002' were . . . already in existence in 1998.").

Plaintiff argues that jurisdiction is proper because "the Border Patrol's activities began dramatically increasing shortly [after] the terrorist attacks on the United States on September 11, 2001," Pl.'s Opp'n 13, at which point plaintiff alleges that the Border Patrol's activities on its property increased "geometric[ally]," Pl.'s Ex. 1 at 2 (Wick Decl. ¶ 2); see supra Part I.D. Indeed, plaintiff argues that its cause of action "accrued upon the construction of the Secondary Fence beginning in 2001 and the Government's subsequent activities on Plaintiff's property, the construction of roads and their improvements, and the Border Patrol's establishment of a base of interdiction operations on Plaintiff's land." Pl.'s Opp'n 12. Plaintiff states that upon completion of portions of the secondary fence in 2001, "illegal aliens began using Plaintiff's property as a passageway into this country and, consequently, the Border Patrol began using Plaintiff's property as a base of operations for interdiction activity." Id. at 12-13; see also Pl.'s Ex. 1 at 3 (Wick Decl. ¶ 4 (stating that the Border Patrol "has claimed the right to use all of the subject property permanently and continuously for its activities, just as if the Border Patrol owned the property")).

Although the court does not assume the truth of plaintiff's allegations for the purpose of determining its jurisdiction, see Cedars-Sinai Med. Ctr., 11 F.3d at 1583-84, it finds that enough independent evidence exists such that the court possesses jurisdiction over plaintiff's claim. First, the Border Patrol acknowledged that its NBPS program "refocused its priorities to place greater emphasis on protecting against terrorist penetration" in the aftermath of the events on September 11, 2001, in order to address "the realities of the post 9/11 security landscape." Def.'s Ex. 3 at 4. To that end, the Border Patrol built upon its Prevention Through Deterrence strategy, id. at 10, and Border Patrol manpower "has been increasing steadily since the adoption of the 'Prevention Through Deterrence' strategy," an increase that has "allowed the [Border Patrol] to place more agents directly on the border," id. at 32; see also Pl.'s Ex. 5 at 4 (Kean Dep. 36:19-37:3 (stating that from the mid-1990s into the 2000s, the Border Patrol "brought in additional agents into the border" and concentrated its efforts in the fourteen-mile region between the Pacific Ocean and Otay Mountain)). This change in strategy by the Border Patrol is supported by both Mr. Wick's observations and the Border Patrol's own acknowledgment that it increased its presence and activities on the subject property. See Pl.'s Ex. 1 at 1-3 (Wick Decl. ¶¶ 1-3); Pl.'s Ex. 6 at 3 (Perez Dep. 14:16-17, Feb. 21, 2007 ("I assign people to these zones on a daily basis 24 hours a day.")).

Second, plaintiff's allegation that the Border Patrol has "[w]ithin the past five years . . . brought grading equipment onto the subject property to grade and maintain roads for its own access," Pl.'s Ex. 1 at 6-7 (Wick Decl. ¶ 11); see also id. at 2 (Wick Decl. ¶ 2 ("Around 2002, the Border Patrol started grading new roads across the subject property . . . .")); Pl.'s Ex. 5 at 6-8 (Kean Dep. 58:16-60:2 (stating that the Border Patrol has maintained, graded, and, in some cases, upgraded existing roads)), is supported by aerial photographs of the subject property. For example, an aerial photograph depicting "new roads which the Border Patrol has created" is appended to Mr. Wick's declaration. See Pl.'s Ex. 1 (Wick Decl. ¶ 11 & Wick Decl. Ex. 2). Additionally, aerial photographs of the subject property taken in 2006 indicate the existence of roads that were not present in aerial photographs dating from 1998. Compare Def.'s Ex. 36 (containing an aerial photograph from 1998), with Def.'s Ex. 37 (containing an aerial photograph from 2006). But see Def.'s Reply 3 (maintaining that the allegedly newly constructed roads "were already in existence in 1998"). Although it is possible that these roads were constructed between 1998 and 2000, thereby falling outside the applicable statute of limitations, the court finds that this photographic evidence supports plaintiff's allegations, is contrary to defendant's contention that these roads existed in 1998, and is sufficient at this stage to establish jurisdiction.

Ultimately, the jurisdictional question is inextricably intertwined with the factual disputes that are present in this case. Nonetheless, as noted above, the court concludes that plaintiff has presented facts demonstrating, by a preponderance of the evidence, that the court possesses jurisdiction over its complaint. In the event that facts presented at trial prove that plaintiff's cause of action accrued more than six years prior to the filing of the complaint, the court may properly dismiss its complaint as stale. See Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006) (stating that subject matter jurisdiction may be raised "at any stage in the litigation, even after trial and the entry of judgment"); accord Booth v. United States, 990 F.2d 617, 620 (Fed. Cir. 1993) (recognizing that subject matter jurisdiction may be challenged on appeal).

### B. Plaintiff Presents a Claim Upon Which Relief Can Be Granted

Defendant asserts that plaintiff does not possess a compensable property right to exclude Border Patrol agents from the subject property "because the entry by the Border Patrol under such circumstances is an exercise of the United States' police power[,] which has traditionally not been viewed as giving rise to a claim for compensation."[22] Def.'s Mot. 2. According to defendant, the Border Patrol's activities on the subject property are non-compensable "because property 'seized by the government under its police power does not constitute property seized for 'public use' within the meaning of the Fifth Amendment.'" Id. at 27 (quoting Seay v. United States, 61 Fed. Cl. 32, 35 (2004)). Furthermore, defendant argues that "[e]ven if Plaintiff possesses a compensable property right to exclude the Border Patrol from its property, its factual allegations . . . do not state a claim upon which relief can be granted," id. at 2, because the Border Patrol's entry onto the subject property "is a traditional exercise of the government's police power," id. at 29; accord Def.'s Reply 12 (stating that the Border Patrol is authorized to enter onto private lands within twenty-five miles of the international border for the purpose of patrolling the border and that plaintiff acquired title to its property "subject to the existence of the Border Patrol's right to access the property to patrol for illegal aliens").

Despite defendant's contention that the Border Patrol's conduct constitutes a lawful exercise of its police power, plaintiff emphasizes that defendant "cites no case to support its assertion that an exercise of the police power cannot also be a taking . . . ." Pl.'s Opp'n 20. Rather, it argues that the cases upon which defendant relies are distinguishable because those cases concern asset forfeiture, seizure of contraband, and nuisance, rather than physical takings. Id. at 21-24. Plaintiff argues that a "long line of physical taking cases . . . require just compensation for the Government's physical occupation of private land" and that this case is no different. Id. at 25; see also id. at 26 ("Since no background principle of real property law deprived Plaintiff of its right to exclude, Defendant's permanent occupancy of Plaintiff's land is a taking for which just compensation must be paid."); id. at 15 (indicating that there is no police power exemption from the Fifth Amendment's just compensation requirement).

Although the Immigration and Nationality Act of 1952 permits defendant to patrol the border to prevent illegal entry of aliens into the United States, 8 U.S.C. § 1357(a)(3) (2000), defendant's right of entry is not limitless. See Pl.'s Ex. 10 at 1-4 (containing a transcript of a CPB San Diego sector training presentation that notes limitations upon the Border Patrol's statutory authority); see also Palazzolo v. Rhode Island, 533 U.S. 606, 635 n.* (2001)

---

[22] Defendant states that it is "not suggesting that compensation under the Fifth Amendment can be avoided simply by the statement that the government action in question was an exercise of the 'police power.'" Def.'s Mot. 28; see also Def.'s Reply 13 ("Similarly, Defendant is also not arguing that every exercise of the police power is [non-compensable]."). Rather, defendant emphasizes that the "type of government law enforcement activity" presented in this case "has not traditionally been considered to constitute an appropriation of property for public use, but is instead a non-appropriative exercise of the sovereign's police power." Def.'s Mot. 28 (citing Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1332 (Fed. Cir. 2006)).

(O'Connor, J., concurring) ("The first question is whether the enactment or application of a regulation constitutes a valid exercise of the police power. The second question is whether the State must compensate a property owner for a diminution in value effected by the State's exercise of its police power."). Because defendant's arguments do not preclude plaintiff's claims and the court assumes, for purposes of an RCFC 12(b)(6) motion, that plaintiff's factual allegations are true and indulges in all reasonable inferences in favor of the nonmoving party, United Pac. Ins. Co., 464 F.3d at 1327-28, plaintiff "raise[s] a right to relief above the speculative level," Twombly, 127 S. Ct. at 1965. Accordingly, to the extent that defendant moves to dismiss plaintiff's amended complaint pursuant to RCFC 12(b)(6), see supra note 2, its motion is denied.

**C. The Existence of Genuine Issues of Material Fact Precludes Summary Judgment**

Together with its motion for summary judgment, defendant submitted twenty-six proposed findings of uncontroverted fact. See Def.'s PFUF ¶¶ 1-26. Plaintiff objected to or disagreed with nearly all of defendant's proposed findings. See Pl.'s Resps. ¶¶ 2-26 (containing plaintiff's objections and counter explanations). Despite these disagreements, defendant contends that summary judgment is appropriate because no material facts are disputed by the parties. See Def.'s Mot. 1-2; see also id. at 16 (stating that the fact-intensive nature of takings cases does not preclude the court from granting summary judgment (citing Allied Gen. Nuclear Servs. v. United States, 839 F.2d 1572, 1578 (Fed. Cir.), cert. denied, 488 U.S. 819 (1988))). The Federal Circuit has cautioned that "[t]he fact-intensive nature of just compensation jurisprudence . . . argues against precipitous grants of summary judgment." Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983). Here, the facts presented to the court by the parties reflect disagreement concerning genuine issues of material fact. As a result, entry of summary judgment is precluded in this case.

For example, the parties dispute whether the Border Patrol's presence on the subject property has increased since December 2000. Compare Pl.'s Opp'n 12-13 (arguing that following construction of the secondary fence in 2001, the Border Patrol "establish[ed] . . . a base of interdiction operations on Plaintiff's land"), and Pl.'s Ex. 6 at 3 (Perez Dep. 14:11-17 (indicating that Border Patrol agents "drive on this property every single day")), with Def.'s Mot. 19-20 (arguing that apprehension statistics "do not support Plaintiff's argument . . . that the presence of the Border Patrol on its property is somehow greater now than it has been in the past"). Additionally, the parties disagree about whether the nature of the Border Patrol's post-December 2000 activities on the subject property is any different from its previous activities. Compare Pl.'s Opp'n 12-13 (maintaining that the Border Patrol's activities "began dramatically increasing shortly after the terrorist attacks on the United States on September 11, 2001, and after the completion of the [secondary] fence"), with Def.'s Reply 17 (arguing that plaintiff's "complaints concerning the Border Patrol's conduct on its property [are] replete with hidden hearsay"). Furthermore, the parties assert differing positions concerning the Border Patrol's alleged creation of or improvements to roads traversing the subject property. Compare Pl.'s Ex. 1 at 6-7 (Wick Decl. ¶ 11 (alleging that the Border Patrol created "several miles" of unpaved roads, brought grading equipment onto the subject property, and maintained roads for its own

access)), with Pl.'s Ex. 5 at 6-7 (Kean Dep. 58:16-60:2 (stating that "I don't know that we've constructed these roads, but they were existing agricultural roads, that have been maintained [by the Border Patrol] over the years," and explaining that the deponent "do[es not] know if these specific roads have been graded and maintained by us, or if we just utilize them")), and Pl.'s Ex. 9 at 4 (Davis Dep. 13:20-23, Feb. 22, 2007 (indicating that one Border Patrol agent "only drive[s] on roads" and that "[i]f there's not a road, I wouldn't have driven cross-country")). Finally, additional factual disputes concerning specific conduct of the Border Patrol, notably whether it "damaged construction material and landscaping on the subject property," Pl.'s Opp'n 1; cf. Def.'s Reply 16-17 (questioning these allegations, emphasizing that plaintiff failed to document a complaint to the Border Patrol or file an administrative claim, and noting that any damage could have resulted from third parties because the subject property "is extremely popular with riders of recreational off-road vehicles"), and whether it cut through a fence and cut or threatened to cut locks to a gate, compare Pl.'s Ex. 1 at 7 (Wick Decl. ¶ 13 (alleging that the Border Patrol cut and destroyed portions of a fence and removed barricades)), with Def.'s Reply 15 (stating that the Border Patrol did not cut any fence, has driven around fencing, and that the incident to which plaintiff refers occurred on another parcel of plaintiff's property), militate against granting summary judgment in favor of defendant.

Plaintiff acknowledges that the Border Patrol is "entitled to access [its] land to prevent illegal immigration." Pl.'s Opp'n 15. However, plaintiff maintains that the Border Patrol's "road grading, destruction of gates and construction work, and permanent round-the-clock occupancy of [its] property constitutes a physical taking for which just compensation is due." Id. Because the court draws all inferences in the light most favorable to the nonmoving party, see Matsushita Elec. Indus. Co., 475 U.S. at 587, it concludes that plaintiff's allegations, if true, may support a finding that the Border Patrol's activities on the subject property constitute a compensable taking under the Fifth Amendment.

## IV. CONCLUSION

For the reasons stated above, defendant's motion to dismiss or, in the alternative, for summary judgment is **DENIED**. Because this Opinion and Order cites material that was filed under seal, the parties shall file, **by no later than 12:00 p.m. on Monday, June 30, 2008**, a status report proposing any redactions of material deemed confidential.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge